Page 1

```
 1              VOLUME: I
              PAGES: 1-220
 2
 3      UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
 4
 5
 6       CIVIL ACTION NO. 02-10062-DPW
        ******************************
 7   LINCOLN E. SMITH,           )
           Plaintiff             )
 8                               )
         vs.                     )
 9                               )
     CITY OF BOSTON, BOSTON      )
10   INSPECTIONAL SERVICES, and  )
     KEVIN JOYCE (AS COMMISSIONER,)
11   DEPARTMENT OF INSPECTIONAL  )
     SERVICES, AND INDIVIDUALLY), )
12       Defendants             )
        ******************************
13
14
15     DEPOSITION OF LINCOLN E. SMITH, a witness
16   called on behalf of the Defendant, pursuant
17   to the Federal Rules of Civil Procedure,
18   before Kelly G. Patterson, a Notary Public
19   in and for the Commonwealth of
20   Massachusetts, at the City of Boston Law
21   Department, Boston City Hall, Boston,
22   Massachusetts, on Thursday, February, 12,
23   2004, commencing at 9:25 a.m.
24
```

Page 2

```
 1   APPEARANCES:
 2
 3   STOPA & ASSOCIATES, LLC
       (by George F. Ohlson, Esquire)
 4     36-38 Mechanic Street
       Foxboro, Massachusetts 02035
 5     Tel. (508) 543-0600
       for the Plaintiff;
 6
 7   CITY OF BOSTON
     LAW DEPARTMENT
 8     (by James M. Chernetsky, Esquire)
       Boston City Hall
 9     Room 615
       Boston, Massachusetts 02201
10     Tel. (617) 635-4048
       for the Defendant.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                I N D E X
 2   DEPONENT:                     PAGE
 3   LINCOLN E. SMITH
 4   Examination by Mr. Chernetsky      4
 5
 6
 7              E X H I B I T S
 8   NO.                          PAGE
 9    1   Answers to Interrogatories.  44
10    2   Document dated 12/23/00.     88
11    3   Document dated December
              20, 2000.        99
12
      4   Notice of Violation dated
13        12/27/00.           126
14    5   Notice of Violation from
          Ms. Fothergill.       127
15
      6   Document.            127
16
      7   Boston Globe article dated
17        December 29, 2000.    149
18    8   Article entitled "City Aide
          in Hot Water".       178
19
      9   Boston Globe article dated
20        March 10, 2001.       187
21   10   Document entitled
          "Re-inspection Result".  203
22
23
24
```

Page 4

```
 1              S T I P U L A T I O N S
 2           IT IS HEREBY STIPULATED AND AGREED by
 3   and between counsel for the respective
 4   parties that the Witness will read and sign
 5   the deposition transcript under the pains
 6   and penalties of perjury; and that the
 7   reading and signing is deemed waived if not
 8   accomplished within 30 days of transcript
 9   delivery.
10           It is further stipulated and agreed
11   that all objections, except as to the form
12   of the questions, and motions to strike will
13   be reserved until the time of trial or
14   pretrial hearing.
15               * * * * *
16           LINCOLN E. SMITH, a witness
17   called for examination by counsel for the
18   Defendant, having been duly sworn, testified
19   as follows:
20           DIRECT EXAMINATION
21   (By Mr. Chernetsky)
22   Q. Good morning, Mr. Smith.
23   A. Good morning. How are you?
24   Q. I'm very good, thank you. Thanks for coming
```

1 (Pages 1 to 4)

G & M COURT REPORTERS, LTD.
(617) 338-0030

Page 5

1   by today.  Just to start out the formality
2   we'll have you state your name for the
3   record.
4   A.  My name is Lincoln Smith.
5   Q.  In the course of arranging for the
6      deposition today some of your attorney's
7      staff told me you might have an issue today
8      of picking up your mother at the airport
9      today.  Does that remain a problem as far as
10     the deposition goes?
11  A.  No, it's late afternoon.
12  Q.  Okay.  I take it you've been deposed before
13     today, correct?
14  A.  Yes.
15  Q.  Even so, probably it just bears repeating
16     some of the things we need to be conscious
17     of as we do this today.  As you're well
18     aware we have a court reporter with us who
19     is here to make a good clean record of what
20     we say here and we need to be cognizant of
21     things that we do in normal conversation
22     like we had before we started which can make
23     it difficult for her, and we want to avoid
24     those things, and examples are just there's

Page 6

1   going to be times when everyone in the room
2   knows exactly what my question is when I'm
3   only two or three words into it and you will
4   attempt to try answering, but that will make
5   it hard for her, so try to wait until I'm
6   done before you begin answering and I'll try
7   to do the same and make sure that I have
8   your whole answer out before I move on to
9   the next question.  Try to be mindful of
10  making verbal answers and being mindful that
11  she can't record a nod of the head and
12  things like "Uh-huh" and so forth, so try to
13  answer yes and no when appropriate.  If you
14  don't understand a question that I ask you
15  just let me know that and I'll try to make a
16  better question that is understandable,
17  because if you don't tell me that you don't
18  understand we're all going to think that you
19  understood the question and record your
20  answer appropriately, so just let me know
21  and I'll try to do better.  If you need to
22  take a break at any point today, if you need
23  to use the men's room or anything like that,
24  you need to talk to your attorney, just let

Page 7

1   me know and we'll do that, as long as
2   there's no question pending.  Does that all
3   make sense and seem fair?
4   A.  Yes, it does.
5   Q.  Are you on any medications or anything which
6      would impair your ability to remember past
7      events or to give truthful and complete
8      answers today?
9   A.  No.
10  Q.  What is your present residential address?
11  A.  No. 6 Willis Street in Dorchester.
12  Q.  Was that the same at the time of the
13     incidents in December of 2000 which form the
14     basis of this complaint?
15  A.  Yes.
16  Q.  How long have you lived at Willis Street?
17  A.  Twenty-plus years.
18  Q.  Did you grow up here in Boston, in
19     Dorchester?
20  A.  Yes.
21  Q.  Have you ever resided anywhere else but
22     Boston?
23  A.  Yes.
24  Q.  Where is that?

Page 8

1   A.  I grew up in Roxbury, moved to Dorchester --
2      I mean, how many years do you want me to go
3      back?
4   Q.  Have you lived outside of the Boston area at
5      all throughout your life?
6   A.  Boston proper?
7   Q.  Right.  Well all of the places you've
8      mentioned so far are Boston, right?
9   A.  Right.  Well my family moved to Weymouth.
10  Q.  You haven't left the state?
11  A.  No.
12  Q.  Tell me a little bit about your educational
13     background.  What's the highest level of
14     education that you completed?
15  A.  I have a Master's of Science degree in
16     administration and planning from
17     Northeastern University.
18  Q.  What year did you earn that degree?
19  A.  1982.
20  Q.  What fields of study are involved in
21     administrational planning?
22  A.  Then, statistical analysis, projections,
23     research.
24  Q.  You said "then," so is there something

2 (Pages 5 to 8)

Page 9

1  different today, the field has evolved?
2  A. I don't know honestly, it's going back to
3  '82.
4  Q. What was your undergraduate degree?
5  A. Criminal justice.
6  Q. Was that also from Northeastern University?
7  A. Yes.
8  Q. What year was that?
9  A. 1980.
10 Q. So you went straight from your undergraduate
11  career to the master's program?
12 A. Yes.
13 Q. Where did you go to high school?
14 A. Weymouth South High School.
15 Q. What year did you graduate from there?
16 A. 1975.
17 Q. Was there a break then between high school
18  and beginning your studies at Northeastern?
19 A. No.
20 Q. You graduated from high school in 1975 and
21  Northeastern in 1980?
22 A. Correct. It's a five-year co-op program.
23 Q. Right. Northeastern does a lot of real work
24  experience as a part of their undergraduate?

Page 10

1  A. Correct.
2  Q. Well I guess four isn't typical anymore. It
3  used to be. What did you do after you
4  completed your master's degree?
5  A. I worked at Northeastern while obtaining my
6  graduate studies and then I come to work for
7  the City of Boston.
8  Q. What did you do while you were at
9  Northeastern while you were still in school?
10 A. I was the coordinator director of the
11  student employment program.
12 Q. Then you came to work for the City of Boston
13  in 1982?
14 A. Yes.
15 Q. What position did you hold then?
16 A. I worked in personnel management within the
17  training department.
18 Q. Is that here at City Hall?
19 A. Yes.
20 Q. How long did you hold that position?
21 A. Until 1986 -- excuse me, I'm doing okay,
22  that until 1986, yes.
23 Q. That was the position from which you were
24  terminated that led to some litigation,

Page 11

1  we'll talk about that later, but is that
2  right?
3  A. Yes.
4  Q. What was your next position after that?
5  A. I went to work for the City Counsel, Boston
6  City Counsel.
7  Q. What year was that?
8  A. I don't know the exact year to be honest
9  with you. I think it was 1996.
10 Q. So there's a ten-year period in between
11  there. What were you doing during that ten
12  years?
13 A. Trying to be re-employed.
14 Q. So you weren't employed full-time during
15  that ten-year period?
16 A. No.
17 Q. Did you work on a part-time basis at all?
18 A. No.
19 Q. In 1996 you took a position with the City
20  Counsel?
21 A. Yes.
22 Q. What is that position?
23 A. Assistant Director of Research.
24 Q. Is that the same position that you hold

Page 12

1  today?
2  A. Yes.
3  Q. What kinds of duties are you performing in
4  that position?
5  A. Legislative research, committee work for
6  various chairs, that's it.
7  Q. So you work for the entire Counsel rather
8  than one particular counsel member?
9  A. That's correct.
10 Q. You mentioned at the outset when I asked you
11  if you had been deposed before, I just want
12  to ask you a little bit about that. Well,
13  why don't we -- you mentioned a moment ago,
14  or I guess I mentioned and you confirmed
15  that there was a lawsuit against the City of
16  Boston resulting from your termination in
17  1986 from your position with the personnel
18  division, is that right?
19 A. Yes.
20 Q. Do you remember who the defendants were in
21  that case?
22 A. The defendants were the City of Boston and
23  the personnel director at that time.
24 Q. What was that person's name?

Page 13

1   A. Robert Consalvo.
2   Q. Maybe an easier way to go about this would
3      be to show you a document. You recall that
4      earlier in the course of this litigation the
5      defendants sent your attorney some written
6      questions to be answered by you?
7   A. Yes.
8   Q. If you flip to the back of the very last
9      page, which is No. 10?
10  A. No. 10.
11  Q. Yeah, the last page. That's your signature
12     where it says "Lincoln Smith"?
13  A. Yes, it is.
14  Q. It says also there "Signed under the pains
15     and penalties of perjury the 27th day of
16     January 2004," you saw that when you signed
17     the document?
18  A. Yes.
19  Q. You looked through this before you signed
20     it?
21  A. Yes.
22  Q. I just want to take a look at Page No. 2 and
23     what you've done for us in Interrogatory
24     No. 2 is respond to our question, "Please

Page 14

1      indicate whether you've been a plaintiff or
2      a defendant in any other civil lawsuits and
3      if so indicate the state, county, case name,
4      and docket number of such lawsuits." I read
5      that correctly?
6   A. Yes.
7   Q. Rather than you tell us from memory all of
8      these, let's take a look at these and you
9      can explain them for us and tell us if
10     that's all. You mentioned a minute ago that
11     you had a suit against the City of Boston
12     and Mr. Consalvo?
13  A. Yes.
14  Q. Would that be either of the suits listed at
15     A and B in your answer?
16  A. I believe, yes. I believe it's B and A, as
17     well. I'm not certain what A references but
18     it would seem to be within the same
19     timeframe.
20  Q. But it looks then like there were two
21     separate lawsuits?
22  A. Yes.
23  Q. One against the City and one against
24     Mr. Consalvo?

Page 15

1   A. Yes.
2   Q. Did those arise out of the same events?
3   A. Yes.
4   Q. I don't want to relitigate that case, but
5      can you give me an idea of what the case was
6      about?
7   A. I guess a real quick synopsis would be an
8      unlawful termination case that come down to
9      a violation of civil rights.
10  Q. Were these two cases consolidated at some
11     point?
12  A. No, I believe, actually, they were not
13     consolidated.
14  Q. Just for Mr. Consalvo, what was the outcome
15     of that matter?
16  A. On the Consalvo matter it went to a jury and
17     the jury found that Mr. Consalvo had
18     violated my civil rights, that the
19     termination was unlawful and that he did it
20     in such a way that it was malicious and
21     intentional, and there was a punitive reward
22     as well.
23  Q. So you had a jury verdict in your favor?
24  A. Yes.

Page 16

1   Q. What was the outcome of the suit with the
2      City of Boston?
3   A. The City of Boston was dismissed in the
4      action.
5   Q. In C your answer identifies Smith versus CU
6      Homeland Insurance Company?
7   A. Yes.
8   Q. What was that case about?
9   A. That case involved a motor vehicle I had
10     that was stolen from Willis Street in
11     Dorchester and the insurance company denied
12     payment on the claim based on garaging.
13  Q. So you sued the insurance company to recover
14     money under your claim, under your policy?
15  A. Yes.
16  Q. What was the outcome of that?
17  A. I believe the parties agreed and it was
18     dismissed.
19  Q. For each of the answers A, B and C there's a
20     notation Suffolk County, does that indicate
21     that these were cases that were filed in the
22     Suffolk Superior Court?
23  A. Yes.
24  Q. D is Huber and Lacy versus Smith at the

4 (Pages 13 to 16)

1    Boston Housing Court where you indicated you
2    were a defendant.  Tell me about that one.
3  A.  That's regarding a tenant that lived at
4    6 Willis Street in Dorchester that -- how
5    much do you want to know?  Landlord/tenant
6    issue.
7  Q.  E looks to be the same, one of the same
8    tenants, except you're a plaintiff in an
9    action against them, is that right?
10 A.  Yes.
11 Q.  About what time period do those date from?
12 A.  I think that was 1999.
13 Q.  Do you know which of those suits was the
14   earlier of the two?
15 A.  I'm going to say D.
16 Q.  Again, we're not going to litigate the case,
17   but what were the allegations that the
18   tenants were making against you?
19 A.  Actually it was a two-prong situation.  I
20   had moved that the tenants be evicted due to
21   the fact -- it was concerning -- it started
22   out with a welfare fraud matter in which
23   they were frauding the government and the
24   Bureau of Special Investigation contacted me

1    regarding certain documentation with respect
2    to Mr. Huber, if in fact he resided at the
3    property, and he did, and the state had
4    pulled out a criminal complaint for larceny,
5    among other things, against Huber and Lacy,
6    and I was to be called as a witness and move
7    for an eviction of them because I was
8    unaware any of this was going on, and they
9    filed a counterclaim against me alleging
10   various violations of various codes within
11   the city.
12 Q.  So is E the action in which you sought to
13   evict?
14 A.  I believe it very well may be, yes.
15 Q.  Did you bring any other type of actions
16   against either of those tenants aside from
17   attempting to evict them?
18 A.  Subsequent to that?  Yeah, a lot of things
19   had stemmed from that actually.  Both Lacy
20   and Huber were convicted of larceny of state
21   monies.  As a result of that Huber and Lacy
22   both intended to intimidate me, and long
23   story short, Huber -- they charged Huber
24   with intimidation of a witness and he

1    ultimately was incarcerated at the South Bay
2    House of Correction for intimidation of a
3    witness and threats.
4  Q.  That was you?
5  A.  Yes.
6  Q.  I'm not sure that I still understand the
7    suit you listed at D, what cause of action
8    they were making against you.  I understand
9    what the federal government brought against
10   them, but what did they accuse you of doing?
11 A.  Violations of state sanitary code, that the
12   apartment wasn't up to par.  Once the state
13   contacted them and they knew I was to be a
14   witness, they alleged code violations in the
15   unit because of the pending eviction matter,
16   so actually there was a counterclaim against
17   me based on my eviction action, summary
18   process action.
19 Q.  You denied the voracity of those allegations
20   of code violations?  Your understanding is
21   that they were motivated by their desire to
22   avoid eviction?
23 A.  Yes.
24 Q.  There's a couple left.  F is a generic

1    reference to many actions in housing court
2    because of ISD inspections.  Just tell me
3    what you intended by that answer.  I don't
4    want you to list them all but can you
5    summarize them for me?
6  A.  I was in and out of Boston Housing Court
7    many times based on a number of issues
8    surrounding the Huber/Lacy matter and issues
9    at 11 Newport Street in Dorchester.
10 Q.  It might make sense now to talk a little bit
11   about your properties.  Do I understand that
12   your residence at Willis Street is a
13   triple-decker?
14 A.  It is, yes.
15 Q.  So you yourself reside in one of the
16   apartments?
17 A.  Yes.
18 Q.  Then you have two tenants there in the
19   normal course of --
20 A.  Yes.
21 Q.  Were Huber and Lacy co-tenants in the same
22   apartment or were they one occupying one
23   apartment and one the other?
24 A.  No, they were in one apartment.

Page 21

1  Q. What other properties do you own?
2  A. I own 11 Newport Street in Dorchester.
3  Q. Maybe you could just describe that property
4     for us, is that also a triple-decker?
5  A. Yes.
6  Q. How many rooms does that have?
7  A. Traditional triple-decker, five, five and
8     five.
9  Q. So in each unit three bedrooms?
10 A. Sometimes they use it as a third bedroom,
11    but I think the intent at the time was
12    perhaps a dining room, but I think some of
13    the tenants may use the dining room as a
14    bedroom.
15 Q. Any other properties that you own currently?
16 A. No.
17 Q. Any others that you've operated as a
18    landlord in say the last 20 years?
19 A. No.
20 Q. Just Willis Street and Newport Street?
21 A. Yes.
22 Q. You've said in Answer 2-F that you've been
23    both a plaintiff and defendant in Housing
24    Court many times.  What are some of the

Page 22

1     examples of the sorts of actions in which
2     you've been a defendant?
3  A. I'd have to obviously look at a file.  It
4     goes back a number of years.
5  Q. Is that because they're so numerous?
6  A. I wouldn't say that they're numerous, but it
7     seems to be that it's consistent over one
8     matter or another, if in fact there was a
9     violation and it was resolved for whatever
10    reason, it was never cleared through the
11    Inspectional Services Department so the
12    process continued through the Boston Housing
13    Court.
14 Q. Well about how many such actions would you
15    say there were that you intended to include
16    in your Answer 2-F?
17 A. From what timeframe to what timeframe?
18 Q. Well since you've owned your properties.
19 A. I can't answer that.
20 Q. Is it more than a dozen?
21 A. Yes.
22 Q. More than 25?
23 A. Over the course of the years, probably.  I'm
24    not certain.  I can't really definitively

Page 23

1     say how many.
2  Q. Is that why then you didn't attempt in your
3     answer to 2-F to enumerate each on of those
4     instances, because they're numerous?
5  A. Well we're going back a number of years.
6  Q. Okay.  By the same token, what types of
7     actions have you been a plaintiff in Housing
8     Court which you were describing by your
9     answer in 2-F?
10 A. When you say "plaintiff," sometimes to be a
11    plaintiff, to get access, issues like that,
12    you have to file, I guess, under the
13    category of being a plaintiff.  I'm not an
14    attorney, but you become a plaintiff to file
15    for a restraining order, which is a civil
16    action, to get access to a unit if a tenant
17    fails to give you access for whatever reason
18    and there is an alleged violation of some
19    kind that you're trying to resolve and they
20    don't give you access, Inspectional Services
21    is in fact involved in trying to resolve
22    whatever issue may be there, but they keep
23    blocking you, you need to go into court and
24    file for a restraining order to get access,

Page 24

1     and I guess that's where I become somewhat
2     of a plaintiff in a number of issues there.
3  Q. Are there other types of situations in which
4     you also become a plaintiff that you were
5     intending to refer to in 2 --
6  A. No, I think that also deals with summary
7     process actions for evictions.  That's it.
8  Q. So those two types, summary process
9     evictions and instances where you've sought
10    to get access to your property, those are
11    the types of actions that you intended by
12    "Plaintiff many times in Housing Court"?
13 A. Yes.
14 Q. About how many of those types of actions
15    would you say you've been involved in?
16 A. Probably half a dozen.
17 Q. At 2-G you've listed Inspectional Services
18    versus Smith, Boston Housing Court, what was
19    that case about?
20 A. It appears to be probable cause matter, an
21    action brought by the Inspectional Services
22    Department against me in '01, and I'd have
23    to reference the docket to kind of elaborate
24    as to what that was, I don't know.

6 (Pages 21 to 24)

Page 25

1   Q. Is that related to H, the Williams versus
2      Smith matter also an '01 docket number in
3      Boston?
4   A. It could be.
5   Q. Are you saying you don't remember?
6   A. I'm trying to be honest. It may very well
7      be. The dates, obviously it's in the same
8      calender year, and there was a civil action
9      against Williams.
10  Q. Okay. In H you've written "Plaintiff,
11     Williams versus Smith".
12  A. Right.
13  Q. That's an error, isn't it, you were the
14     defendant in that case, weren't you?
15  A. It says "Plaintiff, Williams versus Smith".
16     I would assume Williams was the plaintiff.
17  Q. So you didn't mean to indicate by answering
18     plaintiff that you were the plaintiff in the
19     case?
20  A. No.
21  Q. So you're saying that you're not sure what
22     the case you listed in G was about?
23  A. Right. There were three actually, three
24     issues surrounding that. There was a

Page 26

1      restraining order issue that needed to be
2      filed with respect to the Palmira Williams
3      matter for access.
4   Q. Well that would be a 2-F case, wouldn't it,
5      you just told us that was an example of the
6      kinds of things --
7   A. Yes, but coming down here a little bit with
8      respect to H, there were three issues there,
9      and three issues being restraining order
10     issue, a claim brought by Williams against
11     me, and a claim brought by me against
12     Williams.
13  Q. So Williams initiated the suit and you had a
14     counterclaim against her?
15  A. Yes.
16  Q. G is related in some way to the events that
17     were part of the case in H?
18  A. I can't honestly answer that. It's PC, it's
19     probable cause hearing, and it was brought
20     by, I'm assuming, the Inspectional Services
21     Department against me.
22  Q. Well this is the only case of this type that
23     you've listed here in your answer, right?
24  A. Right, but like I told you it's pretty --

Page 27

1      the issues from Inspectional Services
2      Department, there are many, and obviously
3      I'd have to look at some sort of
4      documentation to affirm any questions you
5      may be asking me to be pointed to --
6   Q. I don't want to litigate the case, the only
7      question I'm asking you is just what type of
8      action was it and what property did it
9      relate to and what were the allegations?
10  A. Again, I'm going to say G probably had to do
11     with -- 01 had to do with H with respect to
12     11 Newport Street in Dorchester.
13  Q. Williams, that's a tenant at that time at
14     11 Newport Street?
15  A. Yes.
16  Q. Is Lacy, is that Donna Lacy?
17  A. Yes.
18  Q. What is plaintiff Huber's first name?
19  A. Paul.
20  Q. Is that a complete listing now in 2-A
21     through H of the lawsuits in which you've
22     been involved?
23  A. Yes. To the best of my memory, yes.
24  Q. Weren't you also involved in some litigation

Page 28

1      with your sister and brother-in-law
2      concerning the property at 11 Newport
3      Street?
4   A. Yes.
5   Q. What court was that litigated in?
6   A. That was litigated in the Probate and Family
7      Court.
8   Q. It's here in Suffolk County?
9   A. Yes.
10  Q. What were their names?
11  A. Richard Tracy.
12  Q. Dick Tracy. Did he go by Dick?
13  A. Yeah, he did.
14  Q. That's your brother-in-law, I take it?
15  A. Ex-brother-in-law.
16  Q. What was your sister's name?
17  A. June Sheehan.
18  Q. Who initiated that suit?
19  A. They did, I guess. It was concerning
20     11 Newport Street, the 11 Newport Street
21     property.
22  Q. When did you become the owner of 11 Newport
23     Street, and I realize that may be part of
24     this case?

7 (Pages 25 to 28)

Page 29

1   A. Solely?
2   Q. Yeah. Well, when did you first gain an
3      interest in 11 Newport Street?
4   A. 1982.
5   Q. I take it that was not, you were not the
6      sole owner at that time?
7   A. That's correct.
8   Q. Would it be that your sister and your
9      brother-in-law also had an interest in that
10     property?
11  A. Yes.
12  Q. Was this issue form the subject matter of
13     the litigation in Family and Probate Court?
14  A. Yes.
15  Q. How did that all turn out?
16  A. I have the property so.
17  Q. There was no trial of that case?
18  A. Actually there was. There was a trial
19     before Judge Snew.
20  Q. What timeframe are we talking about for that
21     case? What year did you become the sole
22     owner of 11 Newport Street?
23  A. I'm going to say that was in probably 2000.
24  Q. So there was a period of some length where

Page 30

1      you had a shared ownership interest in the
2      property?
3   A. Yes.
4   Q. Of 18 years roughly?
5   A. Thereabouts.
6   Q. About how long did the litigation with your
7      sister and brother-in-law take to resolve
8      itself?
9   A. Probably five years.
10  Q. Were you involved in the day to day
11     management of the property during that
12     period when you were co-owners in effect?
13  A. Yes.
14  Q. Were your sister and brother-in-law involved
15     at all?
16  A. No.
17  Q. Did you also have a workman's compensation
18     claim against the City at some point?
19  A. Yes.
20  Q. That was during the period when you were,
21     after you were terminated from the City but
22     before you had your job at the City Counsel?
23  A. Yes.
24  Q. What venue, I guess, was that case proceeded

Page 31

1      in?
2   A. The Department of Industrial Accidents.
3   Q. You were the plaintiff, I take it, or the
4      complainant they might say?
5   A. Yes.
6   Q. Who was the respondent or defendant, the
7      City of Boston?
8   A. Yes.
9   Q. About what timeframe did you initiate that
10     action?
11  A. 1991 approximately.
12  Q. So that's about five years after you were
13     last employed by the City at the time that
14     you initiated that action?
15  A. Yes.
16  Q. What was the outcome of that action?
17  A. The Department of Industrial Accidents ruled
18     in my favor.
19  Q. Were you ever involved in litigation with an
20     Attorney Levine?
21  A. Yes, currently.
22  Q. That's ongoing?
23  A. Yes.
24  Q. What's his first name?

Page 32

1   A. Eric.
2   Q. Who was the plaintiff in that matter?
3   A. I am. Well, both actually.
4   Q. Who filed suit?
5   A. I think initially he did and I filed the
6      counterclaim.
7   Q. So the caption would be Levine versus Smith?
8   A. Yes.
9   Q. What venue is that proceeding in?
10  A. Suffolk Superior Court.
11  Q. Do you know what year that case was filed
12     in?
13  A. Probably six months ago, a year ago. Let's
14     say a year ago.
15  Q. What's the subject matter of that action?
16  A. It's regarding fees against me.
17  Q. A fee dispute between you and your attorney?
18  A. Right, and also malpractice and negligence
19     against Mr. Levine who has been suspended
20     from the practice of law by the SJC for two
21     years.
22  Q. So Mr. Levine sought to recover fees from
23     you and then you have a malpractice claim
24     against him which is your counter-suit?

8 (Pages 29 to 32)

Page 33

1    A. Yes, and subsequent to that he's been
2       suspended from the practice of law for two
3       years.
4    Q. Was he suspended, if you know, for issues
5       relating to his handling of your matter?
6    A. I can't comment on that. I don't know if
7       that's solely the case, but I know most
8       recently, probably within the last two days
9       or so, that the Board of Bar Overseers has
10      filed a contempt complaint against
11      Mr. Levine with respect of his handling of
12      practicing without a license.
13   Q. Was he practicing without a license at the
14      time he handled your matter?
15   A. No.
16   Q. What matter did he handle for you?
17   A. He handled the Lacy/Huber matter.
18   Q. That matter concluded in 1991, right -- no,
19      I'm sorry, I'm confused. I was looking at
20      Tracy versus Lacy. The Lacy/Huber matter
21      relates to events in 1999, right?
22   A. Right.
23   Q. How about Regina Quinlan, have you been
24      involved in litigation with her?

Page 34

1    A. I was involved in litigation with Regina
2       Quinlan, yes. I can't say litigation.
3    Q. She represented you in your suit against the
4       City and Mr. Consalvo?
5    A. Yes.
6    Q. There was a fee dispute in that case, is
7       that right?
8    A. Yes, there was.
9    Q. Do I understand that there's no case with
10      its own separate docket number related to
11      those events, it was just part of the end of
12      your litigation with the City where the fee
13      dispute was handled?
14   A. Yes.
15   Q. Did you also bring any sorts of claims
16      against Judge Quinlan in another venue with
17      any Bar Overseers or organizations of that
18      sort?
19   A. When she was a judge, no.
20   Q. Anytime.
21   A. Prior to her being a judge?
22   Q. Sure. At anytime have you ever made a
23      complaint against Judge Quinlan to any
24      agency or body that oversees attorneys?

Page 35

1    A. Yes.
2    Q. When was that?
3    A. I can't give you the exact date.
4    Q. Was it related to the litigation against
5       Mr. Consalvo and the City?
6    A. It was regarding Regina Quinlan's failure to
7       file a worker's compensation claim as a part
8       of the action regarding the Robert Consalvo
9       action.
10   Q. So the case at the Department of Industrial
11      Accidents, it's somehow related to those
12      same issues?
13   A. Well what happened, if I can put it in
14      context here, what had happened was Judge
15      Greenberg, at that particular time Regina
16      Quinlan was my attorney, the City was ruled
17      out of the action based on the fact that the
18      court determined that Robert Consalvo's
19      actions, he did it himself and the Court
20      also ruled that Regina Quinlan should have
21      filed a worker's compensation claim and she
22      did not, and Judge Greenberg raised the
23      issue extensively in court basically asking
24      her why she did not file a claim at the

Page 36

1       Board of Industrial Accidents, that that was
2       the venue to file, you know, for issues
3       surrounding one's health and all that, so
4       that's what that stems from, just so you
5       have clarity.
6    Q. That's exactly what I'm asking. Judge
7       Quinlan did not represent you in the
8       Industrial Accidents Board case then, right?
9    A. That's correct.
10   Q. So the basis of your complaint was her
11      failure to litigate your worker's
12      compensation claim at the appropriate time?
13   A. Right.
14   Q. Do you know what the outcome of that was, if
15      any?
16   A. No.
17   Q. You don't know or --
18   A. The outcome of the complaint itself?
19   Q. Right.
20   A. I believe there was no action taken.
21   Q. What agency or who was the complaint
22      directed to --
23   A. At that particular time the Board of Bar
24      Overseers based on Judge Greenberg's

**Page 37**

1 concerns that he raised at trial.
2 Q. Did you ever receive from the Board of Bar
3   Overseers any notification of their
4   findings?
5 A. Yes, I did.
6 Q. What was that?
7 A. I don't know, its been so many years ago. I
8   think basically it said they weren't going
9   to take any action on it.
10 Q. What was the outcome of the fee dispute with
11   Judge Quinlan?
12 A. It was just ended when the Consalvo matter
13   ended, there was no more action taken.
14 Q. Was she awarded fees?
15 A. She got her fees, yes.
16 Q. The Levine matter you told me is still
17   pending.  What was the outcome of the cases
18   that you listed in 2-G and H which you
19   thought were related to 11 Newport Street
20   and Ms. Williams?  Taking G first,
21   Inspectional Services versus Smith, what was
22   the outcome of that case?
23 A. Again, I don't know.
24 Q. It's concluded, though?

**Page 38**

1 A. I don't even know if it got off the ground.
2   It was a probable cause hearing.
3 Q. How about H, is that matter still ongoing?
4 A. The Palmira Williams matter was scheduled to
5   go to trial and the parties come to an
6   agreement and it's not going to trial and
7   the insurance company is settling it.
8 Q. Has it been dismissed already or that's
9   just --
10 A. I believe it's probably a dismissal.  It was
11   to go to trial a couple of months ago and
12   I'm really not involved in that, that's the
13   insurance company and the Legal Service
14   Center of Jamaica Plain.
15 Q. In Answer to Interrogatory 2 you listed
16   seven cases and we've discussed another five
17   cases and then -- so that's 12, and then in
18   F you mentioned about another -- well, a
19   number of several dozen, we don't know the
20   exact number.  Are there any cases other
21   than those in which you've been a litigant?
22 A. Not that I'm aware of.
23 Q. To the best of your knowledge you've told me
24   about all of them?

**Page 39**

1 A. Correct.
2 Q. Who are the current tenants at 11 Newport
3   Street?
4 A. Brian Dailey is on the third floor, Kate
5   Hayes is on the second floor, and Samantha
6   and David French are on the first floor.
7 Q. Do they number the apartments one to three?
8 A. Yes.
9 Q. Does it go from bottom to top?
10 A. French being on the first and Dailey being
11   on the third.
12 Q. What I'm asking you is, Apartment 1 is the
13   lower, Apartment 2 is the second floor and
14   Apartment 3 is the third floor?
15 A. Right.
16 Q. Are any of those tenants holdovers from the
17   time of December 2000?
18 A. No.
19 Q. So you've had a complete turnover?
20 A. Yes.
21 Q. Who was in those units in December of 2000?
22   Who was in 1?
23 A. O'Shea, Elizabeth O'Shea.
24 Q. She is deceased now?

**Page 40**

1 A. Yes.
2 Q. Did she live there alone?
3 A. She was supposed to live there alone.
4 Q. She didn't?
5 A. She was supposed to live there alone.  When
6   I rented the apartment to her it was for a
7   60-something year old woman that was being
8   displaced out of South Boston and that was
9   the story that was given to me.
10 Q. But in fact others, you believe, were living
11   there?
12 A. Yes.
13 Q. What was the period of her tenancy, when did
14   it begin and end?
15 A. I'd have to look at the file to be honest
16   with you.  She was there for a number of
17   years, though.
18 Q. Did she remain there until her death?
19 A. Yes.
20 Q. Her son was a tenant of yours previously?
21 A. Yes.
22 Q. In the same apartment?
23 A. No, actually her son lived on the third
24   floor.

10 (Pages 37 to 40)

Page 41

1  Q. So when Ms. O'Shea moved in her son was a
2     tenant in No. 3?
3  A. Yes.
4  Q. Who was living in No. 1 with Ms. O'Shea
5     inappropriately?
6  A. I wish I could answer that.
7  Q. You don't know?
8  A. Her daughter moved in, the daughter's son
9     moved in, the son's girlfriend moved in, and
10    I think there was a baby there.
11 Q. Is that a violation of the terms of her
12    lease?
13 A. It was.
14 Q. Do you set your rents according to the
15    number of tenants or is there some impact
16    that it has?
17 A. It did at the time. She was again a woman
18    that was an older woman and I guess my
19    thought pattern is and continues to be that
20    if you have an older person there they're
21    more apt to take care of the property, and
22    that was my thought pattern at the time when
23    I rented to her so.
24 Q. Was this an issue between you and

Page 42

1     Ms. O'Shea or was it something that you
2     accepted?
3  A. No, it was an issue. It was an issue. It
4     was an issue, God rest her sole, I didn't
5     know -- I didn't know she was sick until
6     well after the incident of 2000 and she and
7     I did speak after that, you know, we had a
8     relationship, and she felt badly about
9     everything, and I think I got hurt in March
10    and I probably saw her in July and she came
11    over to speak to me in July of 2000 and told
12    me she was ill.
13 Q. About how many years had she been living
14    there in 2000?
15 A. She may have moved in in 19 -- I can get the
16    record for you. She may have moved in in
17    1998, '99, somewhere in there. She wasn't
18    there very long.
19 Q. Who was in No. 2 in December of 2000?
20 A. Pamela Wallace.
21 Q. She lived there by herself?
22 A. She had a son that lived there.
23 Q. What period of her tenancy, when did she
24    come in and when did she leave?

Page 43

1  A. I believe she came in probably around the
2     same time, '98.
3  Q. Around the same time as Ms. O'Shea?
4  A. Within the same timeframe, thereabouts, yes.
5  Q. When did she leave the apartment?
6  A. 2001.
7  Q. When did Ms. O'Shea die, if you know?
8  A. I'm going to say it was the fall of 2001,
9     maybe November.
10 Q. What was her son's name?
11 A. She had a number of sons.
12 Q. The one who lived in No. 3?
13 A. Stephen O'Shea.
14 Q. Who was in No. 3 in December of 2000?
15 A. Palmira Williams.
16 Q. That's the plaintiff you had occasion to
17    speak of earlier in some litigation in
18    Housing Court?
19 A. Yes.
20 Q. What were the periods of her tenancy?
21 A. I believe she came in probably 2000,
22    early 2000, February of 2000 maybe.
23 Q. When did she leave the apartment?
24 A. She left the apartment in, I believe it was

Page 44

1     2001, 2002. I have to look at my file.
2         (Discussion off the record.)
3         (Recess.)
4  Q. Just to backtrack a bit -- or before we do
5     anything else we should mark this as
6     Exhibit 1?
7         (Answers to Interrogatories marked
8     Exhibit No. 1 for Identification.)
9  Q. Just to backtrack a little bit, were you
10    involved in any litigation to recover your
11    position from which you were terminated in
12    1986?
13 A. Yes.
14 Q. What venue did you pursue that in?
15 A. That was Suffolk Superior Court as well as a
16    result of the Consalvo matter.
17 Q. Would that also be as a result of the Smith
18    versus the City of Boston or something to
19    that effect?
20 A. Yes.
21 Q. Was that following the conclusion of your
22    jury trial and so forth?
23 A. Yes.
24 Q. I'm sorry, I don't remember off the top of

11 (Pages 41 to 44)

Page 45

1    my head when the trial was. Roughly what
2    year was that suit filed?
3    A. I don't know, '92 maybe.
4    Q. Do you remember what year the trial was?
5    A. '91.
6    Q. What was the outcome -- well, you weren't
7       rehired, correct?
8    A. I was not reinstated based on the failure to
9       file a worker's compensation claim.
10   Q. So the failure to file a worker's
11      compensation claim affected the merits of
12      your action to --
13   A. Holding on the City of Boston and on the
14      action, correct.
15   Q. So this case that you're just telling me
16      about now had some sort of resolution on the
17      merits, was that through trial?
18   A. Yes.
19   Q. The workman's comp. thing has come up a few
20      times, I'm not sure I understand that. Were
21      you alleging a disability based on the
22      events surrounding your termination?
23   A. Yes.
24   Q. What was the nature of that?

Page 46

1    A. I don't understand your question.
2    Q. Well when you filed your complaint with the
3       Department of Industrial Accidents, what was
4       the basis of your claim, if you had to
5       summarize it in a short paragraph?
6    A. There were a host of health issues.
7    Q. What were those?
8    A. I've been diagnosed with post-traumatic
9       stress syndrome, depression, hypertension,
10      migraine headaches.
11   Q. Anything else?
12   A. There's a lot of different things involved
13      with it. I guess that's a matter of record.
14      I'm sure you have access to it.
15   Q. I suppose I could, but that's why I have you
16      here to tell me so I don't have to go read
17      all that. So if I understand correctly, you
18      are alleging that conditions that you just
19      described for me were resulting from events
20      surrounding your termination?
21   A. The unlawful acts of Robert Consalvo, yes.
22   Q. Were those conditions that you've described
23      the reason why you weren't employed
24      full-time for that ten-year period?

Page 47

1    A. Yes. Part of it.
2    Q. What's the other part?
3    A. I was obviously looking to be re-employed,
4       however the record reflected that I was
5       fired for cause here in the city and that
6       was ultimately decided by the Supreme
7       Judicial Court and the Appellate Court and
8       they ordered the City of Boston to correct
9       my personnel records to reflect that I was
10      not fired for cause but in fact in violation
11      of my civil rights.
12   Q. Is that another lawsuit in which you were
13      involved to have your record corrected?
14   A. I believe it was part of one of those
15      lawsuits and it ultimately went up to the
16      Appellate Court and they ordered the City to
17      correct my personnel records and there was a
18      declaration, I guess, if that's what it's
19      called, I'm not certain, and nevertheless
20      the City of Boston maintained on their files
21      from '86 forward that I was fired for cause
22      and it took the Appellate Court or the SJC
23      many years after the fact to order the City
24      to correct.

Page 48

1    Q. In what case did that order issue?
2    A. I don't know.
3    Q. Was it a separate complaint for declaratory
4       relief that you filed?
5    A. I don't believe so. I think it was a part
6       of one of the actions. I can't answer that.
7       I don't believe it was a separate action.
8    Q. Are there any other -- is there any other
9       litigation in which you've been involved
10      that you haven't told me about yet?
11   A. No.
12   Q. The problems that you just described for me,
13      the post-traumatic stress and the migraines
14      and the hypertension and there was one more
15      that I'm forgetting --
16   A. Depression.
17   Q. You must have had treatment for those, I
18      imagine?
19   A. Yes.
20   Q. Was there a period when those complaints had
21      resolved?
22   A. No.
23   Q. Did you reach a point ever where you were no
24      longer suffering from those conditions?

G & M COURT REPORTERS, LTD.
(617) 338-0030

Page 49

1  A. No.
2  Q. So even though you returned to work in 1996
3     you continue to suffer from those symptoms?
4  A. Yes.
5  Q. You were telling me about the Huber and Lacy
6     cases and you were describing some
7     fraudulent activities that I guess the
8     federal government had been investigating,
9     am I summarizing that right?
10 A. State, state government.
11 Q. What's a Section 8 tenant? I don't know
12    anything about that, so just if you could
13    give me an idea of what that's about.
14 A. I never had a Section 8 tenant, to be honest
15    with you, until Palmira Williams.
16 Q. She was the only one that you had at that
17    point, up to the date of her tenancy?
18 A. That was the first time I explored the whole
19    possibility of a Section 8 tenant.
20 Q. Give me a brief idea of what Section 8
21    refers to.
22 A. Section 8, the Section 8 program is a
23    subsidized housing program in which there is
24    state allocation, federal allocation of

Page 50

1     dollars to an agency, in this particular
2     case the Boston Housing Authority, and they
3     have a qualifying factor, of course I don't
4     know all of the particulars, they qualify
5     for this type of certificate and if the
6     landlord is willing to take a Section 8
7     tenant on they go through a -- the landlord
8     goes through an extensive inspection of the
9     unit to make sure it's compliant with all
10    the state sanitary codes and it's in
11    compliance.
12 Q. Is a portion of the tenant's rent then is
13    paid by one or another government agency?
14 A. Yes, based on income.
15 Q. Ms. O'Shea was not a Section 8?
16 A. No.
17 Q. Neither were Mr. Huber and Ms. Lacy?
18 A. No.
19 Q. But they were recipients of some other aid
20    program? You described some fraudulent
21    activities that's why I ask.
22 A. What had happened was they weren't paying
23    their rent and it was a minimum rent, I
24    think it was $550 a month, and they were

Page 51

1     three months behind, and I had requested, I
2     said "It's only $550 a month. You're three
3     months behind. I need to get some rent off
4     you," and at that point in time she stated
5     to me that he had left and she didn't have
6     the money, and if I signed, you know, she
7     was going to be looking for some aid for the
8     children, and if I had signed to pay her
9     rent so she wouldn't be evicted, so I signed
10    and a year or so passed and he was back, but
11    I didn't know what they were doing, and long
12    story short, I guess they defrauded the
13    government of approximately $21,000.
14 Q. So the aid that they received, it wasn't a
15    similar situation to Section 8 where the
16    government was paying some portion of their
17    rent, it was some other aid that went
18    directly to them?
19 A. It was a direct payment -- I believe it was
20    aid for dependent children based on the fact
21    that he was not in the home, "he" being the
22    father of the children who worked for
23    Local 25, but I guess they reconciled their
24    differences. I don't try to get involved in

Page 52

1     people's personal matters, and after I
2     signed, a month later he was back and I just
3     thought they reconciled their differences
4     and didn't give it much thought, until I got
5     a call from the Bureau of Special
6     Investigations making an inquiry whether or
7     not he was there.
8  Q. So it wasn't related to their lease with you
9     or tenancy with you other than that the
10    government was interested in who was living
11    there and you had knowledge of that, is that
12    fair?
13 A. I had knowledge and I was the landlord and
14    therefore I was going to be subpoenaed on
15    it.
16 Q. But other than Ms. Williams, at least up
17    until December of 2000, you hadn't had other
18    tenants who were Section 8 tenants?
19 A. Pamela Wallace was a Section 8 tenant. She
20    was on the second floor.
21 Q. She came in in 1998?
22 A. No, I don't believe so.
23 Q. When did she --
24 A. I don't know. I'd probably say 1999.

13 (Pages 49 to 52)

G & M COURT REPORTERS, LTD.
(617) 338-0030

Page 53

1    Q. What was your relationship like with
2       Ms. O'Shea during her tenancy?
3    A. Respectful.
4    Q. Did you have contact with her frequently?
5    A. No.
6    Q. Had she made any complaints about you that
7       you're aware of?
8    A. No.
9    Q. Had you had any issues with her and her
10      tenancy of the apartment?
11   A. No, just the fact that I became aware that
12      there were other people living there that
13      shouldn't have been living there and it was
14      a violation of our agreement.
15   Q. Is there any significance to the number --
16      to who's living in the apartment, similar to
17      what you've described with Ms. Lacy and
18      Mr. Huber or?
19         MR. OHLSON: Objection. I don't
20      think I understand the question.
21         MR. CHERNETSKY: Pardon me?
22   Q. Did you understand the question?
23   A. The question, if I remember correctly, was
24      was there any significance, any difference

Page 54

1       or any significance with the O'Shea tenancy
2       and the Huber/Lacy tenancy.
3    Q. Let me rephrase it. You mention that you
4       had concerns about Ms. O'Shea and who was
5       living in the apartment, was the nature of
6       your concern in anyway related to the same
7       sorts of issues which you describe for us as
8       being important in the Huber/Lacy case?
9       Meaning, was the number of people living in
10      the apartment in anyway significant for any
11      aid programs or anything like that?
12   A. She wasn't on aid. She paid her rent.
13      Mrs. O'Shea paid her rent. She wasn't on
14      any type of aid that I was aware of.
15   Q. So your concern about who was living there
16      was related to what?
17   A. Who was living there, number one, what the
18      relationship was and what they were doing
19      there.
20   Q. Just your general desire to know who your
21      tenants are?
22   A. Yeah, I think it's important to know who
23      your tenants are and to try to run a tight
24      ship.

Page 55

1    Q. How about Pamela Wallace, what was your
2       relationship with her like?
3    A. It was a landlord/tenant relationship.
4    Q. Had she made any complaints about you to any
5       court or agency that you're aware of?
6    A. No.
7    Q. By the same token, had you initiated any
8       proceedings against her?
9    A. No.
10   Q. What about Palmira Williams, what was your
11      relationship with her like?
12   A. A landlord/tenant relationship, until there
13      was an issue about her share of the rent for
14      non-payment and that became an issue.
15   Q. Did you have any issues concerning her
16      upkeep of the property or anything of that
17      nature?
18   A. Yes.
19   Q. What were those?
20   A. Could you rephrase that because there are a
21      number of issues there.
22   Q. Tell me about anything that you can remember
23      about Ms. Williams's tenancy in which you
24      felt was a violation of her lease.

Page 56

1    A. She had people other than herself living in
2       the apartment. Under the Section 8 lease
3       and agreement it was supposed to be for
4       herself -- actually for herself and her son
5       and then there was some change in that but
6       there were other people living there in
7       addition to Ms. Williams, and, you know, the
8       way she kept the unit, the way she kept the
9       common areas, became an issue.
10   Q. What sorts of things did she do in the
11      course of keeping her unit that were
12      deficient?
13   A. She was dirty, number one. Had stock pile
14      cases and cases of empty beer bottles on the
15      back porch, wine bottles, which were
16      attracting rodents and birds and droppings,
17      which was a significant problem in my view.
18      She failed to rectify any of those issues,
19      and when I questioned her about her late
20      share of her rent, she just tried to buck
21      you on everything. She didn't want to pay
22      her share of the rent, which I think was
23      only $20 or $29.
24   Q. So was the balance of her rent paid by the

14 (Pages 53 to 56)

Page 57

1    Section 8 program?
2    A.  Yes.
3    Q.  Is that ratio of payment, government versus
4        tenants, affected by who's living in the
5        apartment?
6    A.  Yes.
7    Q.  So your concerns about who's living in
8        Ms. Williams apartment, aside from your
9        regular concerns that any landlord has, are
10       also related to how you're going to be paid
11       and how that Section 8 program works, is
12       that fair?
13   A.  Yes, she was in violation of the lease with
14       having additional people live there and she
15       was in violation.
16   Q.  If there's additional people living in the
17       apartment, does that reduce the portion of
18       rents paid by the program and increase the
19       portion paid by tenants?
20   A.  It varied.
21   Q.  What was the name of the son that was living
22       in the apartment?
23   A.  Carlos Lima.
24   Q.  What was the last name, can you spell it?

Page 58

1    A.  Carlos Lima, L-i-m-a.
2    Q.  There was another son that you think was
3        there sometimes as well?
4    A.  There were a number of people there.  I
5        can't identify each and every one, but just
6        based on my own observation and reports from
7        people in the area.
8    Q.  Did you discuss this issue with Ms.
9        Williams?
10   A.  Yes.
11   Q.  You made her aware of your concerns about
12       who was living in the apartment?
13   A.  Yes.
14   Q.  What was her response to that?
15   A.  Denial and very argumentative.
16   Q.  About the issues about the trash in the
17       common areas, did you discuss that with her?
18   A.  Yes.
19   Q.  How did you do that?
20   A.  Just "You need to clean your back porch.
21       You can't stock pile beer bottles.  It's
22       bringing pigeons, rodents, droppings."
23   Q.  What was her response?
24   A.  Very argumentative.

Page 59

1    Q.  You had a problem with her son in particular
2        or one of her sons, is that right?
3    A.  I had a problem with the son at one point in
4        time, yes.
5    Q.  Is that Mr. Lima?
6    A.  Yes.
7    Q.  You tell me, but was there an incident when
8        there was a confrontation with Mr. Lima?
9    A.  Yes.
10   Q.  What was that all about?
11   A.  I went to the property to take a piece of
12       sheet rock off the back porch, I believe it
13       was on a, I believe it was on a Saturday if
14       my memory serves me correct, because the
15       rubbish was picked up there on a Friday,
16       there was a holiday or something, went down
17       there to get a piece of sheet rock off the
18       back porch at which point in time Mr. Lima
19       opened the back door and came out on to the
20       porch and started shoving me and pushing me
21       and saying "Get out of here.  Get out," and
22       he's a pretty big guy, young guy, and then
23       of course the mother come out, the sister,
24       the brother-in-law, and pushed me up against

Page 60

1    the wall and threatened me "Get out of
2    here," and next thing I knew they locked the
3    door, so I couldn't get out even if I wanted
4    to get out.
5    Q.  You were in a common area?
6    A.  I was on the back porch.
7    Q.  Is that part of the common area?
8    A.  It's part of the common area, and they
9        called the Boston Police and Boston Police
10       came and basically Boston Police said that
11       she was very uncooperative and that was
12       basically it in a nutshell.
13   Q.  She called the police herself or somebody in
14       her --
15   A.  Someone within that party.
16   Q.  Was anybody arrested?
17   A.  No.
18   Q.  Did anything further result from the police
19       responding to Newport Street on that day?
20   A.  No.
21   Q.  Did you ever see Mr. Lima again after that?
22   A.  Yes.
23   Q.  Did you have any further confrontations with
24       him?

G & M COURT REPORTERS, LTD.
(617) 338-0030

Page 61

1  A. I tried to stay away from him.
2  Q. In the terms of your lease that you have
3     with your tenants, are you permitted to
4     access those common areas at anytime?
5  A. Yes, it comes off a common hallway. If
6     you're familiar with a triple-decker, you
7     got access, you can access the rear porches.
8  Q. So you don't need to enter any tenant's
9     apartment in order to get to that porch?
10 A. No.
11 Q. Did she tell the police that you had entered
12    her apartment without permission?
13 A. Yes.
14 Q. Was she referring to that day or other
15    occasions?
16 A. I don't know what she was referring to.
17 Q. Had you ever entered her apartment without
18    permission?
19 A. Absolutely not.
20 Q. I think you made reference earlier to when
21    you were hurt. I understand that you had a
22    very bad accident of some kind in the year
23    2001, is that right?
24 A. Yes.

Page 62

1  Q. You were a pedestrian and you were struck by
2     an automobile or something like that, is
3     that right?
4  A. Struck by a truck, yes.
5  Q. Did you believe that Ms. Williams's son was
6     involved somehow in your accident?
7  A. I don't know. I can't comment on that.
8  Q. But you have commented on that in the past,
9     haven't you?
10 A. I don't know what happened to be honest with
11    you.
12 Q. It was a possibility to you that somehow
13    Mr. Lima was responsible for your accident?
14 A. No, I'm not going to say that. I don't know
15    that.
16 Q. Have you ever said that to the police?
17 A. The police, if my memory serves me correct,
18    the night I was hit, and I was basically
19    laying there on the ground, the police
20    responded and said "Lincoln, Lincoln,
21    please answer us. Did one of your tenants
22    do this to you?"
23 Q. That was a question that the police asked
24    you without your having raised the

Page 63

1     possibility first?
2  A. Right.
3  Q. Why do you think that that would be the
4     first thought that the police officer would
5     have?
6  A. They were aware that there was a tenant,
7     there were tenant issues.
8  Q. How soon after the confrontation with Mr.
9     Lima that you've described was your
10    accident?
11 A. I can't -- there was some issues obviously
12    surrounding the 11 Newport Street property,
13    late December 2000 going into January 2001,
14    and I was struck on March 8, 2001.
15 Q. The confrontation with Mr. Lima was on
16    January 6, is that right?
17 A. I can't comment. I have no idea to be
18    honest with you.
19 Q. Let me show you a document and just see if
20    it refreshes your recollection at all. I
21    apologize, it's going to take me a moment to
22    find it.
23       MR. CHERNETSKY: I don't have
24    multiple copies of this one, George, so I'll

Page 64

1     show it to you first.
2  Q. Have you ever seen that document before?
3  A. I have, yes.
4  Q. What does it appear to be?
5  A. It's a police report.
6  Q. Are you able to determine what events that
7     report is related to?
8  A. My vision is a little off here. It's
9     obviously regarding Palmira Williams and the
10    date on it is January 6, '01, yes.
11 Q. Who was the, if you know, who was the police
12    officer who asked you whether your tenants
13    had done this to you?
14 A. It was Captain Robert Dunford.
15 Q. Now Superintendent Dunford?
16 A. Yes.
17 Q. He wasn't one of the officers who was on the
18    scene on January 6, was he?
19 A. No, but when I was struck he did come, he
20    was on the scene. They set it up as a, my
21    understanding, as a crime scene and the
22    homicide responded.
23 Q. Tell me a little about what you remember.
24    How did your accident happen? What do you

16 (Pages 61 to 64)

Page 65

1  remember, if anything?
2  A. I was at the funeral of a very good friend
3    of mine's father who had passed away and it
4    was at O'Connor's Funeral Home on Adams
5    Street in Dorchester, and there were some,
6    obviously, issues regarding Inspectional
7    Services Department going on in and around
8    that particular time, and I had left the
9    funeral home and had walked down Adams
10   Street, cut out one car in front of mine,
11   was right at the door of my car and a truck
12   comes speeding up Adams Street and hit me.
13 Q. So the police treated this as potentially
14   not an accident but as an intentional act?
15 A. I don't know how they treated it but what
16   I'm told is that there was a crime scene set
17   up and I know the homicide detectives
18   responded down to Boston Medical around two
19   o'clock in the morning.
20 Q. To interview you or were you too hurt to --
21 A. No, I couldn't be interviewed.
22 Q. So you were quite seriously injured?
23 A. I was, yes.
24 Q. Do you have any understanding what the

Page 66

1    outcome of the investigation was, was
2    anybody arrested?
3  A. Arrested? I don't know if someone was
4    arrested. They did identify the truck, and
5    there was a gentleman by the name of Liam
6    Morgan who had to appear in Dorchester
7    District Court. My understanding is he's
8    fled the country now. He's a fugitive.
9  Q. Is that individual known to you?
10 A. No.
11 Q. Are you aware of any connection between that
12   individual and any of your tenants?
13 A. I don't know.
14 Q. In the course of this investigation did
15   anybody from the police department ever
16   articulate any connection between that
17   individual and any of your tenants?
18 A. I don't understand the question.
19 Q. Well in the time that the police department
20   was investigating your accident, did you
21   ever become aware of any connection between
22   the individual that hit you and any of your
23   tenants?
24 A. Within that timeframe I really can't

Page 67

1    comment. I was seriously injured.
2  Q. To this day, have you ever become aware of
3    anything like that?
4  A. I don't know. I can't comment on that, I
5    have no idea. What happened was --
6    obviously I was hospitalized for a couple of
7    months and in extensive rehabilitative
8    therapy thereafter, and I don't know what
9    course of action the police had taken, but I
10   do know that the last time I had a
11   conversation with, I believe it was
12   Lieutenant Detective Downey that it was
13   their understanding that this gentleman fled
14   the country.
15 Q. What charge was brought against him?
16 A. I don't know.
17 Q. Do you know if this investigation remains
18   opened or is it closed?
19 A. I believe the investigation is open and
20   active.
21 Q. You mentioned that there were a lot of
22   issues around 11 Newport Street in December
23   of 2000 and January of 2001, why don't you
24   tell me what the, the first incident that

Page 68

1    you can recall from that time period, when
2    was that?
3  A. It was the latter part of December 2000
4    concerning a no heat complaint.
5  Q. Which apartment was that related to?
6  A. Apartment No. 1.
7  Q. That's where Ms. O'Shea was?
8  A. Yes.
9  Q. How did you become aware of that?
10 A. I called home and there was a message on my
11   voicemail that the heat had gone down on
12   Newport Street, Apartment No. 1.
13 Q. Who had left that message?
14 A. Someone within the O'Shea household.
15 Q. What did you do in response?
16 A. I immediately called there and they said
17   that there were two inspectors on the scene
18   then.
19 Q. You called the member of the O'Shea
20   household who had left a message?
21 A. Yeah, I just called the O'Shea household and
22   made an inquiry concerning a no heat
23   situation, and they said "Well, there's two
24   inspectors here now," and I said "Could I

17 (Pages 65 to 68)

Page 69

1    speak to one of them."
2    Q. Did you do that?
3    A. Yes.
4    Q. Who was that inspector?
5    A. Inspector Stephen O'Donnell.
6    Q. What was the substance of your conversation
7       with him?
8    A. That there was no heat and that basically
9       that the heat had gone down, they're without
10      heat, and I said "Well, what can I do to
11      mitigate it?" It was, I believe, Saturday
12      afternoon around 4:30, five o'clock,
13      somewhere in that neighborhood.
14   Q. Do you know what date it was?
15   A. I'm going to say December 23. Sunday was
16      the 24th, Monday was the 25th. I'm going to
17      say it was December 23.
18   Q. What was Mr. O'Donnell's response to your
19      question about what could be done to
20      mitigate?
21   A. I said "Well, can we -- obviously it's late
22      in the afternoon Saturday, can we get some
23      heaters in there to keep the place warm,"
24      and he said "Sure, that would be fine," and

Page 70

1    I said "Obviously I'm not in the area now
2       but I'm on my way back in to the city to
3       deal with the issue," and I left my sister's
4       home, we were having pre-Christmas dinner, I
5       left my sister's home and made my way back
6       into the city, but before I got to the city
7       I had stopped at Home Depot and picked up
8       some space heaters and proceeded to the
9       property.
10   Q. Where does your sister live?
11   A. Canton.
12   Q. Each apartment must have its own furnace,
13      right, is that right, you tell me?
14   A. They do, yes.
15   Q. How old was the unit that heated
16      Ms. O'Shea's apartment?
17   A. It wasn't that old. I want to say maybe
18      eight years old.
19   Q. Had you had previous problems with it?
20   A. No.
21   Q. Was there any further conversation with Mr.
22      O'Donnell besides what you described?
23   A. Yes.
24   Q. What was that?

Page 71

1    A. The initial phone call or thereafter?
2    Q. Within that same phone call that you're
3       describing now.
4    A. I said "Obviously I'm on my way back in.
5       I'll pick up the space heaters. It's
6       Saturday evening, tomorrow's Sunday, and
7       hopefully I'll see you when I get there. If
8       I have any problems I'll call you."
9    Q. Was he there when you arrived?
10   A. No.
11   Q. Was anybody from Inspectional Services
12      there?
13   A. No.
14   Q. Did you ever talk to the other inspector who
15      Ms. O'Shea's family member had indicated was
16      present?
17   A. No.
18   Q. Do you know who that was?
19   A. No.
20   Q. When you arrived what did you find?
21   A. I rang the door bell, Mrs. O'Shea answered
22      the door, I said "Hello, Mrs. O'Shea. I'm
23      sorry about your problems. Here, I got some
24      space heaters that I spoke with the

Page 72

1    inspectors about and I'd like to put them in
2       the unit, and she said "I don't want --
3       everything's fine here." She said
4       "Everything's fine." I said "Everything's
5       fine?" I said "They tell me the heat's out
6       here and I'd like to come in." She said
7       "No, you can't. Everything's fine."
8    Q. Was she alone? Did you see any others in
9       the apartment?
10   A. There were others in the apartment. I
11      didn't know -- obviously I never got through
12      the front door, but I knew obviously there
13      were other people there.
14   Q. Anybody that you recognize?
15   A. Like I said, I didn't get through the front
16      door. She just kept it open maybe two or
17      three inches. She never even fully opened
18      it.
19   Q. Is it your understanding that Ms. O'Shea or
20      one of her family members made a complaint
21      to ISD about the lack of heat?
22   A. Yes.
23   Q. Tell me what happened next.
24   A. Obviously I said "Listen, I'd like to get in

18 (Pages 69 to 72)

Page 73

1  the apartment, I heard you have no heat.  I
2  have these space heaters I just purchased.
3  Obviously I want you to keep warm."  "I
4  don't need any space heaters.  Everything is
5  fine.  I have the gas stove on."
6  Q.  What was your response to that?
7  A.  "Mrs. O'Shea, listen, I need to get into the
8  apartment, and I really wish that you would
9  take these space heaters," and she said "No,
10  everything's fine."
11  Q.  You hadn't had any previous problems with
12  Ms. O'Shea, correct?
13  A.  No, just what I had mentioned earlier.  I
14  had some concerns about who was living there
15  and who wasn't living there and any
16  shenanigans that were going on down there, I
17  was hearing different stories, but I was
18  attempting to affirm some of them.
19  Q.  I think you said earlier this was the first
20  complaint that she made about you to ISD
21  that you're aware of?
22  A.  Yes.
23  Q.  You hadn't initiated any kind of actions
24  against Ms. O'Shea up to this point in her

Page 74

1  tenancy, correct?
2  A.  No.
3  Q.  So what did you do after that?
4  A.  What can you do at that hour Saturday?  I
5  went home and I sat and I thought and I said
6  "Well, I'm going to call Stephen O'Donnell."
7  Q.  About what time was it now?
8  A.  I don't know, 8:30, maybe nine o'clock.
9  Q.  Did you call him?
10  A.  I did.
11  Q.  What was the substance of that conversation?
12  A.  I called him on the cell phone and he said
13  to me "Lincoln, what do you want me to do?"
14  "What do I want you to do?  I have these
15  space heaters, you're telling me there's no
16  heat down there, I'd like to get these space
17  heaters into the unit.  We discussed this,
18  you told me it would happen."  "Listen,
19  Lincoln, I'm at the Hanover Mall.  I'm
20  Christmas shopping.  What do you want me to
21  do?  There's nothing I can do for you."
22  Q.  Where is her furnace located?
23  A.  In the basement.
24  Q.  Did you go down and take a look at the

Page 75

1  furnace?
2  A.  I couldn't get into the basement.
3  Q.  Why is that?
4  A.  Doors were locked.
5  Q.  You don't have keys to the doors?  Well, I
6  guess my question is, do you need to enter
7  Ms. O'Shea's apartment in order to access
8  the basement?
9  A.  That's one way of accessing the basement,
10  but no, you can access the basement from the
11  back common hallway.
12  Q.  So why didn't you access the basement via
13  that route?
14  A.  The back door was locked.  The screen door
15  was locked and the back door was locked.
16  Q.  That door is not a part of any particular
17  tenant's apartment, correct?
18  A.  Correct.
19  Q.  You don't have keys to those doors?
20  A.  No.  The -- like I said, the screen door was
21  locked.  For the most part the only one that
22  really used that back door was Mrs. O'Shea
23  because it went out on to a porch into the
24  yard and she was obviously an older woman

Page 76

1  and it was kind of her turf, if you will.
2  Q.  So the screen door has one of those switches
3  that you turn the lock, but it doesn't have
4  a key to go with it?
5  A.  Right, and the back door was locked too
6  because that is always locked.
7  Q.  Well you must have had a key to that door,
8  wouldn't you?
9  A.  No.
10  Q.  Don't you need as a landlord to be able to
11  get access to your building for all kinds of
12  reasons?
13  A.  I guess at some point in time the lock was
14  changed.  I don't know if one of
15  Mrs. O'Shea's son's changed it or what.
16  Q.  Did you ask Ms. O'Shea for access to the
17  basement aside from coming into her
18  apartment to put in space heaters?
19  A.  Yes, I said "I'd like to get in.  I want to
20  go down into the basement."  She said "No,
21  not now."
22  Q.  Did she tell you that she would give you
23  access at another time?
24  A.  No, but I did call her again.

19 (Pages 73 to 76)

Page 77

1  Q. When was that?
2  A. The following day, and actually I spoke to
3     Stephen O'Donnell that night, and when he
4     told me that there wasn't anything he could
5     do because he was Christmas shopping I was a
6     little upset about that, and then I sat and
7     thought for a little bit and I ended up
8     calling the mayor's 24 hour service here at
9     City Hall and asked who the inspector was on
10    duty.
11 Q. The Constituent's Service Hotline, I think
12    they call it?
13 A. Yes, I called that evening.
14 Q. Who did they say was on duty?
15 A. They didn't tell me.  They said we'll have
16    someone call you.
17 Q. Did anybody call you?
18 A. Yes.
19 Q. Who was that?
20 A. I forget the gentleman's name.  Nally maybe.
21 Q. Paul Nally?
22 A. Maybe, I forget.  I can't honestly answer
23    that.
24 Q. What did he tell you?

Page 78

1  A. At this point in time it's probably 11:30 at
2     night, "Lincoln, there's nothing we can do
3     if she doesn't give you access."  I said
4     "Well, you know, obviously I have some
5     concerns here, you know.  I'm trying to
6     mitigate and resolve the problem and."
7  Q. Did you disagree with that statement that
8     there was nothing that they could do for
9     you?  What would you have liked them to do?
10 A. Earlier in the evening I would anticipate
11    that they would have gotten me some sort of
12    access into there if there was a pressing
13    issue with respect to the heat that, you
14    know, in their official capacity that they
15    would have been able to get Mrs. O'Shea to
16    say "Yeah, you know, we need to get in here
17    and resolve this."
18 Q. Do you mean by force of persuasion or are
19    you suggesting that they have some sort of
20    lease power that could compel her to let you
21    into her apartment despite her objections?
22 A. To be honest with you, I'm not familiar with
23    what power the inspector has or what he or
24    she may have.  It would just stand to reason

Page 79

1     that if they were there earlier that they
2     would follow-up and meet me at the property.
3     In fact, I requested Stephen O'Donnell
4     please come down and meet me at the
5     property.
6  Q. They're there at the request of the tenant
7     originally, that's your understanding,
8     correct?
9  A. I guess that's how it happened.
10 Q. The tenant represents that she's happy, what
11    further could they do for you?
12 A. I don't know, that's their job.
13 Q. Was your concern that you were going to be
14    liable in some way with ISD for something
15    that Ms. O'Shea was not permitting you to
16    address?
17 A. No, I was just trying to be a good landlord.
18 Q. So you were trying to keep Ms. O'Shea happy?
19 A. Sure.
20 Q. I'll show you another document.  There's
21    George's copy and one for you.  Do you
22    recognize that document?  (Indicating.)
23 A. Yes, I do.
24 Q. What do you recognize it as?

Page 80

1  A. It's a City of Boston Inspectional Services
2     Department Code Violation or Notice of
3     Violation and it's of an emergency nature.
4  Q. When did you first see this document?
5  A. I don't know.
6  Q. Was it posted when you arrived at the
7     property that evening?
8  A. No.
9  Q. Do you know if you saw it on December 23?
10 A. No.
11 Q. I don't know, I'm looking for you to tell
12    me.  In your experience how do you normally
13    receive this type of document?
14 A. Normally it would be -- something like this
15    would be served by a constable.
16 Q. But you don't recall how this document
17    reached you or when?
18 A. No.  I know I never received it on
19    December 23, I know that.
20 Q. Do you know when you did receive it?
21 A. I don't.
22 Q. Does this document appear to be related to
23    the events that we just described?
24 A. Yes.

20 (Pages 77 to 80)

Page 81

1  Q. This is actually, I guess, a three-page
2     document. I'm looking at the first page
3     under the "Violation" heading, it says "BFD
4     shut down furnace due to soot build up." Do
5     you have an understanding as to whether the
6     fire department was present on the scene
7     that day?
8  A. My understanding was the fire department was
9     there.
10 Q. Do you know who summonsed the fire
11    department?
12 A. No, nor did I ever receive any abatement
13    order or anything from the fire department,
14    so I don't know whether they were there or
15    they weren't there.
16 Q. Did you return to your home at some point on
17    December 23?
18 A. Yes.
19 Q. At Willis Street?
20 A. Yes.
21 Q. If you look at Page 2, which is the flip
22    side of the first page, would you agree with
23    me that it indicates that this was served by
24    leaving a copy at your residence, which is

Page 82

1     listed on the front of the sheet as 6 Willis
2     Street, it says it was posted interior front
3     hall door. Do you recall if that was in
4     fact posted at that location when you
5     returned to your home?
6  A. It was not.
7  Q. Do you know Leslie Cristos, the individual
8     whose name is signed on this document?
9  A. No.
10 Q. You hadn't had past dealings with Inspector
11    Cristos?
12 A. Not that I recall, no.
13 Q. At some point did you get an opportunity to
14    examine the furnace for Unit No. 1?
15 A. Yes.
16 Q. When was that?
17 A. I can't recall.
18 Q. Was it within the same week?
19 A. Within a couple of days, yes.
20 Q. I'm looking again at the "Violation"
21    description. It says "Heating facilities
22    not properly maintained. BFD shut down
23    furnace due to soot buildup. Vent in unit
24    has soot buildup. Also repair/replace

Page 83

1     furnace. Clean soot from forced hot air
2     vents inside unit, bathroom, living room and
3     right bedroom." First of all, did I read
4     that accurately? In other words, is that
5     what it says?
6  A. Yes.
7  Q. Did you have an opportunity to examine the
8     furnace and the vents and so forth?
9  A. I never got into the unit. I eventually did
10    get into the basement.
11 Q. You never did get into the unit?
12 A. No, not for sometime thereafter.
13 Q. When you examined the furnace did it in fact
14    have soot buildup?
15 A. I can't comment. I'm not an HVAC guy.
16 Q. Did you have a contractor who serviced the
17    furnace for you as a result of the notice?
18 A. I replaced the furnace.
19 Q. Did your contractor tell you that there was
20    no soot buildup?
21 A. He told me that the furnace needed to be
22    replaced.
23 Q. Was anything ever done regarding the
24    remaining issues listed in No. 1 which would

Page 84

1     be the cleaning soot from the vents inside
2     the unit, bathroom, living room and bedroom?
3  A. Yes.
4  Q. Who did that for you?
5  A. I hired a contractor.
6  Q. Was it the same individual who did the
7     furnace?
8  A. No.
9  Q. Did they ever tell you if that was in fact
10    accurate, that there was soot in the vents?
11 A. They didn't say one way or the other. I
12    guess my course of action was to resolve any
13    problems that existed down there and made
14    the necessary calls to resolve it.
15 Q. No. 2 in the violations list has to do with
16    minimum temperature requirements and it
17    records temperatures that Inspector Cristos
18    took in the unit, is that what it says
19    there?
20 A. Yes.
21 Q. Then No. 3 is on the third page and it says
22    "No working smoke detectors inside unit,
23    rear common area hall, first and second
24    floors, install working smoke detectors."

21 (Pages 81 to 84)

Page 85

1    Was that accurate that there were no working
2    smoke detectors in those areas?
3    A. No, there were working smoke detectors in
4    the area. Obviously there were batteries in
5    there. I don't know what happened to the
6    batteries, if anything, but there were
7    detectors there, though.
8    Q. You know there were detectors but you don't
9    know if they were working?
10   A. They were working when I put them in and
11   obviously they were working when there was
12   an inspection done on the property and I
13   don't know if they were working -- I can
14   only assume that they were in fact working
15   as their intended use when they were
16   installed on December 23.
17   Q. When were they installed?
18   A. I don't know.
19   Q. The inspection that you mention was in
20   February, is that right?
21   A. Which inspection?
22   Q. You had just mentioned an inspection earlier
23   in which the property was certified, is that
24   for Section 8 purposes?

Page 86

1    A. Yes, there was Section 8 and there was also
2    Inspectional Services Department inspected
3    the property under CMR's for habitability.
4    Q. If I could direct your attention to
5    Exhibit 1, which was your interrogatory
6    answers, and at Page 3, Question No. 3
7    was -- I'm sorry, Question No. 4, "Please
8    provide the date of inspection and
9    certification of the condition of the
10   property as described in Paragraph 12 of the
11   complainant's complaint," and the answer is
12   February 6, 2000. Is that the inspection
13   that you just referred to?
14   A. Yes.
15   Q. So you know that the smoke detectors were
16   working approximately ten months prior to
17   the date of this notice of violation,
18   correct?
19   A. Minimum.
20   Q. Had you tested the smoke detectors since
21   then?
22   A. Yes.
23   Q. When do you think was the last time you
24   tested the smoke detectors?

Page 87

1    A. Probably sometime in the fall. I can't give
2    you an exact date to be honest with you.
3    Q. So you know that they were working at some
4    point in the fall but you don't know if they
5    were working or not on December 23?
6    A. I believe they were working and I believe
7    they were there, yes.
8    Q. On what basis do you believe that they were
9    working?
10   A. When I was on the property I check them.
11   Not that I was there every week, but when I
12   had occasion to be at the property I would
13   grab a broomstick or whatever and make sure
14   that the smoke detectors were working in the
15   common areas and that's the best I can do.
16   Q. Sure, but given that, it may be that they
17   ceased functioning sometime between the last
18   time you poked it with a broomstick and
19   December 23, right?
20   A. I can't -- you know, I wasn't down there
21   December 23. I don't check the smoke
22   detectors every single day.
23   Q. Do you have any reason to believe that any
24   of the violations that Inspector Cristos

Page 88

1    wrote up on December 23 were inaccurate?
2    A. Do I believe they were inaccurate?
3    Q. Right.
4    A. Obviously the heating system was not working
5    on December 23, we know that based on what
6    the Inspector O'Donnell had told me. With
7    respect to Line Item No. 2, based on the
8    temperature, I guess it is what it is. I
9    have no idea.
10   Q. So there were issues --
11   A. I can just take it for face value of what it
12   is. I was trying to resolve the problem
13   down there and mitigate any problems that
14   were there on December 23.
15   Q. So aside from any difficulties that you had
16   remedying the problem, you don't dispute
17   that there was a problem?
18   A. There was obviously a problem, yes.
19        (Document dated 12/23/00 marked
20   Exhibit No. 2 for Identification.)
21   Q. We discussed this December 23 incident in
22   response to my question about what was the
23   first incident that you remember from this
24   time period. Do you recall an incident

G & M COURT REPORTERS, LTD.
(617) 338-0030

Page 89

1    which arose prior to this one?
2    A. With Mrs. O'Shea?
3    Q. In 11 Newport Street.
4    A. There was an issue prior to that with
5    Palmira Williams, yes.
6    Q. What was that all about?
7    A. Again, it had to do with some -- it stemmed
8    from the ongoing issue of people living
9    there that shouldn't be living there, and it
10   just, I don't know if it was, just prior to
11   this incident there was something going on
12   with Palmira Williams, I don't recall
13   exactly what it was.
14   Q. Do you recall an issue about a bathroom sink
15   with a leak from pipes?
16   A. May very well be, yes.
17         MR. CHERNETSKY: Go off for a
18   second.
19         (Discussion off the record.)
20   Q. How about, do you recall an issue around
21   that time in Ms. Williams's apartment
22   related to dampness in one of the bedrooms?
23   A. I don't recall. There may very well have
24   been, yes.

Page 90

1    Q. I'm going to put another document out for
2    you. Do you recognize that document?
3    (Indicating.)
4    A. Yes, I've seen this.
5    Q. Do you recall when you first saw it?
6    A. I don't.
7    Q. Now that -- take a moment, I guess, to look
8    at it and then tell me if that refreshes
9    your recollection at all of the problems
10   with Ms. Williams's apartment?
11   A. Yes.
12   Q. What is your memory now that you've had a
13   chance to look at that, aside from what you
14   told me before?
15   A. With respect to No. 1 --
16   Q. Just to clarify, I guess, there's two --
17   A. 1 and 2.
18   Q. So that's the second page of the document?
19   A. No, it's the first page.
20   Q. Let me see if we have the same documents.
21   Why don't you read it for us so it will be
22   clear.
23   A. With respect to No. 1, "Bathroom sink has an
24   active leak from pipes. Locate source of

Page 91

1    leak and repair."
2    Q. Was that accurate, was there a leak in
3    Ms. Williams's pipes?
4    A. No, it was a brand new sink, brand new
5    vanity prior to Ms. Williams moving in, and
6    as we previously discussed, the unit was
7    inspected not only by the City of Boston
8    Inspectional Services Department with
9    respect to meeting the minimum standards of
10   code violations but also the Boston Housing
11   Authority, so it had two inspections and the
12   apartment was brand spanking new.
13   Q. You would agree with me, wouldn't you, the
14   fact that there was no leak on February 6
15   doesn't mean that there was no leak on
16   December 20?
17   A. It's very difficult to reconcile that to be
18   quite honest with you. When you put in a
19   brand new vanity and a brand new sink and
20   you have a brand new unit, usually those
21   type of things do not happen unless they're
22   done intentionally.
23   Q. When did you first become aware of these
24   issues with her apartment?

Page 92

1    A. I can't answer that.
2    Q. I know you testified that you don't recall
3    when you saw this document, but you somehow
4    became aware of these issues with the
5    apartment?
6    A. Sometime thereafter, yes.
7    Q. How was it that you became aware?
8    A. They come into my possession somehow.
9    Q. Did you find a copy of this notice on your
10   door at 6 Willis Street on December 20,
11   2000?
12   A. No, not that I recall.
13   Q. You became aware of these issues through
14   some other means?
15   A. Yes.
16   Q. What were those?
17   A. I honestly -- they came into my possession
18   somehow, I can't answer that.
19   Q. Did Ms. Williams contact you about these
20   problems?
21   A. No.
22   Q. At no point she contacted you about these
23   issues?
24   A. No.

Page 93

1  Q. So you must have become aware of them
2     through the Inspectional Services, right?
3  A. Right, yes.
4  Q. How about the second of the -- after the
5     sink, which you just read for us, there's an
6     indication "Middle bedroom is infected with
7     gnats," which I think is a misspelling,
8     "from chronic dampness and an active leak in
9     ceiling. Exterminate entire unit to
10    eliminate gnats throughout." Did you
11    inspect the premises after you became aware
12    of these issues, however it was that you
13    became aware of them?
14 A. At one point in time I did, yes.
15 Q. Within the same week at least?
16 A. Within two weeks I'd say. A lot was going
17    on at the property, again, at the end of
18    December, around the holidays, with the no
19    heat complaint, so I was down there actively
20    probably for a good couple of weeks.
21 Q. What was the first time that you can recall
22    attempting to enter Ms. Williams's apartment
23    to investigate these complaints?
24 A. I can't tell you. Obviously it was the

Page 94

1     latter part of December.
2  Q. She let you into the unit to take a look at
3     these issues?
4  A. Yes, I was with someone. I believe I may
5     have been with -- I can't answer that
6     honestly. I was with someone.
7  Q. It's not that she refused you entrance into
8     the unit as Ms. O'Shea had?
9  A. She did deny me access to her unit on a
10    number of occasions, including possibly this
11    one after the incident with Carlos Lima,
12    obviously I was pretty reluctant to go
13    there.
14 Q. But that's several weeks after this so?
15 A. There was a little hostility there going on
16    because of a number of people living there
17    that shouldn't have been living there in
18    violation of the lease.
19 Q. When you did get into the apartment, did you
20    observe a dampness problem in the middle
21    bedroom?
22 A. No, and with respect to -- I know you had
23    mentioned the misspelling in the violation
24    with respect to gnats.

Page 95

1  Q. I don't know, it says N-a-t.
2  A. I don't know what it is either, so I can't
3     comment on it if I don't know what it is.
4  Q. It's a small flying insect of some type.
5     Did you observe any insects in the unit?
6  A. The only insects that I observed flying
7     around were from her empty beer bottles and
8     wine bottles from the back porch.
9  Q. That wasn't in the middle bedroom, though,
10    right?
11 A. No.
12 Q. Did you take a look at the middle bedroom?
13 A. I must have. Like I said, there were a lot
14    of issues going on at that time. My main
15    concern, obviously, was to get heat into the
16    building. I must have. If that was
17    presented to me I'm sure I did.
18 Q. Did you observe an active leak in the
19    ceiling in the middle bedroom?
20 A. I can't recall.
21 Q. How about water stains on the ceiling?
22 A. I don't recall.
23 Q. Did you observe that the ceiling was in
24    danger of collapsing?

Page 96

1  A. No.
2  Q. Did you ever make any repairs in Ms.
3     Williams's apartment related to this notice
4     of violation?
5  A. Myself personally, no.
6  Q. Did you cause any repairs to be made?
7  A. When I was given these notices of order,
8     obviously I engaged the services of vendors
9     and contractors and just gave it to them and
10    said "Go through and do what needs to be
11    done."
12 Q. What did they do?
13 A. I don't know. Obviously they addressed what
14    had to be done. I just gave it to them and
15    said "This is what's out there. Work
16    within."
17 Q. Have you forgotten what they did in
18    particular or you never asked?
19 A. No, I had given them the violations that
20    were presented to me by constable. At one
21    point in time I was served notices to
22    correct these violations by constable at my
23    home. I believe it was, I don't know, on or
24    around December 28, somewhere around there,

24 (Pages 93 to 96)

Page 97

1    and thereafter, obviously, I was dealing
2    with contractors. I said "Make sure
3    everything is up to code and the way it
4    should be."
5    Q. Did any of your contractors ever come to you
6    with this notice of violation dated 12/20
7    and say "Gee, Mr. Smith, I'm not able to
8    find these leaks"?
9    A. No.
10   Q. As far as you know is this listing of
11   problems accurate?
12   A. I can't comment on that.
13   Q. Do you know Inspector Evangeline Davis?
14   A. I do.
15   Q. Did you know her in December of 2000?
16   A. Yes.
17   Q. What interactions had you had with her prior
18   to this?
19   A. Inspector Davis did the pre-rental
20   inspection for 11 Newport Street and
21   approved it.
22   Q. Had you had problems with Inspector Davis
23   before this?
24   A. We had some issues.

Page 98

1    Q. What were those?
2    A. I don't recall to be honest with you.
3    Q. Do you have any reason to believe that
4    Inspector Davis was inaccurate in listing
5    these violations on December 20, 2000?
6    A. I believe Ms. Davis -- there are some issues
7    with Ms. Davis that I don't think she's
8    accurate.
9    Q. Those are related to another violation,
10   though, correct? I'm asking only now about
11   December 20, 2000.
12   A. Again, I don't believe that Ms. Davis is
13   accurate in her reporting.
14   Q. Specifically addressing these violation, do
15   you have a specific reason to believe that
16   any of the violations listed here are not
17   true?
18   A. Like I said, I cannot comment on that. I
19   gave it to a contractor. If in fact there
20   was a violation, I ordered that it be
21   corrected.
22   Q. As you said before your contractor never
23   came to you and said "I never found the leak
24   in the ceiling, can you help me find it," or

Page 99

1    anything like that?
2    A. I don't question my contractors that way. I
3    have faith -- honestly, I believe in people,
4    and I generally don't do business with
5    people that aren't forthcoming or honest, so
6    if I send a contractor there, I engage their
7    services, I have faith that they'll do what
8    needs to be done and it will be resolved.
9    Q. So your answer to that is no, you don't
10   recall any conversation to that nature?
11   A. That's what I said.
12        MR. CHERNETSKY: Let's mark this
13   document as Exhibit 3.
14        (Document dated December 20, 2000
15   marked Exhibit No. 3 for Identification.)
16   Q. What was the next issue that you can recall
17   arising in that part of December 2000?
18   A. We had the no heat issue. Thereafter we had
19   the issue in Mrs. O'Shea's apartment that
20   was a result of the no heat issue, and
21   that's it.
22   Q. I think that in discussing the no heat issue
23   we haven't reached the end of that story,
24   would you agree? You told us about what

Page 100

1    happened on December 23, but there was more,
2    wasn't there? Go ahead and tell me what
3    happened after you were denied entry to
4    Ms. O'Shea's apartment on the 23rd.
5    A. Well, we already discussed what happened on
6    the 23rd, I was denied access. December 24,
7    I got a call from Mrs. O'Shea's son and left
8    a voicemail message informing him,
9    basically, he said "You're F-ing dead. I'm
10   going to F-ing kill you."
11   Q. Was that Mr. Lima?
12   A. No, that was Stephen O'Shea.
13   Q. He was the son that had been your tenant
14   previously?
15   A. That I had evicted as well. And "If there's
16   not F-ing heat in that apartment I'm going
17   to F-ing kill you."
18   Q. That was a message and not a telephone
19   conversation?
20   A. That was a voicemail message that was left
21   for me Saturday. Actually, even prior to
22   getting that message I had called
23   Mrs. O'Shea on the, I believe at this point
24   in time, the 24th being Sunday, I called

25 (Pages 97 to 100)

Page 101

1    Mrs. O'Shea Sunday morning. I said
2    "Mrs. O'Shea, listen, this is Lincoln. I
3    would really appreciate it if you take these
4    space heaters. You know, it's going to get
5    cold out and the gas stove just isn't going
6    to do it for you. Please take these space
7    heaters," and she said "Everything's fine
8    here, Lincoln, don't worry about it," and I
9    remember it distinctly because then I
10   myself, I went to South Shore Plaza to pick
11   up some last minute Christmas items, and I
12   came home and there was a voicemail message
13   on my machine from her son Stephen that said
14   he was going to F-ing kill me.
15 Q. He identified himself on the message?
16 A. He did.
17 Q. You had evicted him from his --
18 A. Yes.
19 Q. He was in No. 3?
20 A. Yes. For non-payment.
21 Q. Did you report that threat to anybody?
22 A. Yes.
23 Q. When did you do that?
24 A. Probably that afternoon when I received it.

Page 102

1 Q. To who?
2 A. I believe to the Boston Police.
3 Q. Police officers came and spoke to you at
4    your residence?
5 A. Yes.
6 Q. That would be the 24th of December?
7 A. I believe so, yes.
8 Q. What happened next?
9 A. That was Sunday. Obviously that was late in
10   the afternoon and nothing happened
11   thereafter. I mean, the next day was
12   Christmas.
13 Q. Right, Christmas was a Monday.
14 A. Christmas was a Monday. Obviously, you
15   know, I was in contact with my contractor
16   and he obviously needed to order a new
17   furnace, and he ordered the new furnace on
18   Tuesday which would be the 26th.
19 Q. At this point you hadn't had access to the
20   basement still?
21 A. No, I was down into the basement sometime --
22 Q. When did you get access to the basement?
23 A. Probably sometime on the 24th I was in the
24   basement.

Page 103

1 Q. Did you determine on the 24th that -- was
2    your contractor there as well on the 24th?
3 A. I don't know when he was, but he was there
4    at some point in time.
5 Q. He agreed that the furnace needed to be
6    replaced?
7 A. He told me that we needed a new furnace,
8    yes.
9 Q. Was the delay just due to the holiday and
10   difficulties in Harrington transacting that
11   kind of business over the holidays?
12 A. What delay?
13 Q. Well, the 24th you told me that your
14   contractor said you needed a new furnace --
15 A. I said I got access in there on the 24th
16   myself and got into the basement, and my
17   contractor at some point in time was at the
18   property as well.
19 Q. When do you think that was?
20 A. I don't know exactly.
21 Q. Well he certainly was there on the 26th?
22 A. Without a doubt. He ordered a new furnace
23   on the 26th which was Tuesday.
24 Q. Go ahead. What else do you remember?

Page 104

1 A. That's about it. I mean, he ordered the new
2    furnace on December 26, Tuesday, the first
3    business day, and I believe he picked it up
4    Wednesday, Wednesday afternoon, somewhere
5    around there.
6 Q. The 27th?
7 A. Yeah, and he had sent some contractors over
8    to pull, or some of his workers over to pull
9    out the old furnace, and at that point in
10   time he was denied access, his workers were
11   denied access to the basement.
12 Q. Did your --
13 A. He was denied access to the basement by
14   Kevin Joyce and the Inspectional Services
15   Department.
16 Q. When did you become aware that Inspectional
17   Services was on the property again?
18 A. From my contractor.
19 Q. Just for clarity, when you're referring to
20   your contractor, are you referring to
21   Mr. Francis Grant from the Comfort Heating
22   Company?
23 A. Yes.
24 Q. Every time you mention your contractor in

26 (Pages 101 to 104)

Page 105

1    relation to this heat incident that's who
2    you're talking about?
3    A. In this particular matter, yes.
4    Q. How did you become aware that anybody from
5       Inspectional Services was on the property on
6       the 27th?
7    A. He called me. He said his workers called
8       him.
9    Q. "He" is Mr. Grant?
10   A. Yes, and he said "I have some guys down in
11      front of the building and they're going in
12      to take the furnace out but they've been
13      denied access."
14   Q. What did you do in response to that?
15   A. I said "Denied access? By whom?" He said
16      "I'm on my way there now. I'm on Columbia
17      Road. My understanding is it's Inspectional
18      Services Department and Kevin Joyce is there
19      himself."
20   Q. You were at home?
21   A. I was actually at my mother's house.
22   Q. Did you in fact go to the Newport Street
23      property?
24   A. Yes, I did.

Page 106

1    Q. That was in response to Mr. Grant's
2       telephone call?
3    A. Yes, I told Mr. Grant I'd meet him there.
4    Q. What happened when you arrived?
5    A. Well, when I arrived there, Kevin Joyce was
6       there with a number of inspectors.
7       Mr. Grant was there with a number of his
8       workers. There was a company there by the
9       name of Dory Fuel, they had people there,
10      and first impressions to me was "What in the
11      world is going on here with all these
12      people?"
13   Q. Do you have an understanding as to how
14      Inspectional Services came to be at your
15      property on that day?
16   A. My understanding is that Mr. Joyce was aware
17      that Lincoln Smith had a property at
18      11 Newport Street that did not have any heat
19      and he obviously took it upon himself, both
20      in his official and personal capacity, to
21      respond.
22   Q. Is it your understanding that Ms. O'Shea or
23      Stephen O'Shea contacted Inspectional
24      Services?

Page 107

1    A. It's not my understanding.
2    Q. You know that that's not the case?
3    A. I don't know. All I know is I was trying to
4       put in a furnace and my contractors were
5       denied access by Kevin Joyce.
6    Q. But you don't know how it is that
7       Inspectional Services came to be at your
8       property on the 27th?
9    A. I would assume that they were following up
10      with the no heat complaints.
11   Q. So what happened after you arrived?
12   A. You know, I said "What's going on here?"
13   Q. To Mr. Joyce?
14   A. To everyone. My contractor's there and
15      we're all standing around and I said "Hey,
16      what's the problem?" My contractor says
17      they're denying us access to the building
18      and he had the new furnace on the back of
19      his truck at that point in time because his
20      workers he sent beforehand to pull out the
21      old furnace, and I said "What do you mean
22      denying you access," and I looked at Kevin
23      Joyce, Commissioner Joyce, and I said
24      "What's this all about? What are you doing

Page 108

1    denying -- we're putting a new furnace in
2    here." No, you're not." I said "Maybe
3    you're missing something here. We have a
4    problem with no heat, I have a contractor
5    here, we have a furnace here, and you're
6    telling me we're not putting in a new
7    furnace?" "That's exactly what I'm telling
8    you." I said "Let's make one thing
9    perfectly clear, this is my building.
10   You're not going to tell me who or what
11   contractor I'm going to have at my
12   property."
13   Q. Did Mr. Joyce articulate any rational for
14      that statement to you?
15   A. He said he hired Dory Fuel.
16   Q. Did he say why?
17   A. To get the heat up and going.
18   Q. Did he indicate to you that you had been
19      derelict somehow in remedying the situation?
20   A. Made reference to the fact that I wasn't
21      timely, I didn't do it quick enough.
22   Q. Did you have any further conversation with
23      Mr. Joyce?
24   A. Just basically that, you know, we were going

27 (Pages 105 to 108)

Page 109

1   to put the furnace and my contractor had a
2   conversation with him and, you know, said if
3   you start that old furnace up you're going
4   to have carbon monoxide go through the
5   building.
6   Q. That was Mr. Grant himself?
7   A. Yeah.
8   Q. Did you yourself have any further
9   conversation with Mr. Joyce?
10  A. Yeah, I said "What are you doing, Kevin?
11  What's this all about?"
12  Q. What did he respond?
13  A. He just smiled and he smirked and he said
14  "I'm taking care of business."
15  Q. Anything else that you can recall that you
16  and he discussed?
17  A. I discussed the fact that my contractor was
18  going to go in there and install that new
19  furnace that I had purchased.
20  Q. Anything else?
21  A. At that point in time, no.
22  Q. Any other conversations with Mr. Joyce on
23  that day?
24  A. I told him he was wrong.

Page 110

1   Q. What did he say?
2   A. I'm taking care of business here. I said "I
3   didn't realize you knew -- I didn't realize
4   you were a licensed heating contractor. I
5   didn't know you had HVAC experience. I
6   thought you were an attorney, Mr. Joyce."
7   Q. In addition to what you told me so far about
8   your conversation, is there any other
9   conversation that you had with him on that
10  day that you haven't told me about yet?
11  A. No. Obviously my goal and objective was
12  very clear and that was to install the new
13  furnace, get it up and running and resolve
14  any problems that were going on there and
15  not belabor the point. I just wanted to be
16  compliant.
17  Q. I understand. Have you now told me all of
18  the conversations that you had with Mr.
19  Joyce, have you described them all to me?
20  A. To the best of my ability now. I don't have
21  any recall. There may have been some other
22  conversations that took place but that was
23  the thrust of it, to get the furnace
24  installed and get it up and running.

Page 111

1   Q. Did you have any conversations with any
2   other individuals from the City or
3   Inspectional Services in particular on that
4   day?
5   A. They were all there.
6   Q. Did you have conversations directly with any
7   other individuals other than Mr. Joyce?
8   A. What's his spokesperson's name?
9   Q. You have to tell me if you know.
10  A. It will come to me.
11  Q. John Dorsey?
12  A. Yeah, Mr. Dorsey.
13  Q. You had a conversation with Mr. Dorsey?
14  A. Well, he was there.
15  Q. If you want to tell me who was there go
16  ahead and do that and then maybe we'll talk
17  about what you talked about?
18  A. I don't know all these guys personally, but
19  I come to know, obviously, Mr. Dorsey
20  afterwards knowing that Mr. Dorsey was Kevin
21  Joyce's public relations guy.
22  Q. So you recognize Mr. Dorsey and --
23  A. I recognized the name that he was the person
24  who would market stories to newspapers, that

Page 112

1   he was a public relations guy that would
2   market things to newspapers to make
3   Mr. Joyce look good.
4   Q. Tell me if this is fair. You recognized an
5   individual on December 27 who you later
6   learned was Mr. Dorsey?
7   A. I knew the name, that's correct, and I
8   connected the dots.
9   Q. You recognize Mr. Joyce?
10  A. Yes.
11  Q. Are there other individuals who were present
12  at the scene on that day from the City who
13  were known to you and whose names you could
14  tell me?
15  A. I don't recall. I don't know.
16  Q. There were other individuals but they
17  weren't people who were known to you who you
18  recognized, correct?
19  A. Right now, no.
20  Q. So you now told me about every conversation
21  that you had with anybody from the City on
22  that day?
23  A. To the best of my ability. I'm sure there
24  were other conversations but it was a number

Page 113

1 of years ago and, you know, again the main
2 focus was getting heat into the building and
3 there were various conversations. I can't
4 tell you each and every single one of them.
5     MR. OHLSON: Could we have a word?
6     MR. CHERNETSKY: Sure.
7     (Recess.)
8     MR. CHERNETSKY: We're back on the
9 record after a short break and Mr. Smith was
10 telling us what he remembers about
11 conversations he had with Mr. Joyce on
12 December 27, 2000.
13 Q. Is there anything that you haven't told me
14    about yet that you want to tell me about
15    now?
16 A. Like I said, there were a lot of things
17    going on at the time and various
18    conversations, and my main focus was
19    obviously to get the furnace in there and a
20    new one installed and Mr. Joyce was just
21    very, I can't think of the exact word I want
22    to use, he was making remarks like "I'm
23    going to treat you just like I've treated
24    Cliff Davis."

Page 114

1 Q. Who's that?
2 A. Slumlord, and started making those type of
3    remarks, and "I'm going to treat you just
4    like I treated Cliff Davis," and I just --
5    my main goal and objective was just to be
6    compliant, get the furnace in, get the
7    people some heat, and that's all I wanted to
8    do.
9 Q. You knew Mr. Joyce before this day?
10 A. Yes.
11 Q. How long had you known him?
12 A. I've known Kevin Joyce for -- I mean, I
13    don't know him personally. I mean, I know
14    of him and he knows of me and we've had
15    dealings. I've known him for 15 years.
16 Q. Do you remember in what context you first
17    met him?
18 A. He was Regina Quinlan's law partner.
19 Q. When was that?
20 A. 1986.
21 Q. He was working with Judge Quinlan at the
22    time that she was your attorney in the case
23    against the City?
24 A. Yes.

Page 115

1 Q. Did he work on that case?
2 A. He was very much privy to it, yes. He was
3    privy to the litigation with the City and
4    was very cognizant of the litigation that I
5    had with the City and worked with Judge
6    Quinlan and was her law partner.
7 Q. Was he her partner or was he her associate,
8    do you know the difference between the two?
9 A. They shared space. I don't know what their
10    relationship was, but obviously their
11    relationship was very close and their
12    relationship was tight.
13 Q. He worked for her, is that your
14    understanding?
15 A. I believe he worked for her or they were
16    partners or they shared the same office
17    suite. Their offices were side by side and
18    they were very, very close.
19 Q. Well there's great disparity between the
20    things you're mentioning, and you may not
21    know that, but I just want to know if you
22    had an understanding --
23 A. Kevin Joyce without a doubt and clearly and
24    distinctly was aware of the litigation that

Page 116

1    I had with the City of Boston and Regina
2    Quinlan and Robert Consalvo who he also
3    knows very well.
4 Q. This was widely reported in the newspapers
5    and such at the time, right, that you won a
6    jury verdict against the City?
7 A. That's why Robert Consalvo's name was in
8    there because Mr. Joyce is obviously close
9    with Mr. Consalvo as well.
10 Q. Why is that? What's their relationship?
11    What's your understanding of their
12    relationship?
13 A. Their relationship is they worked together
14    years ago for a state senator by the name of
15    Joseph Timulty who was a developer who was
16    eventually, as we know he was indicted for
17    fraud, and they worked together,
18    Mr. Consalvo, Kevin Joyce -- and this was
19    obviously before my time but I am cognizant
20    of the fact that there's a relationship
21    between Quinlan, Joyce and Consalvo.
22 Q. When did you become aware of a relationship
23    between Quinlan and Consalvo?
24 A. I'm aware of the relationship between

29 (Pages 113 to 116)

Page 117

1    Consalvo and Joyce.
2  Q. So there's no relationship that you know of
3    between Quinlan and Consalvo?
4  A. Well, obviously my unlawful termination was
5    at the same law firm, and without a doubt
6    that doesn't --
7  Q. You told me you're not sure if Kevin Joyce
8    and Quinlan were in the same law firm or if
9    they were sharing office space, is that
10    right?
11 A. I don't want to split hairs over it to be
12    honest with you.
13 Q. Well, there's quite a difference.
14 A. Well, I don't want to split hairs but I do
15    want to make it perfectly clear that
16    obviously they were in business together or
17    they shared the same office space. They
18    were associates, they worked side by side
19    with each other, and Kevin Joyce was without
20    a doubt cognizant and aware of the
21    litigation between Lincoln Smith versus the
22    City of Boston and Robert Consalvo.
23 Q. A lot of people were aware of that
24    litigation, though, correct, it was no

Page 118

1    secret?
2  A. I don't know, you tell me.
3  Q. It was reported in the newspaper, wasn't it?
4  A. Probably by Mr. Dorsey.
5  Q. Well Mr. Dorsey wasn't working at ISD at the
6    time of your lawsuit with the City, was he?
7  A. I don't know.
8  Q. He's a pretty young man, isn't he?
9  A. I can't comment.
10 Q. Any other things about your personal
11    relationship with Mr. Joyce that you believe
12    would motivate wrongdoing on his part
13    against you?
14 A. With respect to the no heat and the
15    entourage of inspectors and the targeting of
16    me?
17 Q. Yes.
18 A. No, it is what it is.
19 Q. So let me make sure I understand. Your
20    belief is that the fact that you had been
21    the plaintiff in the lawsuit against the
22    City and won a jury verdict against the City
23    and Mr. Consalvo, who was an associate of
24    Mr. Joyce, you believe that that played some

Page 119

1    role in Mr. Joyce's carrying out his duties
2    as commissioner of ISD in the manner in
3    which he did, is that fair?
4  A. I can't answer that. Obviously it would
5    appear to be contemporaneous in nature.
6  Q. Well are you alleging that or not? I mean,
7    you've brought a lawsuit and you're here to
8    tell us the basis of your lawsuit.
9  A. Could you rephrase the question.
10 Q. Are you alleging that Mr. Joyce's execution
11    of his duties as ISD commissioner were
12    affected by his knowledge of your prior
13    lawsuit against the City and Mr. Consalvo?
14 A. In retaliation, yes.
15 Q. Any other basis on which you believe
16    Mr. Joyce was retaliating against you other
17    than your lawsuit against the City and
18    Mr. Consalvo?
19 A. Well it's obviously against the City with
20    respect to the worker's compensation matter.
21    As you're aware, Kevin Joyce, Commissioner
22    Joyce, was in fact a lawyer here in your
23    department, he was assistant corporation
24    counsel, and he was very well aware of the

Page 120

1    litigation that was going on.
2  Q. But I'm aware of litigation that you're
3    bringing against the City, do you think I'm
4    going to develop a vendetta against you now?
5  A. No, but the relationship of course is
6    somewhat different between Kevin Joyce and
7    Regina Quinlan and also Robert Consalvo with
8    respect to the nexus, if you will.
9  Q. I understand. So aside from Mr. Joyce's
10    knowledge of the lawsuit that you had
11    against Mr. Consalvo and the City, also you
12    believe that the fact that you had a dispute
13    with Judge Quinlan about her handling of
14    your worker's compensation matter, that
15    would be a second rationale for his
16    retaliation against you?
17 A. Yes.
18 Q. Now we have those two. Are there any other
19    bases on which you believe that Mr. Joyce
20    was motivated to retaliate against you?
21 A. Based on the fact that he was an attorney
22    here in corporation counsel's office and he
23    was aware at that particular time of the
24    litigation that was going on.

30 (Pages 117 to 120)

Page 121

1  Q. Why would that bother Mr. Joyce?
2  A. Because of his personal relationships with
3     the individuals.
4  Q. That's what we just said. Aside from those
5     two relationships, is there any other that
6     you haven't told me about?
7  A. Just the fact -- made reference to the fact
8     that he was going to treat me like Cliff
9     Davis and every other slumlord in the City
10    and one of the ten worst landlords in the
11    City, and made reference to being one of the
12    worst ten landlords in the City, and "We'll
13    see, we're going to get you," and words to
14    that effect.
15 Q. What was your understanding of the Cliff
16    Davis reference?
17 A. My understanding of the Cliff Davis issue,
18    and I don't know too much about Cliff Davis
19    to be honest with you, except what I too
20    read in the newspapers, that Mr. Davis was a
21    landlord who, it's my understanding, I've
22    never met him, he's a black gentleman who
23    owns apartment buildings that have been
24    known to be troublesome to Inspectional

Page 122

1     Services, and my interpretation at that time
2     and still remains today that we're going to
3     do to you exactly what we did to Cliff Davis
4     and put him out of business, and that's
5     effectively, it's my understanding only from
6     what I read in the newspapers, that that's
7     what they did, they drove him out of
8     business, and Kevin Joyce said to me "I'm
9     going to treat you just like Cliff Davis."
10 Q. Do you have any reason to believe that the
11    treatment Mr. Davis received was in anyway
12    different than what he deserved?
13 A. I can't comment on that.
14 Q. So when Mr. Joyce said he's going to treat
15    you like Cliff Davis, for all you know he's
16    going to enforce the law against you,
17    correct?
18 A. I just base that assessment on what I read
19    in the newspaper and nothing more.
20 Q. Is there anything else about December 27,
21    2000 that you want to tell me that you
22    haven't so far?
23 A. No.
24 Q. I have another document. Do you recognize

Page 123

1     that document? (Indicating.)
2  A. I do, yes.
3  Q. What do you recognize it as?
4  A. It's a Notice of Violation to 11 Newport
5     Street, Apartment No. 1, dated December 27,
6     2000.
7  Q. That's Ms. O'Shea's apartment?
8  A. It is.
9  Q. When do you recall receiving that?
10 A. I don't recall exactly when I received it.
11 Q. You did receive it though at some point?
12 A. Yes.
13 Q. Would you agree that this document, in the
14    violation section, lists 11 violations
15    related to Ms. O'Shea's apartment?
16 A. Yes.
17 Q. When you received this document, whenever
18    that was, did you take any action with
19    regard to these violations?
20 A. Yes.
21 Q. What was that?
22 A. I had a contractor to remedy the situation,
23    including, you know, washing the walls and
24    cleaning the walls of soot that was

Page 124

1     allegedly there as a result of the
2     malfunctioning of the furnace.
3  Q. Did you personally inspect the apartment
4     with regard to these violations?
5  A. I was there when the contractor was there
6     washing the walls, so I stopped by, yes.
7  Q. Are you aware of any of these 11 violations
8     which is in your judgment false?
9  A. It is what it is. The furnace had
10    malfunctioned and my understanding was as a
11    result of the malfunctioning furnace there
12    was some soot, referred to as a puffback of
13    some kind, and we were moving expeditiously
14    to remedy the situation, hired a contractor
15    and he went in and washed the walls.
16 Q. So you remedied these violations but they
17    are accurate as written?
18 A. It is what it is.
19 Q. Is that a yes or no?
20 A. Obviously it is what it is. If in fact the
21    furnace did malfunction, which it did, it
22    needed to be replaced, which eventually it
23    was. If this was the aftermath of the
24    situation I resolved it.

31 (Pages 121 to 124)

Page 125

1   Q. But you're not maintaining that these are
2       false?
3   A. No.
4   Q. I'd just like to ask you about -- this time
5       I do have one for you, George.
6       MR. OHLSON: Okay.
7   Q. Do you recognize this document, and it's a
8       two-page document? (Indicating.)
9   A. Yes, I do.
10  Q. When do you recall receiving this document?
11  A. Must have been December 28.
12  Q. Who was Ms. Fothergill?
13  A. She's the director of policy and planning
14      according to this letter.
15  Q. At least she was on December 28, 2000?
16  A. Yes.
17  Q. Do you know if she's still employed in that
18      capacity?
19  A. No, she's not.
20  Q. Is part of your allegations in this lawsuit
21      related to this document?
22  A. Yes.
23  Q. How so?
24  A. Well it was a document that was delivered to

Page 126

1       me by two constables, not one, on the
2       evening of December 28 at approximately 8:30
3       in the evening, and served with this, which
4       you don't have attached to it --
5   Q. I may have it right here. Is this what you
6       had in mind? (Indicating.)
7   A. Let me take a peek. I believe this was it.
8   Q. You started to describe it, so why don't you
9       finish that. Attached to it was?
10  A. Attached to it was -- this was of course a
11      Notice of Violation issued by the
12      Inspectional Services Department served by
13      constable on December 28.
14      MR. CHERNETSKY: We should probably
15  note for the record that this document that
16  I've put before you that you've just
17  described says on the top of it Exhibit A.
18  That's unrelated to this deposition, that's
19  a designation that your attorney has made in
20  another context, so just so we don't have
21  any confusion. We may as well go ahead and
22  mark it as an exhibit.
23      (Notice of Violation dated
24  12/27/2000 marked Exhibit No. 4 for

Page 127

1       Identification.)
2           (Notice of Violation from
3   Ms. Fothergill marked Exhibit No. 5 for
4   Identification.)
5           (Document marked Exhibit No. 6 for
6   Identification.)
7       MR. CHERNETSKY: Just so we're
8   clear, Exhibit 4 was December 27, 2000
9   Notice of Violation and we just marked as
10  No. 5 the Notice of Violation from
11  Ms. Fothergill which Mr. Smith has just
12  described for us. As well as No. 6, I'm not
13  sure how many pages, let's see, I believe
14  12 pages of -- you tell me what they are,
15  Exhibit 6.
16  A. Well what I'm reading here is based on this
17      Notice of Violation dated December 28 it
18      says on or about December 27 inspectors from
19      the Boston Inspectional Services Department
20      conducted an inspection of the above
21      referenced property and of course the above
22      referenced property is No. 6 Willis Street,
23      they have it listed as No. 6 Willis Street,
24      so there's obviously something wrong with

Page 128

1       that.
2   Q. That's Exhibit 5 that you're looking at,
3       right?
4   A. No -- I'm looking at Exhibit 5, it says "On
5       or about December inspectors from the Boston
6       Inspectional Services conducted an
7       inspection of the above referenced
8       property," meaning No. 6 Willis Street.
9   Q. You were deceived by that? You didn't know
10      what property they meant?
11  A. But there was no --
12  Q. But Exhibit 6 you told me was attached, and
13      on every page there it says 11 Newport
14      Street, were you really confused about --
15  A. No, we know it was obviously No. 11 Newport
16      Street.
17  Q. Okay. Go ahead. What is the significance
18      of the fact that two constables brought you
19      the document rather than one?
20  A. No significance, probably just working
21      together.
22  Q. Okay.
23  A. Of course the document speaks for itself and
24      it ends by saying "I recommend you refer

32 (Pages 125 to 128)

Page 129

1   this matter to your legal representative,
2   since legal is anticipated if the violations
3   are not corrected in a timely manner," and
4   it's signed by Julie Fothergill, Esquire,
5   attorney, obviously, for what I assumed was
6   the Boston Inspectional Services Department.
7   And attached to it was these lists of
8   violations that they said that they found on
9   or about December 27.
10  Q. Are you alleging anything in particular
11     about Ms. Fothergill's signature on this
12     document?
13  A. I can't speak for Ms. Fothergill.
14  Q. You've listed Ms. Fothergill as a witness in
15     this case, right?
16  A. Julie Fothergill will be a witness in this
17     case, yes.
18  Q. What is she going to testify to?
19  A. I don't know what she'll testify to.
20  Q. Well you have an obligation to identify to
21     us who your witnesses are and what they're
22     going to say.  Do you have an understanding
23     of what Julie Fothergill's testimony will
24     be?

Page 130

1   A. I have no idea what Ms. Fothergill's
2      testimony will be.
3   Q. Do you recall talking to detectives from the
4      Boston Police Department's Anti-Corruption
5      Unit regarding this case?
6   A. Yes.  With respect to the Fothergill issue,
7      I don't know, this was the official notice
8      that was given to me, and, you know,
9      obviously, I don't know if this is a legal
10     document or if it isn't a legal document.
11  Q. Is there something else about the document
12     that you found significant?
13  A. I guess it is what it is.
14         MR. OHLSON:  Do you mind if we go
15     off the record for a minute?
16         MR. CHERNETSKY:  No, not at all.
17     (Recess.)
18         MR. CHERNETSKY:  We're back on the
19     record after a short recess.
20  Q. Go ahead.  Do you have any amendments to
21     your previous answers after your break?
22  A. Obviously we were speaking about this
23     violation, this Notice of Violation dated
24     December 28.

Page 131

1   Q. Exhibit 5?
2   A. Correct, which came from the Inspectional
3      Services Department and it was signed by
4      Julie Fothergill, Esquire, and
5      Ms. Fothergill was Kevin Joyce's second in
6      command, if you will, and my understanding
7      is that this is not Julie Fothergill's
8      signature.
9   Q. Does the signature represent itself as Julie
10     Fothergill's signature when you look at it?
11  A. It is signed by somebody other than Julie
12     Fothergill.
13  Q. Is it correct that to the right of the
14     Esquire there are somebody's initials?
15  A. There appears to be the initials LT, which I
16     believe is Lisa Timberlake.
17  Q. What is your understanding of who Lisa
18     Timberlake is?
19  A. She's an assistant to Kevin Joyce.
20  Q. So would you agree that the document then
21     appears to be signed by Lisa Timberlake in
22     Julie Fothergill's name?
23  A. It appears that someone signed Julie
24     Fothergill's name, yes.

Page 132

1   Q. What is the significance of that to you?
2   A. The significance of that to me is I don't
3      know if this documentation is worth the
4      paper it's written on, if in fact someone
5      who is a non-attorney signing an attorney's
6      name in an official capacity has any real
7      meaning to it.
8   Q. So it's your belief that that's an unusual
9      thing, for somebody else to sign somebody's
10     name and initial with their initials?
11  A. It's very unusual.  It's my -- in that type
12     of capacity -- I mean, it's obviously a
13     legal notice that was served by a constable
14     and it's signed by an attorney with
15     attachments, and I know that Ms. Fothergill
16     didn't sign this document.
17  Q. The document represents that Ms. Fothergill
18     did not sign it, correct?
19  A. She did not sign that document, no.
20  Q. Is it your belief that the fact that
21     somebody else signed Ms. Fothergill's name
22     and initialed it somehow invalidates this
23     document?
24  A. It's a legal notice and it says, you know,

33 (Pages 129 to 132)

Page 133

1    obviously it is anticipated that violations
2    are not corrected in a timely manner that
3    the Inspectional Services Department will be
4    taking legal actions, that was what was
5    implied by me and it was signed by an
6    attorney, being Julie Fothergill, so is she
7    the one who's going to take the action being
8    an attorney.
9    Q. Have you discussed this document with
10   Ms. Fothergill?
11   A. Yes.
12   Q. What did she say about this document?
13   A. Ms. Fothergill has advised me she didn't
14   authorize anybody to sign her name to any
15   documentation coming out of Inspectional
16   Services Department.
17   Q. When did you have that conversation with
18   her?
19   A. Probably within the last couple of months.
20   Q. Did you know Ms. Fothergill prior to that
21   conversation?
22   A. Yes, I know Julie Fothergill.
23   Q. In what context did you know her?
24   A. I knew Julie Fothergill when she was a legal

Page 134

1    intern for the corporation counsel office,
2    and I also knew Ms. Fothergill as an
3    attorney as an employee of the City who,
4    again, worked for the City of Boston Law
5    Department and also worked for Kevin Joyce
6    down in the Inspectional Services
7    Department.
8    Q. Did Ms. Fothergill tell you that she
9    remembered this document or did she tell you
10   that in a general way she hadn't given
11   permission for her name?
12   A. Ms. Fothergill told me that No. 1, she
13   didn't sign this document, and No. 2, that
14   she didn't believe that what the City of
15   Boston, and namely Kevin Joyce in
16   particular, was doing to me was correct,
17   that Kevin Joyce had targeted her and said
18   "We're going to Lincoln Smith's house.
19   Let's get him."
20   Q. Anything else about that that you can recall
21   about your conversation with Ms. Fothergill?
22   A. Yes, that John Dorsey and others had
23   contacted the local media including Terry
24   Adler.

Page 135

1    Q. Who is Terry Adler?
2    A. Terry Adler is a reporter for Channel 7
3    News.
4    Q. Did Channel 7 News, as a result, air a
5    story?
6    A. Terry Adler and her news crew came to my
7    home at 6 Willis Street, reviewed the
8    documentation. Terry Adler advised me that
9    she had a conversation with Julie Fothergill
10   and others at the Inspectional Services
11   Department and it was relayed to me that
12   Terry Adler told me something doesn't add up
13   here.
14   Q. Is that a yes or a no as to whether Channel
15   7 News ran a story?
16   A. Channel 7 News decided not to run the story
17   based on documentation that was provided and
18   after a conversation with Julie Fothergill
19   stating in part that it was a setup by Kevin
20   Joyce and the Inspectional Services
21   Department.
22   Q. Any idea why Terry Adler didn't run a story
23   about the scandal of a setup of a landlord
24   by Inspectional Services?

Page 136

1    A. I can't comment on that.
2    Q. It's a better story, isn't it?
3    A. I think Judge Dear even did a better story
4    than that, and I'm sure the Chief Justice of
5    the Housing Court has clearly dictated that
6    Inspectional Services Department that
7    they're off their mark with respect to
8    landlords.
9    Q. How is it that you came to be in contact
10   with the Boston Police Department's
11   Anti-Corruption Unit?
12   A. Actually the Boston Police Department's
13   Anti-Corruption Unit contacted me.
14   Q. When did they do that?
15   A. I don't recall to be honest with you.
16   Q. Did they tell you how it was that they
17   became aware of this incident?
18   A. They did. They said that they became aware
19   of this issue at 11 Newport Street as a
20   result of the newsletter by the Small
21   Property Owner's Association.
22   Q. That's run by your friend Skip Schloming,
23   right?
24   A. My friend?

34 (Pages 133 to 136)

Page 137

1   Q. Yeah.
2   A. I don't know if he's a friend.  He's an
3       associate that I've gotten to know as a
4       result of this furnace issue.  I consider
5       him a friend now, yes, but I didn't know
6       Skip Schloming beforehand, no.
7   Q. Are you aware that the Anti-Corruption Unit
8       opened the investigation at
9       Mr. Schloming's --
10  A. Yes.
11  Q. When did you first meet Mr. Schloming?
12  A. I don't recall the exact date to be honest
13      with you.  I think it was as a result of a
14      newspaper article or something.  I don't
15      recall.
16  Q. Are you a member of the Small Property
17      Owner's Association?
18  A. I was a member of the Small Property Owner's
19      Association.  I don't know if I'm current to
20      be honest with you.
21  Q. When were you first involved with the
22      organization?
23  A. Probably 2000, 2001.
24  Q. To be clear, he's the head of that

Page 138

1       organization along with his wife?
2   A. His wife is, yes.
3   Q. He's at least heavily involved in the
4       organization, would you agree with that?
5   A. I believe his wife is the president of the
6       association and I believe Skip's role is
7       he's the editor of the newspaper that they
8       publish.
9   Q. You don't recall when you first met
10      Mr. Schloming?
11  A. I don't, to be honest with you, but it has
12      to be in 2000, somewhere around there.
13  Q. So it was before, at any rate, before these
14      incidents, particular incidents that we've
15      been discussing today?
16  A. I honestly don't recall.
17  Q. Mr. Schloming managed your properties for
18      you after your accident, is that right?
19  A. He did.  The accident of March 8?
20  Q. Right.
21  A. Yes, he did.
22  Q. Was there another accident that I don't know
23      about?
24  A. No, the March 8.  He in fact managed the

Page 139

1       property while I was in the hospital, yes.
2   Q. Both your Willis Street property and your
3       Newport Street property?
4   A. Yes.
5   Q. Are you familiar with the positions of the,
6       in the general way, that the Small Property
7       Owner's Association takes on landlord/tenant
8       issues?
9   A. I'm aware that it's a grassroots
10      organization that deals with small property
11      owners and issues and how it affects them,
12      yes.
13  Q. In general, do you find yourself to be in
14      agreement with positions that the
15      organization holds?
16  A. For the most part, yes.
17  Q. Do you agree that the sanitary code is too
18      stringent?
19  A. I don't know.  I can't comment on that to be
20      honest with you.  I'm not a student of the
21      sanitary code.
22  Q. Do you agree that lead paint poisoning is
23      not a real problem?
24  A. Again, I can't comment on that just due to

Page 140

1       the fact that I know there's a bunch of
2       different scientific studies out there that
3       lead down different roads, so I don't know
4       conclusively or scientifically what the end
5       result is.  Of course you read about it that
6       yes, in fact it is a problem, and I just
7       don't know enough about it to -- again, I'm
8       not a student of the state sanitary code.
9       I'm not a student of the lead paint law.
10  Q. Subsequent to your accident and
11      Mr. Schloming's involvement in managing your
12      properties, did you become involved with the
13      Small Property Owner's Association in an
14      active way, other than reading their
15      newsletter?
16  A. No.  You mean going to rallies or --
17  Q. Yeah.
18  A. Let's put it this way, I've never been to
19      one of their meetings.  I don't know where
20      they meet, except from what I read in the
21      newsletter I guess they meet at a VFW Hall.
22      I don't know how large a membership it is.
23      Like I said, I'm not actively there banging
24      a drum as a member.  In fact, I'm not even

35 (Pages 137 to 140)

Page 141

1   certain if my membership is current as we
2   speak.
3   Q. You haven't, to this day, become more
4     involved with them?
5   A. No.
6   Q. How is it that Mr. Schloming became involved
7     in managing your properties after you were
8     injured and unable to do that?
9   A. A nice guy. I mean that wholeheartedly. As
10    you're aware I was hurt badly and it was
11    touch and go for awhile, and Skip
12    Schloming came to Boston Medical Center and
13    he identified himself to my mother and my
14    sister and my girlfriend, and they didn't
15    have any idea who he was, and he said "I run
16    an organization called the Small Property
17    Owner's Association. I read about Lincoln
18    and his accident and I'm awful sorry for
19    your troubles and I know you have other
20    things on your mind," is what he said to my
21    family and I found out thereafter, "I know
22    you have other things on your mind." He
23    said "I know that Lincoln has issues with
24    Inspectional Services Department that need

Page 142

1   to be resolved."
2   Q. How did he know that?
3   A. He read about them in the paper.
4   Q. Did he know you at that point or when he
5     approached your family while you were laid
6     up was he also unknown to you then?
7   A. No, I knew of Skip. I may have met him
8     previous to that.
9   Q. You didn't have a friendship or a
10    relationship at that point?
11  A. No, but I knew Skip and we had spoken, but
12    there wasn't any real bond or real
13    friendship at that point in time.
14  Q. So Mr. Schloming approached you or your
15    family after he read about these issues with
16    ISD in December of 2000, he became aware of
17    them and then he approached your family?
18  A. It was all within a relatively, of course,
19    small timeframe here, we're talking months.
20    Obviously, I had these issues and, you know,
21    in December 2000. I got struck by the truck
22    on March 8, 2001.
23  Q. So it's less than three months later?
24  A. There was a lot of media attention going on.

Page 143

1   Like I said Terry Adler and Inspectional
2   Services, they were obviously marketing this
3   story, and when I got hit people didn't
4   know -- like I said, the homicide team had
5   responded. They didn't know what was going
6   to happen. And to Mr. Schloming's credit,
7   and I do give him a tremendous amount of
8   credit, he showed up at the hospital,
9   identified himself to my family and said
10  "Listen, these are some issues that Lincoln
11  is dealing with or has been dealing with and
12  I know that this is the furthest thing from
13  your mind, but if it's okay with you I'll
14  take over and manage until some point in
15  time that Lincoln can get up and running
16  again if he ever does." No one knew at that
17  time if I would ever cognitively be able to
18  get back into the ballgame, and I admire --
19  because I didn't really know him. For some
20  guy to come to the plate like that and to
21  put his energies and his time and to
22  physically go to Boston Medical Center, I
23  respect him. I respect him.
24  Q. Mr. Schloming had not, if I understand you

Page 144

1   correctly, been involved with any of your
2   properties prior to your accident?
3   A. Physically involved, no.
4   Q. Mentally involved?
5   A. No. I mean, he obviously -- no. To my
6     understanding when I was sick here he was on
7     Newport Street. I don't know that for a
8     fact but that's my understanding.
9   Q. At the time of all the incidents that we
10    discussed today with no heat and all the
11    other issues, did Mr. Schloming have any
12    involvement with that?
13  A. No.
14  Q. You had not contacted Mr. Schloming for
15    assistance in dealing with any of your
16    problems with ISD prior to your accident?
17  A. Not that I recall.
18  Q. You think you may have but you forgot about
19    it?
20  A. Like I said, I had conversations with Skip
21    Schloming. I knew who he was. I knew the
22    association or the group was there. I did
23    communicate with him, but I don't recall at
24    this time as to what the subject matter was

36 (Pages 141 to 144)

Page 145

1    on or why.
2  Q. Like you said, it was a pretty short time
3    between these problems and your accident.
4    Do you know what your last contact with
5    Mr. Schloming, what your last contact with
6    Mr. Schloming was?
7  A. I don't, to be honest with you.
8  Q. So what sorts of things did he do for you in
9    the course of managing your property?
10 A. I don't know.
11 Q. You were seriously hurt, correct?
12 A. Yes.
13 Q. Were you in the hospital for some lengthy
14   period?
15 A. Yes.
16 Q. How long was that?
17 A. I believe I was at Boston Medical Center for
18   close to a month and then I went to the
19   acute brain injury section at Braintree
20   Rehab. for a month.
21 Q. How are you doing now?
22 A. Good, I hope.
23 Q. Basically, what kind of injuries did you
24   have?

Page 146

1  A. They were extensive. I have total facial
2    reconstruction. I have plates in my hips.
3    My legs had to be rebuilt. I had to learn
4    to do everything all over again.
5  Q. So obviously you were unable to carry out
6    your normal, not only your landlord duties
7    but all your daily activities and such, is
8    that right?
9  A. I extensively rehabilitated for about
10   18 months. I rehabilitated for 18 months in
11   total.
12 Q. So Mr. Schloming became involved with the
13   litigation involving Ms. Williams?
14 A. I believe he did, yes.
15 Q. What did he do in that regard for you?
16 A. I don't know.
17 Q. He's not an attorney, is he?
18 A. He's not an attorney. He is a licensed
19   builder, though.
20 Q. In what capacity did he assist you in that
21   litigation?
22 A. It's my understanding he kind of oversaw
23   some things, and being a licensed builder, I
24   guess he made sure that everything was to

Page 147

1    code that needed to be to code based on, I
2    think he was just trying to make sure
3    everything was resolved so I had one less
4    problem and I could just really focus on my
5    health and my family could focus on my
6    recovery, and I think his intentions were
7    very good, and I never paid him anything for
8    it, nor did he ever ask for payment.
9  Q. You were grateful for the assistance at the
10   difficult time?
11 A. At that very difficult time, and I guess I
12   was very humbled by the fact that when
13   you're down some people do come to the table
14   and help, and I was grateful.
15 Q. Was it Mr. Schloming's idea to initiate this
16   lawsuit against the City?
17 A. No.
18 Q. Do you recall writing Mr. Schloming and
19   telling him that you were grateful for his
20   assistance while you were injured and that
21   as soon as you were back on your feet you'd
22   join him and SPOA in fighting the battle
23   against corruption at ISD?
24 A. No, I don't recall that. I think I may have

Page 148

1    said that when I was back up and running,
2    landlords should be treated fairly and with
3    respect and dignity.
4  Q. Do you remember writing to him and saying
5    "Again, I sincerely appreciate all your
6    help, and you can rest assured that when I
7    am totally back on my feet I will be side by
8    side with you and SPOA to expose and correct
9    the injustice in the ISD system"?
10 A. Yes.
11 Q. We've had some conversation --
12 A. May I see that letter?
13 Q. Your attorney gave me the letter. If he
14   wants to show it to you later he can show it
15   to you.
16 A. Okay.
17 Q. We've had some conversation about various
18   media outlets and stories that were out
19   there. Why don't you tell me, what media
20   attention can you recall related to the
21   events of December 2000?
22 A. Well I'm aware that John Dorsey, after
23   collaborating with Kevin Joyce, had marketed
24   the no heat situation to Terry Adler. I

37 (Pages 145 to 148)

Page 149

1    know that for a fact.
2  Q.  We discussed that already.
3  A.  Yeah.  I also know that they marketed it to
4    other media outlets, as well, including the
5    Boston Globe and the Boston Herald.
6  Q.  Did they run articles, do you know?
7  A.  I believe the Boston Globe did.  In fact, I
8    know the Boston Globe did run an article
9    sometime between Christmas and New Year's.
10  Q.  Tell me if this looks like to you the
11    article that you were thinking of.
12    (Indicating.)
13  A.  Yes.
14  Q.  Why don't you take a moment, maybe you're
15    very familiar with it, but if you would like
16    to take a moment to read it over or just
17    refamiliarize yourself with it?
18        (Boston Globe article dated
19    December 29, 2000 marked Exhibit No. 7 for
20    Identification.)
21  Q.  Do you know who Amber Bollman is?
22  A.  I do know who Amber Bollman is.
23  Q.  She spoke to you before writing this
24    article, didn't she?

Page 150

1  A.  She did, yes.
2  Q.  Would you agree that it appears that she
3    also spoke to Ms. O'Shea?
4  A.  Yes.
5  Q.  There are quotes in here from Ms. O'Shea?
6  A.  There is, yes.
7  Q.  Would you agree that those quotes are at
8    odds with her representation to you that
9    everything was okay in her apartment?
10  A.  Yes.  I believe Amber Bollman at the time
11    was a student writer.  I don't know if she
12    had the skill level, if you will, to make
13    proper inquiries.
14  Q.  Amber Bollman doesn't have anything against
15    you?
16  A.  No.
17  Q.  One thing, the reference to Deborah O'Neil.
18    Is that part of your claim against Kevin
19    Joyce and the City today that there's animas
20    against you, as it says here, because of
21    your relationship with Deborah O'Neil?
22  A.  What that says is, with respect to the
23    unlawful termination, that stems back to
24    that time just for clarity purposes.

Page 151

1  Q.  That's why I'm asking.
2  A.  It was regarding the unlawful termination.
3  Q.  So part of your allegations in that lawsuit
4    was that one motivation for your wrongful
5    termination had to do with your relationship
6    with Ms. O'Neil?
7  A.  That's correct.
8  Q.  You're not alleging that that is an element
9    of this case, other than retaliation for
10    your lawsuit?
11  A.  No, it's an ongoing issue.
12  Q.  Is there something improper in your mind
13    about Mr. Dorsey speaking to the media?
14  A.  You're going to have to rephrase that
15    question.
16  Q.  Well, Mr. Dorsey is the ISD spokesman,
17    correct?
18  A.  It's my understanding he's a contractor,
19    he's a contracted employee to deal with
20    media events, yes.
21  Q.  When Amber Bollman contacted you, you talked
22    to her, right?
23  A.  Yes.
24  Q.  When Amber Bollman contacted Ms. O'Shea she

Page 152

1    talked to her it appears, correct?
2  A.  It appears she talked to Tom Menino, the
3    mayor, also quoted as saying --
4  Q.  But I'm asking you now about Ms. O'Shea, it
5    appears that Amber Bollman contacted Ms.
6    O'Shea and she talked to her?
7  A.  If you look at the article in its entirety
8    with respect to quotes, obviously she must
9    have spoken to the mayor after the mayor
10    spoke to Kevin Joyce.
11  Q.  My question is, what is it that you find
12    inappropriate about the fact that Ms.
13    Bollman also spoke to officials at the City
14    in the course of writing her article?
15  A.  Well, I feel that they -- obviously, John
16    Dorsey, that's his job to create media
17    events to make people look good at someone
18    else's expense.
19  Q.  What information do you have that leads you
20    to that conclusion?
21  A.  He was the spokesperson and he was the
22    contract employee, and the intent of the
23    contract at that time was to be his public
24    relations person, that's my understanding of

Page 153

1    it.
2    Q. Tell me what in this article is false.
3    A. The whole article just about. Obviously --
4       I shouldn't say the whole article. I'd have
5       to go paragraph by paragraph. I mean, if
6       you want to do that I'll be willing to do
7       that.
8    Q. I just want you to tell me anything that you
9       see in here that's false?
10   A. Well obviously I bought space heaters, I
11      wanted to rectify the problem as quickly as
12      possible. Obviously I take pride in my name
13      and my work, and when there's certain quotes
14      by certain --
15   Q. Give me an example of that.
16   A. I do say this respectfully with respect to
17      the mayor, and I mean this is
18      unconscionable. How can you let a person
19      stay without heat for five days? It's even
20      worse because it's a public official,
21      someone who deals with public policy.
22      Obviously I'm troubled by that because I did
23      make a conscientious effort. I called the
24      mayor's 24-hour service the night of the

Page 154

1    incident to try to get access. I'm sure the
2    mayor wasn't given the total and truthful
3    story by Kevin Joyce and John Dorsey.
4    Q. So I think you said twice now that your
5       belief was that the mayor was given a false
6       impression of the events and that's the
7       source of that statement?
8    A. That and obviously based on what John Dorsey
9       and Kevin Joyce marketed Bollman.
10   Q. Do you have any information supporting your
11      conclusion that John Dorsey marketed
12      information to Amber Bollman?
13   A. Yes.
14   Q. What is that?
15   A. From conversations I've had with Julie
16      Fothergill and also with a conversation I
17      had with Terry Adler at Channel 7.
18   Q. Terry Adler didn't know what conversations
19      Mr. Dorsey had with Amber Bollman, did she?
20      She told you about her own experience with
21      Mr. Dorsey?
22   A. No, but it was the same story that was
23      marketed to all of the media outlets.
24   Q. So Ms. Adler told you her story about

Page 155

1    Mr. Dorsey and her report, you're
2    extrapolating that to Ms. Bollman on that
3    basis, but you don't know what Mr. Dorsey
4    did with regard to Ms. Bollman, do you?
5    A. Yes, it's my contention and my belief based
6       on conversations that I had with Julie
7       Fothergill and also with Terry Adler, at
8       that point in time, that John Dorsey
9       marketed the story on behalf of Kevin Joyce
10      and collaborating with Kevin Joyce to make
11      me look like a bad policy person, if you
12      will, and I'm troubled by that.
13   Q. Any other sources of information aside from
14      Ms. Fothergill and Ms. Adler relating to
15      Mr. Dorsey's relation with Amber Bollman?
16   A. No.
17   Q. Incidently, you've listed the mayor as a
18      witness in this case, is that related to
19      this quotation?
20   A. Obviously the mayor is quoted as saying --
21      it is what it is.
22   Q. Is there any other information that you
23      believe the mayor possesses about any of the
24      events that we discussed today or any

Page 156

1    involvement that he had in any of these
2    events that you're aware of?
3    A. I can't speak for the mayor, but I am aware
4       that the mayor has a very, very close
5       relationship with Kevin Joyce and Robert
6       Consalvo.
7    Q. Focus on the question. The question is, are
8       you aware of any involvement the mayor has
9       with your case aside from this quotation?
10   A. I can't comment, I don't know.
11   Q. So the answer is no?
12   A. I don't know.
13   Q. The only basis on which the mayor has been
14      listed as a witness in this case is the fact
15      that he's quoted in this article, is that
16      correct?
17   A. He was obviously aware of the problem on
18      Newport Street based on a conversation he
19      had with Kevin Joyce and Kevin Joyce's
20      relationship with Robert Consalvo.
21   Q. What other facts cited here in this article
22      are false?
23   A. John Dorsey's quote "If you're gonna make a
24      business out of providing basic services

39 (Pages 153 to 156)

Page 157

1    such as housing, it's not something you can
2    do at your own convenience, Dorsey said,
3    it's a full-time commitment and something
4    that should not be taken lightly."
5  Q. You don't agree with that statement?  You're
6    a landlord, don't you agree with what he
7    says there?
8  A. I agree with the fact that I don't take
9    things lightly, and he's obviously implying
10   that after reading the article in its
11   entirety, he's implying that I'm something
12   other than that, that I don't take it
13   seriously and that I do provide housing for
14   people and that I do take it lightly, and
15   obviously I don't agree with Mr. Dorsey's
16   assessment when the article is read in its
17   entirety.
18  Q. Any other particular facts in here that you
19    take issue with?
20  A. Again, with Mr. Dorsey, he states that
21    "Smith waited far too long before ordering
22    and installing a new furnace."  Obviously I
23    thought I was very timely.
24  Q. Each of these things that you've listed,

Page 158

1    including the mayor's statement and the two
2    statements by Mr. Dorsey, they're not
3    factual statements, are they, they're
4    opinions, do you agree with that?
5  A. They're opinions in their official capacity.
6  Q. Anything of a factual nature in the article
7    that's incorrect?  Anything else?
8  A. Again, we can go paragraph by paragraph if
9    you want to start in the beginning and I'd
10   be more than happy to do that with you.
11  Q. I'm not trying to be difficult, but you
12   understand that you've brought a lawsuit in
13   which you've alleged libel, so it's an
14   element of your case as to what is false in
15   this case --
16      MR. OHLSON:  If I can help, I think
17   it would be best for clarification to go
18   paragraph by paragraph, because you're
19   asking the question and I think that will
20   give the best answer.
21  A. That's why I had suggested when you read the
22   article in its whole, in its entirety, one
23   reasonably could conclude that I didn't do
24   the proper thing here.

Page 159

1  Q. I understand completely the point that
2    you're making.  I just need you to, in order
3    to understand the nature of your claim, I
4    need to hear from you exactly what it is
5    that you take issue with in the article.  We
6    need to make a catalog of it in order to
7    understand your claims.  We can't resolve
8    your claims until we understand.
9  A. I understand, and I respect your position as
10   well.
11  Q. Okay.
12  A. Paragraph 1.  Your question.
13  Q. I guess we'll read it.  "The City Counsel's
14   chief research assistant, Lincoln Smith,
15   left his 73-year-old tenant stranded without
16   heat for five days over the icy holiday
17   weekend, according to the City's
18   Inspectional Services Department."  You
19   agree that's your job and that that's your
20   job title, right?  Are you the chief
21   research assistant for the City Counsel or
22   were you at that time?
23  A. I am the deputy research assistant.
24  Q. But that inaccuracy is not the basis for

Page 160

1    your libel complaint, correct?
2  A. No, but yet inaccurate.
3  Q. Was Ms. O'Shea without heat for five days
4    over the holiday weekend?
5  A. Yes.
6  Q. So I take it that you're disagreeing with
7    the first paragraph would be that you left
8    her stranded without heat, correct?
9  A. I didn't leave her stranded.  I tried to
10   mitigate and provide space heaters over
11   Christmas for her.
12  Q. So you take issue with the characterization
13   by the Inspectional Services Department in
14   that paragraph that you left her stranded?
15  A. Inspectional Services Department said I left
16   her stranded.  We know that's not true.
17  Q. The next paragraph is a quotation or
18   partially a quotation.  "'My Christmas was
19   horrible,' said Elizabeth O'Shea, who has
20   lived in Smith's triple-decker for three
21   years".  Did she live in your apartment for
22   three years?
23  A. I don't believe so, no.  I'd have to look
24   but I don't believe it was three years.

40 (Pages 157 to 160)

Page 161

1  Q.  You agree that they had spoken to
2      Ms. O'Shea, correct?  You agree that it
3      appears that Ms. Bollman spoke to Ms. O'Shea
4      directly?
5  A.  Yes, or someone identifying themself as
6      Mrs. O'Shea.
7  Q.  Okay.
8  A.  I can't affirm that one way or the other
9      because there were multiple people living.
10 Q.  Do you have any reason to believe, any facts
11     of which you have knowledge to lead you to
12     believe that it was an imposter who spoke to
13     Ms. Bollman?
14 A.  I wouldn't characterize it as an imposter,
15     but it's my belief that someone in
16     Mrs. O'Shea's household called Inspectional
17     Services.  I'm not certain whether it was
18     Mrs. O'Shea, it could have been her
19     daughter.
20 Q.  Well she says here it's a 73-year-old woman,
21     so Ms. Bollman at least spoke to somebody
22     who at least looked like a 73-year-old
23     woman, right?
24 A.  I don't know if Ms. Bollman saw her.  I

Page 162

1      would assume that Ms. Bollman spoke to her
2      on the telephone.  I can't confirm that she
3      went to 11 Newport Street and saw
4      Mrs. O'Shea.  Like myself, I'm certain she
5      probably called.
6  Q.  Why don't you tell me anything else in that
7      second paragraph that you think is false.  I
8      think what we need to do here is go
9      paragraph by paragraph and hear from
10     Mr. Smith false statements that he
11     attributes to the City, because would you
12     agree that some of this appears to be --
13     there appears to be inaccuracies that appear
14     not to be based on information from the
15     City?
16 A.  I think this article was generated by the
17     City.
18 Q.  The second paragraph is all attributed to
19     Ms. O'Shea --
20     MR. OHLSON:  I think what we want
21     to do here is exactly what you said.  Your
22     question is, is it false statements or false
23     information from the City, then we can go
24     paragraph by paragraph and pick out those.

Page 163

1      If there's none we can move on to the next
2      paragraph.
3  Q.  Is that fair, Mr. Smith?
4  A.  Whatever.
5  Q.  We'll take it as a given that the general
6      pattern of the article is upsetting to you
7      and you don't agree with it.  Okay?  But
8      what we need to do is figure out the
9      particular false statements by City
10     officials, agreed?
11 A.  Agreed.
12 Q.  I'm not going to take your silence on the
13     general tenure of the article as you're
14     agreeing with it.
15 A.  Agreed in part, due in part to the fact that
16     this article was in fact generated by John
17     Dorsey on behalf of Kevin Joyce at the
18     Inspectional Services Department, that's how
19     that article was written.
20 Q.  I understand that that's part of your
21     allegation.  Are we happy with the first two
22     photographs then?
23 A.  Yes.
24 Q.  The third paragraph says "City officials say

Page 164

1      Smith ignored the problem until they
2      threatened to condemn his building."  Go
3      ahead and tell me what you think about that.
4  A.  Obviously I did not agree with the problem,
5      in fact I was right on top of it that
6      afternoon.
7  Q.  For the reasons we've already discussed?
8  A.  Right.
9  Q.  Did somebody threaten to condemn the
10     building?
11 A.  Yeah, Kevin Joyce threatened.  He said "I'm
12     going to close this building down."
13 Q.  The reference to Cliff Davis earlier?
14 A.  That was in addition to the Cliff Davis.  He
15     said "I'm going to shut this building down.
16     I'm going to condemn it."
17 Q.  The next paragraph is attributed to you, do
18     we agree with that?
19     MR. OHLSON:  So you're not asking
20     questions about that paragraph?
21     MR. CHERNETSKY:  I don't think --
22     if there's inaccuracies in there I don't
23     think it would fall within the guidelines we
24     just created of being from the City.  Right?

41 (Pages 161 to 164)

Page 165

1      MR. OHLSON: Okay.
2  A. I don't agree with that in total, no.
3      MR. OHLSON: Well I guess if we can
4      go off the record for a second.
5      (Discussion off the record.)
6  Q. The paragraph beginning "Smith says he
7      offered" --
8  A. I did offer --
9  Q. You don't need to tell me about everything
10     in there, but just tell me is there
11     something in there that's false that comes
12     from the City?
13 A. "City inspector said it had not been cleaned
14     in two years."
15 Q. Okay. Next paragraph?
16 A. O'Shea did refuse the space heaters.
17 Q. Don't tell me what you agree with. Just
18     tell me is there anything in that paragraph
19     that is false that comes from the City and
20     if not we'll just move on without discussing
21     it.
22 A. No, that's fine.
23 Q. The next one we've already discussed, the
24     paragraph "This is unconscionably wrong"?

Page 166

1  A. Yeah.
2  Q. Can we move forward from that one because
3      we've already discussed it?
4  A. Yeah.
5  Q. "Smith, who in 1998," how about that one?
6  A. I was cited as one of the worst ten
7      landlords. That's wrong. I was cited.
8  Q. All it says is that you were cited as one,
9      so whether you were or you weren't, that's
10     accurate, right?
11 A. Okay.
12 Q. Next paragraph that starts "In 1990"?
13 A. It's true.
14 Q. Next paragraph, "Smith says"?
15 A. True.
16 Q. The next paragraph is entirely a quotation
17     from you so we can skip that one, I assume,
18     correct?
19 A. Right.
20 Q. The same for the next one, "Am I being
21     targeted"?
22 A. Yes.
23 Q. The next one we discussed already. Do you
24     have anything to add to that paragraph?

Page 167

1  A. Just that John Dorsey said that I waited too
2      long and obviously that was not true, that's
3      not accurate.
4  Q. "By Wednesday," that paragraph, anything
5      there?
6  A. I can't comment on that. I don't know what
7      records the Inspectional Services Department
8      keeps so I can't comment.
9  Q. So there's nothing in there that you know to
10     be false?
11 A. No.
12 Q. The next paragraph we've already discussed?
13 A. "If you're going to make a business," of
14     John Dorsey, again which is totally false.
15 Q. Next paragraph "While she waited"?
16 A. I can't comment on that.
17 Q. You don't know?
18 A. I don't know. I don't even believe
19     Mrs. O'Shea was there at that apartment at
20     that particular time. I was told that she
21     went to stay with her daughter.
22 Q. Do you have any reason to believe that that
23     information came from the City?
24 A. I can't comment.

Page 168

1  Q. Next paragraph, "At times," anything in
2      there that's false that came from the City?
3  A. Can't comment.
4  Q. You've got to tell me.
5  A. I don't know. I can't speak for that
6      statement.
7  Q. You don't see anything now that you know to
8      be false that came from the City?
9  A. No.
10 Q. Next paragraph is just a quotation from
11     Ms. O'Shea?
12 A. Yeah.
13 Q. Next paragraph "Smith says"? I guess the
14     next two paragraphs are both quotations from
15     you, we can skip those?
16 A. "Smith says he faced off against the
17     stubborn ISD throughout the entire episode."
18     I did. I was trying to be compliant.
19 Q. We don't need to discuss the ones you agree
20     with, just tell me the ones that you don't.
21     The next one, anything you see in there? I
22     just want to be cognizant of your time
23     concerns and such.
24 A. Yes and no. Obviously it says "Smith says

42 (Pages 165 to 168)

Page 169

1  he called the City's building inspector and
2  the mayor's office from Cape Cod on
3  Saturday." I was not on the Cape, I was in
4  Canton.
5  Q. If that was false it was because of an error
6  by the Globe, right, and not because the
7  City told Amber Bollman that you were on
8  Cape Cod?
9  A. It's my understanding that Stephen O'Donnell
10  may have told Kevin Joyce I was on Cape Cod.
11  Q. But this is a quotation attributed to you,
12  "Smith said he called City building
13  inspectors and the mayor's office from Cape
14  Cod"?
15  A. They said, Inspectional Services.
16  Q. It doesn't say --
17  A. I was in Canton.
18  Q. We'll agree that you don't agree that you
19  were on Cape Cod?
20  A. It says ISD officials refused to help, which
21  they did. I called on Saturday evening and
22  he was at Hanover Mall --
23  Q. You agree with me that there's nothing in
24  that paragraph that's not attributed to you?

Page 170

1  A. Right.
2  Q. Okay. Next one, anything in there?
3  A. That's true.
4  Q. "According to Smith," next paragraph?
5  A. That's true.
6  Q. Next paragraph, "Smith who also owns"?
7  A. That's true.
8  Q. "In 1997"?
9  A. That's true.
10  Q. That's something that we haven't talked
11  about, is that additional litigation in
12  which you were involved, or what's that all
13  about?
14  A. It was alleged that by, again, people within
15  this administration, that I was in violation
16  of the City residency requirement, and again
17  a retaliatory act once I was re-employed,
18  and I ended up in a three-day hearing here
19  before the Compliance Commission.
20  Q. Who brought that?
21  A. The City Personnel Department.
22  Q. It was a formal hearing?
23  A. It was a formal hearing. It was brought by
24  the City Personnel Department, Richard

Page 171

1  Driscoll, who was sitting on the Commission
2  at the time in personnel, and of course
3  Robert Consalvo was the personnel director,
4  so I think enough said in that regard.
5  Q. So that's another proceeding that you hadn't
6  told us about before. Are there any other
7  litigations or proceedings of any kind out
8  there that you haven't told us about before?
9  A. No. That was not a court proceeding it was
10  an administration.
11  Q. I understand. Anything like that that you
12  might not have thought I was asking you
13  about before that you haven't told me about?
14  A. No.
15  Q. There's just one left in this article then,
16  "In 1998 he was cited"?
17  A. That's false.
18  Q. What's false in there?
19  A. "Appeared on a prior list of 48 landlords
20  with outstanding warrants." There was an
21  issue in 1998, I don't remember all of the
22  particulars to be quite honest with you, and
23  I believe, again just downloading here for a
24  minute, if my memory serves me correct, my

Page 172

1  name did appear on a list that was
2  generated --
3  Q. Okay. Were you cited for a maintenance
4  violation in 1998?
5  A. Probably.
6  Q. Did you fail to show up at a trial in
7  Housing Court that year?
8  A. I was never given notice.
9  Q. There was a trial and you didn't come to it?
10  A. There was never a trial. I was never given
11  a notice.
12  Q. Separate questions. Whether you were given
13  notice or not, was there a trial or --
14  A. No.
15  Q. -- proceeding of some kind at which you did
16  not appear?
17  A. Does it say there was a trial?
18  Q. Okay. Fair enough. Whether you were there
19  or not and whatever reason you weren't
20  there, was there a trial in Housing Court
21  for which you did not appear?
22  A. There was not a trial in Housing Court in
23  which I did not appear.
24  Q. What was there?

43 (Pages 169 to 172)

Page 173

1  A. I don't know.
2  Q. Is Housing Court across from City Hall at
3     this time?
4  A. Yes, it was.
5  Q. So is the only issue that you have in that
6     paragraph the use of the word "trial"
7     instead of "proceeding" or something like
8     that?
9  A. There was no trial. Yes, that's correct.
10 Q. The reason we got into this article was I
11    asked you what media publications there
12    were. You told me about Terry Adler at
13    Channel 7 and this article in the Globe, are
14    there any others?
15 A. There were other articles written in Small
16    Property Owners Newsletter that were
17    written.
18 Q. Slanderous article in Small Property Owners?
19 A. No.
20 Q. I'm only interested in articles that are
21    part of your libel or slander.
22 A. No.
23 Q. Are there any other articles aside from the
24    Boston Globe article?

Page 174

1  A. There may be a Boston Herald article
2     somewhere.
3        MR. OHLSON: Just a question as to
4     the characterization of the question. We
5     can go off the record.
6        MR. CHERNETSKY: Well stay on the
7     record.
8        MR. OHLSON: That's a Boston Globe
9     article, the second one.
10       MR. CHERNETSKY: Yeah.
11       THE WITNESS: That's a Herald
12    article that contributes to the fact that --
13 Q. This article is about your injury, right?
14 A. Yeah, it references the fact.
15 Q. I have two articles here, one is from the
16    Boston Herald and it's entitled "City
17    counsel worker seriously hurt in hit and
18    run," March 10, 2001, and the other looks
19    like the Globe to me, I don't actually see
20    that anywhere, "City aid no hot water
21    because tenant is not". Go ahead, either
22    one of those contain slanderous statements
23    related to this case?
24       MR. OHLSON: You can answer if you

Page 175

1     remember.
2  A. Again, I think it's just a continuation of
3     the nucleus, if you will, that it just is
4     ongoing, slanderous remarks that have been
5     written about me and by Inspectional
6     Services.
7  Q. Your complaint in this case mentions
8     December 27, 2000 and the no heat complaint
9     and so forth?
10 A. Right.
11 Q. It doesn't go on to talk about other issues
12    which arose with Palmira Williams. Are
13    those, this hot water being an example, are
14    those incidents part of your lawsuit or are
15    those just things that happened afterwards
16    that are not part of the lawsuit?
17 A. Well, my understanding of the original
18    complaint that was filed dealt specifically
19    with the furnace and my ability to install
20    the furnace, but as a result of Kevin
21    Joyce's actions and John Dorsey acting in
22    his behalf as well, of course other things
23    stemmed from that incident on or about
24    December 23.

Page 176

1  Q. You understand that you haven't alleged that
2     previously, correct?
3  A. Well, I understand you, and for the record I
4     want to make it perfectly clear that
5     obviously there's been a set of events that
6     developed from the original event of
7     December 23 regarding Kevin Joyce and his
8     entourage of Inspectional Services employees
9     that developed into other issues here, and
10    it's very troublesome to me obviously and
11    one would -- I guess one would be naive to
12    think that these issues did not stem from
13    Kevin Joyce's personal visit to the
14    property.
15 Q. Are your slander and libel claims related to
16    events in December of 2000 or do they also
17    include media coverage of subsequent events
18    which we haven't discussed today?
19 A. Again, I think there's a direct linkage, if
20    you will, to the original event of
21    December 23.
22 Q. So if I understand you, is your objection to
23    characterizations of the December 2000
24    events which occur in these articles, even

44 (Pages 173 to 176)

Page 177

1 though the articles on their face are not
2 about those events, or are you including
3 these subsequent events with Ms. Williams in
4 your lawsuit as themselves being causes of
5 action?
6 A. In your answer to our interrogatories, if my
7 memory serves me correct, you have
8 Ms. Williams listed as a witness.
9 Q. Well, we've discussed an incident, haven't
10 we, in December 2000 involving
11 Ms. Williams's apartment on December 20,
12 right?
13 A. We have.
14 Q. But there were further incidents in the year
15 2001 with Ms. Williams which respond to
16 their own litigation, I understand, in which
17 do not relate directly to any events that we
18 discussed today, which were not articulated
19 in your lawsuit originally as themselves
20 being the sources of causes of action
21 against the City?
22 A. Correct.
23 Q. Is that still the case today, whether
24 they're relevant or not for the media

Page 178

1 claims, do you agree that what happened with
2 Ms. Williams later in 2001 is not the basis
3 of your civil rights lawsuit?
4 A. Yes, that's my understanding. I think to be
5 clear about it I think everything stems from
6 the December 23 events.
7 Q. I understand that in covering these later
8 events they may have made reference to other
9 events, and to the extent that is part of
10 your libel and slander claim, let's take a
11 look at that. So I'm showing you, this is
12 another Boston Globe article, and I think
13 we'll get this done a lot faster this time.
14 Let's take the same approach with this one
15 that we did with the previous one.
16 (Boston Globe article entitled
17 "City Aide in Hot Water" marked Exhibit
18 No. 8 for Identification.)
19 Q. Go ahead.
20 A. Paragraph 1, that's false.
21 Q. That's not related to December 27, right?
22 What we're looking for is false statements
23 related to the subject of this lawsuit,
24 right? You agree?

Page 179

1 MR. OHLSON: What's your question?
2 Q. Well, what I think we agreed a moment ago
3 that the incidents with the hot water are
4 not a part of the civil rights liability
5 theory in this lawsuit, but there may be
6 items related to that, in coverage of those
7 events, which are related to the slander
8 charges and so forth, right?
9 A. That extended out from the original incident
10 on December 23.
11 Q. So what I'm getting at is, whether you were
12 arraigned on charges on March 9 or not --
13 A. Well obviously that's not the case because
14 we all know on March 8 I was hit by the
15 truck.
16 Q. Let's, rather than parse it out, go ahead
17 and tell me anything in this article that
18 you think is false that came from the City.
19 So you don't agree that you were going to be
20 arraigned on March 9?
21 A. No, I was not going to be arraigned on
22 March 9, and subsequent, obviously, we know
23 I was hit by the truck on March 8.
24 Q. Do you incidently know the date of this

Page 180

1 article, when it ran? This is the copy that
2 you gave us but I don't see a date on it.
3 MR. OHLSON: It might be in the
4 answers to interrogatories.
5 Q. February 24, 2001 is the answer you gave
6 previously, does that sound right to you?
7 A. Possibly.
8 Q. So you weren't going to be arraigned?
9 A. To the best of my ability, no.
10 Q. Do you know that to be false?
11 A. Again, to the best of my ability, I don't
12 have any recall.
13 Q. You don't have any information?
14 A. No.
15 Q. You don't have information that that's
16 false?
17 A. No.
18 Q. How about the next paragraph?
19 A. No, I didn't know I was going to be
20 arraigned on March 9.
21 Q. Okay. You don't know that to be a false and
22 slanderous statement created by the City, do
23 you?
24 A. No.

45 (Pages 177 to 180)

G & M COURT REPORTERS, LTD.
(617) 338-0030

Page 181

1  Q. Anything in the next paragraph that you
2     recognize as a false statement created by
3     the City?  It appears to be a quotation
4     attributed to the tenant, would you agree
5     with that?
6  A. Yes.
7  Q. The next paragraph?
8  A. Right.
9  Q. Would you agree that that appears also to be
10    attributed to the tenant?
11 A. Yes.
12 Q. Would you agree that the next paragraph
13    beginning "Life is miserable" is also
14    attributed to Ms. Williams?
15 A. Yes.
16 Q. How about the next paragraph that starts
17    "This is the third complaint"?
18 A. Obviously that was information obtained
19    through Inspectional Services Department.
20 Q. How do you know that?
21 A. Elizabeth O'Shea said that she was left
22    without heat for five days over Christmas,
23    so that was information originally obtained
24    through John Dorsey, I'm assuming.

Page 182

1  Q. We agreed earlier that Ms. O'Shea talked to
2     the Globe, didn't we?
3  A. No, we didn't.  We don't know who talked to
4     the Globe.
5  Q. So somebody at least who represented
6     themselves as Ms. O'Shea spoke to the
7     Globe's Amber Bollman in December 2000,
8     right?
9  A. Yes.
10 Q. "Smith is no stranger to controversy,"
11    anything in that paragraph?
12 A. "In 1998, he was named by the Inspectional
13    Services to a list of the city's worst
14    landlords."
15 Q. You agree that that's true, right, you were
16    named to a list in 1998, whether or not you
17    were the city's worst landlord?
18 A. Yes.
19 Q. How about the rest of that?
20 A. That's true.
21 Q. You object to the word "trial", right?
22 A. Yeah.
23 Q. "Smith has been at odds"?
24 A. That's not true.

Page 183

1  Q. What's not true?
2  A. I haven't been at odds with City agencies.
3     I like to think I have a good working
4     relationship with many departments.
5  Q. It didn't say that nobody in the City gets
6     along with you, you have numerous lawsuits,
7     right?
8  A. What I do agree with, "In 1986 he was fired
9     by former City Personnel Chief, Robert
10    Consalvo."
11 Q. I agree with that.
12 A. I also agree that I was awarded $142,000 for
13    his illegal acts.
14 Q. That's the next paragraph, though.  You're
15    saying that's inaccurate that you've been at
16    odds with some City agencies for 15 years?
17 A. Some City agencies.
18 Q. It says "some".
19 A. Yeah.
20 Q. So that's not a false statement?
21 A. No.
22 Q. The next paragraph you said you agree with,
23    right?
24 A. Yeah.

Page 184

1  Q. The next paragraph begins "Smith's boss,"
2     nothing in there?
3  A. No, just that obviously as a result of the
4     Globe article on January 27 they went to the
5     Counsel president regarding that article.
6  Q. Is there anything in that paragraph that you
7     find to be false and that was created by the
8     City of Boston or its employees?
9  A. Well that paragraph in itself obviously.  If
10    the Counsel president was going to take a
11    look at it that was generated by the Globe
12    article that was marketed by John Dorsey.
13 Q. I'm not asking you that.  It's a very simple
14    question.  Is there anything in there that's
15    false that you believe is false and can be
16    attributed to the City?
17 A. No.
18 Q. Next paragraph "On January 9"?
19 A. I don't know what she did.
20 Q. You don't know about that paragraph?
21 A. No.
22 Q. There's nothing in there that you know to be
23    false in other words?
24 A. Right.

46 (Pages 181 to 184)

Page 185

1  Q. How about the next paragraph, "When the
2     violations"?
3  A. I believe that's true.
4  Q. Next paragraph, "Spokesman John Dorsey"?
5  A. That's obviously John Dorsey speaking again
6     and that's based on information he has at
7     Inspectional Services, so I'd have to --
8     that's his position.  I mean, obviously they
9     were overlapping and the violations were, in
10    fact, corrected but weren't closed out
11    timely, if there were any violations.
12 Q. So you specifically deny what in there, that
13    her water had not been restored?
14 A. Right.  Water had been restored.
15 Q. Anything else besides that?
16 A. No.
17 Q. "City inspectors plan to return again on
18    Wednesday"?
19 A. I can't comment on that.
20 Q. Next paragraph?
21 A. I can't comment on Mr. Dorsey or what he
22    says.
23 Q. It's a state of Mr. Dorsey's opinion in
24    general that doesn't relate?

Page 186

1  A. Right.
2  Q. Next paragraph?
3  A. That's true.
4  Q. Next paragraph is also attributed to you?
5  A. Right.
6  Q. Next paragraph is also attributed to you
7     that begins "According to Smith"?
8  A. That's true.
9  Q. Next paragraph is also attributed to you?
10 A. That is true.  I wrote her a letter on
11    January 25.
12 Q. "A hearing in Boston Housing Court is
13    scheduled for March 2"?
14 A. That was true.
15 Q. "Smith also pointed out," so the rest of
16    that paragraph appears to be attributed to
17    you?
18 A. That is true.
19 Q. The final paragraph starts "Williams says"
20    and appears to be attributed to the tenant,
21    correct?
22 A. Yes.
23 Q. Is this article related to your accident
24    also, an article that you consider to have

Page 187

1     slanderous statements related to your
2     lawsuit?
3  A. I'd have to take a look.
4  Q. Okay.
5        (Boston Globe article dated
6     March 10, 2001 marked Exhibit No. 9 for
7     Identification.)
8  Q. Maybe we can agree that the first three
9     paragraphs in total all summarize the facts
10    of your accident?
11 A. Right.
12 Q. Nothing in there that is of slanderous
13    statement?
14 A. No.
15 Q. The next paragraph begins "Police
16    impounded," and it does quote a City
17    official.  Is there anything in there that
18    you think is false?
19 A. No.
20 Q. Anything in the "Owner of the truck"
21    paragraph?
22 A. No.
23 Q. Anything in "City Counsel president"
24    paragraph?

Page 188

1  A. No.
2  Q. Next paragraph is a quote attributed to
3     Mr. Yancey.  Anything there?
4  A. No.
5  Q. Next paragraph is a quotation, anything
6     there?
7  A. No.
8  Q. The next describes your injuries according
9     to the police officers, anything there?
10 A. No.  I mean there were additional injuries
11    but that is what it is.
12 Q. The next paragraph describes your job and
13    your lawsuit, anything in there?
14 A. No, that's true.
15 Q. The next paragraph begins the "Suffolk
16    County Court," anything in there that's not
17    true?
18 A. No, that's true.
19 Q. Next paragraph?
20 A. That's true.
21 Q. Next paragraph, "Two years later"?
22 A. True.
23 Q. Next paragraph?
24 A. That's, I guess, true.

47 (Pages 185 to 188)

Page 189

1  Q. Next one?
2  A. That's the police department speaking. It
3     is what it is.
4  Q. Not something that you consider slanderous
5     or libelous?
6  A. No.
7  Q. The final quotation?
8  A. Again, it is what it is. No.
9  Q. So in Deposition Exhibit No. 9 then, I think
10    we've gotten through that entire article
11    without identifying any statements that you
12    consider to be part of your slander or
13    libel?
14 A. That's correct.
15 Q. Tell me about how these statements and these
16    articles have impacted you in anyway. How
17    have they done that?
18 A. Well, its affected me on a number of fronts
19    actually, from a health perspective and also
20    on one's professional reputation, and
21    thirdly, also, standing in the community,
22    community folks and members of the family
23    and stuff like that.
24 Q. Can you give me some examples of incidents

Page 190

1     or statements or anything that you can think
2     of that illustrates that for us?
3  A. It happens all the time. People always
4     reference the fact "Oh, yeah, here's the
5     slumlord. Oh, yeah, he's the worst landlord
6     in the City. Here he comes now."
7  Q. I'm glad you mention that because I forgot
8     to address that earlier. In 1998 we said
9     you were listed as one of the city's worst
10    landlords, right?
11 A. Yes.
12 Q. Kevin Joyce wasn't the inspector of
13    Inspectional Services at that time, would
14    you agree?
15 A. I believe he was an attorney here at your
16    law department at the time.
17 Q. So that's no?
18 A. Right.
19 Q. Mr. Ead was the commissioner then?
20 A. I believe it was John Ead.
21 Q. Any reason you believe Mr. Ead had a grudge
22    against you or targeted you unfairly?
23 A. I didn't know Mr. Ead.
24 Q. None that you're aware of?

Page 191

1     (Witness nods.)
2  Q. Is your --
3        MR. CHERNETSKY:  Off the record for
4     a second.
5        (Discussion off the record.)
6  Q. So you described that people have said
7     "There goes the slumlord," and such
8     statements as that. Do you believe that
9     that was associated with your appearance on
10    the 1998 list or was it relating to the
11    publicity around the events in 2000?
12 A. I think it was surrounding -- a continuation
13    of '98 but reaffirmed from the events in
14    2000 and ongoing.
15 Q. Is there anybody that you can identify for
16    us who was with you and heard people make
17    these sorts of statements?
18 A. It comes from all different corners, so I
19    couldn't single anybody out, but its
20    obviously common knowledge that, you know,
21    the Inspectional Services Department has
22    targeted me as one of the worst landlords
23    and is obviously trying to make hey with it,
24    and it's troublesome to me professionally

Page 192

1     working in the position I'm in dealing with
2     various officials, not only at this level
3     but also at the State level, when one views
4     you professionally as something that you're
5     not.
6  Q. Has your name ever appeared on such a list
7     since 1998 that you know of?
8  A. I don't, just based on the fact that it
9     continues to be referenced most recently
10    regarding the Kevin Joyce matter and seems
11    to resurface.
12 Q. You mentioned interactions with State
13    officials who you believe were aware of this
14    reputation. Can you tell me anybody in
15    particular who you had such dealings with
16    and who you became aware that they --
17 A. No, I mean, it's sadly to say it's -- people
18    view it as common knowledge, you know.
19 Q. Do people say this to you --
20 A. And I'm troubled by it and I go "Well, I'm
21    the worst landlord in the City." I only own
22    a triple-decker. I don't own 500 or 1500
23    units of housing in the City. I own one
24    triple-decker with three units, nothing

48 (Pages 189 to 192)

Page 193

1   more, so I don't know how I can be one of
2   the worst landlords in the City, and it's
3   very, very troublesome to me.  I take
4   tremendous pride in my name and reputation,
5   and my father told me many, many years ago,
6   the only thing you have in life is your name
7   and your reputation, and I'm very troubled
8   by this targeting and ongoing events by the
9   Inspectional Services Department in
10   retaliation regarding Kevin Joyce and the
11   matter surrounding that.
12  Q.  We'll talk about that.  For now I'm just
13   focussed on other people, and I understand
14   that, you know, there's a feeling that these
15   claims in the paper create within you and
16   how you feel about yourself and so forth,
17   but do people say to you "Hey, Lincoln
18   Smith, you're the worst landlord," do people
19   say that kind of thing to you face to face?
20  A.  People have said it, sure.
21  Q.  Can you give me an example?
22  A.  I can't.
23  Q.  Do you recall anybody telling you about
24   things that people said like that?

Page 194

1   A.  People talk about it all the time, being the
2   worst landlord.  "You left that woman down
3   there with no heat.  What type of guy are
4   you?"
5   Q.  Can you recall a specific individual who did
6   that?
7   A.  You know, even people within your family say
8   "You wouldn't do something like that.  Why
9   would they say something like that," and it
10   not only hurts me but hurts family members.
11   Extended family would be reading that and
12   say look at --
13  Q.  That's an example of somebody who doesn't
14   believe it.  Do you know any specific people
15   who you have heard, say or do anything that
16   you believe was directly related to their
17   having read these articles and believed
18   untrue things about you?  Do you have any
19   specific person or incident that you can
20   describe for me?
21  A.  No.  People do believe it, though.
22  Q.  You mentioned that also about how it made
23   you feel for yourself, and I believe you
24   said in your interrogatories that you

Page 195

1   suffered emotional injuries and
2   embarrassment.  Can you just tell me a
3   little bit about that, and you started to
4   already but is there anything more that you
5   want to say about that?
6   A.  Well obviously I continue to be troubled
7   knowing the reason why these certain things
8   happen, because I try to be honest and
9   forthcoming and it's very disheartening.  It
10   makes you depressed, doesn't make you feel
11   like a very good person.  You become very
12   anxious, and I mean, it's already clearly
13   established that obviously I have issues,
14   been diagnosed with post-traumatic stress
15   syndrome as a result of the Robert Consalvo
16   matter, and it just doesn't let up.  It's
17   like keep hammering this guy until the point
18   in time that, what, you become
19   non-functional.  I mean, it's very difficult
20   to get up when you're continuously punched
21   in the face.  At some point in time you
22   don't get up.
23  Q.  Have you had treatment related to these
24   feelings since?

Page 196

1   A.  Sure.  Yes.
2   Q.  Any treatment which you had subsequent to
3   the events that we've discussed today
4   related to this lawsuit which you were not
5   involved in already for your post-traumatic
6   stress, or was it sort of a continuation and
7   a magnification of the same problems?
8   A.  It's a continuation perhaps and to some
9   extent maybe an exacerbation of what's been
10   going on with me for a long period of time,
11   and at some point in time you just don't get
12   back up again, you know.  You can only get
13   hit so many times before you don't get back
14   up on your feet again, and unfortunately the
15   City continues to take this tack, and namely
16   Kevin Joyce because of his relationship with
17   Consalvo and others that I need to
18   continuously go through this type of
19   unwanted and unneeded exposure that's
20   marketed by Inspectional Services.
21  Q.  Let me go back to Exhibit 1, which was the
22   interrogatories.  If you could flip to
23   Page 6, please.  No. 14, toward the bottom
24   of the page, we asked you about physicians

49 (Pages 193 to 196)

Page 197

1  who treated you for conditions which
2  resulted from events described in your
3  complaint, and you've listed three doctors
4  here, Doctor Wolf, Doctor Keating and Doctor
5  Mooney. Are those individuals whom you were
6  treating with even for your prior
7  post-traumatic stress and depression or are
8  these individuals who are solely relating to
9  the events described in the complaint?
10  A. No, they're my treating physicians.
11  Q. Any other impact that the events that you
12  described in the complaint have had upon you
13  that you haven't already told me about?
14  A. Could you rephrase the question?
15  Q. Well, you've told me about damage to your
16  reputation and then you've told me about
17  emotional injuries, both of which you
18  believe arose or exacerbated problems that
19  you have. Is there anything else that you
20  haven't told me about?
21  A. Just your overall professional standing in
22  terms of marketability and people view you
23  differently.
24  Q. Any monetary damages of any kind?

Page 198

1  A. Of course. I mean, how do you quantify
2  upward mobility because someone views you
3  differently? Someone who has an advanced
4  degree in administration and planning, how
5  do you qualify or quantify something like
6  that because someone views you differently?
7  Q. Are you asking me?
8  A. I mean, it's a statement being made, and I'm
9  troubled by that because I worked very hard
10  for my education, and I worked and am
11  committed to public service.
12  Q. You're talking about your reputation and
13  damages, right? I'm asking you is there
14  anything --
15  A. You're talking monetary-wise. How do you
16  move on? If I understand you correctly, you
17  had asked if I had suffered monetarily, and
18  the answer is yes. You have a professional
19  reputation, you're as good as your word.
20  Q. How has that affected you monetarily?
21  A. I'm a relatively young guy. How do you --
22  people in the marketplace, if they view you
23  as a slug, and I don't use that word --
24  Q. Are you talking about the job market?

Page 199

1  A. The job market, moving up, sure, of course.
2  Q. Have there been any positions that you have
3  applied for that you didn't get because
4  somebody told you that you didn't get
5  because you were a slum landlord or
6  something like that?
7  A. Well you get into some self-esteem issues
8  that have affected me, going through all of
9  these issues here.
10      MR. OHLSON: I was just going to
11  say answer the question, that's all.
12  A. Yeah, there are issues there. When someone
13  keeps hitting you in the face how many times
14  can you continue to get up and get on your
15  feet?
16  Q. So you haven't actually applied for
17  positions for which you were turned down for
18  reasons relating to this lawsuit?
19  A. No.
20  Q. Aside from career advancement type monetary
21  damages, are there any other monetary
22  damages that you can articulate?
23  A. Sure. In the rental market, I mean, people
24  look at you differently. It's a small city,

Page 200

1  as you know, and if they think you're a
2  slumlord, "Stay away from his apartment.
3  You don't want to go there."
4  Q. Have your apartments been vacant for any
5  period since December of 2000?
6  A. There were some vacancies, but of course
7  they're filled now.
8  Q. About how long did your apartments remain
9  vacant?
10  A. I'd have to look.
11  Q. Can you provide that information to us?
12  A. Sure.
13  Q. Anthony Papillo, P-a-p-i-l-l-o. What I'm
14  doing now is I'm looking at Page 9 of your
15  document.
16  A. My understanding, he's an attorney, right,
17  for the Inspectional Services Department. I
18  don't think he's there any longer.
19  Q. The interrogatory asks you to provide
20  information relating to persons who have
21  knowledge of the events described in your
22  complaint, so I guess my question is, what
23  caused you to answer with Mr. Papillo's name
24  in that context?

50 (Pages 197 to 200)

Page 201

1  A. Perhaps because he signed one of the
2     documents.
3  Q. Anything other than that that you're aware
4     of?
5  A. No.
6  Q. He is CC'd on Exhibit 5, which was the Julie
7     Fothergill, is that -- any reason other than
8     that that you're aware of?
9  A. No.
10 Q. How about Robert Conlin who's listed in D?
11 A. He's an inspector, I believe.
12 Q. Any knowledge of why he would have
13    particular knowledge about the events that
14    we described?
15 A. No.
16 Q. Would it be the same for E?
17 A. Yes.
18 Q. Who is Robert Mitchell in H?
19 A. He's one of my plumbers, contractor. He did
20    work on Newport Street.
21 Q. Was he involved in the events of December 20
22    or 23 or 27 which we've discussed?
23 A. He was not the heating contractor, no.
24    Comfort Heating was.

Page 202

1  Q. We talked about leaks in Ms. Williams
2     apartment on the December 20 violation, was
3     he the contractor who did those repairs for
4     you?
5  A. If in fact there was a leak. If my memory
6     serves me correct what I did when I was
7     served this notice by the constables that
8     was signed by Julie Fothergill, I just
9     called up people that I had on my Rolodex
10    and said "Get over there and solve any
11    problems that need to be solved," and of
12    course I called Mitchell, based on what was
13    served upon me, and I'm sure he went out and
14    if there was something that needed to be
15    addressed he did.
16 Q. You believe he was one of the contractors to
17    whom you gave --
18 A. Yes.
19 Q. Inspector Meaney listed at L, same question
20    as before.
21 A. Yes.
22 Q. You don't know specifically why he's listed
23    other than his name may have appeared on a
24    report?

Page 203

1  A. Right.
2  Q. The same for Tony Jones at O?
3  A. Right.
4  Q. Same for Sean Croak at P?
5  A. Right.
6  Q. Would that be the same for Paul Nally at Q?
7  A. Yes.
8  Q. No specific information for any of those
9     individuals?
10 A. No.
11 Q. Is it your belief that Mr. Grant from
12    Comfort Heating overheard or was in a
13    position to hear your conversations with
14    Mr. Joyce on December 27?
15 A. Yes.
16 Q. Have you discussed the incident with him
17    since then?
18 A. No.
19 Q. One other document that I wanted to ask you
20    about.
21       (Document entitled "Re-inspection
22    Result" marked Exhibit No. 10 for
23    Identification.)
24       MR. CHERNETSKY: Again, to clarify

Page 204

1  for the record, we've marked Deposition
2  Exhibit 10, which is a three-page document
3  with a heading "Re-inspection Result," and
4  what I want to point out, it says Exhibit B
5  at the top of that document, but that's
6  unrelated to this deposition and that's a
7  designation that was made by Counsel in
8  another context.
9  Q. Do you recognize this document, Mr. Smith,
10    or this series of documents?
11 A. Yes.
12 Q. What do you recognize them as?
13 A. Re-inspection results, I guess.
14 Q. Is there anything of any particular
15    significance to your claims about these
16    documents?
17 A. Just says 24-hour notice no heat and
18    re-inspection was, at least according to
19    Evangeline Davis, the inspector, was that
20    the re-inspection occurred on 12/26, and of
21    course the 26th is the day after Christmas
22    in which the new furnace was ordered, and
23    the attachment is three pieces and if you
24    notice the case numbers appear to be

Page 205

```
 1    different up in the right-hand corner as you
 2    work through it.
 3  Q. What's the significance of that?
 4  A. Obviously it was -- I don't know. Various
 5    cases, I guess, that she had concerning this
 6    24-hour notice no heat and --
 7  Q. The apartment number is also incorrect,
 8    isn't that right? No heat complaint was in
 9    Apartment 1 and not Apartment 3 as is noted?
10  A. Right.
11  Q. Is there significance to that beyond the
12    fact of that error?
13  A. Just obviously it's problematic to me that
14    there's a re-inspection when they know full
15    well that the furnace was ordered on the
16    26th, and she cites the wrong apartment
17    number and there's various case numbers, so
18    it just seems to be some sort of
19    recordkeeping issue that's not consistent
20    with what I'd consider professional
21    recordkeeping or recordkeeping with respect
22    to an inspector how they should do it.
23  Q. Any significance beyond the fact that there
24    appear to be mistakes in the reference to
```

Page 207

```
 1    listed it refers to the no heat complaint,
 2    right?
 3  A. Right, but the no heat complaint was on the
 4    first floor and she has a cross-reference to
 5    the third floor.
 6  Q. Right, I understand that. So either the
 7    case number is wrong or the violation
 8    reference is wrong, correct?
 9  A. Or the inspector didn't get it right.
10  Q. Is there any significance to you aside from
11    the fact that the inspector didn't get it
12    right on this form?
13  A. No, the inspector obviously didn't get it
14    right. If she doesn't get the apartment
15    number right who knows what else she didn't
16    get right.
17  Q. Are you alleging some kind of intentional
18    act there or is it --
19  A. It would seem problematic to me if someone
20    is going to recommend prosecution that they
21    get their story right instead of prosecuting
22    someone when the story is not correct or
23    accurate.
24  Q. You mention that you knew Ms. Davis from
```

Page 206

```
 1    the apartment number?
 2  A. No.
 3  Q. I just want to put before you again Exhibits
 4    No. 2 and 3, and would you agree that the
 5    case number on Exhibit 3, at the top
 6    right-hand corner, is 8806, and that's a
 7    violation from December 20, 2000 and that
 8    corresponds with the first page of
 9    Exhibit 10 from your deposition, even though
10    I understand you're saying there's a
11    difference in the allegation here, but those
12    numbers at least match up, correct?
13  A. But referencing the second page --
14  Q. Let me make it simpler. Do you agree that
15    there was a violation number that ended 8806
16    on December 20?
17  A. For Apartment No. 3.
18  Q. Correct.
19  A. Written by Evangeline Davis, and this other
20    docket number that you have marked as
21    Exhibit No. --
22  Q. Right, Exhibit No. 10 in this deposition
23    identifies Case 8806, also Apartment No. 3,
24    but instead of being for the violations
```

Page 208

```
 1    prior contact. Did you have further contact
 2    with her concerning these events in December
 3    2000 subsequently? Subsequent to December
 4    2000, did you ever discuss with Ms. Davis
 5    the events of December 2000?
 6  A. After December 20 or before?
 7  Q. After.
 8  A. She did a pre-rental inspection, that's the
 9    only reason I raise that. There's a
10    pre-rental inspection that's set by City of
11    Boston Code which I was compliant with and
12    certificate had issued regarding compliance,
13    and Ms. Davis did that.
14  Q. That was from February of 2000?
15  A. Right, and that's why I just raised that
16    issue, because the building was in
17    compliance then.
18  Q. Did you have further contact with Ms. Davis
19    following, you know, in January 2001 or
20    since?
21  A. Yes.
22  Q. In which you discussed these incidents in
23    December of 2000?
24  A. Yes.
```

52 (Pages 205 to 208)

Page 209

1  Q. What did she tell you?
2  A. Ms. Davis was deposed with respect to some
3     of these violations that she had written.
4  Q. Would that be in Ms. Williams's lawsuit?
5  A. Yes.
6  Q. You've told us in your interrogatory answers
7     that Ms. Davis said that all activity and
8     contact was through Defendant Joyce.  What
9     does that mean and when did she tell you
10    that?
11 A. A number of people told me that everything
12    was going through special operations.  I
13    can't exactly remember the exact date or
14    time, but when I was trying to clear some of
15    these violations as written, obviously I'd
16    be in touch with people at 1010 Mass. Ave.,
17    I'd physically go there, and they'd say
18    "Lincoln, Kevin Joyce is handling this one.
19    This is his own."
20 Q. Do you remember the individuals who told you
21    that?
22 A. I don't.  It was pretty generic in terms of
23    people that would say that to me.
24 Q. More than one person told you that but you

Page 210

1     don't remember who they were?
2  A. Right.
3  Q. Did Ms. Davis tell you that?
4  A. I believe Ms. Davis may have told me that,
5     yes, in one conversation.
6  Q. You're not sure?
7  A. I believe she did, yes.
8  Q. When was that conversation?
9  A. I believe it was on the telephone.
10 Q. What do you remember about the conversation?
11 A. I don't to be honest with you.  There was so
12    much going on I was just trying to clear
13    everything up and she said everything's
14    going through the commissioner's office.
15 Q. I guess that's one thing that is part of
16    this lawsuit that we haven't really
17    addressed, and that is the closeouts and
18    re-inspections of the properties.  If you
19    can express for me your concerns about that
20    issue?
21 A. My concerns are just the timeliness of the
22    closeout.  I was, in my opinion, very
23    efficient contacting contractors once I was
24    provided notice that there may have been

Page 211

1     some issues there to resolve the matters
2     very quickly and expeditiously, and I guess
3     I expected the same from Inspectional
4     Services, but instead what I was getting,
5     like from Evangeline Davis, prosecution
6     recommended, and many of these issues of
7     alleged violations as cited were never
8     closed out until months after the fact, if
9     at all, and I was just kept in total limbo
10    whether or not the property was clean, with
11    respect to if there were any outstanding
12    violations, or whether I was going to have
13    to again, you know, go through the whole
14    probable cause hearings through Housing
15    Court, which is very time consuming and very
16    expensive.
17 Q. Did you have any probable cause hearings in
18    Housing Court related to the events of
19    December 20, 23 or 27?
20 A. There were notices sent to me that there
21    would in fact be probable cause hearings,
22    and I believe -- in fact, I may have written
23    to the clerk magistrate at that time asking
24    for clarity and intervention whether these

Page 212

1     matters were in fact closed or if they were
2     real, because I wasn't getting any
3     information out of Inspectional Services.
4  Q. What was the outcome of that?
5  A. Shortly thereafter, I believe that's when
6     Judge Dear had come out saying that
7     Inspectional Services Department was running
8     rough shot over landlords and that landlords
9     should consider some sort of class action
10    suit against Inspectional Services
11    Department.
12 Q. That doesn't answer my question as to what
13    happened to events in this case and whether
14    you were required to appear in court related
15    to this case?
16 A. I believe I did.  Again, I would have to
17    look at my file, but I was trying to
18    basically resolve it both at 1010 Mass. Ave.
19    and at Boston Housing Court as well.  I
20    couldn't get anything definitive, that's
21    another reason why I was troubled.
22 Q. It's your recollection that you actually
23    appeared in court related to violations of
24    December 20, 23 and 27 of 2000?

53 (Pages 209 to 212)

Page 213

1    A.  I was noticed to appear in court for
2        violations that were written on those dates,
3        and they were no processed after, obviously,
4        I was served to appear.
5    Q.  So you were served and then you made
6        inquiries and then essentially they went
7        away?
8    A.  Long time thereafter, right.
9    Q.  Anything else about that topic that you
10       wanted to tell me about that you haven't
11       already?
12   A.  No.
13   Q.  You mentioned earlier that you had
14       conversations with Elizabeth O'Shea
15       subsequent to these events when she told you
16       that she was sick, that's right?
17   A.  Yes.
18   Q.  You said something in there that she said
19       something about being sorry about the
20       events?
21   A.  She did, yes.
22   Q.  Tell me more about that.  What did she say?
23   A.  I remember clearly she -- in fact, my
24       girlfriend was there at the time.  I was out

Page 214

1        doing something in the yard and she had come
2        to me with the rent.  Her daughter had
3        driven her over, one of the other daughters
4        that didn't live at the property.
5    Q.  This was at Willis Street?
6    A.  Right, and I was out in the yard and she got
7        out of the car and she says "Here's your
8        rent, Lincoln," and I thanked her and she
9        said "You know, I'm really sorry about
10       everything that happened down there," and
11       you know she just -- I think she felt badly
12       because she and I always got along fairly
13       well and then she went on to tell me that
14       ultimately she was going to be passing away
15       and that she was terminal and she didn't
16       have much time to live, and I think she was
17       just kind of wanted to clean the slate a
18       little bit and was very apologetic about
19       what happened there and with the family.
20   Q.  What do you think she was apologizing for?
21       Was she just sorry that your relationship
22       had experienced this difficult time or was
23       she apologizing for some specific conduct of
24       hers?

Page 215

1    A.  I don't think she was apologizing for any
2        specific conduct of hers.  Perhaps the
3        events and the negativeness surrounding the
4        December 23 issue and the events that
5        happened thereafter concerning her and her
6        family, and I think she -- my own feeling is
7        I think she was trying to make peace with
8        herself, because I honestly did everything I
9        possibly could have done for Mrs. O'Shea in
10       that timeframe, and I think she was just
11       attempting to make peace with herself and
12       thereafter she told me she was terminal and
13       she wasn't expected to live within a couple
14       of months or whatever it was.
15   Q.  I know you don't claim any particular
16       knowledge about this yourself, but you told
17       me that the police department, at least, was
18       investigating a theory as to whether one of
19       your tenants or their son's may have been
20       involved in your accident.  Any idea whether
21       that refers to Mr. Lima or to Mrs. O'Shea's
22       son who made that threat against you?
23   A.  I'm sorry?  I was just thinking about
24       Mrs. O'Shea and her passing, because I

Page 216

1        honestly feel that she knew the end of the
2        road was near and she was attempting to find
3        peace with that, and I felt badly about that
4        too.
5    Q.  What I was asking was, do you have any idea
6        about whether the police and others were
7        investigating the possibility that one of
8        your tenants or their sons may have been
9        involved in your accident, do you have any
10       knowledge as to whether that refers to Mr.
11       Lima or Ms. O'Shea's son who had threatened
12       you or some other person besides those two,
13       any insight in that?
14   A.  Again, it just is based on the fact that
15       Captain Bob Dunford, who is now
16       Superintendent Dunford, had said to me that
17       night that they were cognizant of the fact
18       that there were some tenant issues there,
19       and unfortunately I was pretty much on to it
20       and I was trying to resolve it, and
21       Mrs. O'Shea's grandson -- after I had gotten
22       hit, Mrs. O'Shea's grandson -- I knew
23       something was amiss there and I was trying
24       to personally connect the dots, and the

54 (Pages 213 to 216)

Page 217

1  reason why Mrs. O'Shea probably didn't let
2  me in that night was because her grandson
3  was there and her daughter was there and
4  none of them should have been there, but
5  long story short, Boston Police Department
6  served a warrant on the building and
7  arrested her grandson for drug distribution.
8  Q. Would that have an impact under Section 8,
9  if you have a tenant who is involved in drug
10 activity --
11 A. She wasn't a Section 8 tenant.
12 Q. Mrs. Williams was, correct?
13 A. Yes.
14       MR. CHERNETSKY:  George, do you
15 have any questions?
16       MR. OHLSON:  No questions.
17       MR. CHERNETSKY:  Well, I want to
18 thank you, Mr. Smith, for coming down here
19 today.  I know it was a long haul and I
20 appreciate your time, and with that we'll
21 end it.
22       (Whereupon the Deposition was
23 concluded at 2:34 p.m.)
24

Page 218

1  DEPONENT'S ERRATA SHEET
2  AND SIGNATURE INSTRUCTIONS
3
4     The original of the Errata Sheet has
5  been delivered to Atty. George F. Ohlson,
6  Jr.
7     When the Errata Sheet has been
8  completed by the deponent and signed, a copy
9  thereof should be delivered to each party of
10 record and the ORIGINAL delivered to Atty.
11 James M. Chernetsky to whom the original
12 deposition transcript was delivered.
13
14       INSTRUCTIONS TO DEPONENT
15
16    After reading this volume of your
   deposition, indicate any corrections or
17 changes to your testimony and the reasons
   therefor on the Errata Sheet supplied to you
18 and sign it.  DO NOT make marks or notations
   on the transcript volume itself.
19
20 REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
21 COMPLETED AND SIGNED ERRATA SHEET WHEN
22 RECEIVED.
23
24

Page 219

1  ATTACH TO THE DEPOSITION OF LINCOLN E. SMITH
   CASE:  SMITH vs. CITY OF BOSTON, et al
2
3       ERRATA SHEET
4  INSTRUCTIONS:  After reading the transcript
   of your deposition, note any change or
   correction to your testimony and the reason
5  therefor on this sheet.  DO NOT make any
   marks or notations on the transcript volume
6  itself.  Sign and date this errata sheet
   (before a Notary Public, if required).
7  Refer to Page 218 of the transcript for
   errata sheet distribution instructions.
8  PAGE  LINE
9       CHANGE:
        REASON:
10      CHANGE:
        REASON:
11      CHANGE:
        REASON:
12      CHANGE:
        REASON:
13      CHANGE:
        REASON:
14      CHANGE:
        REASON:
15      CHANGE:
        REASON:
16      CHANGE:
        REASON:
17      CHANGE:
        REASON:
18      CHANGE:
        REASON:
19
    I have read the foregoing transcript
20 of my deposition and except for any
   corrections or changes noted above, I hereby
21 subscribe to the transcript as an accurate
   record of the statements made by me.
22
23
        (WITNESS)       (DATE)
24

Page 220

1  COMMONWEALTH OF MASSACHUSETTS
   MIDDLESEX, ss.
2
3     I, Kelly G. Patterson, a Notary Public duly
4  commissioned and qualified within and for
5  the Commonwealth of Massachusetts, do hereby
6  certify:
7     That LINCOLN E. SMITH, the witness whose
8  deposition is hereinbefore set forth, was
9  duly sworn by me, and that such deposition
10 is a true record of the testimony given by
11 the witness to the best of my skill,
12 knowledge, and ability.
13    IN WITNESS WHEREOF, I have hereunto set my
14 hand and my affixed notarial seal this 1st
15 day of March, 2004.
16
17
18
19       Kelly G. Patterson
         Notary Public
20
21
22
   My Commission expires:
23 September 20, 2007
24

55 (Pages 217 to 220)