## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x
LINCOLN E. SMITH,

    Plaintiff,

vs.  Civil Action
No. 03-10062-DPW

CITY OF BOSTON/BOSTON INSPECTIONAL
SERVICES, AND KEVIN JOYCE,

    Defendants.
- - - - - - - - - - - - - - - - - x

DEPOSITION OF KEVIN J. JOYCE, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Deborah S. Gutierrez, a Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public in and for the Commonwealth of Massachusetts, at the Boston City Hall, One City Hall Plaza, Boston, Massachusetts, on Tuesday, February 17, 2004, commencing at 10:55 a.m.

- - - - -

BEACON HILL COURT REPORTING, INC.
44 Bayswater Street
Boston, MA 02128
(617) 569-8050

BEACON HILL COURT REPORTING, INC.
(617) 569-8050

## Page 2

1 APPEARANCES:

2
ON BEHALF OF THE PLAINTIFF:
3
MARK STOPA, ESQUIRE
4 Grady & Stopa
36 Mechanic Street
5 Foxboro, Massachusetts 02035
(508) 543-0600
6
7 ON BEHALF OF THE DEFENDANTS:

8 JAMES M. CHERNETSKY, ESQUIRE
KENNETH J. FORTON, ESQUIRE
9 City of Boston
Boston City Hall, Room 615
10 Boston, Massachusetts 02201
(617) 635-4048
11
12 Also Present:

13 Lincoln Smith

## Page 3

INDEX

WITNESS  PAGE
Kevin J. Joyce

    Examination by Mr. Stopa  4
    Examination by Mr. Chernetsky  75
    Examination by Mr. Stopa  76

EXHIBITS

NUMBER  DESCRIPTION  PAGE
1  Collection of documents  56
2  Collection of documents  56

## Page 4

PROCEEDINGS
\* \* \* \* \*

Kevin J. Joyce,
having been first duly sworn, testified as follows:

    MR. STOPA: Usual stipulations?

    MR. CHERNETSKY: Yeah. Why don't we say what they are.

    MR. STOPA: Okay. All objections reserved except as to form, and waive notary, read and sign.

    MR. CHERNETSKY: Thirty days?

    MR. STOPA: Fine.

    MR. CHERNETSKY: Okay. And we're also reserving motions to strike?

    MR. STOPA: Yes.

    MR. CHERNETSKY: Okay.

    MR. STOPA: All motions other than as to form.

EXAMINATION BY MR. STOPA:

Q. May I have your full name, sir.

A. Kevin J. Joyce.

Q. What's your address?

A. 1010 Massachusetts Avenue, Boston, 02118.

Q. And would you share for me -- share with me your

Page 5

1　educational background.
2　A. Um.... St. Gregory's Grammar School in --
3　Q. How about we start with college and --
4　A. -- Stonehill College, New England School of Law.
5　Q. When did you graduate from Stonehill College?
6　A. '78.
7　Q. And New England school of Law is when?
8　A. '82.
9　Q. And what is your current employ?
10　A. My employer?
11　Q. Employ. Yes. How are you employed?
12　A. City of Boston.
13　Q. What's your position?
14　A. Commissioner of the Inspectional Services
15　　Department.
16　Q. And how long have you held that position?
17　A. Since September of '98.
18　Q. How many people work in the inspectional services
19　　department?
20　A. Approximately 240.
21　Q. And you manage all of them?
22　A. I do.
23　Q. Okay. And what is the inspectional services
24　　department charged with doing?

Page 6

1　A. Inspectional services department is charged with
2　　administering various public safety regulations in
3　　the City of Boston such as the state sanitary code,
4　　state building code, electrical code, different
5　　codes --
6　Q. Okay.
7　A. -- like that.
8　Q. And you enforce these codes as relates to
9　　residential property owners?
10　A. Sure.
11　Q. Business property owners?
12　A. Sure.
13　Q. All right. Approximately how many different
14　　buildings fall -- well, strike that.
15　　　Literally every building in the City
16　　of Boston, then, falls under the scope of the work
17　　of the inspectional services department, correct?
18　A. Conceivably, sure.
19　Q. Is there any one area -- strike that.
20　　　The focus of your work, does that have
21　　-- does your work have any primary focus, or do you
22　　just generally cover every building in the City?
23　A. Well, my focus is to manage the department. I'm
24　　the overall manager.

Page 7

1　Q. But when I say your focus I'm talking about
2　　inspectional services. When I ask you a question
3　　of you personally, I'll direct it that way.
4　A. Okay.
5　Q. So your department, then, obviously oversees the
6　　application of the codes over all buildings.
7　A. Correct.
8　Q. Do you find that residential dwellings are of a
9　　larger concern versus commercial dwellings? Or is
10　　that an incorrect understanding on my part?
11　A. It's incorrect. I don't see any distinction.
12　Q. So a building is a building and you enforce the
13　　codes as to all of them?
14　A. Right.
15　Q. Okay. And prior to your taking on the position of
16　　commissioner of the inspectional services
17　　department, did you have any prior experience in
18　　regards to commercial property or residential
19　　property management or oversight?
20　A. My family owned residential property when I was a
21　　kid. I had some responsibilities there.
22　Q. Okay. Had you had any experience with the various
23　　codes that you are now charged with enforcing?
24　A. As a lawyer.

Page 8

1　Q. As a lawyer?
2　A. Yes.
3　Q. Where was that?
4　A. I worked in the city law department.
5　Q. How long did you work in the city law department?
6　A. I suppose I worked here from 1991 to 1998. Before
7　　that I was in private practice. I did some
8　　permitting work and zoning work while I was in
9　　private practice.
10　Q. Okay. Where were you in private practice?
11　A. Regina Quinlan and Dan O'Connell at 6 Beacon
12　　Street.
13　Q. And were you in private practice from the time you
14　　graduated from law school until the time you went
15　　to work for the city law department?
16　A. Yes, except I went to inspectional services before
17　　I came to the city law department. And I think I
18　　was in inspectional services for a year, year and a
19　　half before I came here.
20　Q. And what did you do with inspectional services
21　　during that tenure?
22　A. I was what they call -- I was a special assistant
23　　corporation counsel. I did the labor relations for
24　　the department. I ran the -- I oversaw the plants

Case 1:03-cv-10062-DPW   Document 21-3   Filed 03/29/04   Page 3 of 20

Kevin J. Joyce - 2/17/04                    Condenselt                    Smith vs. City of Boston

Page 9

1  examination unit in the building division.
2  Q. Okay. Now, what does the structure of inspectional
3     services department look like, corporate structure?
4     Obviously, you're up at the top.
5  A. Commissioner. There's three basic divisions;
6     administration and finance, buildings and
7     structures, and field services.
8  Q. And do you have a manager for each one of those
9     divisions?
10 A. I do.
11 Q. What sort of a job label do they carry?
12 A. Deputy commissioner.
13 Q. And who's your deputy commissioner for
14    administration and finance?
15 A. Dick Kanaskie.
16 Q. Can you spell that last name, please.
17 A. K-a-n-a-s-k-i-e.
18 Q. And, I'm sorry, what was the second one you named?
19 A. Buildings and structures.
20 Q. Thank you. I couldn't read my own writing.
21 A. And that's under Gary Moccia.
22 Q. How do you spell his last name?
23 A. M-o-c-c-i-a. And he's technically the inspector,
24    what they call the inspector of buildings.

Page 10

1  Q. But does he also carry the moniker of deputy
2     commissioner?
3  A. I think he's an assistant commissioner.
4  Q. And the last one was field services, and who heads
5     that up?
6  A. Frank Frattaroli.
7  Q. How do you spell Frank's last name?
8  A. F-r-a-t-t-a-r-o-l-i. And he's a deputy
9     commissioner.
10 Q. You don't hire people with simple last names, I
11    take it.
12 A. Well, they were there before I came.
13 Q. Actually, that was my next question; did you hire
14    any of those people.
15    So they were all there when you took
16    the position?
17 A. Yup.
18 Q. Okay. So somebody else's fault.
19    And how many people fall under the
20    administration and finance division, other
21    employees besides the deputy commissioner? And if
22    it's an approximation that's fine, too. It's
23    obviously not critical information.
24 A. Say 50.

Page 11

1  Q. And how about building and structures?
2  A. Seventy-five.
3  Q. And field services?
4  A. That's the bulk of it. About two -- 150 maybe,
5     something like that.
6  Q. Okay.
7  A. These numbers --
8  Q. I'll accept them as being vague and approximate.
9  A. Yeah. I mean, you know.
10 Q. As I suggested, these are not critical issues, so
11    I'm not concerned about it. I just want to have an
12    idea.
13    Now, buildings and structures, what
14    does that department do?
15 A. That administers the City of Boston -- primarily
16    administers the City of Boston zoning code and the
17    state building code in Boston.
18 Q. I take it administration and finance is what it
19    sounds like it is.
20 A. Right. It's, you know, all the money, the
21    business of the operation. Corporate -- that would
22    be -- in the private sector that would be corporate
23    business.
24 Q. How large is the budget for inspectional services?

Page 12

1  A. About 13.4 million.
2  Q. Never enough, though.
3  A. Never enough.
4  Q. Okay. Let's go over to field services. Obviously,
5     the largest of the three departments.
6  A. Mm-hmm.
7  Q. What is their main charge? What do they do?
8  A. They do the state sanitary code, the federal food
9     code, some state environmental and city
10    environmental codes and regulations.
11        MR. CHERNETSKY: Excuse me, Mark.
12        MR. STOPA: Sure. Let's go off for a
13 second.
14    (Brief interruption in the proceedings
15    to answer the phone.)
16    (Whereupon, Lincoln Smith entered the
17    proceedings.)
18        MR. STOPA: Okay. Let's go back.
19        MR. CHERNETSKY: I'm sorry, Mark.
20 Can we just hear the question and answer again
21 because the phone started ringing in the middle of
22 it.
23    (The record was read back.)
24 Q. Okay. That was about it for field services?

Page 13

1  A. Yeah.
2  Q. Yes?
3  A. Yes.
4  Q. Okay. And below Frank, I'm not going to try to
5     pronounce his last name, how does that department
6     break down?
7  A. Health division, housing division, environmental
8     services division, and weights and measures.
9  Q. Are those 150 employees evenly broken up into those
10    separate aspects, or is there a weighting towards
11    one or the other?
12 A. It goes by the way the positions fall. I'd say
13    generally, generally they're all just about the
14    same.
15 Q. Okay. Now, if someone calls in a complaint that
16    there's no heat in a house or in a building, what
17    division handles that problem?
18 A. Generally, it would be the housing division, could
19    be building. Depends where it's assigned.
20 Q. So different situations might be assigned to
21    different --
22 A. Yes.
23 Q. Let me finish, please. Different structures,
24    buildings and structures, versus field services?

Page 14

1  A. Could be.
2  Q. What would make the distinction as to whether it
3     went to one or the other? What would make that
4     decision?
5  A. Public safety, whatever technical issues arise.
6     The inspectors determine where they send these
7     things when they come in.
8  Q. Okay.
9  A. But generally no heat would go to housing and
10    residential permits.
11 Q. Where's that?
12 A. That's in Frank Frattaroli's, field services.
13 Q. I guess that's where I was going.
14       Of the 150 or so people that are in
15    the field services division, how many of those
16    people are inspectors?
17 A. I would say 120.
18 Q. And the balance would be what?
19 A. Managers and administrative staff.
20 Q. Now, let's talk about your office for a second. I
21    don't mean physically your office but your
22    figurative office.
23       Other than yourself, what other kind
24    of staff do you have there?

Page 15

1  A. I have an administrative assistant.
2  Q. Who is that?
3  A. Missy DeRosa.
4  Q. And how do spell Missy's last name?
5  A. D-e-R-o-s-a.
6  Q. And who else is there?
7  A. Then there's the chief of staff.
8  Q. Who's that?
9  A. Carol McDermott.
10 Q. Cal?
11 A. Carol.
12 Q. Carol?
13 A. Yeah. She's a woman. C-a-r-o-l.
14 Q. Sorry. And who else is there?
15 A. Then under Carol McDermott there's a policy
16    director.
17 Q. Who's that?
18 A. John Dorsey.
19 Q. Okay. Go ahead.
20 A. And then there's a spokesperson who is Lisa
21    Timberlake.
22 Q. Now, as most of what we're doing here in regards to
23    Mr. Smith's litigation relates to December of 2000,
24    were any of those people on your administrative

Page 16

1     staff there at that time? Were they holding
2     positions at that time?
3  A. Yes. Carol Mc -- yeah, all three of them. Well,
4     Missy DeRosa, I can't remember about when Missy
5     DeRosa came. I know that Lisa Timberlake was
6     there, and I know that John Dorsey was there.
7     Carol McDermott may or may not have been. I'm not
8     sure.
9  Q. Okay. And was John Dorsey holding that same
10    position back then, policy director?
11 A. I don't know. I can't remember.
12 Q. What does a policy director do?
13 A. Coordinates policy for the department.
14 Q. Can you explain that further? I don't understand
15    what that means.
16 A. Drafts policies, drafts -- drafts rules and
17    regulations, collaborates with the division
18    managers on what -- what policies need to be
19    implemented in the department.
20 Q. Okay. And -- I'm sorry.
21 A. And he also handles any press inquiries, meeting
22    inquiries, anything like that --
23 Q. Okay.
24 A. -- that's handled.

### Page 17

1  Q. And how about the chief of staff, Carol McDermott,
2      what does that position do?
3  A. Generally oversees the management of the
4      department, coordinates with the division, the
5      deputy commissioners and the division managers,
6      supervises the policy office, does some training,
7      some human resources stuff, things of that nature.
8  Q. Okay. And Missy DeRosa, an administrative person,
9      was that administrative aid or admin --
10 A. She's -- I think she's a 17 clerk. She helps me
11     manage my correspondence, answers my phone, does my
12     filing, does things that I -- you know, they call
13     them clerks but they're, you know, I like to refer
14     to them as administrators.
15 Q. Fair enough. And spokesperson Lisa Timberlake you
16     said.
17 A. Mm-hmm.
18 Q. What is -- the spokesperson essentially is --
19 A. Answers question from the media about issues that
20     come up.
21 Q. Okay. Did you have a Julie Fothergill on your
22     administrative staff back then?
23 A. I did.
24 Q. What was her position?

### Page 18

1  A. I don't remember. In the year 2000 I don't know.
2      She had various assignments. I think she oversaw
3      the policy office in 2000.
4  Q. Did she then after that time hold a different
5      position?
6  A. For a while.
7  Q. What was that?
8  A. She was the manager of the legal division.
9  Q. Where does the legal division fall?
10 A. Doesn't really exist anymore as the legal division.
11     It's sort of been incorporated into something new,
12     something different.
13 Q. What's it now incorporated into?
14 A. I think it's called investigations and regulatory
15     affairs.
16 Q. Is that part of your inspectional services
17     department?
18 A. It goes under buildings and structures is where
19     it's located presently.
20 Q. Okay. Why was there a change with that
21     subclassification?
22 A. Because the corporation counsel's office does the
23     city's law work and the departments basically do
24     their -- they administer the codes up to the point

### Page 19

1      that it requires a lawyer, and then the city law
2      department takes the cases from there.
3  Q. Okay. Now, your department, are your procedures
4      for how you handle complaints concerning -- we'll
5      just stick with a no heat call on a rental
6      property. Okay? Are your procedures different
7      today than they were in or about the time period of
8      December 2000?
9  A. I wouldn't say they're different.
10 Q. Okay. The reason I'm asking is I'm going to ask
11     you what the procedures are when a call comes in
12     and so forth, and I just need to know whether
13     there's some distinction or difference between the
14     way things were handled in December 2000 versus
15     2003, 2004.
16 A. There's more formality to it. There's more
17     published guidance from the department and the
18     inspectors on the process of performing inspections
19     and work rules and standards and uniform
20     inspections.
21 Q. Okay.
22 A. So, you know, that's not really different, it's
23     more formal.
24 Q. That's fine. And I appreciate that distinction

### Page 20

1      because I think that might be helpful as we
2      proceed. So I'm going to ask my questions, then,
3      based upon the time period surrounding December
4      2000, which is, again, our focus on this
5      litigation.
6          If a call for no heat in a residential
7      rental property came in to your office, what would
8      next happen with that complaint?
9  A. As I -- you know, I'm not a -- I have a general
10     overview of the process. I don't have --
11 Q. Okay.
12 A. I'm not -- you know, I'm not a technical person.
13     I'm not answering these complaints on a daily
14     basis. My general impression is that a call comes
15     in, someone makes a complaint, an inspector's
16     dispatched, and then, you know, takes a course from
17     there.
18 Q. Okay. And when an inspector is dispatched to the
19     property, what are they supposed to do?
20 A. Respond to the complaint.
21 Q. To see if there is no heat?
22 A. Are we talking a no heat complaint?
23 Q. Yeah, that's what -- I think I qualified it by
24     saying --

### Page 21

1  A. They assess and see if -- you know, find out the
2     facts.
3  Q. Okay. And the -- let's say the inspector gets
4     dispatched, they arrive at whatever the facility
5     is, the building is, what sort of authority do they
6     have while they're there? What can they do?
7  A. For a no heat complaint?
8  Q. Yes.
9  A. I understand that they take the temperature of the
10    unit. The law sets what the temperature's supposed
11    to be, or the code sets what the temperature is
12    supposed to be, and they make a determination
13    whether it meets the code or not.
14 Q. Let's assume that an inspector arrives at a
15    property and the temperature is below what the code
16    requires, what then does an inspector do?
17       MR. CHERNETSKY: Objection. Go
18    ahead and answer.
19 A. As I understand it, it's a violation of the code.
20 Q. Okay. And violation, is that a written violation?
21 A. Yes.
22 Q. Okay. And what do they do with that?
23 A. Serve it on the responsible party.
24 Q. Okay. And that would be the property owner?

### Page 22

1  A. Property owner, yeah.
2  Q. What would then happen with that violation?
3  A. Well, if the issue was addressed, the violation
4     would be dismissed. If the issue was left
5     unaddressed, the matter would be sworn in for
6     court.
7  Q. Are there procedures to follow-up with determining
8     whether or not a violation or a situation has been
9     resolved at a property?
10 A. Sure. They go back and reinspect. That's one way.
11 Q. When do they do that?
12 A. Well, it depends on what the violation was. You
13    know, you're given -- each code gives, you know,
14    time tables of fixing certain types of violations.
15    No heat is an emergency violation. I think you
16    have within 24 hours to respond to that, fix it.
17 Q. Okay. So depending upon what the violation is, if
18    I understand your testimony correct, the code sets
19    out how much time the property owner has to resolve
20    the problem. And is it then the properties --
21    property owner's responsibility to report back to
22    inspectional services?
23 A. Yes.
24 Q. Okay. Does inspectional services go back and

### Page 23

1     reinspect whether or not they get a notice from the
2     property owner?
3  A. They should.
4  Q. Okay. Are there written policies and procedures as
5     to what they should -- again, I'm talking about
6     2000, written policies and procedures concerning
7     when they're supposed to go back to reinspect?
8  A. There are now. I'm not so sure about 2000.
9  Q. What do your current policies and procedures say
10    about reinspection?
11 A. That when a -- my understanding is that when
12    notified by the landlord that the situation's been
13    resolved, they're required to go back and
14    reinspect.
15 Q. Were there any written policies or procedures of
16    any kind for inspectors to follow back in December
17    2000, that time period?
18 A. I think so. I'm pretty sure there were some. But
19    the code, for example, is one policy and procedure
20    that was written that they had in place.
21 Q. Well, I think my question is more on the lines of,
22    if I understood your testimony, you have very
23    specific policies and procedures about -- regarding
24    reinspection after notification from a landlord or

### Page 24

1     property owner that something's been resolved.
2     That type of interoffice policy and procedure as to
3     how they were to react in reinspection and
4     violation situations.
5  A. Right. I can't remember, you know, without looking
6     at it and be able to tell you.
7  Q. If there were policies and procedures that existed
8     back then, would you still have them?
9  A. Sure.
10 Q. Okay.
11 A. Department would.
12 Q. Yeah. And, again, if I say you I'm not meaning you
13    specifically --
14 A. Right.
15 Q. -- unless I address it that way.
16 A. Right.
17 Q. Sticking with that, the difference between 2000
18    and currently on the policies and procedures for
19    reinspection, is it your understanding, sir, that
20    in the -- in or about the time period of December
21    2000 there was no requirement that they go back and
22    reinspect after they were noticed, given
23    notification that the situation was cured?
24 A. I -- I think there wasn't a written one. Matter of

## Page 25

1 responsibility I think they were always required to
2 go back and reinspect. I think.
3 Q. So your expectation is that they would go back and
4 reinspect after given notice that a problem is
5 cured. Is that -- is my statement correct?
6 A. That's what my expectation was, and I think the
7 department required that they -- there's no way,
8 other way to determine whether or not the condition
9 is fixed unless you go back and reinspect, as a
10 practical matter.
11 Q. Okay. But if the department required it, was it
12 just -- that was part of the verbal instruction
13 given to the people that worked in the department
14 that that's how they were supposed to manage it?
15 Or was there some --
16 A. I don't know. I -- I don't know.
17 Q. Okay. Are there occasions where more than one
18 inspector is sent out to a property? Again, I'm
19 dealing with the December 2000 time period.
20      MR. CHERNETSKY: Are we dealing now
21 only with no heat complaints?
22      MR. STOPA: Yeah. Let's -- we'll
23 restrict all of the questioning to no heat
24 situations.

## Page 26

1 Q. Were there occasions -- strike that.
2      Under what circumstances might you
3 send out more than one inspector to a property?
4 A. If they were requested.
5 Q. Who sort of information would lead to a request for
6 more than one inspector?
7 A. If the inspector that responded first called and
8 asked for other inspectors to be out there that
9 they would go. You know, I can't --
10 Q. I understand.
11 A. -- conceive of -- I mean, I can't speculate so....
12 Q. Okay. Under what circumstances would you
13 personally go to the scene of a reported no heat
14 problem?
15 A. Well, my practice has been since I've been there to
16 sometimes go on inspections so I can understand
17 what the inspectors do. Sometimes I'd go because
18 they requested me to go.
19 Q. Who's "they?"
20 A. It would be the inspectors.
21 Q. In the amount of time that you've been the
22 commissioner, and, again, I apologize that I'm not
23 remembering, but that was -- when did you become
24 commissioner?

## Page 27

1 A. '98.
2 Q. '98. From 1998 through the present time, how many
3 times have you personally gone out in response to
4 complaints for no heat?
5 A. Hundreds.
6 Q. And, again, that's if you just decide you want to
7 go because you want to understand the process
8 better, or an inspector's requested that you
9 appear?
10 A. It's a combination.
11 Q. If you go to a -- the scene of a report of no heat
12 violation, or perhaps any violation where you would
13 go yourself, do you take any of your staff with
14 you?
15      MR. CHERNETSKY: Objection. You can
16 answer.
17 Q. Do you take any of your staff with you? I'm
18 talking other than inspectors who may already be at
19 the scene.
20 A. Well, I have -- there's an inspector assigned to me
21 who I usually bring with me whenever I go out.
22 Q. Who is the inspector that is currently assigned to
23 you?
24 A. Paul Nally.

## Page 28

1 Q. How do you spell his last name?
2 A. N-a-l-l-y.
3 Q. And how long has he been assigned to you?
4 A. Since I would say 1999. That's one of his duties.
5 He does other things but....
6 Q. Why is it that you have an inspector assigned to
7 you?
8 A. Part of it's just for my personal security, when
9 threats are on me.
10 Q. I would take it there are sometimes when you're not
11 a very popular --
12 A. -- person.
13 Q. -- guy.
14 A. And also for his assistance in some of things that
15 we've been focusing on are environmentally related,
16 and he does all of the auto shop, auto shop issues
17 that relate to the environment. And, you know, I'm
18 involved in that so I usually have to -- he's the
19 one that would be with me.
20 Q. Anyone other than Mr. Nally?
21 A. Sometimes Inspector Brown.
22 Q. What's Inspector Brown's full name?
23 A. Wilbur, Wilbur Brown.
24 Q. Now, does he -- he's assigned to what division?

### Page 29

1  A. Special operations.
2  Q. Where does special operations fall?
3  A. Investigations and regulatory affairs.
4  Q. Okay. In which division?
5  A. I'm sorry. Buildings and structures.
6  Q. Okay. Anyone else from your staff go along with
7     you?
8  A. Generally when -- it's usually me and one of those
9     two people.
10 Q. Okay.
11 A. Sometimes, you know, if there's media there press
12    people come.
13 Q. You just anticipated --
14 A. Sometimes other inspectors if it's a major incident
15    or a building collapse or a major fire or some
16    biohazard type thing, you know, more people would
17    come because they'd be needed.
18 Q. So you would take your spokesperson or public
19    relations person with you if you anticipated that
20    there was -- it was going to be a media event?
21 A. Yeah, so they could address the issues.
22 Q. Now, how long have you known Mr. Lincoln -- strike
23    that.
24       Do you know Mr. Lincoln Smith?

### Page 30

1  A. Do I know him. Yeah, I know of him. I mean, I've
2     met him a couple of occasions, today, 2000.
3  Q. Prior to 2000, December of 2000, had you ever met
4     Mr. Lincoln Smith?
5  A. I don't think I ever met him. I can't remember. I
6     meet a lot of people.
7  Q. Did you know of him?
8  A. Heard his name. You could say I heard his name.
9  Q. In what context had you heard his name?
10 A. Just general, from the newspapers.
11 Q. So you had no personal involvement with Mr. Smith
12    prior to December of 2000?
13 A. Not that I recall. I know that he -- he was
14    represented by Regina Quinlan at one point.
15 Q. Was that while you and Regina Quinlan were law
16    partners?
17 A. I was an associate. You know, if I was, you know,
18    certainly privilege would attach to me as her
19    employee, so I wouldn't say anything beyond that.
20 Q. Did you work on Mr. Smith's piece of litigation
21    that Miss Quinlan represented him on?
22 A. Not that I recall. But if I did I'd have to -- I
23    would assert attorney/client privilege.
24 Q. I understand. I wasn't going to ask what if

### Page 31

1     anything you may have done or said, just do you
2     recall working on his case.
3  A. I don't.
4  Q. Do you recall what that piece of litigation
5     concerned?
6  A. No.
7  Q. Well, if I suggested to you it involved a suit
8     against the City of Boston, would that refresh your
9     recollection as to what that was relating to?
10 A. No, not -- other than the city being a defendant, I
11    don't know what the particulars were.
12 Q. Okay. Do you recall how that piece of litigation
13    was resolved?
14 A. No. Long time ago.
15 Q. I beg your pardon?
16 A. I said it was a long time. It was, like, in the
17    '80s.
18 Q. Okay. Do you know how many pieces of property
19    Mr. Lincoln Smith owned in or about the time period
20    of December 2000?
21 A. No.
22 Q. You are aware that a no heat call was received by
23    the city for a piece of property that Mr. Lincoln
24    Smith owned in December of 2000.

### Page 32

1       MR. CHERNETSKY: Is that a question?
2       MR. STOPA: Yes.
3       MR. CHERNETSKY: Would you repeat it.
4       MR. STOPA: Well, strike that
5     question.
6  Q. In December of 2000, did there come a time when you
7     were at Mr. Lincoln Smith's property located at 11
8     Newport Street, Dorchester?
9  A. Yes.
10 Q. And when was that?
11 A. It was in -- best I can remember, it was in
12    December or January of 2000.
13 Q. And why were you there? You individually.
14 A. I can't remember why I was there, but I know I was
15    there.
16 Q. Do you recall what kind of property that is at 11
17    Newport Street?
18 A. I think it was some sort of a residential building,
19    if I can remember.
20 Q. But you don't remember if it was a triple-decker
21    versus an apartment building?
22 A. I'm sorry. As I sit here I don't.
23 Q. Okay. And, I'm sorry, your testimony is you're not
24    sure why you personally went to that location that

### Page 33

1 night or that day?
2 A. Why -- I think the inspectors asked me to go, as I
3   remember.
4 Q. Any idea as to why?
5 A. I think the issue was that they were having
6   difficulty getting Mr. Smith to restore the heat.
7   Impression was that they were afraid of Mr. Smith
8   given his position with the city.
9 Q. What is your understanding as to what his position
10   with the city was at that time?
11 A. I think he was city -- I knew him to be a city --
12   my impression was that he was a city official. I
13   didn't know which department but they seemed to.
14 Q. Do you recall in response to the original --
15   strike that.
16        The reason for being at Mr. Smith's
17   property at 11 Newport Street was a report of no
18   heat. Is that correct?
19 A. As I understand it, yes, no heat, right.
20 Q. And do you have a recollection of what day it was
21   that your office received the report of no heat?
22 A. No.
23 Q. Okay. Is it --
24 A. I can't.

### Page 34

1 Q. Do you have a recollection as to whether you were
2   out there on the day the no heat was reported or on
3   some later day?
4 A. My memory is it was a later date. And the issue
5   was the difficulty in getting Mr. Smith to turn on
6   the heat after some time had passed.
7 Q. Was it a matter of him not turning on the heat or
8   there had to be repairs?
9 A. Well, as I -- there was -- he was -- as I
10   understood it at the time, he had been cited for a
11   faulty boiler, and the boiler hadn't been repaired.
12   And they were reluctant or afraid of Mr. Smith and
13   they asked me to go.
14 Q. Is it your understanding that your inspectors read
15   this as a politically sensitive situation because
16   Mr. Smith worked for the City of Boston?
17 A. I think they were afraid of retaliation if he --
18   retaliation from him if they performed their duties
19   to get him to turn his heat back on. My impression
20   I had.
21 Q. What authority would -- and I'm talking December
22   2000. What authority would have Mr. Smith --
23   strike that.
24        What authority might Mr. Smith have

### Page 35

1   had over any of your employees during that time
2   period?
3        MR. CHERNETSKY: Objection.
4 A. I don't know.
5 Q. Well, what is your understanding as to the nature
6   of their fear? What did they think he was going to
7   do?
8 A. I have no idea.
9 Q. Now, when you arrived at the 11 Newport Street
10   property, how many other of your people were there?
11 A. I don't remember.
12 Q. Do you remember the specific names of anybody who
13   was there?
14 A. No.
15 Q. Do you recall that the issue relating to the heat
16   was resolved?
17 A. It became resolved while we were there.
18 Q. Do you recall how it was resolved?
19 A. I think Mr. Smith stated he hired a contractor to
20   fix the boiler, and that when the contractor said
21   that he had been paid money by Mr. Smith to fix the
22   boiler in my mind that was resolved.
23 Q. Okay. Do you have a recollection that the no heat
24   call came in to your office approximately two days

### Page 36

1   before Christmas? Do you recall that?
2 A. I don't know the specific amount of days. There
3   was a time frame from the time the call came in and
4   the day I went out there.
5 Q. Okay.
6 A. Two, three, four days. I don't, you know,
7   precisely recall it.
8 Q. Other than the day that you went out to the
9   property, had you become personally involved in the
10   no heat problem at 11 Newport Street?
11 A. No.
12 Q. As a part of your involvement, did you ever inquire
13   as to what efforts Mr. Smith had made prior to that
14   day that you were on the property to cure that
15   problem?
16 A. No.
17 Q. Did any of your staff suggest to you that they had
18   inquired as to what efforts he had taken?
19 A. Not that I recall.
20 Q. If someone calls in a no heat problem, a tenant, I
21   take it there's some effort that is made to contact
22   the property owner?
23        MR. CHERNETSKY: Objection.
24 Q. Is that part of your practice and procedure?

Page 37

1  A. I think so.
2  Q. Well, would you anticipate that your inspectors if
3     they're on the scene for a reported no heat would
4     then effort to find out who owns the property?
5  A. Oh, sure, yeah.
6  Q. Okay. And let's assume for the purposes of this
7     next couple of questions that we have a situation
8     that requires the replacement of a furnace or
9     boiler. Okay? Are property owners permitted to
10    take steps other than the immediate replacement of
11    the furnace in order to cure the no heat problem?
12 A. That's a better question for the inspectors. My
13    understanding is that if the codes allow that to
14    occur it can.
15 Q. Okay. Well, let's apply that aspect to our factual
16    base. As I suggested with my question before,
17    we're talking in or around the time period of
18    Christmas 2000. Is that also your understanding?
19 A. Late December, early January. I don't -- that's
20    all I remember.
21 Q. Okay.
22 A. What I is know it was very cold, very cold. I
23    remember you could -- it was very cold. It was a,
24    you know, like a cold spell like we just had this

Page 38

1     January, was my understanding of what it was.
2     Again, it was a span of three, four days, late
3     December, early January.
4  Q. Well, if I suggested to you that the call for no
5     heat came in to your office at around 4:45 in the
6     evening on December the 23rd, would you have any
7     reason to think that that was inaccurate?
8  A. If you've checked the record, no.
9  Q. Okay.
10 A. Well, if that's what it is that's what it is. I
11    won't argue with you over that.
12 Q. Let's assume that then, because I'll suggest to you
13    that that's what I pulled from the documents.
14       And that around 6:30 that evening
15    after your -- one of the inspectors had gone to the
16    property Mr. Smith was notified that there was a
17    problem with no heat. Okay? So let's assume that.
18    In regards to your -- the practices and procedures
19    of your department, would it have been acceptable
20    for Mr. Smith to purchase and take to the property
21    space heaters --
22       MR. CHERNETSKY: Objection.
23 Q. -- to temporarily resolve the no heat problem?
24 A. I don't know.

Page 39

1  Q. Well, would you have had -- if you were out on the
2     scene and Mr. Smith had suggested to you that he
3     was bringing space heaters over to keep the tenant
4     warm, --
5       MR. CHERNETSKY: Objection.
6  Q. -- would that have caused a problem in your mind?
7  A. Well, be asking that of the inspectors. The
8     inspectors make those determinations, not me. I'm
9     the commissioner. The inspectors deal with these
10    things on a case-by-case basis. And if space
11    heaters are a solution and they accept the space
12    heaters, that's up to them.
13 Q. So it's solely within the authority of the
14    inspector to decide whether that's an appropriate
15    resolution?
16 A. It's their job. That's -- I rely on them to
17    administer the code. I don't tell them what to do.
18    I rely on their judgment under all these situations
19    to do the proper thing.
20 Q. In the hundreds of times that you've gone out to
21    properties together with your inspectors, have you
22    ever personally witnessed a tenant who wouldn't
23    permit a landlord to make repairs?
24 A. No.

Page 40

1  Q. Not once, ever?
2  A. No.
3  Q. Do you have a recollection of Mr. Smith telling you
4     that he attempted to bring space heaters in to the
5     apartment at 11 Newport Street to correct that
6     situation on a temporary basis but wasn't permitted
7     to do so by the tenant?
8  A. Not that I recall, no.
9  Q. You have no recollection of ever hearing that
10    before?
11 A. No.
12 Q. Okay. If I suggested to you that the records
13    indicate that you were on the premises of 11
14    Newport Street on December the 27th, would that
15    comport with your recollection?
16 A. Two or three days in late December.
17 Q. Okay. And while I understand your earlier
18    testimony was that you don't remember how many
19    people might have been on the property at the time,
20    do you recall that Mr. Smith's contractor was on
21    the property when you arrived?
22 A. Not when I arrived. There was a contractor there,
23    and I never found out who the contractor -- they
24    could never figure it out, whose contractor it was,

Page 41

1　　when I arrived.
2　Q. Well, do you have a recollection that the -- that
3　　you or somebody on your staff had taken a
4　　contractor there?
5　A. I think that the inspectors had brought a
6　　contractor there, but I'm not certain about that.
7　Q. Do you have a recollection of what your involvement
8　　was in the process as it took place on the property
9　　that day?
10　A. A little bit.
11　Q. What is it that you recollect that you did while on
12　　the premises that day?
13　A. I think I accompanied the inspectors inside the
14　　house, saw the basement was -- the oil burner or
15　　the boiler, whatever it was was pointed out to me,
16　　was covered in soot. There was a person walking
17　　around, and he was covered in soot. And then
18　　Mr. Smith came along. He had some conversations
19　　with the inspectors, and then it was brought to my
20　　attention that he had made arrangements with the
21　　contractor to fix the boiler. And the contractor
22　　confirmed that he had been paid or had a contract
23　　to do it, and as far as I was concerned the issue
24　　was resolved because he was going to fix the

Page 42

1　　boiler. And I went on my way.
2　Q. Do you have a recollection of telling Mr. Smith
3　　that you were not going to permit his contractor to
4　　make the repairs?
5　A. No. I don't think I would have said permit his
6　　contractor to make the repairs. I think I would
7　　have said that it was that unless he showed me that
8　　he had a signed contract with his contractor to
9　　make the repairs, I wasn't going to believe that
10　　the thing had been resolved.
11　Q. Well, if Mr. Smith was there and his contractor was
12　　there, why is it that you had to inquire further
13　　into their relationship?
14　A. Because I didn't know if they had made -- come to
15　　an agreement yet until they told me.
16　Q. Do you remember telling Mr. Smith that he was going
17　　to have to pay for the inspectional services repair
18　　contractor that was on the site?
19　A. No.
20　Q. Do you recall telling Mr. Smith that you had taken
21　　over the job?
22　A. No.
23　Q. That you were not going to permit his contractor to
24　　make any repairs?

Page 43

1　A. No.
2　Q. Do you recall that there was an issue over a
3　　cracked heat exchanger in the furnace unit?
4　A. No.
5　Q. Do you recall that Mr. Smith's contractor told you
6　　and the other persons there, that if the old unit
7　　was turned on that carbon monoxide would get into
8　　the house?
9　A. No, no. I --
10　Q. No recollection?
11　A. Soot, there was something about soot. All I heard
12　　was about soot.
13　Q. So your testimony, sir, is after you were able to
14　　determine that Mr. Smith had a contractor there who
15　　was contracted to make the repairs you were
16　　satisfied and you left.
17　A. Yes.
18　Q. Did you have an opportunity to speak directly with
19　　Mr. Smith that evening?
20　A. I think so.
21　Q. Do you recall what you said and what he said?
22　A. Specifically, no.
23　Q. Generally, do you recall the conversation?
24　A. I think he introduced himself to me, and I think I

Page 44

1　　told him that I was concerned about that the heat
2　　had been off for an extended period and it appeared
3　　to me that he hadn't made any arrangements to get
4　　it restored, and that elderly tenants could --
5　　generally, elderly people are more susceptible to
6　　health problems and cold weather and he should be
7　　taking care to get it restored.
8　Q. And what is your recollection as to what Mr. Smith
9　　said in response to that?
10　A. I think he indicated that he had a contractor. And
11　　I said that -- I think I said -- well, I can't
12　　remember exactly what I said, but he then indicated
13　　to me that he had paid the contractor, made a
14　　contract with him, the contractor confirmed that,
15　　and then I left.
16　Q. Did you give your inspectors any other
17　　instructions when you left the property?
18　A. Just told them to be thorough, you know, make sure
19　　the heat's restored.
20　Q. Do you recall telling inspectors or an inspector
21　　there, "Write up every violation you can find?"
22　A. I don't recall saying that.
23　Q. Might you have said it?
24　A. Probably could have said be very thorough in your

Page 45

1  inspection.
2  Q. Did you have an understanding as to how many
3     property -- I know I asked you this earlier,
4     whether you knew Mr. Smith -- how many properties
5     he owned at that time period.
6        Did you have an understanding as you
7     were standing there how many buildings he owned?
8  A. No.
9  Q. Okay.
10 A. No.
11 Q. Did you ever tell Mr. Smith that day or evening
12    that you were going to treat him the same way you
13    treated Cliff Davis?
14 A. I don't remember those exact words, but I indicated
15    to him that my department was going to treat him
16    the same as any other landlord, you know, just
17    wasn't -- the issue was no heat, and regardless of
18    the status of the city employee he would be held to
19    the same standard that all landlords were held to.
20 Q. Well, did he ask for any favors?
21 A. From me, no.
22 Q. Did he ask for a favor from anybody?
23 A. I don't know.
24 Q. Did Mr. Smith ever raise the issue of him being a

Page 46

1  city employee?
2  A. To me, no.
3  Q. To your knowledge, did he raise that to anyone
4     there?
5  A. Inspectors I think.
6  Q. What leads you to believe that?
7  A. The impression I had from them.
8  Q. Which inspector had called you to come out there?
9  A. I think it was Steve O'Donnell.
10 Q. Do you know what Mr. Steve O'Donnell said to you
11    in making the request?
12 A. No. I can't recall. I don't remember.
13 Q. Who is Cliff Davis?
14 A. Cliff Davis was a known landlord in the city that
15    owned a lot of properties in substandard
16    conditions.
17 Q. Was that during your tenure as a commissioner?
18 A. It's partly during my tenure, partly during the
19    tenure of the former commissioner John Eade.
20 Q. I'm sorry, who?
21 A. John Eade.
22 Q. How do you spell his last name?
23 A. E-a-d-e.
24 Q. Does Mr. Davis continue to own properties in the

Page 47

1  City of Boston?
2  A. I don't know.
3  Q. What was your involvement with Mr. Davis?
4  A. Just as a commissioner of inspectional services.
5  Q. Was there a particular problem with Mr. Davis and
6     his properties?
7  A. Yes.
8  Q. What sort of problem?
9  A. Multiple code violations.
10 Q. Did the issues relating to Mr. Clifford Davis end
11    up in litigation?
12 A. They would get sworn out into housing court, a lot
13    of his violations. It's probably a lot of housing
14    court cases.
15 Q. Did Mr. Davis ever bring suit against the city or
16    you?
17 A. I don't know. I don't know.
18 Q. Well, did there come a time when Mr. Davis's
19    properties were no longer an ongoing issue?
20 A. They're less of an issue now. I think he made an
21    effort to clean his properties up and be more
22    responsive. I haven't heard his name in a couple
23    years, so that's a good thing.
24 Q. Okay.

Page 48

1      MR. CHERNETSKY: When you're done,
2   I'd like to take a break just for myself.
3      MR. STOPA: Sure.
4      (A short break was taken.)
5      MR. STOPA: Okay. Let's go back.
6      MR. CHERNETSKY: Sure.
7  Q. Okay. Was your public relations aid, John Dorsey,
8     there that evening, December 27th?
9  A. At some point.
10 Q. Did you call him to come there?
11 A. No.
12 Q. Why did he show up, then?
13 A. Why? I don't think I can answer why.
14 Q. I'm sorry, you don't think --
15 A. I would assume he had calls from the news media.
16    I would assume.
17 Q. Why would there be calls from the news media for a
18    no heat call for 11 Newport Street in Dorchester?
19 A. No --
20      MR. CHERNETSKY: Objection.
21 A. I have no idea.
22 Q. Okay. And, actually, I made a couple references to
23    this being in the evening, but I never asked you.
24       Do you recall what time of the day it

Page 49

1 was that you were at 11 Newport Street on December
2 the 27th?
3 A. It was -- it was dark and cold, so I would say late
4 afternoon, early evening.
5 Q. Well, let's try to figure out what people were at
6 the scene. You know that Mr. Dorsey arrived there
7 at some point.
8 A. Right.
9 Q. Was that after your arrival?
10 A. Yes.
11 Q. And how did you personally get there?
12 A. I probably went there with Paul Nally.
13 Q. Okay.
14 A. If I remember right.
15 Q. And I think you think you said Mr. O'Donnell was
16 involved with this transaction in some way?
17 A. Right. Mr. O'Donnell and some inspectors.
18 Q. Is -- Mr. O'Donnell is an inspector, right?
19 A. Mr. O'Donnell is a manager. There's some
20 inspectors involved, which I don't remember who
21 they were.
22 Q. Why was Mr. O'Donnell there, then?
23 A. Supervisor. I don't know.
24 Q. Well, from your experience as the commissioner, on

Page 50

1 an average winter, cold winter type day, how many
2 calls for no heat does your department get?
3 A. I have -- well, I don't know. This year since the
4 cold snap in January we've had about a thousand
5 calls for no heat.
6 Q. For the season?
7 A. Since January, since the --
8 Q. Since January.
9 A. Since the first cold snap in mid January. If I
10 remember right, you know.
11 Q. Well --
12 A. You're asking me stuff about four years ago. I
13 can't remember where I was two days ago.
14 Q. No, no. Let me reask the question, then. I'm not
15 asking specifically about two years ago. I'm
16 talking about in your experience as commissioner.
17 On average through most winters you get calls for
18 no heat in the wintertime, correct?
19 A. Correct.
20 Q. And you get calls for no heat every day. Is that
21 a fair statement?
22 A. It's temperature driven. If the temperature drops
23 below 20 degrees, we get a perceptible increase in
24 no heat calls.

Page 51

1 Q. Okay.
2 A. So, you know, that's -- and it goes with what the
3 temperature is. It's hard to say. But this year I
4 know we've had about a thousand up until now since
5 the cold snap in January.
6 Q. Okay. So that's probably better than 30 a day
7 since January for this year.
8 A. But not every day was cold, so it could be 60 a
9 day.
10 Q. I understand. Again, I was talking on average.
11    Okay. So now let's go back to
12 December of 2000.
13 A. Right.
14 Q. If I suggested to you that 11 Newport Street is a
15 triple-decker, do you have any reason to suggest --
16 that your memory thinks otherwise?
17 A. No, not really. I just can't remember what it is.
18 Q. Okay. And that was a cold period?
19 A. I remember it being cold, right.
20 Q. Okay. So at 11 Newport Street we have
21 Mr. O'Donnell who's -- I'm sorry, what was his --
22 A. He's a manager.
23 Q. Manager.
24 A. Right.

Page 52

1 Q. How many inspectors does he manage?
2 A. Fifteen maybe.
3 Q. Okay. And how many of his inspectors were out
4 there with him?
5 A. I think there were two or three of them.
6 Q. So we have Mr. O'Donnell; we have two or three
7 inspections. We have the commissioner because you
8 were out there.
9 A. Right.
10 Q. And we have Mr. Dorsey who was your public
11 relations person.
12 A. Right.
13 Q. Mr. Nally who's your personal inspector.
14 A. He's assigned to me.
15 Q. I'm sorry. Wrong terminology.
16    Anybody else out there?
17 A. Not that I can remember.
18 Q. Quite crowded, though.
19 A. Well, Lincoln Smith, we had a couple contractors,
20 we had some tenants.
21 Q. Okay. Do you recall anybody else from your office
22 being there?
23 A. Do I recall?
24 Q. Yes.

### Page 53

1   A. As I -- no, not -- no.
2   Q. Did you request anybody else to come --
3   A. No.
4   Q. -- and they were unable to attend?
5   A. Not that I recall, no.
6   Q. So we've got all these people out there for a no
7     heat call at 11 Newport Street, and in that group
8     are two contractors. Is that right?
9   A. I think so.
10   Q. Okay. And one of those contractors was
11     commissioned to the scene by someone on your staff?
12   A. As I understand it, yes.
13   Q. Okay. How is it that your staff determines who to
14     call in if they have to call a contractor in?
15   A. I think there's -- they had -- there was a protocol
16     they have to follow.
17   Q. Well, do you have a list of contractors that are
18     approved?
19   A. I think so. I think that's how it works.
20   Q. Well, who determines who's on that list?
21   A. It would be the city.
22   Q. Who the city? Who in the city?
23   A. You know, I don't know. No particular person. I
24     know there's procedures they have to follow to make

### Page 54

1     those kinds of lists so.... In this particular
2     instance I don't know. I don't know.
3   Q. So in some fashion the city has an approved
4     contractors list, and that's made available to you
5     should you need a contractor of that variety?
6   A. The inspectors it is. And, again, I don't remember
7     -- I don't manage the day-to-day nitty-gritty
8     details of this. I understand there's a process
9     that they have -- contractors that they can call in
10     these instances when they need them.
11   Q. And, again, I was making reference to the
12     figurative you, your department.
13   A. Yeah. The department has it. You know, the
14     particulars I don't know.
15   Q. Okay. So you left the scene of 11 Newport Street
16     on December 27th satisfied that there was a
17     contractor who was making the repairs on behalf of
18     the property owner.
19   A. Right.
20   Q. Okay. Do you know if any other violations were
21     written up for that property as a result of the
22     inspectors being on location that day?
23   A. No. No.
24   Q. Did you have any involvement with anything having

### Page 55

1     to do with that property after your visit of that
2     day?
3   A. Not that I recall.
4   Q. Who is Evangeline Davis?
5   A. She's a supervisor, another supervisor. Like
6     Mr. O'Donnell she's sort of the same -- she's an
7     MM7; he's an MM7.
8   Q. And what was her involvement with this property,
9     11 Newport Street?
10   A. I don't know.
11   Q. Was she there that night or that afternoon?
12   A. I don't know.
13   Q. Have you ever been made aware that Miss Davis
14     brought up 17 violations for Mr. Smith's property
15     as a result of that visit on December the 27th?
16   A. Not that I recall.
17   Q. Do you recall if you ever had any conversation with
18     Miss Davis after that date regarding the handling
19     of violations at 11 Newport Street?
20   A. No. I don't think I ever spoke to her about this.
21   Q. Do you have any recollection of telling Miss Davis
22     this was a special investigation and that all
23     aspects had to go through your office?
24   A. Not that I recall.

### Page 56

1   Q. Are there occasions where there are special
2     investigations where everything that happens in the
3     investigation has to go through you or your office?
4   A. I mean, back then, in the year 2000, if there were
5     multiple violations on a property, those would go
6     through my office so that the violator would be
7     given a comprehensive package of all of the
8     violations that affected the property rather than
9     get them piecemeal from the separate divisions of
10     the department. It was more of a -- it was a
11     coordination thing that we would try to implement
12     and then -- you know, it's different now but back
13     then they were being handled by my office.
14   Q. Well, do you have a recollection of that type of
15     involvement with Mr. Smith's property?
16   A. No, no.
17       MR. STOPA: Let's mark this as one
18     document, please.
19       (Exhibits 1 and 2 were marked for
20     identification.)
21   Q. Sir, let me show you what's been marked for
22     Exhibit 1 for identification, ask you to take a
23     look at that.
24   A. (Witness reading documents.)

Page 57

1  Q. Okay. Now, having had a chance to look at that,
2     do you recall ever seeing that?
3  A. No.
4  Q. Those documents before?
5  A. No.
6  Q. Okay. On the second page of the notice of
7     violation, signature -- a signature written, Julie
8     Fothergill, Esquire is there, and there are
9     initials next to that. Do you know whose initials
10    those are?
11 A. LL? LP?
12 Q. Who might have signed that on behalf of
13    Miss Fothergill, if you know?
14 A. I have no idea. LP. LP? Could be a clerk.
15 Q. Okay. Do you have a recollection of instructing
16    anyone to send out this notice of violation and the
17    attached notices?
18 A. Not that I recall.
19 Q. You don't have any recollection of getting involved
20    with that transaction?
21 A. No.
22 Q. Okay.
23 A. Other than, you know, generally. That was Julie's
24    job. That's what she did, she put together these

Page 58

1     types of things.
2  Q. When you say "these types of things," can you be a
3     little more specific, please?
4  A. These multiple violations. When -- some of them
5     are from the housing unit, some of them are from
6     the building department, building division. So one
7     of the things that this process was designed to do
8     was give you your violations from the separate
9     divisions in one package so that you could better
10    understand the issues that you needed to deal with.
11 Q. Okay.
12 A. Prior to -- the other way that it was done was
13    piecemeal. You might get some violations from
14    housing, and you might get some violations from
15    building, not at the same time but relating to the
16    same incident. There was, you know, a whole --
17    there was a lot of criticism against the department
18    for doing business in that fashion, so we were
19    trying to change the process so people would
20    understand from the beginning what the total
21    picture was. That's the way I can explain it best.
22 Q. Okay. I think I understand that. Okay.
23         So this package of violations goes out
24    from your office over the name of Julie Fothergill,

Page 59

1     who's the director of policy and planning. What
2     involvement did your office have in regard to those
3     violations after that date? And, again, this is
4     dated December 28, 2000.
5  A. I don't know. I don't know.
6  Q. Do you know who was to conduct the reinspections?
7  A. No. I would assume the inspectors that were
8     involved in the case.
9  Q. But your testimony is you personally did not any
10    involvement with this after that date.
11 A. No.
12 Q. Do you recall Mr. Smith having contact with your
13    office concerning open violations following this
14    notice of December 28, 2000?
15 A. No.
16 Q. Do you have any recollection of Mr. Smith notifying
17    your office that he had cured some or all of these
18    violations but that no one was reinspecting?
19 A. No. No.
20 Q. Let me show you Exhibit 2 for identification, ask
21    you to take a look at that.
22 A. (Witness reading document.)
23 Q. Do you recall ever seeing Exhibit 2 before?
24 A. No.

Page 60

1  Q. Looking at the last page, there's a certified mail
2     card that's addressed to you and it's signed for.
3     Is that your signature?
4  A. No.
5  Q. Do you know whose it is?
6  A. No idea. Hard to read. I have no idea. But I
7     could have seen it, you know. I'm not disputing
8     that. I just don't recall it.
9  Q. Okay. Did you ever instruct anyone on your staff
10    not to close out open violations at 11 Newport
11    Street?
12 A. No, I wouldn't do that. Generally, what we try to
13    do is make sure everything's resolved at the same
14    time.
15 Q. How -- tell me how that impacts the question I just
16    asked.
17 A. What?
18 Q. How does that impact the question I just asked?
19 A. If you get multiple violations before we close out
20    the case, we like to see everything resolved or at
21    least a plan put in place as to some -- sometimes
22    it's things that you can't fix right away that --
23    you know, structural things that, you know, that
24    requires months of work. Generally, we like to

### Page 61

1    keep them together and close it off all at once
2    when the work's completed.
3 Q. And violations, do they come in different
4    categories?
5 A. Yes.
6 Q. Some sort of major violation --
7 A. Right.
8 Q. -- category?
9         Do you have -- what sort of
10   terminology do you put on them? If it's what I
11   would term as a major violation, some very
12   problematic structural difficulty, for instance,
13   how would your office label that?
14 A. The inspectors would do that.
15 Q. I understand.
16 A. They --
17 Q. What kind of a word do they associate with it?
18   Again, for instance, I used the word major
19   violation. What would your office use?
20 A. I'd say the same thing. I would say it was a major
21   violation.
22 Q. Okay.
23 A. It's technical, you know. Certain things require
24   immediate -- like, no heat, stick with no heat is

### Page 62

1    the best example. No heat in the heating season by
2    law requires immediate attention. Similarly, there
3    might be some element of a building that would
4    require immediate attention or some, you know, food
5    thing that requires immediate attention and that's
6    all -- some codes are more specific than others, so
7    it's clearer under some codes what's more immediate
8    in nature.
9 Q. Okay. So if I understood your testimony in regard
10   to this package of notice -- violation notices and
11   closing out the case, it was the habit and practice
12   of your office to keep the entire case open until
13   you've taken care of all of the individual
14   violations.
15 A. Right.
16 Q. Is that what your testimony was?
17 A. Right.
18 Q. And then you would close the entire case at once?
19 A. Right. And if something was resolved -- it's a
20   checklist. Those things are checklists. Five of
21   them might be fixed, and they're not going to move
22   forward on the five that are fixed. They're only
23   concerned about the two remaining and then they
24   sign it off all together.

### Page 63

1 Q. During your tenure as a commissioner, have you seen
2    situations where problems at residential dwellings
3    are sometimes caused by the people who live there?
4 A. Sometimes. Sure.
5 Q. Tenants break things. Is that a fair statement?
6 A. Sure. I'm not -- sure.
7 Q. Does your office take into consideration problems
8    with tenants in regard to violations which are
9    noticed?
10 A. More so now I think than we did then.
11 Q. How do you deal with it now?
12 A. I think that inspectors are more -- over the last
13   couple of years we've been able to establish more
14   communication with property owners, and we've done
15   a lot of outreach with property owners. And we run
16   seminars for the property owners so they understand
17   their obligations. I think previously that kind of
18   outreach hadn't been undertaken and people were
19   confused about what their responsibilities were.
20 Q. Okay.
21 A. So now we try to explain things to people in a more
22   positive position. And the inspectors are more
23   aware, or we try to make them more aware, that a
24   lot of these conditions might arise because of the

### Page 64

1    tenant. And there's all sorts of landlord tenant
2    disputes, and we're always in the awkward position
3    of having to arbitrate them. So we try to get
4    comfortable in addressing both sides and bring them
5    together.
6 Q. Is Miss Evangeline Davis still employed with
7    inspectional services?
8 A. Yes.
9 Q. Same position?
10 A. She could have been an inspector at the time. She
11   -- sometimes she's -- for staffing reasons she
12   sometimes is an acting manager. That's what it is.
13 Q. Okay.
14 A. So right now she's an inspector.
15 Q. She has on occasion been --
16 A. Yes, yes.
17 Q. Okay.
18 A. See, my memory's all foggy. She could have been an
19   inspector then.
20 Q. Okay. Which would explain why her name would have
21   appeared on one or more of these documents.
22 A. Yeah. That's probably it. There's three managers
23   over there, and when one goes out for an extended
24   period we -- she's been known -- she's been put

Page 65

1 into an acting managers slot before.
2 Q. Okay. So in or about December 2000, do you have a
3 recollection if she was an acting manager then or
4 simply an inspector?
5 A. I don't but you can check the records. The records
6 will tell you.
7 Q. What records would tell you that?
8 A. The city records. If you're acting as a manager,
9 they have to sign papers for it, put papers
10 through.
11 Q. So if that became an issue in some way, there would
12 be a way to find out whether she was or not?
13 A. Yes.
14 Q. Do you recall making any comments to anyone in the
15 media, any type of media, concerning Mr. Lincoln
16 Smith?
17 A. Do I recall it?
18 Q. Yes.
19 A. No. Personally you're asking?
20 Q. I'm asking you personally.
21 A. Not that I recall.
22 Q. Do you have -- okay.
23    Do you have any recollection of
24 instructing anyone on your staff to issue a

Page 66

1 statement or information regarding Mr. Smith?
2 A. I could have.
3 Q. What leads you to believe that you could have? Do
4 you have a recollection of something?
5 A. Well, the fact that John Dorsey was there, you
6 know.
7 Q. Do I take it then from that answer that you don't
8 have any specific recollection?
9 A. No, no.
10 Q. Do you recall --
11 A. It would just be speculation.
12 Q. Okay. Do you recall in or about that time period
13 there was some sort of a list about the city's
14 worst landlords?
15 A. There was speculation about a list of the city's
16 worst landlords. I don't think there was ever a
17 list generated. I never -- never. People have
18 asked me that before. I haven't seen it.
19 Q. Okay. So if I understand your testimony, your
20 office didn't prepare or keep a list of the city's
21 worst landlords?
22 A. To my knowledge, no.
23 Q. Well, did your office keep a list of which
24 landlords had the most violations, statistical

Page 67

1 analysis?
2 A. To my knowledge, no.
3 Q. In that time period, December 2000, did your office
4 keep statistics of any kind?
5 A. Other than what's kept on the city -- the city
6 system for purposes of budget and accounting and
7 the number of permits, numbers of complaints and
8 things like that, no.
9 Q. When you say the city's system, what sort of
10 information is kept there?
11 A. Financial information, number of complaints, number
12 of permits issued in the different categories.
13 Q. Let me ask you this. If someone you had to respond
14 to suggested to you, go find out who -- which
15 landlord has the most violations in the city for
16 the year 2003, would you have the ability to get
17 that information?
18 A. The only way you could do that is go into community
19 buildings. You could I suppose run -- you could
20 run -- you could run the address and it would give
21 you the number of complaints against the address.
22 It would give you the complaints.
23 Q. Okay.
24 A. It wouldn't give you -- there's no way to --

Page 68

1 there's no way to put someone's name in and show
2 you how many complaints they've got.
3 Q. Okay. So the record keeping --
4 A. That I know of.
5 Q. Okay. So the record keeping of violations
6 currently, let's do currently, currently is such
7 that you can research a property and determine how
8 many violations that property's had. Is that
9 correct?
10 A. Correct.
11 Q. But you don't have the ability to cross-reference
12 an owner's name, either an individual or
13 corporation, to see what all of their properties
14 had done?
15 A. Correct.
16 Q. Do you have the ability to research an owner and
17 determine how many properties an owner has?
18 A. Um.... No, no, no. That would be time consuming.
19 You would have to know what property a person
20 owned. We don't have a -- we can't tie it in to a
21 property, we could only go by addresses.
22 Q. So all of your computerized record keeping is done
23 by address?
24 A. Yeah.

Page 69

1  Q. Do you have a recollection of ever saying to
2     anyone in the media that Mr. Lincoln Smith was one
3     of the city's worst landlords?
4  A. Not that I know of.
5  Q. Do you recall if anyone -- do you have any
6     recollection of anyone on your staff making such a
7     statement to any outlet, media outlet?
8        MR. CHERNETSKY: What time period are
9     we talking about?
10       MR. STOPA: Following December 2000.
11 A. Not that I know. I know that Dorsey handled the
12    media on this. I think. But beyond that, not
13    specifically what was said. I don't know.
14 Q. So what I need to have an understanding is, you say
15    that Dorsey handled the media on this. What sort
16    of media involvement was there, as you recall?
17 A. There was media involvement. I think there was a
18    couple of newspaper stories about it, and Dorsey
19    handled it, is what I recall.
20 Q. How did the newspapers find out about it?
21 A. I don't know.
22 Q. Do you recall someone from your office notifying
23    them?
24 A. I don't recall that, no.

Page 70

1  Q. Well, does your office on occasion bring matters of
2     interest to newspapers and other media?
3  A. On occasion.
4  Q. And on other occasions they come to you with
5     inquiries concerning issues?
6  A. Yeah. Usually, if the news media -- as I
7     understand it, I'm not the press person, but I've
8     been told that if one TV station calls you about
9     something, you notify all the other TV stations,
10    for example. It's part of business. That's how
11    they operate. So I can't say that it happened in
12    this case.
13 Q. Well, when you say they operate, they work for you.
14 A. Well, the press part of it I don't -- you know,
15    they work for me and they -- they're in that
16    industry, so they handle the press. I try to stay
17    away from it.
18 Q. Well, the press people you have on staff, who do
19    they take their lead from? Who do they report to?
20 A. Me. But just like the inspectors, they handle the
21    details of the situation as it presents itself to
22    them. I trust their judgment and rely upon them to
23    do their jobs.
24 Q. But as commissioner you are -- you drive the

Page 71

1     policy of the whole department, do you not?
2  A. I certainly do.
3  Q. So how would your press people know how much media
4     attention you want to be exposed to?
5  A. I -- personally, I try not to be involved in the
6     media. I tell them I don't want to be involved in
7     it. People handle it.
8  Q. Well, then, under what circumstances -- if your
9     personal policy and your theory for running your
10    department is such that you want to avoid the media
11    or be exposed to the media, under what
12    circumstances do you have your staff contact the
13    media to bring issues to their attention?
14 A. If we were announcing a program or a procedure or
15    something that the people want to know about, if
16    we're trying to do educational things, community
17    outreach, announcing some new program in the
18    community that's going to be a benefit for
19    everybody that you -- proactive stuff. If we get
20    calls from the media, they have to respond to them.
21    I leave it to them as to how they respond or to who
22    they respond.
23 Q. Under what circumstances do you have your staff be
24    proactive when it comes to individual property

Page 72

1     owners and violations on any of the properties?
2  A. I don't.
3  Q. So if I understand your testimony, there isn't any
4     chance that it was your staff that initiated the
5     media's interest in Mr. Smith's property at 11
6     Newport Street?
7        MR. CHERNETSKY: Objection.
8  A. Any chance? I don't know. I can't say that.
9  Q. Well, under what circumstance would you have your
10    staff report to the media that there was this --
11    this problem at Mr. Smith's property?
12 A. I wouldn't.
13 Q. Well, with whatever guidance you give your media
14    people on your staff, under what circumstances
15    would you expect that they would take that issue to
16    the media on a proactive basis?
17 A. Only in response -- I would say in response to a
18    call from the media.
19 Q. So the only way that your staff would have contact
20    with the media is if the media contacted them in
21    regards to Mr. Smith's property?
22 A. It's pure speculation, but that's generally what I
23    would expect.
24 Q. Well, and I'm -- that's what I'm trying to define

Page 73

1  here, trying to take some of the speculation out.
2       So given a circumstance like you were
3  faced with on December the 27th, 2000, under your
4  watch, with your policies and procedures, you would
5  not expect your staff to take that issue to the
6  media. Is that a fair statement?
7  A. That's a fair statement.
8  Q. Okay. And you would expect, under your policies
9  and procedures and practice, that they would only
10 respond to the media if the media initiated the
11 inquiry?
12 A. Yes.
13 Q. And Mr. Dorsey during that time period was your
14 public relations person. Is that correct?
15 A. Correct.
16 Q. And he was on the scene with you at Mr. Smith's
17 property --
18 A. Yes.
19 Q. -- at 11 Newport Street that evening?
20 A. Right.
21 Q. Do you have a recollection as to why you had him be
22 there?
23 A. Probably because I didn't want to have to answer
24 all his questions. If he wanted to know what was

Page 74

1  going on, I probably told him to go out there and
2  find out himself because I was leaving.
3  Q. Answer whose questions?
4  A. The news people's questions.
5  Q. How is it that the news people were at 11 Newport
6  Street that day?
7  A. They weren't.
8  Q. So you were anticipating that they might be?
9  A. No. I think Dorsey had questions as to what was
10 going on because he had calls from the media. And
11 I told him to go out there and find out for
12 himself, basically. That's best as I can recall.
13 Q. Well, do you have a recollection as to how the
14 media found out about this home at 11 Newport
15 Street?
16 A. No, no.
17 Q. But your testimony is that neither you nor, to the
18 best of your knowledge, anyone on your staff
19 initiated contact with the media concerning 11
20 Newport Street?
21 A. That's my -- yeah.
22     MR. STOPA: Just give me two minutes
23 and we might be done.
24     MR. CHERNETSKY: Sure.

Page 75

1     (A short break was taken.)
2     MR. STOPA: Go back on the record to
3  say I have nothing further to ask.
4     MR. CHERNETSKY: I think I just have
5  a very brief one or two. Can I just see Exhibit 1.
6  EXAMINATION BY MR. CHERNETSKY:
7  Q. Commissioner, I'm going to ask you to look again at
8  Exhibit No. 1 if you would.
9  A. (Witness complying.)
10 Q. And I believe that earlier Mr. Stopa directed your
11 attention to the signature on page two. Do you
12 recall that?
13 A. I do.
14 Q. Do you have any specific memory of that particular
15 signature on this particular document?
16 A. No. But this is a form letter and it....
17 Q. This is a document that your office uses routinely
18 in the course of business?
19 A. Routinely in the course of business. And I think
20 the issue is whether I directed somebody to sign it
21 or not. I very well could have. These things, if
22 they pile up or something, I'll just instruct the
23 staff to do what they do with them generally.
24 Q. But you don't recall that particular document?

Page 76

1  A. No, I don't recall this particular document, no.
2  Q. And what are the sorts of circumstances under which
3  somebody other than Miss Fothergill might sign that
4  document for her?
5  A. If she wasn't there to sign it, if, you know,
6  things were piling up in her box, they want to move
7  the paper through. These are standard, what do you
8  call it, general business type things. They like
9  to keep the process moving.
10 Q. Is there anything unusual about a staff member
11 signing for one of your directors?
12 A. No, no.
13     MR. CHERNETSKY: That's all I have.
14 Nothing further.
15     MR. STOPA: Actually, on that.
16     MR. CHERNETSKY: Sure.
17 EXAMINATION BY MR. STOPA:
18 Q. Next to Miss Fothergill's name is that -- the
19 initials and a circle. Might that be LT for Lisa
20 Timberlake?
21 A. It could be. Looks more like a P to me than a T,
22 but it could be.
23 Q. Well, do you have anybody in your staff with the
24 last name beginning with P such that --

Page 77

1　A. We have --
2　Q. Let me finish. Such that it would be somebody in
3　　　your office that would sign this?
4　A. Yeah, filling in or something on a given day.
5　　　Sure.
6　Q. Okay.
7　A. Yeah. Lisa, there's a Lisa Palmer. She's an MM4
8　　　or something who could conceivably fill in on a
9　　　given day.
10　Q. When you say you have staff, if you're missing
11　　　staff you have other people that will come in and
12　　　fill in at your office?
13　A. Yeah.
14　Q. And, I'm sorry, this Lisa Palmer is -- where does
15　　　she normally work?
16　A. Switchboard.
17　Q. And how often would she come to work as -- on your
18　　　administrative staff as a fill-in?
19　A. Occasionally.
20　　　　MR. STOPA:  Okay. I don't have
21　　　anything else. Thanks.
22　　　　MR. CHERNETSKY:  Okay.
23　　　(Whereupon, the deposition was
24　　　adjourned at 1:05 p.m.)

Page 78

1　　　　CERTIFICATE
2
3
4　　　I, KEVIN J. JOYCE, do hereby certify that I
5　have read the foregoing transcript of my testimony,
6　and I further certify the said transcript is a true
7　and accurate record of said testimony.
8
9
10　　　Dated at this ____ day of _____, 2004.
11
12
13
14
15
16　　　　_____
17　　　　　　KEVIN J. JOYCE
18
19
20
21
22
23
24

Page 79

1　　　　CERTIFICATE
2
3　COMMONWEALTH OF MASSACHUSETTS )
　　　　　　　　　　　　　　　　　 ) ss.
4　COUNTY OF SUFFOLK　　　　　　　 )
5
6　　　　I, Deborah S. Gutierrez, a Registered
　　Professional Reporter and Notary Public within and
7　　for the Commonwealth of Massachusetts, do hereby
　　certify:
8
　　　　That KEVIN J. JOYCE, the witness whose
9　　deposition is hereinbefore set forth, was duly
　　sworn by me, and that the foregoing transcript is a
10　true and accurate record of the testimony given by
　　such witness.
11　　　　I further certify that I am not
　　related to any of the parties in this matter by
12　blood or marriage, and that I am in no way
　　interested in the outcome of this matter.
13
14
15
　　　　IN WITNESS WHEREOF, I have hereunto
16　set my hand and seal this 25th day of February,
　　2004.
17
18
19
20
21
22　　_____
　　　Notary Public
　　　My commission expires on
23　　February 18, 2005
24