## Page 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                BOSTON MUNICIPAL COURT

-----------------------------------
Lincoln Smith,                          :
          Plaintiff               :
                                        :
VS.                                     :    Civil Action
                                        :    No.  T47183
City of Boston, Boston Inspectional     :
Services, Kevin J. Joyce,               :
          Defendants              :
-----------------------------------

      DEPOSITION of EVANGELINA MAXWELL-DAVIS a witness called on behalf of the Plaintiff, pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Nancy Atherton, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Office of Stopa & Associates, 36 Mechanic Street, Suite 208, Foxboro, Massachusetts, on Thursday, February 19, 2004, commencing at 10:00 a.m.

BEACON HILL COURT REPORTING, INC.
44 Bayswater Street
Boston, MA 02128
(617) 569-8050

## Page 2

APPEARANCES:

    STOPA & ASSOCIATES, LLC
    George F. Ohlson, Jr., Esquire
    36 Mechanic Street, Suite 208
    Foxboro, MA 02035
        Attorney for the Plaintiff

    CITY OF BOSTON LAW DEPARTMENT
    James S. Chernetsky, Esquire
    City Hall - Room 615
    Boston, MA 02201
        Attorney for the Defendants

ALSO PRESENT: Lincoln Smith, Plaintiff

## Page 3

### INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Evangelina Maxwell-Davis | | | | |
| By Mr. Ohlson: | 4 | | 44 | |
| By Mr. Chernetsky: | | 37 | | 45 |

FURTHER REDIRECT
    46

FURTHER RECROSS
    48

### EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | 2/6/01 Inspection Report | 18 |
| 2-4 | Reinspection Results | 25 |
| 5 | 12/23/00 Notice of Violation | 40 |
| 6 | Notice of Violation - 008806 | 40 |
| 7 | 12/20/00 Notice of Violation | 42 |

## Page 4

PROCEEDINGS

    MR. OHLSON:  Do you want to do the usual stipulations?

    MR. CHERNETSKY:  Sure.  Why don't we say what they are though just for the record.

    MR. OHLSON:  Sure.  All objections, except as to form, and -- I'm sorry -- all objections and motions to strike, except for form, reserved until time of trial. And do you want her to read and sign, 30 days?

    MR. CHERNETSKY:  Sure.  We'll waive the notary. What he means is you'll get a chance to review the deposition transcript and correct any errors if you have them.

    THE WITNESS:  Okay.

    EVANGELINA MAXWELL-DAVIS,

A witness called for examination, having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. OHLSON:

Q    My name is George Ohlson and I'm an attorney with Stopa & Associates, and I represent the plaintiff Lincoln Smith in this action.  So have you ever been deposed before?

A    Yes.

Q    Okay.  When were you deposed?

A    I don't recall what year or what time, but I have been.

6

```
 1   Q   Well, I'm just going to go through some simple just
 2       instructions that, you know, you've probably heard
 3       before.  A deposition is a fancy way of saying that I ask
 4       you questions and you answer them.  And at times
 5       throughout this deposition I'll probably ask questions
 6       that may not make sense, so you may need to ask me to
 7       rephrase them.
 8           The thing is that only one of us can talk because of
 9       the stenographer at one time.  And I ask that if you
10       don't understand a question, that you ask me to repeat
11       it, and I'll rephrase it so you understand it.  And then
12       I ask that you wait until I'm done with my question
13       before you answer because you could anticipate the wrong
14       end of the question.
15           And if you want to take a break at any time, feel
16       free to do that.  Just if there's a question pending, I
17       need you to answer the question before we take the break.
18       So if there's nothing else, I'll get started.
19           And could you state your full name?
20   A   Evangelina Maxwell-Davis.
21   Q   And what is your marital status?
22   A   Right now?
23   Q   Yes.
24   A   I'm currently in the middle of a divorce.
25   Q   And what is your date of birth?
```

```
 1   A   11/13/65.
 2   Q   And what is your highest level of education?
 3   A   College.
 4   Q   Where did you go to college?
 5   A   Quincy, Quincy College.
 6   Q   Was that an undergraduate degree?
 7   A   Paralegal studies, yes.
 8   Q   Was that a junior college at the time or was it a
 9       four-year college?
10   A   At the time it was a junior college.
11   Q   So you have a two-year --
12   A   I have a two-year --
13   Q   -- associates?
14   A   -- associates degree in paralegal studies.
15   Q   Okay.  And what year was that?
16   A   In the '80s.  I can't --
17   Q   Okay.  And when you finished with your paralegal degree,
18       where did you work?
19   A   Attorney Earl Miller's office in Boston.
20   Q   And how long did you work there?
21   A   Six years.
22   Q   And when you finished with the attorney's office, where
23       did you go next?
24   A   I don't know.  Maybe Rogerson Communities after that.
25   Q   Okay.  And do you know where you worked after that?
```

7

```
 1   A   Yeah.  I worked for the city.
 2   Q   And what did you do for the city?
 3   A   I was an office manager for Jamaica Plain Community
 4       Centers.
 5   Q   What year was that?
 6   A   Probably '96.
 7   Q   And how long did you do that?
 8   A   Maybe two years.
 9   Q   And where did you go after that?
10   A   Where I currently work now, inspectional services.
11   Q   And that's the City of Boston Inspectional Services?
12   A   Yes, correct.
13   Q   So you started there in 1998?
14   A   Yes.
15   Q   Approximately?
16   A   Yeah.
17   Q   And what was your position when you started?
18   A   My position at inspectional services?
19   Q   Yes, when you started.
20   A   I was an inspector.
21   Q   Did you have any background in housing inspection before
22       the position?
23   A   Yes.
24   Q   What was your background?
25   A   When I worked with the attorney we did housing and
```

8

```
 1       evictions and all different types of housing.
 2   Q   So what specifically were you exposed to as a paralegal?
 3   A   All types of everything as far as housing is concerned.
 4   Q   But what type of responsibilities did you -- what were
 5       your duties that had to do with -- let me rephrase the
 6       question.  What specifically did you do?  Did you type
 7       letters?  Did you do research?
 8   A   I did everything.  I typed letters.  I did research.  I
 9       sat in on hearings.  I did everything.
10   Q   Did you go to school at all for -- to be an inspector?
11   A   Yes, when I got to inspectional services I was trained.
12   Q   Tell me about that training.  What was it, an in-house
13       training at inspectional services?
14   A   Yes, it was in-house, and I went out with a senior
15       inspector for about, I don't know, maybe six months.
16   Q   If I could back up a second.  What -- so you are saying
17       that you went out with a senior inspector and followed
18       him throughout his day, is that what you're saying?
19   A   I wouldn't say I followed him throughout his day.  I
20       would say he trained me on certain aspects of the job,
21       yes.
22   Q   Okay.  Was there any sort of formal classroom part to
23       this training?
24   A   In-house classroom training, yes.
25   Q   How long did that last?
```

```
 1   A   Maybe six months.
 2   Q   Okay.  And did you do this at the same time when you
 3       worked alongside this senior inspector?
 4   A   Correct, yes.
 5   Q   And what sort of things did -- generally speaking, what
 6       sort of things did you learn at this training?
 7   A   The state sanitary code.
 8   Q   And when you say the state sanitary code, what is your
 9       interaction as an inspector with the state sanitary code?
10   A   We enforce the state sanitary code.
11   Q   So when you -- and is this -- when you say that you
12       enforce the state sanitary code, is this for the City of
13       Boston?
14   A   Yes.
15   Q   And solely the City of Boston?
16   A   Yes.
17   Q   So are you still an inspector?
18   A   Yes.
19   Q   Did your position at any time change at Boston
20       Inspectional Services?
21   A   Yes.
22   Q   What did it change to?
23   A   I acted in different -- assistant director position.
24   Q   Assistant director of?
25   A   Housing, the same department that I still work for.
```

```
 1   Q   And how long did you do that?
 2   A   Maybe a year.
 3   Q   Is that the only different position that you've had at
 4       ISD other than housing inspector?
 5   A   Yes.
 6   Q   When you had the training at ISD, did, you know, the
 7       formal classroom, did they bring in outside people to
 8       train you or was it inside people that trained you?
 9   A   I mean I've sat at a lot of trainings within my
10       department where some outside people came in and it was
11       some in-house people.
12   Q   How many trainings have you gone through in the time
13       you've been there?
14   A   I can't -- maybe 20, maybe 25.
15           MR. CHERNETSKY:  You don't have to guess if you
16       don't know.
17           THE WITNESS:  Okay.
18   Q   As an inspector, what are your day-to-day duties?
19   A   To go out and inspect properties.
20   Q   And how do you know which properties to go to?
21   A   It's complaint driven.
22   Q   So if a tenant makes a complaint with the city, then you
23       would go out and inspect that property, is that right?
24   A   Yes.
25   Q   And how many inspections do you do per day?
```

```
 1   A   It varies.
 2   Q   On average.
 3   A   Thirteen.
 4   Q   And is there a particular area which you inspect within
 5       the city?
 6   A   Yes.
 7   Q   What is that area?
 8   A   Currently?
 9   Q   Currently or throughout the time that you've been at ISD
10       I guess.
11   A   I've inspected the entire City of Boston.
12   Q   Okay.  Where were you inspecting in December of 2000?
13   A   Ward 13.
14   Q   And what is Ward 13?
15   A   Dorchester.
16   Q   Do you know Lincoln Smith?
17   A   Yes, I know Lincoln Smith as Lincoln Smith.
18   Q   How do you know him?
19   A   I know that he's the owner of a property that I
20       inspected.
21   Q   And when did you meet Lincoln first?
22   A   I don't recall.
23   Q   Was it before December of 2000?
24   A   I really don't recall.
25   Q   What is your personal opinion of Lincoln Smith?
```

```
 1   A   I don't have a personal opinion of Lincoln Smith.
 2           MR. CHERNETSKY:  Objection.
 3   Q   Could you give me an overview of the inspection process
 4       if there's a complaint?  What happens next?  What do you
 5       do next?
 6   A   Can you rephrase that?  Do you want my opinion of what it
 7       is because that's not my job.
 8   Q   Not your opinion.  I just want to know the different
 9       steps.  If you go to a property from a complaint and then
10       you go and you find a violation, how does the process go
11       from there?  What happens after that?
12   A   If I go to a property --
13           MR. CHERNETSKY:  George, are you asking about the
14       process today or the process in December of 2000?
15           MR. OHLSON:  In December of 2000.
16   A   In December of 2000, if I go to a property and I find a
17       violation in a unit that I have inspected, then I go back
18       to the office depending on if it's an emergency status
19       property or if it's just something that can be written
20       when I get back to the office.  I go back to the office.
21       I write a legal notice.  The property owner is served by
22       one of our constables if it's within the City of Boston,
23       and he has however many days to correct the violations.
24       If it's a 24-hour notice, he has 24 hours.  If it's a
25       seven-day notice, he has seven days from the day he was
```

14

```
 1        served.
 2   Q    Okay.  What determines whether or not there's 24 hours
 3        notice or seven days or --
 4   A    The state sanitary code determines that.
 5   Q    Okay.  Are you familiar with the different violations and
 6        which ones require more notice or which ones require less
 7        notice?
 8   A    Yes.
 9   Q    Who in ISD matches up the violations with the sanitary
10        code to determine how much notice is given?
11   A    The inspectors.
12   Q    So that would be something that you would do?
13   A    It's a judgment call when you are out in the field.  When
14        you are out of in field and you see that a ceiling is
15        caved in and there's water pouring down, then yes, I'd
16        say this needs to be fixed immediately.
17   Q    So would a no-heat complaint be an emergency situation?
18   A    Yes.
19   Q    Okay.  So after a landlord has notice of a violation,
20        he's given how much -- 24 hours to fix it for example?
21             MR. CHERNETSKY:  Objection.
22   Q    I'll rephrase the question.  Suppose that the time period
23        which is allotted expires, seven days or 24 hours,
24        whatever, what happens next?  Does ISD reinspect the
25        property at that point?
```

```
 1             MR. CHERNETSKY:  Objection, but you can answer.
 2             THE WITNESS:  Answer?
 3             MR. CHERNETSKY:  Yup.
 4   A    Yes.  When the time period is up, the inspector goes back
 5        and reinspects the property to see if the violation has
 6        been corrected.
 7   Q    Is the landlord given notice that ISD is coming to
 8        reinspect?
 9   A    In December --
10   Q    2000.
11   A    -- 2000, no the landlord was not given notice.
12   Q    Is that different now?
13   A    Now the landlord is given a copy of the reinspection
14        notice.  It is mailed out to the landlord.  So he knows
15        whether or not his property was approved, whether he
16        fixed the violation properly or whether he did not.
17   Q    But I guess my question is this, does the landlord know
18        that you are going to be on the property to reinspect
19        before you get there to reinspect?  Do you see what I'm
20        saying?
21   A    Do you want me to answer now?
22   Q    Please.
23   A    No.
24   Q    So in December of 2000, would the landlord get notice
25        after the fact, after you've done your reinspection that
```

15

```
 1        it took place?
 2   A    No.
 3   Q    And why was that?
 4             MR. CHERNETSKY:  Objection.  Answer if you can.
 5   A    I don't know.
 6   Q    Okay.  So have you been to 11 Newport Street?
 7   A    Yes.
 8   Q    And how many times do you think you've been there?
 9   A    I can't answer that.
10   Q    Were you there before December of 2000?
11   A    I don't know.
12   Q    Do you know if you were there on December 23, 2000?
13   A    I really don't know unless I have paperwork in front of
14        me.  I don't remember.
15   Q    Okay.  If I told you that was the first day of the
16        no-heat complaint that this litigation is about with
17        Evangelina Davis (sic), were you there on that day?
18             MR. CHERNETSKY:  Objection.  It's Miss O'Shea who I
19        believe made the no-heat complaint.
20   Q    Miss O'Shea; I'm sorry.  You're Miss Davis.  The first
21        day that Miss O'Shea complained about the heat was
22        December 23.  Were you one of the inspectors that was
23        present on the property on that day?
24   A    I don't -- I really don't know.
25   Q    Okay.  Bear with me for a second.  When we talked about
```

16

```
 1        inspections that you do, there's two kinds of
 2        inspections, correct, there's an inspection for a code
 3        violation; there's also a preinspection for rental
 4        property?
 5             MR. CHERNETSKY:  Objection.  You can answer.
 6   A    There's a reinspection.
 7   Q    Okay.
 8   A    I mean there's reinspections.  There's prerental
 9        inspections which are done before tenants move into a
10        property.
11   Q    Okay.
12   A    And then there's inspections complaint driven.
13   Q    Okay.  So my statement that there's two kinds is
14        inaccurate.  There's reinspections, and those stem from
15        double-checking as to whether or not a violation has been
16        corrected, is that right?
17   A    Yes.
18   Q    And then there's the inspection that stems from a
19        complaint.  But then there's a whole different category
20        of preinspections for rental properties, is that correct?
21   A    Yes.
22   Q    Okay.  Did you do a preinspection of 11 Newport Street?
23   A    What apartment 11 Newport Street?
24   Q    Apartment 3.
25   A    Yes.
```

Case 1:03-cv-10062-DPW   Document 21-4   Filed 03/29/04   Page 5 of 13

Page 17

| | | |
|---|---|---|
| 1 | Q | Do you remember when you did that? |
| 2 | A | No. |
| 3 | Q | Okay. When you do an inspection, would you check things like the heat? |
| 5 | A | When I do what type of inspection? |
| 6 | Q | A preinspection, would you check to see if the heat was in working order? |
| 8 | A | It depends. Sometimes when the system -- when you go to do a preinspection the gas isn't on. The system is not on and you can't check it. If you can check it, yes. |
| 11 | Q | If an inspection was done in February, would you be able to check to see if the heat was working? |
| 13 | | MR. CHERNETSKY: Objection. |
| 14 | A | What type of inspection? |
| 15 | Q | I'm sorry, preinspection. |
| 16 | A | Can you ask your question again? |
| 17 | Q | Sure. If an inspection was done in February, would it be easier to check to see if the heat was in working order? |
| 19 | | MR. CHERNETSKY: Objection. |
| 20 | A | I can't answer that. There's so many different components. |
| 22 | Q | Fair enough. This is the inspection done on February 6 of 2000 for Unit 3. |
| 24 | | MR. OHLSON: We'll mark this as Exhibit 1. |
| 25 | | (2/6/01 inspection report marked as Exhibit No. 1.) |

Page 18

| | | |
|---|---|---|
| 1 | | MR. CHERNETSKY: This could get a little confusing. Let's note on the record there's an exhibit tag on this document that says Exhibit 1, Davis, 10/16/01 from another context. |
| 5 | | MR. OHLSON: Right. |
| 6 | Q | Do you remember this document? |
| 7 | A | I don't see that document. |
| 8 | Q | Okay. This document, what this indicates is about when the inspection of Unit 3 was done of 11 Newport Street? |
| 10 | A | Are you asking me a question? |
| 11 | Q | Yes. |
| 12 | A | You want to know if this is an approval certificate from the preinspection of Unit No. 3? |
| 14 | Q | What the approval certificate -- |
| 15 | A | You are asking me what this is, and I don't see these. All I do is the inspection, turn in my paperwork and someone else picks it up from there. So I never see these. So I can assume from reading it, it says inspection certificate, that that's what it is. |
| 20 | Q | And so you do the preinspection, you turn in your paperwork, and then some else issues this? |
| 22 | A | Correct. |
| 23 | Q | What paperwork do you turn in? |
| 24 | A | I turn in my work sheet that says whether the unit was approved or not approved or whether it had to fix some |

Page 19

| | | |
|---|---|---|
| 1 | | things before it got approved or just my work sheet. |
| 2 | Q | Okay. And so this inspection, if you look on here, was issued on -- the certificate was issued on February 6, 2000. Does that mean that you inspected the property on February 6, 2000? |
| 6 | A | I don't know. |
| 7 | | MR. CHERNETSKY: I think she said she doesn't know anything about this document or how it's created. |
| 9 | | MR. OHLSON: I understand. |
| 10 | Q | So with your work sheet you check off the different -- you look on this work sheet; it has the different areas that you would inspect when you go into a property, is that correct? |
| 14 | A | No. |
| 15 | Q | Then what is the work sheet again? |
| 16 | A | A work sheet is an open space for me to write things on, for me to write my notes of what I see, what needs to be done or what you need corrected. |
| 19 | Q | Okay. Getting back to some of the things you would look at when you do an inspection, would you look for water stains in an apartment? |
| 22 | A | Is that a preinspection? |
| 23 | Q | Yes, preinspection. |
| 24 | A | Yes. |
| 25 | Q | Would you in a preinspection, would you look for rodents? |

Page 20

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Rats? |
| 3 | A | Yes. |
| 4 | Q | Mice? |
| 5 | A | Evidence of mice. |
| 6 | Q | Okay. How about insects? |
| 7 | A | Evidence of. |
| 8 | Q | In addition, would you look to see if there was garbage piled up or would that be something that you would put in your work sheet if there was an excessive amount of garbage? |
| 12 | A | Excessive amount of garbage where? |
| 13 | Q | For example, if there was beer bottles and cans and trash that were debris, if they were blocking an entrance or if they were just laying out on a porch or something like that. |
| 17 | | MR. CHERNETSKY: Objection. |
| 18 | A | When the preinspection was done for this unit it was empty. No one was living there. There was no cans, bottles or anything anywhere. The apartment was empty. |
| 21 | Q | Okay. When you do a preinspection, do you just look at the apartment itself in a triple-decker apartment complex or do you look at the common areas and the other aspects of the property? |
| 25 | A | You look in the unit itself and the common areas. |

22

```
 1   Q   Okay.  Would you look at the doors to see if they had any
 2       problems opening, closing?
 3   A   Yes.
 4   Q   Would you look to see if there was soot on the walls?
 5   A   I look at the walls in general.  I'm not looking for
 6       anything in particular.  I look for the walls to make
 7       sure they are in good repair.
 8   Q   I see.  Would you notice to see -- if you saw a broken
 9       bathroom -- strike that.  Do you remember what the
10       condition of Apartment 3 was when you did the
11       reinspection?
12           MR. CHERNETSKY:  Objection.
13   Q   Preinspection, excuse me.
14   A   No.
15   Q   Do you remember saying that it seemed like it was just
16       painted?
17   A   I don't remember.
18   Q   If you issued a preinspection -- strike that.  If the
19       department issued a preinspection certificate, would that
20       mean that the apartment met the sanitary code?
21           MR. CHERNETSKY:  Objection.
22   A   At that time.
23   Q   Okay.  When you say at that time, does the sanitary code
24       frequently change?
25   A   When I say at that time, I mean at the time of the
```

```
 1       inspection.  At the time I performed the inspection, the
 2       apartment met the requirements of the state sanitary
 3       code.
 4   Q   Okay.  Do you remember whether you in the case of the --
 5       strike that.  Do you remember finding violations on
 6       Mr. Smith's property?
 7           MR. CHERNETSKY:  What time are you talking about?
 8   Q   In or around December of 2000.
 9   A   What property?
10   Q   11 Newport Street.
11   A   I don't.
12   Q   Okay.  If an inspection is done and it finds violations
13       and then there's a reinspection and those violations have
14       been corrected, what action is taken by yourself as an
15       inspector?  What do you do next?
16           MR. CHERNETSKY:  Objection.
17   Q   Does that make sense?
18   A   We close the case.  If the violations have been
19       corrected, then the case is closed.
20   Q   And how do you do that?  Is there paperwork that reflects
21       that?
22   A   Yes.
23   Q   Do you remember whether or not Mr. Smith wrote you at any
24       point?
25   A   Mr. Smith wrote me at many points.
```

23

```
 1   Q   Okay.  Did Mr. Smith -- did you get the feeling that
 2       Mr. Smith was unhappy about the pace -- excuse me --
 3       strike that.  Did you get the feeling that Mr. Smith was
 4       unhappy about the amount of time it took ISD to close out
 5       violations?
 6   A   I don't really have an opinion on that.  Whether he was
 7       happy or not the way we closed out the violations, is
 8       that your question?
 9   Q   No, it's not.  Was Mr. Smith complaining to you about how
10       quickly or how slow violations were closed out?
11   A   I don't recall that.
12   Q   Okay.  Do you remember issuing a violation for Apartment
13       1 because there was no heat in the apartment?
14   A   No.
15   Q   Do you remember stating to Mr. Smith that you could not
16       close out the no-heat complaint because a company by the
17       name of EnviroTech placed breathable filters over the
18       registers?
19   A   No.
20   Q   After they cleaned out the duct work?
21   A   No, I never said that.
22   Q   Okay.  If Mr. Smith had replaced the furnace so the
23       furnace was in good working order, then the complaint for
24       no heat at that point would be closed?
25   A   If the apartment met the requirements of the temperature
```

24

```
 1       requirements and if the heating system was actually
 2       working.
 3   Q   Okay.  I want to take a few minutes and go through these
 4       violations with you, if we could.  These are the
 5       originals of the violations dated 12/28/2000.
 6           MR. OHLSON:  You have copies of these, right?
 7           MR. CHERNETSKY:  Yes.
 8           MR. OHLSON:  Okay.  Do you think it's better that we
 9       mark them each separately?
10           MR. CHERNETSKY:  I guess it depends on if you want
11       to discuss them separately or if you want to discuss them
12       as a group.  Maybe mark them as a group if you want to.
13       You can make the decision how to mark them as you see how
14       they come in.
15           MR. OHLSON:  Good enough.
16   BY MR. OHLSON:
17   Q   Do you know if these are violations that you found by
18       inspecting the property?
19   A   It's a building inspector violations.
20   Q   So this is not from ISD?
21   A   It is.  It's from a building inspector not a housing
22       inspector.
23   Q   What is the difference?
24   A   A building inspector does the building, the outside
25       perimeters to see if permits were secure.  Housing does
```

26

```
 1              inside.
 2       Q      Okay.
 3              MR. OHLSON:  Then I don't need to do that as an
 4       exhibit.
 5       Q      I want to show you some documents here and these I will
 6       mark as an exhibit.
 7              MR. OHLSON:  You've seen these three, right?
 8              MR. CHERNETSKY:  Yes.
 9              MR. OHLSON:  All set?
10              MR. CHERNETSKY:  Sure.
11  BY MR. OHLSON:
12       Q      These are three reinspections results.  Now, are these
13       reinspections that you did?
14       A      Yes.
15              MR. OHLSON:  And what I'd like to do is mark each
16       one of them as an exhibit.
17              (Reinspection results marked as Exhibits 2-4.).
18       Q      The dates on these, what are the dates on these three
19       documents that you did the reinspections?
20       A      You want to know what the date is?
21       Q      Please.
22       A      December 26, 2000.
23       Q      For you to do a reinspection, would you have to go to the
24       property?
25       A      Yes.
```

27

```
 1       A      Yes.
 2       Q      And what is to the right of that?
 3       A      Twenty-four hours, no heat.
 4       Q      So that would mean that Apartment 3 on that date had no
 5       heat.  And what does 24 hours mean?
 6       A      Maybe that there was a 24-hour notice written previous to
 7       that.
 8       Q      Are you guessing or are you sure that it's -- that's what
 9       it is; there was a 24-hour notice before that or could
10       you mean that the apartment went 24 hours without heat?
11              MR. CHERNETSKY:  Objection.
12       A      No.
13       Q      Okay.  And then on Exhibit No. 3 below the mark one of
14       the following, what is checked off?
15       A      Prosecution recommended.
16       Q      And what does it say to the right?
17       A      Twenty-four hour notice, no heat.
18       Q      Okay.  And then on Exhibit 4 in parentheses under mark
19       one of the following, what does it say?  Is there
20       anything checked off?
21       A      Prosecution recommended.
22       Q      And is there anything written to the right?
23       A      No.
24       Q      Okay.  Why would you have three documents like this for a
25       reinspection that -- well, these two are obviously
```

28

```
 1       Q      And what is the apartment number?
 2       A      The apartment number that's on the document?
 3       Q      Please.
 4       A      Apartment 3.
 5       Q      And that's on all three documents?
 6       A      Yes.
 7       Q      And what is the case number here on 2, Exhibit 2?
 8       A      008726, 008806.
 9       Q      And then --
10       A      No case number.
11              MR. CHERNETSKY:  Maybe we should say the second was
12       Exhibit 3 and then Exhibit 4.
13              MR. OHLSON:  Right.
14       Q      Why would -- oh, if I could back up a second.  On Exhibit
15       2, what does it say as far as an explanation of what was
16       found?
17       A      It says violations not corrected.
18       Q      And there's -- does it say anything else?
19       A      As opposed to what was found, no.  It says violations not
20       corrected.
21       Q      Okay.  There's a -- in parenthesis there's a sentence
22       that says, Mark one of the following.  And what is below
23       that?
24       A      Prosecution recommended.
25       Q      Is that checked off?
```

28

```
 1       different, would you agree, because 24 hour, no heat is
 2       written in different spots?
 3              MR. CHERNETSKY:  Objection.
 4       Q      Excuse me.  Strike that then.  Why would you have these
 5       three documents for the one reinspection?
 6       A      First of all, it's two different cases, so two different
 7       -- each case you need a separate form for.
 8       Q      Okay.
 9       A      So because it's two different numbers on each exhibit
10       means -- indicates that it's two separate cases.  And the
11       only other thing that I can say is that maybe one was for
12       Apartment 1 and one was Apartment 3 and I made an error
13       in writing apartment numbers on them.
14       Q      Okay.  But --
15       A      But they are two separate cases.
16       Q      But look at the time on both of them.
17       A      Uh-huh.
18       Q      On Exhibit No. 2 and Exhibit No. 3, is the time the same?
19       A      The time is the same.
20       Q      So could these be for different apartments if the time
21       was the same?
22       A      The time exhibits the time I stepped foot onto the
23       property.
24       Q      Okay.  And with the third one, Exhibit No. 4, why is
25       there no explanation written in the right-hand corner in
```

Page 29

```
 1      contrast to the other two they say 24 hour, no heat? Why
 2      is there no written comments?
 3   A  I don't normally write written comments. I may have been
 4      trying to differentiate something one from the other and
 5      that's why I did that. My norm is not to do that.
 6   Q  And why would there be no case number?
 7   A  Sometimes there's not a case number put on the complaint
 8      form before we go out into the office.
 9   Q  What do you do with these results, reinspection results
10      when you are done with the reinspection?
11   A  I hand in my paperwork to my supervisor.
12   Q  Okay. And if you know, if you could read down the
13      bottom, what is this down the bottom of Exhibit No. 2?
14   A  You want me to read that?
15   Q  Please.
16   A  Signed this 4th day of February 2001 under the pains and
17      penalties of perjury the inspector inspected the above
18      described premises, E. Maxwell Davis, housing inspector,
19      the City of Boston.
20   Q  Why would you be on this document?
21   A  Someone came in and requested it or a certified copy of
22      the reinspection results and that's how we certify the
23      copy.
24   Q  Okay. So this is in response to a request that someone
25      else had after the after the inspection?
```

Page 30

```
 1   A  Correct.
 2   Q  Okay. Throughout the time you've been at ISD, who has
 3      been your supervisor? When you first started, who was
 4      your supervisor?
 5   A  Michael Ford.
 6   Q  Michael what?
 7   A  Michael Ford.
 8   Q  And how long was he your supervisor?
 9   A  I don't want to guess.
10   Q  Are you saying you don't know?
11   A  No, I don't know.
12   Q  Okay. What was his title at that time?
13   A  Assistant director.
14   Q  And did there ever come a time when your supervisor
15      changed?
16   A  Yes.
17   Q  When was that?
18   A  When Michael Ford retired.
19   Q  And then who was the supervisor at that point?
20   A  Dion Irish.
21   Q  Who was your supervisor in December of 2000?
22   A  I don't recall. Probably Michael Ford.
23   Q  Okay. Do you know who Clifford Davis is?
24   A  Yes.
25   Q  Who is Clifford Davis?
```

Page 31

```
 1   A  A landlord.
 2   Q  Do you know what happened to -- do you know if Clifford
 3      Davis -- strike that. Do you know if Mr. Davis is still
 4      a landlord?
 5   A  No, I don't know.
 6   Q  Did you ever inspect Mr. Davis' property?
 7   A  Yes.
 8   Q  Did you -- when you inspected his property, do you know
 9      if you found violations?
10   A  Yes.
11   Q  Do you know if Mr. Joyce ever said to Mr. Smith that I'm
12      going to treat you like I treated Clifford Davis?
13   A  I don't know that.
14   Q  Do you know if on December 27 that Mr. Joyce ordered his
15      inspectors to find every violation he could at 11 Newport
16      Street?
17           MR. CHERNETSKY: Objection.
18   A  I don't know that either.
19   Q  Okay. Have you ever falsified records?
20   A  No.
21   Q  At Boston Inspectional Services?
22   A  No.
23   Q  Do you know if Commissioner Joyce, how many times he has
24      gone onto property when you've been there?
25   A  I don't know.
```

Page 32

```
 1   Q  When you go out on inspections, does he ever go?
 2   A  Me in particular?
 3   Q  Right.
 4   A  I've been out on inspections with Commissioner Joyce,
 5      yes.
 6   Q  How many times would you say?
 7   A  I don't know.
 8   Q  And why -- do you know why Commissioner Joyce went on
 9      those particular inspections with you?
10   A  No.
11   Q  When Mr. Joyce went with you, did he bring John Dorsey?
12   A  Not that I recall.
13   Q  Did you ever say to Mr. Smith that any and all contact
14      had to go through Commissioner Joyce with his violations?
15   A  No.
16   Q  Was that the way it was though, did all contact have to
17      go through Mr. Joyce to clear up Mr. Smith's violations?
18   A  No.
19           MR. OHLSON: Off the record a minute.
20           (Short break taken.)
21   Q  Do you know who Tony Jones is?
22   A  Yes.
23   Q  Does he work at ISD?
24   A  Not anymore.
25   Q  What was his position when he worked there?
```

34

```
 1  A   Housing inspector.
 2  Q   Do you know a Steven O'Donnell?
 3  A   Yes.
 4  Q   Did he work for ISD?
 5  A   Yes.
 6  Q   Does he still work for them?
 7  A   Yes.
 8  Q   Was he ever your supervisor, Mr. O'Donnell?
 9  A   No, not my immediate supervisor, no.  But the managers
10      that are on the floor, they can tell you -- they can give
11      you an order to do something as opposed to your immediate
12      supervisor, also.
13  Q   And what was Mr. O'Donnell's title?
14  A   Assistant director.
15  Q   Of?
16  A   Of inspection of the housing department.
17  Q   And so he could give you instructions?
18  A   Yes.
19  Q   Were you ever an acting supervisor?
20  A   Yes.
21  Q   And is that the director of housing position that you
22      told me about?
23  A   The assistant director, yes.
24  Q   Is that the same?
25  A   Same thing.
```

```
 1  Q   And why did you only retain that position for I think you
 2      said one year, is that right?
 3  A   It was acting position.
 4  Q   Acting.  Why did you not continue to be in that role?
 5  A   I prefer to be in the field.
 6          MR. CHERNETSKY:  Objection.
 7  Q   So it was your decision?
 8  A   Uh-huh.  I mean they posted the job and I didn't apply
 9      for it.
10  Q   Okay.  Were you ever demoted at ISD?
11  A   No.
12  Q   Is it common on a no-heat call to inform the commissioner
13      of it?  I'll rephrase the question.  How many no-heat
14      calls do you respond to in the wintertime?
15          MR. CHERNETSKY:  Which wintertime?
16  Q   Strike that.  In December of 2000.
17  A   I don't know --
18  Q   Okay.
19  A   -- how many no-heat calls.
20  Q   Would it be -- could you estimate?
21  A   I mean 30, 40, 50.
22  Q   Is it common for apartments to lose heating during the
23      wintertime when it's cold?
24  A   If the system breaks down and it's not being maintained,
25      yes, it's going to break down in the winter.
```

35

```
 1  Q   Does the commissioner get involved with every no-heat
 2      call that you know of?
 3  A   I don't know what the commissioner does.
 4  Q   Have you ever called the commissioner to inform him that
 5      you responded to a no-heat call or that there was a
 6      no-heat call?
 7  A   No.
 8  Q   Do you have any special licenses?
 9  A   I have a led license to inspect to see if led is present
10      in an apartment.  I have a constable license.
11  Q   Do you have any licenses in plumbing?
12  A   No.
13  Q   Or heating ventilation and air-conditioning?
14  A   No.
15  Q   Do you have any certification from the department of
16      public safety?
17  A   No.
18  Q   Do you remember a leak in the bathroom in Mr. Smith's
19      apartment building on 11 Newport Street in December of
20      2000?
21  A   In what apartment?
22  Q   In Apartment 1, do you remember finding a violation?
23  A   I do not.
24  Q   Do you remember -- so then you wouldn't remember whether
25      that was repaired, is you correct?
```

36

```
 1  A   This is correct.
 2  Q   And then you wouldn't remember whether or not -- strike
 3      that.  Do you remember a leak in the roof at Apartment 3
 4      on 11 Newport Street?
 5  A   I remember a leak in the ceiling.
 6  Q   Okay.
 7  A   In Apartment 3 on Newport Street.
 8  Q   Do you know whether or not the roof was repaired?
 9  A   Yes.
10  Q   Do you know when that was?
11  A   I do not.
12  Q   How long does it typically take before -- strike that.
13      Do you remember finding approximately 200 beer bottles
14      and household garbage in I would say in the vicinity of
15      Apartment 3 on the porch, back porch?
16  A   I remember the back porch of Apartment 3, and there was
17      not 200 beer bottles.  I can't give you a number.  But I
18      have a vague picture in my mind of what the porch, the
19      rear porch of that unit looked like, and it did have some
20      beer bottles on it.  And I can't give you a number.  But
21      I know from looking at it, it was nowhere near 200
22      bottles.
23  Q   Do you know who was responsible for putting that garbage
24      and those beer bottles there?
25  A   No.
```

38

```
 1   Q   Do you know if it was Miss Williams, the tenant in
 2       Apartment 3?
 3           MR. CHERNETSKY: Objection.
 4   A   No.
 5   Q   Do you remember speaking to Miss Williams about it?
 6   A   Yes.
 7   Q   And what did you tell Miss Williams?
 8   A   I told Miss Williams that she needed to clean off the
 9       rear porch.
10   Q   And did she do that?
11   A   Yes.
12   Q   Did you ever receive a certified letter from Mr. Smith
13       regarding 11 Newport Street?
14   A   No, not that I recall.
15           MR. OHLSON: Give us a minute.
16           (Discussion off the record.)
17           MR. OHLSON: No further questions. Do you have
18       anything?
19           MR. CHERNETSKY: I do.
20   CROSS-EXAMINATION
21   BY MR. CHERNETSKY:
22           MR. CHERNETSKY: George, if I may see, please,
23       Exhibits 2, 3 and 4.
24           MR. OHLSON: Oh, sure.
25   Q   Inspector, I'm going to put in front of you again what we
```

```
 1       marked earlier as Exhibits 2, 3 and 4. Are those
 2       reinspection reports?
 3   A   Yes.
 4   Q   And is the reinspection conducted when a notice of
 5       violation has not been cleared within the time prescribed
 6       therein?
 7   A   Yes.
 8   Q   And I'm going to look first at what's been marked as
 9       Exhibit No. 4. Actually, strike that. Again, Exhibit
10       No. 2, what is the case number on the reinspection result
11       of Exhibit 2?
12   A   008726.
13   Q   Okay. And I'm going to show Mr. Ohlson first a document
14       and then I'll show it to you. Do you recognize this
15       document type?
16   A   Yes.
17   Q   And what is this form called?
18   A   It's a 24-hour notice, legal notice.
19   Q   And does this also have a case number written on it?
20   A   Yes, it does.
21   Q   And does that match the numbers that are written on
22       Exhibit 2 which we marked earlier today?
23   A   Yes.
24   Q   Okay. And were you the inspector who conducted the
25       original inspection which led to this legal notice?
```

39

```
 1   A   No.
 2   Q   Okay. And what date was this inspection conducted on?
 3   A   December 23, 2000.
 4   Q   And could you just review the notice briefly and tell me
 5       when you are done, please?
 6   A   Okay.
 7   Q   Does it appear to you that this notice of violation
 8       includes a 24-hour no-heat complaint?
 9   A   Yes.
10   Q   And what is the apartment number at which that complaint
11       was registered?
12   A   Apartment No. 1.
13   Q   At 11 Newport Street we should say?
14   A   Yes, at 11 Newport Street.
15   Q   And what apartment is listed on the reinspection result
16       which is Exhibit No. 2?
17   A   Apartment No. 3.
18   Q   So that's incorrect, would that be fair to say?
19   A   Yes, the apartment number is incorrect.
20   Q   Aside from the discrepancy between apartment numbers,
21       does this reinspection result appear to coincide with
22       this notice of violation?
23   A   Yes.
24   Q   I'm sorry. Strike that. Let me just rephrase that
25       better. Does the reinspection result report which is
```

40

```
 1       Exhibit No. 2 appear to coincide with this notice of
 2       violation dated 12/23 of 2000?
 3   A   Yes.
 4   Q   Okay.
 5           MR. CHERNETSKY: Let's mark that please as Exhibit
 6       5.
 7           (12/23/00 notice of violation marked as Exhibit
 8           No. 5.)
 9   Q   Turning now to Exhibit No. 3 which we marked earlier, I'd
10       like to also direct your attention to a document which
11       for the record was previously marked as deposition
12       Exhibit No. 3 in plaintiff Lincoln Smith's deposition and
13       already bears that marking.
14           MR. CHERNETSKY: Why don't we go ahead and mark that
15       now as Exhibit No. 6 I believe.
16           (Notice of violation - 008806 marked as Exhibit
17           No. 6.)
18   Q   What is the case number and H number on what we've marked
19       earlier as Exhibit No. 3?
20   A   H-14, case number 008806.
21   Q   What is the H number and case number on what we've just
22       marked as Exhibit No. 6?
23   A   H-14, 008806.
24   Q   Okay. And is this notice of violation Exhibit 6 an
25       inspection which you conducted?
```

41

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And what apartment is noted on Exhibit No. 6? |
| 3 | A | Three. |
| 4 | Q | And what apartment is noted on Exhibit No. 3? |
| 5 | A | Three. |
| 6 | Q | And what is the -- if you could review Exhibit No. 6 for us. What is the type of violation which you've cited there? |
| 9 | A | The middle bedroom ceiling has a water leak. |
| 10 | Q | Okay. And what was the time frame for that violation to be rectified? |
| 12 | A | Twenty-four hours. |
| 13 | Q | And what on Exhibit 3 has been marked as the complaint type or what notation had been made as what the type of complaint is? |
| 16 | A | 24-hour notice. |
| 17 | Q | Right. Anything else? |
| 18 | A | Prosecution recommended, 24-hour notice, no heat. |
| 19 | Q | Okay. Exhibit 6 however is not related to a heat complaint, is that correct? |
| 21 | A | That's correct. |
| 22 | Q | Okay. |
| 23 | A | Can I say something? |
| 24 | Q | Go ahead. |
| 25 | A | I just want to clear up that maybe this could have been a |

42

| | | |
|---|---|---|
| 1 | | clerical error or one of my errors, an error in the office. I didn't write the H numbers on here. I was asked to certify this. They may have written H numbers on this, and it may have been, you know, before I may have written it and not known they were going to put the H number on it. I may have assumed it was going to go with that. And I had made a mistake of writing Apartment 3. |
| 9 | Q | Besides the reference to no heat on Exhibit No. 3, does Exhibit No. 3 and Exhibit No. 6 appear to coincide? |
| 11 | A | Yes. |
| 12 | | MR. CHERNETSKY: And I'd like to mark that as Exhibit No. 7, please. |
| 14 | | (2/20/00 notice of violation marked as Exhibit No. 7.) |
| 16 | Q | Do you recognize the document that I'm putting before you as Exhibit No. 7? |
| 18 | A | Yes. |
| 19 | Q | And is that also on December 20 of 2000 as 11 Newport Street? |
| 21 | A | Yes. |
| 22 | Q | Also Apartment No. 3? |
| 23 | A | Yes. |
| 24 | Q | And is that also an inspection that you conducted personally? |

43

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What was the length of time prescribed for the landlord to correct the violations in Exhibit No. 7? |
| 4 | A | Two days. |
| 5 | Q | Is the difference between two days and 24 hours in Exhibit No. 6 and 7 the reason why there is separate forms even though it's the same apartment? |
| 8 | A | Yes. |
| 9 | Q | All right. Is it fair to say that both Exhibit No. 7 and Exhibit No. 4 which we marked earlier in both cases there is no H number or case number designated? |
| 12 | A | Yes. |
| 13 | Q | And Exhibit No. 4 also does not make any reference to a 24-hour violation, is that correct? |
| 15 | A | Yes. |
| 16 | Q | Does it appear to you that Exhibit No. 4 is the reinspection result which was generated as a result of the outstanding violation listed in Exhibit No. 7? |
| 19 | A | Yes. |
| 20 | Q | Okay. Is it your understanding looking at these exhibits that on December 26, 2000 there were three violations outstanding? |
| 23 | A | Yes. |
| 24 | | MR. CHERNETSKY: That's all I have, George. |
| 25 | | MR. OHLSON: Okay. |

44

| | | |
|---|---|---|
| 1 | | MR. CHERNETSKY: Anything else? |
| 2 | | MR. OHLSON: Just a couple of things. |
| 4 | REDIRECT-EXAMINATION | |
| 5 | BY MR. OHLSON: | |
| 6 | Q | Do you remember what prompted you to go out on the property on December 20 with -- oh, strike that. |
| 8 | | MR. OHLSON: Let me just look at them right side up. |
| 9 | | MR. CHERNETSKY: Sure. |
| 10 | Q | Looking at Exhibit No. 6 and 7, the ones that you signed on the bottom, do you remember what prompted you to go out on these inspections on these days -- on this day? |
| 13 | A | On December 20? |
| 14 | Q | Yes, 2000. |
| 15 | A | Miss Williams filed a complaint with our office. |
| 16 | Q | Okay. You were trying to explain to us that there may have been an error and that's why that may have been mistaken; that there may have been an error in these. Could you clear that up for me, please? |
| 20 | A | What I said, I did not write the H numbers on these documents. |
| 22 | Q | Okay. |
| 23 | | MR. CHERNETSKY: And just to clarify what these, you are pointing to? |
| 25 | | MR. OHLSON: We are talking about Exhibits 2, 3 and |

## Page 45

```
 1         4.
 2    Q    And what's the significance of not writing the H numbers
 3         on the document?
 4    A    I may have certified these at my desk and walked up,
 5         given them to a clerk and they wrote the H numbers on
 6         them.
 7    Q    Okay.  Did you notice any of these violations when you
 8         did the prerental inspection in February of 2000?
 9    A    Did I notice that the ceiling was leaking, no.  At that
10         time the ceiling wasn't leaking.  Did I notice the
11         bathroom sink had a leak, at that time there was no leak.
12    Q    What about infestation with gnats?
13    A    There was no one living in the property at the time.
14    Q    But this is the same apartment that in February you
15         issued -- well, you generated the paperwork that led to
16         the prerental inspection certification, is that correct?
17    A    Yes.
18              MR. OHLSON:  That's all I have.
19    RECROSS-EXAMINATION
20    BY MR. CHERNETSKY:
21    Q    Just one or two more.  A prerental certification
22         certifies that the property meets the sanitary code on
23         the day it's inspected, correct?
24    A    Correct.
25    Q    It makes no representation as to what the condition of
```

## Page 46

```
 1         the property will be in the future?
 2    A    Correct.
 3              MR. CHERNETSKY:  That's it.
 4    FURTHER REDIRECT-EXAMINATION
 5    BY MR. OHLSON:
 6    Q    Just one more question.  I shouldn't start with that.
 7         The prerental inspection you're looking to see if a
 8         property meets the state sanitary code, is that right?
 9    A    Yes.
10    Q    And also is there a separate code for the City of Boston?
11    A    I don't understand your question.
12    Q    Okay.  Is there a separate set of standards that
13         apartments would have to meet aside from the state
14         sanitary code the Boston City -- the City of Boston has?
15         Is there a different code for the City of Boston?
16    A    On the day that I did that prerental inspection?
17    Q    In 2000.
18    A    No.
19    Q    Did you change subsequently?
20    A    There's a city ordinance passed now, yes.
21    Q    And when did that pass?
22    A    I don't know.  Recently.
23    Q    Was there a City of Boston code at the time in December
24         of 2000 regarding prerental inspections?  Was there any?
25    A    When I do a prerental inspection, I'm looking to see if
```

## Page 47

```
 1         the unit meets the state sanitary code.
 2    Q    Okay.
 3    A    I enforce just the state sanitary code.
 4    Q    Is there any regulations in place about how to do a
 5         prerental inspection?
 6    A    Then or now?
 7    Q    Then.
 8    A    No.  Now we have a different set of rules.
 9    Q    Okay.
10              MR. OHLSON:  I have no more questions.
11              MR. OHLSON:  Do you want to talk to me?  Just one
12         minute.
13              (Short break taken.)
14    BY MR. OHLSON:
15    Q    I wanted to clarify what I was asking you before.  Is
16         there a City of Boston code requiring prerental
17         inspections that you know of?
18    A    Yes.
19    Q    Okay.  And is the intent of that code to encourage
20         prerental inspections, encourage landlords to get
21         prerental inspections?
22              MR. CHERNETSKY:  Objection.
23    A    I don't what the intent of the code is.
24    Q    Does a landlord have to pay a fee with a prerental
25         inspection?
```

## Page 48

```
 1    A    Yes.
 2    Q    Did you ever feel threatened by Mr. Smith?
 3    A    No.
 4    Q    Did you ever feel unsafe around Mr. Smith?
 5    A    Yes.
 6    Q    What do you mean by that?
 7    A    I mean that I did an inspection one day and he walked
 8         very closely behind me spurring out all kinds of
 9         statements behind me because he was unsatisfied with what
10         I was saying.  That made me uncomfortable.
11              MR. OHLSON:  I have nothing further.
12    FURTHER RECROSS-EXAMINATION
13    BY MR. CHERNETSKY:
14    Q    You're a housing inspector you said, correct?
15    A    Yes.
16    Q    You were responsible for enforcing the sanitary code as
17         part of your duties as housing inspector?
18    A    Yes.
19    Q    Are there other units with an ISD who deal with other
20         types of codes?
21    A    Yes.
22    Q    But your job is focused on the sanitary code, correct?
23    A    Yes.
24    Q    Did Mr. Smith ever mention or remind you of his position
25         as an employee of the City of Boston?
```

49

```
 1  A    Yes.
 2  Q    What did he say?
 3  A    Do you know who I am?
 4  Q    Did you feel that Mr. Smith wanted you to be more lenient
 5       enforcing the code because of his status as a city
 6       employee?
 7  A    That or feel threatened by him.
 8  Q    Did Mr. Smith ever threaten your job?
 9  A    I don't remember Mr. Smith's act words, but he spurred
10       out so many things, negative things to me that it just
11       made me uncomfortable.
12  Q    Do you recall Mr. Smith ever threatening to contact the
13       press about your conduct of your duties?
14  A    Yes.
15            MR. CHERNETSKY:  That's all I have.
16            MR. OHLSON:  No further questions.
17            (Deposition concluded at 11:30 a.m.)
```

50

Excerpt from Rule 30(e):

Submission to Witness; Changes; Signing.

When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to or by him/her, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them.

***********************************

I, EVANGELINA MAXWELL-DAVIS, have examined the above transcript of my testimony, and it is true and correct to the best of my knowledge, information and belief. Any corrections are noted on the errata sheet.

Signed under the pains and penalties of perjury this _____ date of _____, 2004.

_____
Deponent's Signature

Subscribed and sworn to before me this ____ day of _____, 2004.

_____
Notary Public

My Commission Expires:
_____

51

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

I, Nancy Atherton, a Shorthand Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 19th day of February, 2004 the person hereinbefore named, who was by me duly sworn to testify to the truth of her knowledge concerning the matters in controversy in this cause; that she was thereupon carefully examined upon her oath and her examination reduced to typewriting under my direction; and that the deposition is a true and accurate record of the testimony given by the witness.

I further certify that I am not interested in the cause of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 4th day of March, 2004.

_____
NANCY ATHERTON

My Commission Expires:
   May 28, 2010