VOL. I
PAGES 1-52
EXHIBITS 1-3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 03-10062-DPW

———————————————

LINCOLN SMITH,
        Plaintiff
vs.

CITY OF BOSTON, BOSTON INSPECTIONAL
SERVICES AND KEVIN JOYCE (As Commissioner,
Department of Inspectional Services, and
Individually)
        Defendants

———————————————

        DEPOSITION OF JOHN J. DORSEY, JUNIOR,

taken on behalf of the plaintiff, pursuant to

the applicable provisions of the Federal Rules

of Civil Procedure, before Irma Widomski, a

Registered Merit Reporter, and Certified

Shorthand Reporter, No. 131593 in and for the

Commonwealth of Massachusetts, at the offices of

Stopa & Associates, 36-38 Mechanic Street, Suite

208, Foxboro, Massachusetts, on Friday, February

20, 2004, commencing at 10:45 a.m.

        BEACON HILL COURT REPORTING
            44 BAYSWATER STREET
        BOSTON, MASSACHUSETTS 02128
            (617) 569-8050

---

2

PRESENT:

Stopa & Associates, LLC
        (by George F. Ohlson, Jr., Esquire)
        36-38 Mechanic Street, Suite 208,
        Foxboro, Massachusetts 02035
        For the plaintiff

City of Boston
        (by James M. Chernetsky, Esquire)
        Assistant Corporation Counsel
        Boston City Hall, Room 615
        Boston, Massachusetts 02201
        For the defendants

Also Present:  Lincoln Smith

---

3

                    I N D E X

WITNESS:     DIRECT  CROSS  REDIRECT  RECROSS

John J. Dorsey, Jr.

BY Mr. Ohlson 4                  49
BY Mr. Chernetsky  46

                E X H I B I T S

NO.  PAGE  DESCRIPTION

1    27    Boston Globe article

2    32    Article

3    39    Letter, 12/28/00

---

4

            JOHN J. DORSEY, JUNIOR

a witness first having been duly sworn, under

oath deposes and says as follows:

            DIRECT EXAMINATION

MR. OHLSON:

Q.   Mr. Dorsey, my name is George Ohlson.  I

represent the plaintiff, Lincoln Smith, in this

civil action.

            Could you state your full name for the

record?

A.   John J. Dorsey, Junior.

            MR. CHERNETSKY:  We need the

stipulations.  We'll just say we just

articulated stipulations.  We stipulated at the

deposition not a half-hour ago and we'll proceed

under the same rules.

            MR. OHLSON:  Same rules.  Good enough.

Likewise with the notary, we'll -- 30 days.

We're going to send you the deposition and

you'll read it and sign it, and we're going to

waive the notary.

            MR. CHERNETSKY:  Yes

MR. OHLSON.

Q.   I'll introduce myself again.  So my name is

6

1     George Ohlson, I'm the attorney for Mr. Smith,
2     the plaintiff in this civil action.  Could you
3     state your full name?
4  A.  John J. Dorsey, Junior.
5  Q.  Are you married or single?
6  A.  Single.
7  Q.  And your address.  Home address?
8  A.  5 Lexington Street, Charlestown, Massachusetts.
9  Q.  What's the highest level of education?
10  A.  Juris doctorate.
11  Q.  Where did you receive that?
12  A.  Suffolk University.
13  Q.  What year did you graduate from Suffolk?
14  A.  2002.
15  Q.  And have you ever been deposed before?
16  A.  No, sir.
17  Q.  Where do you currently work?
18  A.  Boston Inspectional Services, 1010 Mass. Ave.
19  Q.  How long have you been there?
20  A.  About three years.
21  Q.  So what year did you start then?
22  A.  2002.
23  Q.  What did you do before?
24  A.  I was at the mayor's office.

1  Q.  What did you do for the mayor?
2  A.  I managed media.
3  Q.  How long did you do that for the mayor?
4  A.  About seven years, since 19 -- April 1994.
5  Q.  Where were you employed in December of 2000?
6  A.  Boston Inspectional Services.
7  Q.  And what was your position there at that point?
8  A.  I did, I basically helped out with legal and
9     I -- with some policy stuff and also to take
10     over all the media operations.
11  Q.  Is that what you currently do there?
12  A.  I do mostly policy stuff now and Lisa Timberlake
13     mostly does the media stuff.
14  Q.  In December 2000, whose payroll were you on,
15     were you on Inspectional Services or the mayor's
16     office?
17  A.  Probably Inspectional Services, December of
18     2000.
19  Q.  Were you on a contract basis?
20  A.  Probably at that point, yes.
21  Q.  Did you work full-time or part-time?
22  A.  Full-time.
23  Q.  And did you go to school at that point?
24  A.  At night.  I was an evening student.

7

1  Q.  Part-time law student at Suffolk?
2  A.  Correct.
3  Q.  Which essentially as we know is full-time?
4  A.  Yes, sir.
5  Q.  In December 2000, what were the duties and
6     responsibilities of the position that you have?
7  A.  Basically, try to help out with the media, help
8     out with some research, kind of get organized,
9     organize more proactive outreach efforts,
10     educational and awareness type stuff.
11  Q.  When you say research, research on what?
12  A.  Different policy type of issues.
13  Q.  So legal research?
14  A.  Some, yes.
15  Q.  What other types of research?
16  A.  Just different kinds of ideas in terms of what
17     was working and for, you know, municipal
18     operations, things like that.
19  Q.  What sort of media, media projects did you work
20     on?
21  A.  Everything from home improvement contractor type
22     stuff to, you know, everything, day-to-day
23     outreach type stuff.  Quality of life, stuff
24     like that.

8

1  Q.  Who is your supervisor at this point?
2  A.  Julie Fothergill.
3  Q.  That was in December of 2000?
4  A.  Right.
5  Q.  And who is above Julie Fothergill?
6  A.  I don't know if there is a chief of staff at
7     that time.  Either commissioner or the chief of
8     staff or the deputy commission, deputy
9     commissioner.
10  Q.  As in December of 2000, did you -- there ever
11     come a time where you would actually go to a
12     property?
13  A.  Yes.  I was relatively new to inspectional
14     services at that point so I was trying to learn
15     the field operation.  It would happen pretty
16     regularly.
17  Q.  Who would, whose decision was it for you to go
18     to the property?
19  A.  It depends.  If it was media there the
20     inspectors would call us, sometimes the
21     commissioner would ask me to go.  It depends
22     what the situation was.
23  Q.  What situations would the commissioner ask you
24     to go there?

10

```
1    A.   If there was media there and he wanted me to
2         deal with them.
3    Q.   How many properties -- actually, you know what?
4         I forgot to give you the instructions.  Let me
5         back up a second.
6              One of the things that I wanted to say
7         is -- and we have already gone through quite a
8         few questions.  Only one of us can talk at a
9         time.  So if -- that's for the stenographer, she
10        can only take down one voice.
11             Also, wait before you answer, wait
12        until I finish my question.  Also, answers like
13        nod of the head and stuff like that don't work.
14        Answers have to be audible.  And if you don't
15        understand a question, ask me to repeat it.
16        Also, if you need to take a break, I just ask
17        that we finish the question that I've asked.  In
18        other words, if there is a question pending, I
19        ask you that you answer it before we take a
20        break.  Those were the ground rules I should
21        told you about ten minutes ago.
22   A.   Okay.
23   Q.   So back to December of 2000, what, approximately
24        how many properties would you say that you went
```

```
1         to per week?
2    A.   I have no idea.
3    Q.   Did you go to many that involved a situation
4         where a tenant had no heat?
5    A.   If there was media there or there was -- a lot
6         of times with the field operation, just to see
7         the inspectors in action, sure, absolutely.
8    Q.   Did, in your position, did you ever contact the
9         media to come to a site?
10   A.   At times, sure.  If they had called and said if
11        we have any no heat calls, could you let us
12        know, or a lot of times no heat is probably one
13        of the biggest requests that we get during the
14        wintertime for media.  This most recent cold
15        snap is a good example of that.
16   Q.   So do you recall in December of 2000 if you ever
17        contacted the media for a no heat call?
18   A.   I'm sure I did.  We do every -- we have a number
19        of requests for no heat situations from six TV
20        stations and two newspapers.
21   Q.   What are those TV stations?
22   A.   Network affiliates, neighborhood network news.
23   Q.   So ABC?
24   A.   Right.
```

11

```
1    Q.   CBS?
2    A.   Right.
3    Q.   NBC?
4    A.   Correct.
5    Q.   What are the others, I'm trying to remember?
6    A.   Fox and WB, Tribune television.
7    Q.   What about New England Cable news?
8    A.   Yes.  We might but I think they get a lot of
9         their stuff from channel five.
10   Q.   What are the two, did you say two print media?
11   A.   Correct, Globe and Herald.
12   Q.   Do you have contact at each one of these places?
13   A.   I know people just from the industry but no
14        specific contact, no.
15   Q.   So if there was a media event, how would you get
16        in touch with -- would you know who to call in
17        like the Boston Globe or the Boston Herald?
18   A.   Generally, the standard protocol of what they
19        call the call around, is for most media outreach
20        is you would call the assignment desk for
21        television and whoever picks up the phone at the
22        assignment desk, you tell them what's going on
23        or if they had called with an earlier inquiry
24        that you want to follow up on, that's where you
```

12

```
1         would relay the information to.
2    Q.   And the assignment desk would give it to a
3         writer that would --
4    A.   Or the reporter, they would assign the reporter
5         and dispatch a reporter, reported to the
6         location.
7    Q.   Were you present at -- strike that.  Do you know
8         Mr. Smith?
9    A.   Just from this case.
10   Q.   When did you first meet him?
11   A.   I know that he was at the scene that we were at
12        that gave rise to this action.
13   Q.   Was that on December 27, 2000?
14   A.   I don't know the exact date.
15   Q.   Was there a time in late December of 2000 that
16        you were with Mr. Smith and Commissioner Joyce
17        at 11 Newport Street?
18   A.   Yes.  Mr. Smith was there toward the end but we
19        had gone around to several different properties
20        that day.  That was one of them.
21   Q.   And do you remember how you -- how the decision
22        came about on that day for you to go to this
23        property?
24   A.   Basically, it was the unremedied no heat calls
```

13

```
 1         that we often would just go out into the field,
 2         A, for learning the process at that point but
 3         also, just to see what's going on in the field.
 4         By that point, it was just we were visiting
 5         properties that still had no heat after the
 6         holiday season or that had still been without
 7         heat for several days.
 8    Q.   And were you present in the commissioner's
 9         office before you left to go to go to 11 Newport
10         Street on that day?
11    A.   Oh, I don't know.
12    Q.   Do you recall whether Commissioner Joyce got a
13         call from Steven O'Donnell on that day?
14    A.   No.
15    Q.   Do you recall Commissioner Joyce stating we got
16         him?
17    A.   Who? Steve?
18    Q.   No. Strike that. Do you recall Commissioner
19         Joyce referring to Mr. Smith saying that we got
20         him?
21    A.   No.
22    Q.   Do you recall any conversations that Mr. Joyce
23         had about Lincoln Smith at any point?
24    A.   No.
```

14

```
 1    Q.   Do you recall Julie Fothergill stating what
 2         you're doing is wrong in refusing to go to the
 3         scene at 11 Newport Street?
 4    A.   No. I don't even remember Julie being involved.
 5         I took the media over pretty much.
 6    Q.   So do you know who informed the commissioner's
 7         office about the no heat situation on 11 Newport
 8         Street on this day?
 9    A.   Generally no heats are something that they pay
10         very close attention to. This year we set a new
11         record in terms of the number of no heats.
12         Actually, we saw probably a new record in terms
13         of compliance from a lot of landlords.
14         Generally that's something that everyone pays
15         very close attention to because of the danger
16         involved with no heat during an extreme cold.
17    Q.   Do you know if you traveled with Commissioner
18         Joyce to the scene of 11 Newport Street that
19         day?
20    A.   I don't recall. I may have, I don't recall.
21    Q.   Why would you go to the -- why did you go to
22         that scene on that day?
23    A.   We were out visiting all the people that still
24         haven't remedied their no heat calls. That was
```

15

```
 1         one of the calls. I was also learning the field
 2         operations at that point.
 3    Q.   So did you go to other properties on that day as
 4         well?
 5    A.   I think two others, yes.
 6    Q.   Where were they located?
 7    A.   I don't remember. I don't know.
 8    Q.   So do you know if Commissioner Joyce wanted you
 9         to go on this day?
10    A.   He wanted me, he probably wanted me to deal with
11         the media. He doesn't like to deal with the
12         media.
13    Q.   But do you have any recollection whether or not
14         he gave you any instructions to go?
15    A.   Not that I know. I probably volunteered to go
16         because I really wanted to learn how things
17         operated. And also, if there was any media
18         there, I wanted to be able to deal with them
19         because that was my responsibility.
20    Q.   Do you remember who else was there on that day?
21    A.   The tenants, and there were probably some
22         inspectors. I don't know who the inspector on
23         the case was.
24    Q.   Do you know if -- was there a contractor by the
```

16

```
 1         name of Dorey Fuel?
 2    A.   I know a contractor eventually showed up. We
 3         had attempted to contact Mr. Smith to see what
 4         was going on. Apparently, there had been some
 5         communication. Apparently, there was no remedy
 6         forthcoming.
 7    Q.   Do you know if, when you got to the scene, did
 8         you see a contractor there?
 9    A.   I remember one eventually came but I think that
10         was after attempts were made to contact the
11         property owner.
12    Q.   Was that only one contractor that came?
13    A.   I don't remember if there were.
14    Q.   Did Inspectional Services have an independent
15         contractor that came?
16    A.   I know that one contractor came. It was either
17         one that we got through Neighborhood Development
18         or one we got or one that the property owner
19         got.
20    Q.   Do you ever feel threatened by Mr. Smith?
21    A.   Me personally, no.
22    Q.   Do you know if anybody in -- that generally
23         people were there from Inspectional Services on
24         that day?
```

17

```
1   A.  No.
2   Q.  Would you say that there was -- do you remember
3       if Paul Nally was there?
4   A.  No, I don't remember if he was.
5   Q.  Shawn Croke?
6   A.  He worked for the department at that point but I
7       don't know if he was there.
8   Q.  Do you remember anybody saying they felt
9       threatened by Mr. Smith?
10  A.  Not at that time.  After the fact, a couple of
11      days afterward, they were talking about what
12      happened.  Just debrief on the no heat
13      situations.
14  Q.  What was said in that conversation?
15  A.  Through third hand someone had said something
16      about contacting Counselor Kelly about
17      threatening his job, threatening inspectors'
18      jobs.
19  Q.  Who was saying that?
20  A.  It was, I think it was Steve O'Donnell or one of
21      the inspectors.  I don't remember clearly at
22      that point.  It wasn't the topic of
23      conversation.  It was kind of an afterthought to
24      just how the no heats were going and how no heat
```

Beacon Hill Court Reporting

18

```
1       season had gone.
2   Q.  Was Steve O'Donnell there on that date?
3   A.  I'm sure he was there at some point.
4   Q.  For the record, if I told you that the date in
5       question was December 27, 2000, would that seem
6       to refresh your memory?
7   A.  No.  I just know it was after, just after
8       Christmas.
9   Q.  How many inspectors would typically go to a no
10      heat situation?
11  A.  It depends on how large the unit is really.
12  Q.  How many personnel from ISD would typically go?
13  A.  It depends if it's a relocation, or if there is
14      building needs or plumbing needs, or it depends.
15  Q.  Would the fact that it was a media event
16      determine how many Inspectional Services?
17  A.  No, absolutely not.  Other than personnel to
18      manage the media.
19  Q.  You said when you got there, Mr. Smith wasn't
20      there?
21  A.  No.
22  Q.  Was there a contractor trying to put in a new
23      furnace when you got there?
24  A.  I don't remember.  I know there was one
```

Beacon Hill Court Reporting

19

```
1       eventually on the scene but I don't remember if
2       there was one when I first got there.
3   Q.  Do you know who was there when you first got
4       there?
5   A.  The tenants and probably an inspector.
6   Q.  Do you remember the contractor Comfort Heating,
7       does that --
8   A.  No.  I don't remember any of the contractor's
9       names.
10  Q.  Do you have any dealings with the independent
11      contractors that come to, that Inspectional
12      Services may use?
13  A.  No.
14  Q.  Do you ever, did you ever call Dorey Fuel at any
15      point?
16  A.  No.  I wouldn't contract with them.
17  Q.  Do you have any knowledge as to when they would
18      use an independent contractor and when they
19      wouldn't, when they would let the landlord take
20      care of it?
21  A.  I think if there is an emergency situation, they
22      probably would contact someone.  If there was no
23      remedy forthcoming but they might contact
24      someone.
```

Beacon Hill Court Reporting

20

```
1   Q.  If a landlord had his own contractor?
2   A.  Right.
3   Q.  Would it be necessary for Inspectional Services
4       to get a contractor?
5           MR. CHERNETSKY:  Objection.
6   A.  It depends.  There's a contractor doing the
7       work, is there going to be a remedy forthcoming.
8   Q.  Do you remember Commissioner Joyce at any point
9       not allowing Mr. Smith's contractor from doing
10      the work?
11  A.  I don't recall.  No, I think the objective was
12      to remedy the situation.
13  Q.  Do you remember whether the contractor was going
14      to repair the furnace rather than replace the
15      furnace?
16  A.  I don't remember that level of detail.
17  Q.  And, then, do you remember anything about
18      Commissioner Joyce being told that if you repair
19      the furnace rather than replaced it, that carbon
20      monoxide would be sent throughout the whole
21      building?
22  A.  No.  All I know is that there was just from my
23      own personal observation, if the furnace itself
24      was filled with soot, there was a trash bag with
```

Beacon Hill Court Reporting

21

```
1    some soot and there would seem to be some soot
2    around the baseboard but other than that, I
3    don't remember much about what the condition of
4    it was.
5    Q.   Do you remember whether or not Commissioner
6         Joyce's ordered his inspectors to go through the
7         property with a fine tooth comb to find every
8         violation?
9    A.   No.  The inspectors have a legal obligation to
10        classify violations when they saw them, when
11        they see them.  It would be pointless to do
12        that.  In fact, I remember the inspectors wrote
13        up one of the occupants as well on one of the
14        units.
15   Q.   I'm not sure if you answered my question.  I
16        guess my question is, I understand what you are
17        saying what their legal obligation is, but do
18        you recall whether Commissioner Joyce said that
19        or not?
20   A.   No, I wouldn't.
21   Q.   Do you recall whether or not Commissioner Joyce
22        said that I'm going to treat you like I treated
23        Clifford Davis?
24   A.   I don't remember that.
```

22

```
1    Q.   Do you recall anything about whether or not
2         Mr. Joyce paid special attention to certain
3         cases, whether or not all activity in a case had
4         to go through him?
5              MR. CHERNETSKY:  Objection.
6    A.   No.  I think when inspectors would bring
7         questions to him or managers would bring
8         questions to him or there was a question as to
9         how to proceed, that's the only time he would
10        really only become involved.
11   Q.   Do you know if Mr. Joyce had any special
12        interests in Mr. Smith's case?
13   A.   Other than the fact to see the heat turned back
14        on, no.  Similar to the other two cases as well.
15   Q.   Where do you get your information when you speak
16        to the media?
17   A.   Generally, from the inspectors or from the
18        scene.
19   Q.   When you say from the scene, does that mean you
20        get the information from your own observations?
21   A.   No.  Sometimes the inspectors would relay it.
22        I'm not an inspector so I don't know how to
23        classify the violations.  I know what the
24        process is but I generally get it from the
```

23

```
1    inspectors.
2    Q.   Do you have any background in the state sanitary
3         code?
4    A.   At that point, I did not.
5    Q.   Do you have any background now?
6    A.   Just practical application.  Not from actual
7         violation but just process and sections, things
8         like that.
9    Q.   Learning on the job?
10   A.   Correct.
11   Q.   Do you ever include the mayor's office in any of
12        Inspectional Services media events?
13   A.   Just as part of the chain of command.  It's part
14        of the chain of command for having anything to
15        do with the media.  I will generally as a
16        protocol let them know what's going on.
17   Q.   Do you know if you did that in Mr. Smith's case?
18   A.   We probably just let them know there was no heat
19        calls but not particularly who they were.  We
20        were just getting media attention.  There's so
21        many things going through that office, they
22        don't need to know that level of detail.
23   Q.   Well, how much detail?
24   A.   We would let them know the media outlets that
```

24

```
1    are inquiring and what the situation is, they're
2    doing no heat calls.  If they want more, they'll
3    let us know.
4    Q.   Is there anybody in the mayor's office that
5         would do -- get independent information from
6         Inspectional Services that you know of?
7    A.   No.  Generally not, no.
8    Q.   So with a no heat call, the mayor, mayor's
9         office would only find out about their
10        information from Inspectional Services, would
11        you say?
12   A.   The mayor's 24-hour hotline takes in a lot of
13        calls for no heat calls and they're referred
14        over to Inspectional Services.
15   Q.   Let me start with this.  Are you familiar with
16        something called the Worst Landlord List?
17   A.   No.
18   Q.   Does Inspectional Services have such a thing?
19   A.   No.  We have a student housing database, that
20        some caller requested to see when calls -- to
21        see which properties we're having problems with.
22        The different colleges but we don't have a worst
23        landlord list, no.
24             The department may have had one at one
```

25

```
1          time but no, we've discontinued anything like
2          that if there was one.  I have no knowledge of
3          the worst landlord list.
4     Q.   I'll come back to that.  Where do you -- you get
5          your information from inspectors at the scene,
6          that's correct, that's what you said before?
7     A.   Generally, yes.
8     Q.   And before you speak to the media, do you do
9          anything to check the accuracy of the
10         information that you get?
11    A.   Basically talk to a manager about it sometimes.
12         Other than that, no.
13    Q.   Who would the manager be?
14    A.   It depends on what the division is.
15    Q.   You're saying a manager within the inspectors?
16    A.   Right.  The housing, building, weights and
17         measures.
18    Q.   Do you know of anything, any animosity between
19         the mayor's office and Mr. Smith?
20    A.   Right now, no, not that I know of.
21    Q.   Do you recall if you had a conversation with
22         Teri Adler in December 2000 regarding this case?
23    A.   No, I don't.
24    Q.   No, you didn't have a conversation?
```

26

```
1     A.   I don't recall.
2     Q.   What about -- do you remember whether Miss
3          o'Shea was on the property that day?
4     A.   Who's Ms. O'Shea?
5     Q.   Elizabeth O'Shea, the tenant from unit one with
6          the no heat complaint?
7     A.   I don't know what -- there was an elderly woman
8          there and her daughter.
9     Q.   Do you know was she, what was her demeanor like
10         on that day?
11    A.   She was angry and frustrated.
12    Q.   Why was she angry and frustrated?
13    A.   Because of her situation.
14    Q.   What situation was that?
15    A.   The no heat condition.
16    Q.   Did you have a conversation, sorry, did you have
17         a conversation with the third floor tenant,
18         Palmira Williams?
19    A.   I don't recall particular conversations I had
20         from three or four years ago.
21    Q.   Did you ever have a conversation with Amber
22         Bollman from the Boston Globe?
23    A.   She was an intern at the Boston Globe.
24    Q.   Is that a yes or no?
```

27

```
1     A.   Yes.
2               MR. CHERNETSKY:  If I could clarify
3          the question.  Are you asking in reference to
4          this incident?
5     A.   I don't remember.  With the situations like
6          this, they trade hands and one person can take
7          the notes and another person can write it.  I
8          talked to her probably on a number of different
9          issues during her six months there.
10    Q.   Did you recognize this article?
11    A.   I don't recognize it, no.  I know it's from the
12         Boston Globe.
13              MR. OHLSON:  We're going to mark this
14         as Exhibit 1.
15         (Exhibit 1 marked for identification.)
16    Q.   Do you remember what the reasons were for you
17         contacting or do you know if you contacted Ms.
18         Bollman for this article or whether she
19         contacted you?
20    A.   I don't remember.
21    Q.   Were there ever times she contacted you?
22    A.   Sure.  Or the mayor's office or refer a call
23         over or the editor will call.
24    Q.   Did you ever contact her?
```

28

```
1     A.   During -- I'm sure at six months she was there,
2          I'm sure at some point I did.
3     Q.   Can you read this statement in parentheses here?
4     A.   "ISD spokesman John Dorsey said Smith waited far
5          too long before ordering and installing a new
6          furnace."
7     Q.   Is that, do you know if this is what you
8          actually -- accurately said to the Boston Globe?
9     A.   Well, it's paraphrased.  It's not in quotes.
10         And I don't even know if Amber was the one that
11         asked the questions.  There could have been
12         another person that gave the notes to her and
13         wrote it.  It could have been something that her
14         editor paraphrased.  Honestly, I don't know.
15    Q.   Is that inaccurate?
16    A.   Well, if he -- if the property owner was given
17         notice of a violation such as no heat, they
18         generally have 24 hours before they have to
19         start making remedies.  So by the 27th, that was
20         more than 24 hours.
21    Q.   What do you mean by start making a remedy?
22    A.   Basically, start the repairs.
23    Q.   Even if -- that would be true even on a weekend
24         where a contractor is unavailable?
```

1   A.  Sure, absolutely.

2   Q.  Or even during the Christmas weekend?

3   A.  The code doesn't specify exemptions for

4      holidays.

5   Q.  Is that true even if an apartment was going to

6      be abandoned for a weekend, would it be

7      necessary -- strike it out.  If an apartment was

8      abandoned in your opinion, is it the same kind

9      of emergency situation as someone that was

10      actually living in the property with no heat?

11           MR. CHERNETSKY:  Objection.

12   A.  I think most, some tenants relocate when they

13      can't get the remedy done in time.  So that is

14      one option but I think by this point the weekend

15      had expired.

16   Q.  If you point down here, there's another quote

17      here, it starts with "If you're going to," could

18      you read that?

19   A.  "If you're going to make a business of providing

20      a basic service such as housing, it's not

21      something you can do at your own convenience, "

22      Dorsey said.  "It's a full-time commitment and

23      something that should not be taken lightly."

24   Q.  Do you remember whether that was your accurate

1      words?

2   A.  I don't remember if it's my accurate words.

3      Again, sometimes things even in quotes can be

4      paraphrased to be more concise by editors but

5      I'm sure the general idea is accurate.

6   Q.  Accurate as to what you said?

7   A.  Accurate, I may have been speaking about no heat

8      in general but not about this particular case.

9      It was editorially used to apply to this case.

10      Some of the interview may have been used to

11      speak about the no heat issue in general.

12      Editorially, if they decide to focus on one

13      case, that's something we don't have control

14      over.

15   Q.  Did you speak to the mayor at all directly about

16      the no heat issue for Lincoln Smith?

17   A.  I probably spoke to the mayor's press office.

18   Q.  Who did you speak to there?

19   A.  I probably, like I said, I relayed the

20      information to the mayor's press office.

21   Q.  So you're saying that you did not speak with the

22      mayor?

23   A.  Not that I know of.  It's three years ago, four

24      years ago.

1   Q.  Do you recognize, do you recognize this Boston

2      Globe article?  I'll give you this copy.

3   A.  I know it's from the Boston Globe.  I don't

4      recall it off the top of my head.

5   Q.  And if I was to say that this was February 24,

6      2001, would that --

7   A.  No.

8   Q.  Does this refresh your recollection if you --

9      did you speak with the Katherine Zezima?

10   A.  I don't recall.

11   Q.  This section here, where it has your name, could

12      you read that?

13   A.  "Spokesman June Dorsey said inspectors went back

14      to the house three days ago to check on another

15      violation which had been fixed and found that

16      Williams' hot water was still not restored."

17   Q.  Did -- first of all, is that -- that's not a

18      quote from you, right?

19   A.  That's paraphrased.

20   Q.  Do you remember speaking to the Boston Globe

21      about this situation saying that statement?

22   A.  Is this the same from December?

23   Q.  This is regarding the Palmira Williams case?

24   A.  Is that from December?

1   Q.  No, it's not.

2   A.  I don't remember this case.

3           MR. OHLSON:  If we could mark this as

4      Exhibit 2.

5      (Exhibit 2 marked for identification.)

6   Q.  If we could, okay.  I wanted to go back to

7      Exhibit 1, if we could.  Could you read this

8      quote by the mayor?

9   A.  "This is unconscionably wrong, Mayor Thomas M.

10      Menino said in an interview yesterday.  How can

11      you let a person stay for five days with no

12      heat?  It's even worse because it's a public

13      official, someone who deals with public policy

14      and is familiar with the law."

15   Q.  How would the mayor's office get all that

16      information?

17   A.  Probably they ask who owns the property a lot of

18      times, and that's -- the major has been in the

19      City Council, he's a public official since 1983.

20   Q.  Would you tell them, so you would tell them the

21      property owner?

22   A.  Right.

23   Q.  And would you tell them the amount of days that

24      heat was out on the property?

33

```
 1   A.   Well, if they had an interest they would call
 2        back and say, Okay, what's going on, what's the
 3        situation there?  Or sometimes the media will
 4        call and they want -- if it's a situation
 5        they'll call around to different public
 6        officials and ask them what they think.  And so
 7        they may call up the mayor and say what do you
 8        think about the situation so they'll call us and
 9        ask, well, what is the situation?  What's going
10        on?
11   Q.   Do you recall if the mayor's office called you
12        on this case?
13   A.   No, I don't.  I know no heat is generally a big
14        issue.  It's something that the mayor is
15        concerned about and wants us to respond to and
16        be able to respond to 24 hours a day.
17   Q.   In 2000, did you work in the mayor's press
18        office at all?
19   A.   Yes.
20   Q.   Did you work in the mayor's press office in
21        December of 2000?
22   A.   Not that I know of.  I mean I did some work for
23        them but I was based out of 1010 Mass. Ave.
24   Q.   So when you say you did some work for them, what
```

34

```
 1        do you mean by that?
 2   A.   Special projects.  I do work with Patricia
 3        Malone, different things like that, doing
 4        consumer outreach.
 5   Q.   Who is Patricia Malone?
 6   A.   She's the consumers affairs director.
 7   Q.   So how many hours a week was your work for the
 8        mayor's office?
 9   A.   I don't know, I don't recall.
10   Q.   Did you, were you working in financial services
11        full-time?
12   A.   I was basically using the office there and
13        sometimes I was doing work for ISD; sometimes I
14        was doing work for the mayor's office but the
15        work with Patricia Malone was primarily because
16        of the home improvement contractor outreach we
17        were doing so it was related to ISD.
18   Q.   Was any of that related to a no heat situation?
19   A.   No.
20   Q.   I'm sorry.
21   A.   It was all basically elderly consumers and home
22        improvement contractor stuff.
23   Q.   Do you recall if Mr. Smith ever called the
24        mayor's hot line regarding the issue with the no
```

35

```
 1        heat?
 2   A.   I do remember hearing something about after the
 3        fact, after it all transpired.
 4   Q.   What did you hear?
 5   A.   That he had called and just wanted to see what
 6        the situation was.  He was calling 24 hours to
 7        see what the situation was.
 8   Q.   Do you know when he called?
 9   A.   No.
10   Q.   Do you know if when he called, he said that he
11        couldn't get into the apartment because the
12        tenant wouldn't let him in and he had went out
13        and purchased space heaters?
14   A.   No.  I just -- I know that the reason why it
15        came up because they were wondering why he
16        called the mayor's office instead of ISD.
17   Q.   Do you know if he tried to call, he tried to get
18        ISD, their help into getting into the property?
19   A.   Right.
20   Q.   But the tenant wouldn't let him in, were you
21        aware of that?
22   A.   No.
23   Q.   And if I could back up a second?
24   A.   Sure.
```

36

```
 1   Q.   So when you made these statements to the media,
 2        you weren't given the information that he tried
 3        to get space heaters?
 4   A.   No.  I don't recall what information I was given
 5        at that point.  I may have, I may not have.
 6   Q.   You just told me that you didn't know he called
 7        the mayor's hot line until the day after the
 8        fact, is that correct?
 9   A.   Right.  So by that time, it may have been
10        information I was given at the scene, it may
11        have been information I was given by the tenant,
12        it may have been information the tenant gave
13        during the interview.  I don't know.
14   Q.   Do you know his calls were at night, one in
15        which was at 10:30 p.m., and were you ever told
16        that he was calling, he called the mayor's hot
17        line, he received a call back close to midnight,
18        were you ever told of anything?
19             MR. CHERNETSKY:  Objection.
20   A.   I don't know what the time was.
21   Q.   Do you remember what days of the week these --
22        the time line was with the no heat call?
23   A.   No.  I vaguely remember the initial call came in
24        for Christmas, and then I think we went out like
```

1    a couple of days or a day or two after Christmas

2    for the ones that hadn't been remedied still.

3  Q.  If I told you that Christmas was on a Monday,

4    and the day you were able to go out was December

5    27, which was a Wednesday, and the first day

6    that Mr. Smith could call a contractor was

7    Tuesday, the 26th, does that --

8         MR. CHERNETSKY:  Objection.

9  Q.  Does that, were you ever told about that?

10  A.  I think the law requires a remedy.  It doesn't

11    really provide for any exemptions for holidays.

12  Q.  Were you aware that the property needed a new

13    furnace?

14  A.  When I observed it, I just knew that heat was

15    not working.  I saw the soot and the furnace and

16    that there was no heat.

17  Q.  Do you have any background in heat, ventilation

18    and air-conditioning?

19  A.  I relied on what the inspectors told us.

20  Q.  Do you have a license in that area?

21  A.  No, I don't have a license.

22  Q.  Do you have any special licenses in Inspectional

23    Services or anything?

24  A.  No.

1  Q.  What was your undergraduate degree in?

2  A.  Journalism.

3  Q.  Have you ever dealt with Teri Adler at Channel

4    7?

5  A.  I'm sure.

6  Q.  And what circumstances did you deal with her?

7  A.  News stories.

8  Q.  For ISD?

9  A.  Sure.

10  Q.  And the mayor's office?

11  A.  Mm-hmm.

12  Q.  Was there ever a time that she refused to go

13    forward with a story that you were working on?

14  A.  No, not that I recall.

15  Q.  Do you know if she refused to go forward with a

16    story about Lincoln Smith?

17  A.  No.

18  Q.  Julie Fothergill, she was your supervisor, is

19    that right?

20  A.  Right.

21  Q.  Do you remember whether or not there was -- she

22    refused to sign a document at all?

23  A.  No.

24  Q.  This is Exhibit 1 from the previous deposition.

1    So can we mark this, what are we up to now?  Is

2    it three?

3         MR. CHERNETSKY:  Yes.

4    (Exhibit 3 marked for identification.)

5  Q.  Did you recognize this document at all?

6  A.  It's the standard NOV packet that we would send

7    out.

8  Q.  What is a NOV packet?

9  A.  It's where there are multiple violations for a

10    property, you organize them out of one packet.

11  Q.  What does N-O-V stand for?

12  A.  Notice of violation.

13  Q.  Do you recognize this signature?

14  A.  I know it's Julie Fothergill's signature.

15  Q.  Do you know who initialed this?

16  A.  Lisa Palmer.

17  Q.  Could that be Lisa Timberlake?

18  A.  It could, I don't know.  It looks like an LP.

19  Q.  Do you know if -- do you recall if Julie

20    Fothergill refused to sign this document?

21  A.  No.  I honestly don't remember being involved

22    with the case other than she would put together

23    NOV packets periodically.  She could have been

24    but --

1  Q.  Do you have her current position?

2  A.  No.

3  Q.  I'm sorry.

4         MR. CHERNETSKY:  Objection.

5  Q.  Strike that.  What position was hers when she

6    was your supervisor?

7  A.  She had two different positions.  I forget what

8    the previous one was but then she changed to an

9    assistant commissioner position.

10  Q.  And what is your title now?

11  A.  Assistant commissioner of communications and

12    policy.

13  Q.  Was that a title that she held at one point?

14  A.  I think she was assistant commissioner of policy

15    and planning and then she got promoted to the

16    legal division, head of the legal division.

17  Q.  Were you in the building when, on December 27,

18    2000, when a call for no heat came in, do you

19    know if you were there?

20  A.  I don't remember.

21         MR. CHERNETSKY:  Objection.

22  Q.  Did you travel with anybody to the scene on

23    December 27, 2000?

24  A.  I don't remember, I may have.

41

```
1              (Discussion off the record.)
2              MR. OHLSON:  Give me a minute.
3    Q.   Where is your office relative to Julie
4         Fothergill?
5              MR. CHERNETSKY:  Objection.  Today?
6    Q.   Strike that.  Where was your office in 2000?
7    A.   Next to hers.
8    Q.   Was she in work on December 27?
9    A.   I don't remember.
10   Q.   In the office there, who signs legal documents,
11        is it typically?
12   A.   If they're trying to get it out quick, they --
13        someone might, the person who's signing it whose
14        signature is on it may approve it and send it
15        back to someone.  Whoever they send it back to
16        may sign it for them and send it out.
17   Q.   Is it --
18   A.   But only with, only after the person has signed
19        off on it as good to go.
20   Q.   Does anything ever get signed without the person
21        seeing a draft of the --
22   A.   No.
23   Q.   -- the document?  Where is Inspector Nally's
24        office?
```

Beacon Hill Court Reporting

42

```
1    A.   Inspector Nally's in 2000?
2    Q.   Yes.
3    A.   I think it was in project, I think I'm not
4         positive, I think it was down on the fourth
5         floor or over in the housing division.
6    Q.   Did he ever travel with you and the
7         commissioner?
8    A.   Sometimes, yes.
9    Q.   And what circumstances would those be?
10   A.   A variety of circumstances.  If he was going out
11        to a scene, different situations.
12   Q.   A no heat call?
13   A.   No heat, collapsed building, a variety,
14        community meeting.
15   Q.   Do you know Tony Jones?
16   A.   No.
17   Q.   What about Stephen O'Donnell?
18   A.   Yes.
19   Q.   How do you know Steve O'Donnell?
20   A.   He's a supervisor at the housing division.
21   Q.   And do you interact frequently with him?
22   A.   Yes, on a regular basis.
23   Q.   How long have you known him?
24   A.   About three or four years.
```

Beacon Hill Court Reporting

43

```
1    Q.   Do you know if he was involved at all with --
2         strike it out.  Do you know if he was working on
3         December 27?
4    A.   No, I don't.
5    Q.   Do you recall whether or not he talked to
6         Commissioner Joyce at all about Mr. Smith and
7         the no heat situation around that time?
8    A.   As a housing manager, he probably spoke with
9         people in the commissioner's office about the no
10        heats, yes.  If it was an existing no heat on
11        the 27th, he probably did.
12   Q.   Would a situation where a no heat went for a
13        while without being remedied, is that a type of
14        thing that the commissioner would get involved
15        in?
16   A.   Yes.  He probably -- he would probably go out
17        into the field to see what the status was and
18        make sure the tenants were okay and check on the
19        inspectors.  That's pretty standard.  He did it
20        this year; he does it every year.
21             MR. OHLSON:  If we could have a
22        minute.
23             (Recess.)
24   Q.   Sorry about the delay.  If we can go back on the
```

Beacon Hill Court Reporting

44

```
1         record.  Do you know where Tony Jones is now?
2    A.   No.
3    Q.   Did you ever know him?
4    A.   No.
5    Q.   Do you know Lesley Christos?
6    A.   Yes.
7    Q.   Was he working for the department in December of
8         2000?
9    A.   I don't remember.
10   Q.   Do you know if he still works for the
11        department?
12   A.   Yes, he does.
13   Q.   What's his position?
14   A.   He's a housing inspector.
15   Q.   Did you have conversation with Tony Jones --
16        strike that -- with Lesley Christos about the no
17        heat situation?
18   A.   I don't remember.
19   Q.   Did you have a conversation with Steve O'Donnell
20        about the no heat situation?
21   A.   I probably spoke to whoever the inspectors were
22        dealing with the situation.
23   Q.   Do you remember who the inspectors present on
24        the 27th were?
```

Beacon Hill Court Reporting

45

1   A.  No.

2   Q.  So if I understand correctly from what you said

3      before, you were working at the mayor's office

4      and also working for ISD at the same time in

5      December 2000?

6   A.  I was doing some work for the mayor's office but

7      I was working for ISD.

8   Q.  So could you be on both payrolls or are you --

9   A.  No, I was, basically I worked like two days a

10     week for the mayor's office and I worked for

11     three days a week for ISD or two days a week

12     for.  Basically it would vary.

13   Q.  Whose payroll?

14   A.  I was a contract employee.

15   Q.  For?

16   A.  For the mayor's office and for ISD.

17   Q.  Would you get one paycheck per week or two?

18   A.  I don't remember at that point but I was

19     basically, I was just working on special

20     projects for the mayor's office.

21   Q.  And you never had a conversation with Mayor

22     Menino about Mr. Smith's situation even though

23     you worked in the press office at that time?

24           MR. CHERNETSKY:  Objection.

Beacon Hill Court Reporting

---

46

1   A.  I didn't work in the press office at that time.

2      I was working for some particular projects but

3      they had nothing to do with no heat.

4           I wouldn't speak directly to the

5      mayor.  I would give the information to the

6      mayor's press office but that's regardless of,

7      that's just the protocol.  All the line

8      departments do that.

9           MR. OHLSON:  I have no more questions.

10          CROSS-EXAMINATION

11   MR. CHERNETSKY:

12   Q.  Mr. Dorsey, if I could turn your attention to

13     what was marked as Exhibit 3 in this complaint,

14     it's right in front of you right there.  If you

15     look at the second page there's a signature

16     block for Julie Fothergill there?

17   A.  Mm-hmm.

18   Q.  And looking at that, does that refresh your

19     memory as to what Julie Fothergill's position

20     with ISD was in December of 2000?

21   A.  Director of policy and planning.

22   Q.  I also would like you to look at Exhibit No. 1.

23     I guess you probably have that, George.

24           Let me ask you first, in December of

Beacon Hill Court Reporting

---

47

1     2000, you had only recently gone to work for

2     ISD?

3   A.  Correct.

4   Q.  But did you have prior experience in media

5     relations, correct?

6   A.  Correct.

7   Q.  You worked in the mayor's office on media issues

8     for approximately six years?

9   A.  Six or seven years.

10   Q.  Your undergraduate major was in journalism?

11   A.  Correct.

12   Q.  Through that experience, do you have knowledge

13     of how media outlets compile their stories?

14   A.  Yes.

15   Q.  Print media in particular?

16   A.  Right.

17   Q.  If you would look at Exhibit No. 1 which is two

18     pages, the first page that has the headline, the

19     last paragraph to begin on that page, it says,

20     "Smith who in 1998 was cited as one of the

21     city's worst landlords has been feuding with the

22     administration of Menino and former mayor

23     Raymond L. Flynn -- and it continues on the next

24     page -- since 1986 when he was fired by then

Beacon Hill Court Reporting

---

48

1     city personnel chief Robert Consalvo, C O N S A

2     L V O."  Do you have an understanding as to how

3     the Boston Globe would get that type of

4     information?

5   A.  Well, if they've done previous stories, a lot of

6     times what reporters will do is they'll pull up

7     archived and see what else they can get on a

8     story or person or they'll take that information

9     and put it in.

10   Q.  Did anybody at the Globe ask you questions about

11     Mr. Smith's political affiliations?

12   A.  I don't remember, no.

13   Q.  Did anybody?

14   A.  I wouldn't have knowledge of this stuff right

15     here until I read it now.  In fact, prior to

16     this, I thought I knew that he was involved in a

17     lawsuit but I thought it was against Counselor

18     O'Neill.

19   Q.  You didn't yourself have knowledge in December

20     of 2000 of Mr. Smith's political affiliations

21     past or present?

22   A.  What do you mean, by Democratic Republican?

23   Q.  The kinds of thing that we've just were

24     describing?

Beacon Hill Court Reporting

49

```
 1   A.   I knew he was involved in a lawsuit with the
 2        city but I thought it was against Counselor
 3        O'Neill.
 4   Q.   Did you tell the Globe in December of 2000 that
 5        Mr. Smith had been involved in a lawsuit with
 6        the city?
 7   A.   I don't remember.  I don't think it would have
 8        been relevant.
 9   Q.   It's your understanding that they possessed that
10        information already?
11             MR. OHLSON:  Objection.
12   A.   I don't think I would have even considered
13        because the issue was no heat.  It wasn't -- our
14        objective was stick to message and it was no
15        heat.  It wasn't the person.
16             MR. OHLSON:  That is all.
17             MR. CHERNETSKY:  That is all I have
18        got.
19             REDIRECT EXAMINATION
20   MR. OHLSON:
21   Q.   Do you know who Robert Consalvo is?
22   A.   City counselor.
23   Q.   Have you ever met him before?
24   A.   Oh, yes, I met him.  He's a city counselor.
```

50

```
 1   Q.   Do you know the circumstances in which that
 2        case -- strike that.  Do you know anything about
 3        that civil suit?
 4   A.   No, absolutely not.
 5             MR. OHLSON:  That is all I have.
 6             MR. CHERNETSKY:  Okay.
 7   (Whereupon, the deposition closed at 12 o'clock
 8        noontime.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

51

```
 1             SIGNATURE PAGE/ERRATA SHEET
 2
 3   Re: Lincoln Smith vs city of Boston, et al
 4   Date February 20, 2004
 5   Deposition of:  John J. Dorsey, Jr.
 6        I, John J. Dorsey, Jr., do hereby certify
     that I have read the foregoing transcript of my
 7   testimony and further certify that it is a true
     and accurate record of my testimony (with the
 8   exception of the following changes listed
     below):
 9   Page Line  Correction
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21        Signed under the pains and penalties of
22   perjury this  day of        , 2004.
23
24                    John J. Dorsey, Jr.
```

52

```
 1   COMMONWEALTH OF MASSACHUSETTS
 2   MIDDLESEX, ss
 3        I, Irma Widomski, Registered Merit
     Reporter and Certified Shorthand Reporter,
 4   016512, in and for the Commonwealth of
     Massachusetts, do hereby certify that there came
 5   before me on the 20th day of February, 2004, at
     10:45 a.m., the person hereinbefore named, who
 6   was by me duly sworn to testify to the truth and
     nothing but the truth of his knowledge touching
 7   and concerning the matters in controversy in
     this cause; that he was thereupon examined upon
 8   his oath, and his examination reduced to
     typewriting under my direction; and that the
 9   deposition is a true record of the testimony
     given by the witness.
10
11        I further certify that I am neither
     attorney nor counsel for, nor related to or
12   employed by, any of the parties to the action in
     which this deposition is taken, and further that
13   I am not a relative or employee of any attorney
     or counsel employed by the parties hereto or
14   financially interested in the action.
15        In witness whereof, I have hereunto
     set my hand and seal this 3 day of March    ,
16   2004.
17
18                    _____
                      Irma Widomski, Notary Public
                      My Commission expires:
19                    January 22, 2010
20
21
22   *** THE FOREGOING CERTIFICATION OF THIS
     TRANSCRIPT DOES NOT APPLY TO ANY UNAUTHORIZED
23   REPRODUCTION OF SAME BY ANY MEANS UNLESS UNDER
     THE DIRECT CONTROL AND/OR SUPERVISION OF THE
24   CERTIFYING REPORTER.
```