## Page 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                              BOSTON MUNICIPAL COURT

-----------------------------------
Lincoln Smith,                    :
        Plaintiff         :
VS.                               :     Civil Action
                                No. T47183
City of Boston, Boston Inpectional :
Services, Kevin J. Joyce,
        Defendants
                                :
-----------------------------------

DEPOSITION of STEVEN G. O'DONNELL, witness called on behalf of the Plaintiff, pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Nancy Atherton, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Office of Stopa & Associates, 36 Mechanic Street, Suite 208, Foxboro, Massachusetts, on Thursday, February 19, 2004, commencing at 11:45 a.m.

BEACON HILL COURT REPORTING, INC.
44 Bayswater Street
Boston, MA 02128
(617) 569-8050

## Page 2

APPEARANCES:

   STOPA & ASSOCIATES, LLC
   George F. Ohlson, Jr., Esquire
   36 Mechanic Street, Suite 208
   Foxboro, MA 02035
      Attorney for the Plaintiff

   CITY OF BOSTON LAW DEPARTMENT
   James S. Chernetsky, Esquire
   City Hall - Room 615
   Boston, MA 02201
      Attorney for the Defendants

ALSO PRESENT: Lincoln Smith, Plaintiff

## Page 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Steven G. O'Donnell | | | | |
| By Mr. Ohlson: | 4 | | 28 | |
| By Mr. Chernetsky: | | 24 | | |

E X H I B I T S
NONE

## Page 4

P R O C E E D I N G S

MR. CHERNETSKY: I guess maybe we ought to say we'll go with the same stipulations that you articulated at Miss Maxwell's deposition.

MR. OHLSON: That would be fine.

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the witness will read and sign the deposition, and the certification, sealing and filing thereof are hereby waived.

It is further stipulated that all objections, except as to form of the question, including motions to strike testimony, are reserved until the time of trial.

STEVEN G. O'DONNELL,

A witness called for examination, having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. OHLSON:

Q   Mr. O'Donnell, would you state your full name for the record?

A   Steven G. O'Donnell. G. for George.

Q   My name is George Ohlson. I'm an attorney with Stopa & Associates, and I represent Mr. Smith, the plaintiff in this civil action. Mr. O'Donnell, what is your address?

```
 1  A   135 Concord Street, Rockland, Mass.
 2  Q   And what is your marital status?
 3  A   Married.
 4  Q   And what is your date of birth?
 5  A   February 26, 1954.
 6  Q   Are you employed?
 7  A   Yes, I am.
 8  Q   And where are you employed?
 9  A   Inspectional services department for the City of Boston.
10  Q   Did you do anything in preparation for this deposition
11      today?
12  A   No.
13  Q   About your employment background -- oh, strike that.  How
14      about education, what's your highest level of education?
15  A   Graduated from South Boston High School.
16  Q   When you graduated high school, where did you work after
17      that?
18  A   I had a couple of part-time jobs doing catering stuff for
19      Doyle Caterers.  And then I believe I started for the
20      city in 1975.
21  Q   And when you started with the city in 1975, what
22      department did you work in?
23  A   I was a heavy equipment operator for the Boston police
24      department.
25  Q   And how long did you hold that position?
```

```
 1  A   Approximately three or four years.
 2  Q   And what did you do after that?
 3  A   I was an intake specialist for the Project Yes
 4      Development, a federally funded program.
 5  Q   Was that part of the City of Boston as well?
 6  A   That's correct.
 7  Q   And how long did you hold that position?
 8  A   1981, '82.  It's been another three or four years.
 9  Q   And where did you go from there?
10  A   Consumer affairs and licensing.
11  Q   If I could stop for a second.  I skipped a step.  I
12      forgot the instruction part of this.  Have you been
13      deposed before?
14  A   Uh-huh, yes, I have.
15  Q   And so you know that this is just a question and answer
16      session which I've demonstrated?
17  A   Correct.
18  Q   A few minutes before.  At times I may ask questions that
19      are unclear or confusing.  If I do that, please ask me to
20      repeat them and I'll do that.
21  A   Okay.
22  Q   Only one of us can talk at a time.  If we both talk at
23      the same time, the court reporter can't pick up both of
24      us.  And if you need to take a break at any time, that
25      would be fine.  Just if there's a question pending, I ask
```

7

```
 1      that you answer the question that's pending and then
 2      we'll take the break.
 3  A   Okay.
 4  Q   So if there's nothing further, I'd like to move back
 5      towards where I was.  So you said that you worked for
 6      consumer affairs?
 7  A   Consumer affairs and licensing.  The whole career is with
 8      the City of Boston.  That was another three or four
 9      years.  And --
10  Q   Continue.  Go ahead.
11  A   Continue all the way through?
12  Q   I thought --
13  A   Consumer affairs and licensing.
14  Q   So after that, what position did you hold in the City of
15      Boston?
16  A   I was the director of the city animal control program.
17      That was in '86.
18  Q   How long did that last?
19  A   To 1991.
20  Q   And then in 1991?
21  A   I was the executive secretary for the inspectional
22      services department.
23  Q   And have you been with inspectional services ever since?
24  A   Since then, yes.
25  Q   What positions have you held at inspectional services?
```

8

```
 1  A   Executive secretary and assistant director of housing,
 2      which I currently hold today.
 3  Q   Okay.  What sort of training have you received in
 4      inspectional services?
 5  A   Through the years several seminars, and I took courses
 6      for led, for led testing and examination and several
 7      seminars over the years and courses regarding housing
 8      inspections and inspections conducting.
 9  Q   Do you hold inspections yourself?  Do you do them?
10  A   Usually I have an inspector on the scene with me.
11  Q   Did you have any prior housing inspection experience
12      before your time at ISD?
13  A   No, I did not.
14  Q   Now, as assistant director of -- is that correct,
15      assistant director of housing?
16  A   That is correct.
17  Q   What are your duties and responsibilities?
18  A   Supervision of personnel, administrative support staff,
19      inspectors.  I conduct administrative hearings at times
20      and run the office at 1010 Mass. Ave.
21  Q   Who are the employees that you supervise?
22  A   Administrative support personnel and inspectors.
23  Q   So those are housing inspectors?
24  A   That is correct.
25  Q   Okay.  Do you know who Lincoln Smith is?
```

10

```
 1   A    Yes.
 2   Q    How long have you known Lincoln?
 3   A    Guessing over 20 years.
 4   Q    How did you first come in contact with Lincoln?
 5   A    Neighborhood.  Friends that I knew that he knew in the
 6        neighborhood in Dorchester.
 7   Q    Okay.  Have you ever been to the 11 Newport Street
 8        apartments?
 9   A    Yes.  Yes, I have.
10   Q    When were you -- do you remember when you were there?
11   A    Specific dates I don't recall.  I believe that was on two
12        occasions.
13   Q    Were those in December of 2000?
14   A    One was in December of 2000.  I don't recall the other
15        date.
16   Q    Okay.  Do you remember in December of 2000 a no-heat
17        situation at 11 Newport Street?
18   A    Yes.
19   Q    Were you yourself an inspector there on December 23,
20        2000?
21   A    Yes, I believe that is the date.
22   Q    And what generated -- what caused you to be there?
23   A    I believe the first floor tenants called our office
24        telling us that she was experiencing no heat in her
25        apartment.  Inspector Les Christos responded to the scene
```

11

```
 1        and asked me to come out to take a look at the place.
 2   Q    Why did Mr. Christos ask you to come along?
 3   A    Because the situation -- I believe the situation with the
 4        apartment, the registers had black soot on the walls from
 5        the registers, and the heating system had all black soot
 6        coming out of the middle of it.
 7   Q    So why would your presence be required then?
 8   A    He wanted -- I believe he wanted to vacate the house at
 9        that time.
10   Q    In other words, he wanted everybody to leave the
11        apartment?
12   A    Correct.
13   Q    And is that something that he could do on his own?
14   A    They do that now; but back then, no.  A supervisor went
15        out to take a look before authorization of vacating a
16        premises took place.
17   Q    Is that something that was done at 11 Newport Street?
18   A    No, not that night, no.
19   Q    Do you know if it was done at any point?
20   A    I don't know.
21   Q    And what would the reason for vacating the apartment be?
22   A    It was freezing cold that particular night and the
23        heating system was not working.
24   Q    Okay.  So as a result of the no-heat complaint, did --
25        strike that.  Did you ever speak to Lincoln Smith on that
```

11

```
 1        date?
 2   A    That evening, yes, I believe I did make a phone call and
 3        left a message on his answering machine, and he did call
 4        me back.
 5   Q    And do you recall what you and he discussed?
 6   A    We discussed him picking up some heaters for the unit
 7        because the tenants did not want to leave.
 8   Q    So he said that he would get some space heaters for the
 9        unit?
10   A    That's correct.
11   Q    Because the tenants didn't want to leave the apartment?
12   A    No.  I asked him to get the space heaters because the
13        tenants did not want to vacate the unit.  They wanted to
14        stay there.  The woman wanted to stay there.
15   Q    Do you know if he got the space heaters?
16   A    He called me on the telephone letting me know that he had
17        the space heaters, yes, he did.
18   Q    Did he tell you anything about whether or not he was
19        allowed to put the space heaters in?
20   A    He told me the woman wouldn't let him put the space
21        heaters in.
22   Q    And how did you respond?
23   A    I told him let me make a phone call.  And I made a phone
24        call to the tenant, and she shared with me that she
25        didn't want the space heaters because she was leaving the
```

12

```
 1        next morning and to let me know she was going to be gone
 2        for two or three days and just wanted her heating unit
 3        fixed so when she came back she would have heat.
 4   Q    And what did you say?
 5   A    I said fine.  Have a good night.
 6   Q    Did you ever tell Mr. Smith that there was -- during that
 7        second phone conversation when he informed you that the
 8        tenant denied him access, did you ever tell Mr. Smith
 9        that there was nothing that you could do?
10   A    I don't think I put it that way.  I shared with Mr. Smith
11        that the tenant did not want the space heaters; that
12        there was nothing I could do to change her mind.
13   Q    Did you ever say to Mr. Smith that, you know, I'm doing
14        my Christmas shopping; what do you want me to do or
15        anything of that --
16   A    Yes.  How the conversation was was that he was quite
17        agitated at the time obviously because I would imagine I
18        had requested that he go purchase some space heaters only
19        to find out when he went back she wouldn't let him in.
20        So he called me quite frustrated about that.
21            And what I told him was there was nothing I could do
22        to make her take the space heaters meaning in the
23        conversation over the phone I mentioned to him there was
24        nothing I could do and mentioned to him that at that
25        moment I was somewhere Christmas shopping I think.
```

14

| | | |
|---|---|---|
| 1 | Q | When you say that he was frustrated, are you speculating? |
| 2 | A | Yes. |
| 3 | Q | As to why he was frustrated? |
| 4 | A | Well, by the tone of his voice on the phone. |
| 5 | Q | And you speculated as to whether or not he was frustrated is what you are saying? |
| 7 | A | Correct. |
| 8 | Q | What happens when a situation like that -- strike that. What's a landlord's responsibility if a tenant won't take the space heaters and there's no heat in the apartment? |
| 11 | A | Well, they usually have two choices. We determine what the conditions are in that particular apartment and on that particular night. And depending upon the weather, two things go through our minds is whether we need to vacate the unit or in a particular case would space heaters suffice for the night. |
| | | If we get in touch with landlords and they are cooperative, we try to allow them to put in space heaters for the night if they promise to have a plumber there the next morning to correct the problem. |
| | | A few things have to fall in place to determine what exactly happens in any given situation. In this particular situation the woman did not want space heaters. She let me know that she was staying with family for the next three or four days, so it eased my |

mind she wasn't going to be in the unit. And she just wanted to go to bed. It was like 10:00 or 10:30 at night.

| | | |
|---|---|---|
| 4 | Q | So how long would Mr. Smith have to fix the furnace then? |
| 5 | A | We typically give landlords 24-hour notices, 24 hours to correct the problem. |
| 7 | Q | Okay. Would that be altered by the fact that she was going to leave the apartment? |
| 9 | A | Would it be altered? |
| 10 | Q | Would he be allowed -- strike that first question. Would he be allowed more time to fix the furnace because she was going to leave the apartment? |
| 13 | | MR. CHERNETSKY: Objection. Go ahead and answer. |
| 14 | A | Typically once a notice is served to an owner notifyin him or her of the problem, a reinspection occurs after 24 -- sometimes they are after 24 hours has elapsed and receiving a notice. It doesn't matter whether he put in space heaters or whether the people were put up in a hotel. |
| 20 | Q | As we said that the date of this phone conversation and the initial contact between yourself and the tenant was December 23. So would it be fair to say it would be difficult to get a contractor to replace a furnace two days before Christmas? |
| 25 | | MR. CHERNETSKY: Objection. Go ahead. |

15

| | | |
|---|---|---|
| 1 | A | I don't know. |
| 2 | Q | Were you present at the property on December 27, 2000? |
| 3 | A | I don't believe so. |
| 4 | Q | I'm sorry? |
| 5 | A | I don't believe so. |
| 6 | Q | I'll show you your answers to interrogatories. These are your answers to interrogatories. And is that your signature on the last page? |
| 9 | A | Yes, it is. |
| 10 | Q | There's no page numbers on these, but on Interrogatory No. 3, could you read the question? |
| 12 | A | Please list the names and addresses, occupations of every employee or agent of the defendant who was present at the Newport Street property on December 27, 2000. |
| 15 | Q | And is your name listed in the answers to interrogatories of No. 3? |
| 17 | A | Yes, it is. |
| 18 | Q | Does that refresh your memory as to whether you were there on December 27? |
| 20 | A | Can I look at that again? |
| 21 | Q | Sure. |
| 22 | A | I don't recall being there on the 27th. |
| 23 | Q | Okay. |
| 24 | A | I may have been there. I don't recall. I believe I testified earlier there was two occasions, and there was |

16

another occasion I was there on the third floor with Inspector Maxwell-Davis.

| | | |
|---|---|---|
| 3 | Q | If you could repeat that; I'm sorry. |
| 4 | A | I said I mentioned earlier that I was there on two occasions. |
| 6 | Q | Right. |
| 7 | A | My recollection was there once with Inspector Christos on December 23 and another day with Inspector Maxwell-Davis. I don't recall anything on the 27th. |
| 10 | Q | Okay. Do you recall being at the -- so is it fair to say you weren't at the property with Commissioner Joyce on that day? |
| 13 | A | I don't recall being there on that particular day, no. |
| 14 | Q | Bear with me for a second. Did you ever have a conversation with Kevin Joyce on December 27 about the property at 11 Newport Street? |
| 17 | A | I don't believe so. |
| 18 | Q | Did you ever at any time notify Mr. Joyce that the heat was still out on the 27th? |
| 20 | A | He may have asked me in conversation, and I would just refer to the reports of whatever inspectors have issued a reinspection report for him. And that I'm sure if I had conversation with someone during that period of 2000, I had information, and I would have shared that with him. |
| 25 | Q | Did you call Kevin Joyce's office on December 27, 2000? |

18

1  A   I don't recall.
2  Q   Do you know if with regarding Mr. Smith's violations that
3      all -- whether all activity and contact regarding his
4      violations had to go through Mr. Joyce?
5  A   I'm sorry.  Repeat that.
6  Q   Okay.  Do you know if whether or not all activity or all
7      communications regarding whether or not Mr. Smith's
8      violations were closed out had to go through Commissioner
9      Joyce?
10 A   I don't know that, no.
11 Q   Do you know if Mr. Joyce -- excuse me, strike that.  Do
12     you know if Mr. Smith ever repaired the heater?  Do you
13     know if he repaired the furnace, excuse me?
14 A   Yes, I believe at some point that the case was closed
15     because the heat was restored.
16 Q   Do you know if he replaced the furnace or whether or not
17     it was simply a repair done to the old furnace?
18 A   I don't know which occurred.
19 Q   Do you know if Mr. Joyce ever said to Mr. Smith that he
20     would treat him like he treated Clifford Davis?
21 A   No, I wasn't there when that was said.
22 Q   Do you know if it was said?
23 A   No.
24 Q   In your experience approximately in the year of 2000, how
25     many no-heat complaints do you get per week -- did you

1      get per week, do you recall?
2  A   During -- I'm just going to say during the winter months
3      from I'm going to say when it starts getting cold in
4      November, December, January, February we probably get
5      about an average of 300 a week.
6  Q   300 a week?
7  A   Uh-huh.
8  Q   And how many of those do you go out to the site?
9  A   Let me strike that.  It's not 300 a week.  It's average
10     during real cold spells in one week we may get a thousand
11     if it's very, very cold and heating systems aren't used
12     to going 24/7.  In the City of Boston when we get a very
13     cold spell, heating systems tend to break down, and we'll
14     get over a thousand no-heat complaints in one week.
15 Q   I see.  So how many no-heat complaints would you say that
16     you personally go to the site in the year 2000 for
17     example?
18 A   Personally go to the sites to vacate the unit is minimal.
19     It's I would say maybe ten, ten in the winter season.
20 Q   What about Commissioner Joyce, have you ever been to a
21     site with a no-heat complaint where he's been there?
22 A   Not initially, no.
23 Q   What do you mean by no, not initially?
24 A   Meaning typically when I am called, I'm usually called by
25     an inspector to meet the inspector on the scene and

19

1      that's the only person on the scene.
2  Q   Is Commissioner Joyce ever summoned afterwards?
3  A   Yes.
4  Q   And what would the reasons for that be?
5  A   I don't know.  Some tend to keep the commissioner
6      informed and the commissioner may choose to go to the
7      scene.
8  Q   Have you ever summoned the commissioner to a scene?
9  A   No.  I've been to a scene where the commissioner is
10     there.
11 Q   And do you recall what properties those were?
12 A   No.  There's been many.
13 Q   Approximately how many?
14 A   Since he's been there maybe 20.
15 Q   Do you know John Dorsey?
16 A   Yes, I know John Dorsey.
17 Q   Does he work for Boston Inspectional Services?
18 A   Yes, he does.
19 Q   What is his position?
20 A   He is the person who deals with the news media.
21 Q   Have you ever been to a scene where there has been no
22     heat where John Dorsey has been present?
23 A   I don't believe so.
24 Q   Do you know if he has been at a no-heat --
25 A   Yes, he has.

20

1  Q   What would be the reason for bringing him to a no-heat
2      complaint?
3  A   I would imagine to inform the press of a situation that's
4      going on in the city and typically calls the press and
5      goes out on inspections.  He usually goes out with
6      inspectors.
7          MR. OHLSON:  If I could have a few minutes.
8          (Short break taken.)
9  BY MR. OHLSON:
10 Q   What was the policy with independent contractors with the
11     inspectional services?  Does the department ever call
12     independent contractors to fix like a furnace for no
13     heat?
14 A   Yes, we have before.
15 Q   And what would be the reason for calling them?
16 A   Unable to get in touch with the landlord.
17 Q   If you could get in touch with the landlord, would there
18     be any reason to call an independent contractor?
19         MR. CHERNETSKY:  Objection.
20 A   I personally wouldn't if I was in communication with the
21     landlord.
22 Q   Would other people do that?
23 A   I don't know.
24         MR. CHERNETSKY:  Objection.
25 Q   Have you seen instances where other people have called an

22

```
 1      indpendent contractor even though the landlord was in
 2      contact with ISD?
 3   A  Not that I'm aware of, no.
 4   Q  Do you know if that was the case with the property at
 5      11 Newport Street?
 6   A  No, I'm not aware of how that was repaired.
 7   Q  So is it your testimony -- back up.  Do you know who
 8      Dorey Fuel is?
 9   A  Yes.
10   Q  Are they an independent contractor that inspectional
11      services uses?
12   A  Yes, it is.
13   Q  And were they used -- what are the different times that
14      they've been used and approximately what years have they
15      been used?
16   A  I haven't called any independent contractors to fix
17      heating units this year at all.  I believe I may have
18      done one last year.
19   Q  Do you know if Dorey Fuel was used in the year 2000?
20   A  Yeah, Dorey was one of three or four contractors called
21      to assist during 2000.
22   Q  Do you know the O'Shea family?
23   A  Is that the family who lived at the first floor?
24   Q  Apartment 1.
25   A  Yes, I met them that night.
```

23

```
 1   Q  Is the first time you met them?
 2   A  Yeah.
 3   Q  Where did you grow up?
 4   A  Buttonwood Street in Dorchester.
 5   Q  Is that close to 11 Newport Street?
 6   A  It's about five or six blocks away.
 7   Q  Do you know Julie Fothergil?
 8   A  Yes.
 9   Q  How do you know her?
10   A  She used to be an employee at inspectional services.
11   Q  Did you ever have a conversation with her about Lincoln
12      Smith?
13   A  I don't believe so.  I don't recall if I did.
14   Q  Do you know Alysa Timberlake?
15   A  Yes.
16   Q  What is her position at Boston Inspectional Services
17      Department?
18   A  She works out of the commissioner's office.  I believe
19      she assists the chief of staff and Mr. Dorsey on his
20      media things.
21   Q  So just to clarify a previous answer, are you saying that
22      on December 27 that you did not call the commissioner
23      regarding the no-heat complaint?
24   A  I don't believe so.
25   Q  Who would be responsible for calling an independent
```

23

```
 1      contractor if there was a no-heat complaint?
 2   A  Usually we'd go through myself, the assistant
 3      commissioner or above.
 4   Q  Who is the assistant commissioner?
 5   A  Dion Irish.
 6   Q  And when you say above, who would that be?
 7   A  Deputy commissioners and the commissioner.
 8   Q  Who is the commissioner?
 9   A  Who is the commissioner?
10   Q  Yes.
11   A  Kevin Joyce.
12   Q  And who were the deputy commissioners?
13   A  Gary Moccia, Dick Kanaskie and Frank Frattaroli.
14          MR. OHLSON:  Give me a few minutes.
15          (Short break taken.)
16   BY MR. OHLSON:
17   Q  Have you ever been in touch with the mayor about a
18      situation where the heat goes out in an apartment?
19   A  No.  He and I don't get along.
20   Q  Why don't you get along?
21   A  I don't know.
22   Q  Are you serious; you don't get along with the mayor?
23   A  I should say --
24          MR. CHERNETSKY:  Objection.
25   A  -- no comment.
```

24

```
 1   Q  Okay.
 2   A  My apologies.
 3   Q  Did you have a cousin that lived at Allen and Newport
 4      Street?
 5   A  Yes.
 6   Q  What was his name?
 7   A  I think it was a her.  I think it was Joanne.
 8   Q  Is that Joanne O'Donnell?
 9   A  That is correct.
10   Q  And was she ever evicted?
11   A  I wasn't aware of that -- I was made aware of it.  I
12      wasn't aware of it while it was going on.
13   Q  What was she evicted for?
14   A  I don't know.
15          MR. OHLSON:  I'm all set.  I don't have anymore
16      questions.
17   CROSS-EXAMINATION
18   BY MR. CHERNETSKY:
19   Q  Mr. O'Donnell, in response to Mr. Ohlson's questions
20      earlier you described some conversations that you had
21      with Mr. Smith about the possibility of space heaters as
22      a temporary solution to the no-heat problem.  Do you
23      recall that?
24   A  Yes, I do.
25   Q  And you described that you may have been Christmas
```

|   |   |
|---|---|
| 1 | shopping as you engaged in some of these telephone |
| 2 | conversations with Mr. Smith, is that right? |
| 3 | A   Yes, that is correct. |
| 4 | Q   Even if you had been present at 11 Newport Street, is |
| 5 | there anything that you could have done to force a tenant |
| 6 | to accept space heaters? |
| 7 | A   No. |
| 8 | Q   So your power to do anything for Mr. Smith was unrelated |
| 9 | as to where you were, is that correct? |
| 10 | A   That is correct. |
| 11 | Q   Would it be safe to have space heaters in a unit without |
| 12 | the tenant present for a period of several days? |
| 13 | A   I would not recommend space heaters being left turned on |
| 14 | in anyone's unit while no one was there. |
| 15 | Q   During your conversations with Mr. Smith on that evening |
| 16 | of December 23, did he ever express concern for the |
| 17 | welfare of the tenant? |
| 18 | A   No. |
| 19 | Q   You don't recall whether you telephoned Commissioner |
| 20 | Joyce about the no-heat situation at 11 Newport Street? |
| 21 | A   I can say the reason why I say no is I usually do not |
| 22 | call anyone other than Dion Irish if I have a particular |
| 23 | problem at an address. And beyond him it would be Deputy |
| 24 | Frattaroli. I can't recall once that I ever called the |
| 25 | commissioner, any commissioner to a situation like that. |

1  Q   I believe you also testified that it's possible that you
2      responded to an inquiry from the commissioner, and that
3      if you have reinspection reports to the effect that there
4      was still no heat that you would let him know that, is
5      that correct?
6  A   I would share with him any information on any complaint.
7  Q   Okay.
8  A   I'd refer to the file to get my answer usually.
9  Q   And I'd just like to show you what was marked as Exhibit
10     No. 5 at the deposition of Inspector Maxwell-Davis and
11     also what was marked as Exhibit No. 2 in the deposition
12     of Inspector Maxwell-Davis. Do you recognize the types
13     of documents which I'm showing you?
14 A   Yes. Exhibit No. 5 is an emergency legal notice also
15     known as an abatement order with violations from
16     inspectors recorded on here. And they are typically
17     served to landlords to notify them that certain
18     violations are at their properties.
19 Q   Okay. And how about Exhibit No. 2?
20 A   Exhibit No. 2 is a reinspection report form. Typically
21     inspectors fill them out telling us fix that, telling us
22     what has occurred, what repairs have or have not been
23     made at that particular date and time.
24 Q   And Exhibit No. 2 is a reinspection result form relating
25     to a no-heat complaint at 11 Newport Street?

27

1  A   Yes, it is.
2  Q   And does it show a reinspection date of December 26,
3      2000?
4  A   Yes, it does.
5  Q   And can you tell us what inspector completed that form?
6  A   Inspector Maxwell-Davis.
7  Q   And --
8  A   Evangelina Maxwell-Davis.
9  Q   Is Inspector Maxwell-Davis someone over whom you have
10     managerial responsibility?
11 A   That is correct.
12 Q   And would you have had access to that form once she
13     submitted it?
14 A   Yes, I would.
15 Q   Mr. Ohlson asked you earlier to speculate about the
16     reasons why Mr. Dorsey may or may not respond to the
17     property where there's a no-heat complaint. Are you
18     familiar with all aspects of Mr. Dorsey's duties and
19     responsibilities?
20 A   No, I'm not.
21 Q   Might there be reasons that Mr. Dorsey has of which he
22     does not make you aware for being at a property with a
23     no-heat complaint?
24 A   I'm sure he does.
25         MR. CHERNETSKY:  George, I have nothing beyond that.

28

1  REDIRECT-EXAMINATION
2  BY MR. OHLSON:
3  Q   Did you have a conversation with anybody besides counsel
4      about your deposition here today?
5  A   Mr. Irish, maybe my wife and people at the office, let
6      them know where I was going.
7  Q   Did you talk about the content of what you would say with
8      any of these people?
9  A   No.
10 Q   Was the nature of your conversation with Mr. Irish solely
11     about where you were going today?
12 A   That is correct.
13 Q   Did anybody say anything to you about what you would say
14     today?
15 A   No.
16 Q   Did anyone express any opinions about Mr. Smith?
17 A   No.
18 Q   Who is Inspector Nally?
19 A   Paul Nally works out of the commissioner's office.
20 Q   What does he do for the commissioner?
21 A   Particularly I don't know what the particulars are. All
22     I know is he usually goes to scenes with the
23     commissioner. And I believe he does something regarding
24     commercial buildings for permits and stuff.
25 Q   Did you get a telephone call from Inspector Nally on

```
         December 23, 2000?
 A       I don't recall.
 Q       Do you recall getting a telephone call from him around
         that time, December of 2000?
 A       No.
 Q       Did you ever speak with him regarding the property at
         11 Newport Street?
 A       Not that I recall.
         MR. OHLSON:  I have nothing further.
         MR. CHERNETSKY:  Neither do I.
         (Deposition concluded at 12:30 p.m.)
```

---

Excerpt from Rule 30(e):

Submission to Witness; Changes; Signing.

When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to or by him/her, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them.

************************************

I, STEVEN G. O'DONNELL, have examined the above transcript of my testimony, and it is true and correct to the best of my knowledge, information and belief. Any corrections are noted on the errata sheet.

Signed under the pains and penalties of perjury this ____ date of _____, 2004.

_____
Deponent's Signature

Subscribed and sworn to before me this ____ day of _____, 2004.

_____
Notary Public

My Commission Expires:
_____

---

31

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

I, Nancy Atherton, a Shorthand Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 19th day of February, 2004 the person hereinbefore named, who was by me duly sworn to testify to the truth of his knowledge concerning the matters in controversy in this cause; that he was thereupon carefully examined upon his oath and his examination reduced to typewriting under my direction; and that the deposition is a true and accurate record of the testimony given by the witness.

I further certify that I am not interested in the cause of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 4th day of March, 2004.

_____
NANCY ATHERTON

My Commission Expires:
   May 28, 2010