UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LINCOLN E. SMITH, | ) | |
|       Plaintiff, | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| CITY OF BOSTON, BOSTON | ) | CIVIL ACTION NO. |
| INSPECTIONAL SERVICES, AND KEVIN | ) | 03-10062-DPW |
| JOYCE (AS COMMISSIONER, | ) | |
| DEPARTMENT OF INSPECTIONAL | ) | |
| SERVICES, AND INDIVIDUALLY), | ) | |
|       Defendants. | ) | |
| | ) | |

MEMORANDUM AND ORDER
July 13, 2004

Lincoln E. Smith, a landlord who concedes that city inspectors found housing code violations after they were initially brought to one of his properties by a tenant's no heat complaint during a cold late afternoon in December, presses this action complaining that the City of Boston and Kevin Joyce, its then Commissioner of Inspectional Services, injured him in their manner of addressing his violations. He asserts a number of federal constitutional, state statutory, and state common law claims. I find none of the claims has merit and accordingly will allow the defendants' motions for summary judgment.

## I. BACKGROUND

### A. Facts

Smith owns two properties in the City of Boston, including a three family home at 11 Newport Street which he rents to tenants.

At approximately 4:45 PM on December 23, 2000, the tenant in

Apartment #1, Mrs. O'Shea, called Boston Inspectional Services Department (ISD) with a complaint of no heat.  Pursuant to ISD procedure, Inspector Lesley Christos visited the property to investigate.  Finding the complaint valid, Inspector Christos filed a "Notice of Violation" for lack of heat, noting that because the furnace was not properly maintained, soot had built up in the vents and on the walls.  Consequently, the fire department determined the heating system needed to be shut down completely.  Because Massachusetts state sanitary code directs that a no-heat complaint is an emergency situation, Smith, as landlord, was required to remedy the violation within twenty-four hours.

When Smith learned of the no-heat complaint, he called Steve O'Donnell, Inspector Christos's supervisor, to discuss remedial options.  Because of the Christmas holiday, both decided that a proper short-term solution would be to supply space heaters for the weekend and to have a repairman on site as soon as the holiday passed.  Accordingly, that same night, Smith purchased and attempted to place three space heaters in Mrs. O'Shea's apartment. But Mrs. O'Shea refused to accept them; she planned to be away for the holiday and was worried about the potential fire hazard the space heaters posed.  Unsure as to how to proceed, Smith again contacted O'Donnell, who advised him that ISD had no power to force tenants to accept temporary solutions like space heaters.

ISD policy directs that properties with violations be

reinspected at the expiration of the time allotted for remedy. Accordingly, Inspector Evangeline Davis reinspected 11 Newport Street for the no-heat complaint on December 26, 2000, finding that the violation remained outstanding.

On December 27, 2000, Smith's repairman was on site to fix the heating system. ISD Commissioner Kevin Joyce was also present checking on the status of the complaint. Joyce allegedly instructed a team of ISD inspectors to "go through the property with a fine tooth comb and write up every violation" they could find. Joyce also allegedly warned Smith that ISD was going to treat him "like Cliff Davis," alluding to a reputed Boston slumlord who had previously been investigated for housing violations by ISD.

Inspector Toney Jones wrote a Notice of Violation for the Newport Street apartment, citing eleven new code violations. On December 28, 2000, Smith received a "NOV packet"[1] from the Commissioner's office for multiple violations at 11 Newport Street. Smith claims that he remedied all of the violations within the time allotted and repeatedly requested that his property be reinspected so that the violations could be cleared from his record.

---

[1]In 2000, if there were multiple violations on one property, ISD policy would issue a comprehensive NOV packet consolidating all violations. These violations would be coordinated through the Commissioner's office, rather than handled piecemeal by the separate divisions of ISD.

Apparently, bureaucracy was slow and minimally responsive.[2]

On December 29, 2000, the Boston Globe published an article, "Council Worker Feels Heat from Unhappy Tenant," covering the no-heat complaint.  The article reported that Smith "left his 73-year-old tenant stranded without heat for five days," and included quotations from Mrs. O'Shea, ISD employee John Dorsey, Mayor Thomas Menino, and Smith himself.  The article also recapitulated the facts surrounding Smith's previous employment litigation with the City[3] and his inclusion on a 1998 list of Boston's "worst landlords" published by the Boston Globe.

Viewing these events in their totality, Smith sees the December 27 inspection, the litany of code violations, the slow response to his NOV packet, and the media attention as part of a malicious scheme initiated by Joyce to embarrass and humiliate him. He contends that Joyce and the City's employees used the no-heat

_____

[2]Neither party has developed in detail the factual record pertaining to the status of the NOV packet.  Smith has submitted his correspondence inquiring about the status of his violations, but it is unclear how ISD has responded, if at all.

[3]Lincoln Smith is currently employed by the Defendant, City of Boston ("the City), as an Assistant Director of Research. Between 1982 and 1986, he held a position in personnel management within the City's training department.  Smith's termination from this position led to litigation against the City and the personnel director in 1986.  Smith prevailed in his suit against the personnel director individually.  In that litigation, Smith was represented by Regina Quinlan.  Their relationship was equally contentious: Smith filed a complaint against her to the Board of Bar Overseers for her handling of his case. Coincidentally, Kevin Joyce was once employed as an associate attorney by Quinlan.

4

complaint as an opportunity to pursue personal vendettas, to
retaliate against him for the prior employment litigation, and to
punish him for historically being 'at odds' politically with high-
ranking city officials.

## B.  Procedural History

Smith filed this action in the Suffolk Superior Court in
December, 2002 against the City and against Kevin Joyce, both in
his official capacity as Commissioner of ISD and individually.  In
his complaint, he alleged causes of action for "interference with
his rights guaranteed and protected under the Massachusetts Civil
Rights Act, the Federal Civil Rights Statute, 42 U.S.C. § 1983, as
well as the Fourth and Fourteenth Amendments..." (Count I); slander
(Count II); libel (Count III); and intentional and negligent
infliction of emotional distress (Counts IV and V, respectively).

Because Count I states a federal question over which federal
district courts have original jurisdiction, on January 10, 2003,
the Defendants removed this action to district court pursuant to 28
U.S.C. § 1441.

On February 11, 2003, I dismissed all five counts against
Joyce in his official capacity and the counts for slander, libel,
and intentional infliction of emotional distress against the City.
The City now seeks summary judgment on the two counts remaining
against it, those for violation of Smith's civil rights and for
negligent infliction of emotional distress.   Joyce moves for

5

summary judgment on all five counts alleged against him individually.

## II.  <u>DISCUSSION</u>

### A.  Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Summary judgment may enter when a plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial.  <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "Once the movant avers an absence of evidence to support the nonmoving party's case, the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'"  <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1261 (1st Cir. 1991) (quoting <u>Celotex</u>, 477 U.S. at 325).

A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law."  <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000).  For an issue to be "genuine," the evidence relevant to the issue, viewed in the light most flattering to the non-moving party, must be "sufficiently open-ended to permit a rational factfinder to

resolve the issue in favor of either side." <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990). Rather, "[t]he evidence illustrating the factual controversy...must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." <u>Mack v. Great Atl. & Pac. Tea Co.</u>, 871 F.2d 179, 181 (1st Cir. 1989).

**B.   § 1983 Claims (Count 1)**

To sustain an action under 42 U.S.C. § 1983, Collins must show both: "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." <u>Chongris v. Bd. of Appeals</u>, 811 F.2d 36, 40 (1st Cir. 1987); <u>see also</u> <u>Frazier v. Fairhaven Sch. Comm.</u>, 276 F.3d 52, 57 (1st Cir. 2002).

It is undisputed that the first prong is met in this case. Because Joyce and his team of inspectors were acting as ISD employees enforcing the state housing code, they were, in their official capacities, acting under the color of state law. <u>See Frazier</u>, 276 F.3d at 57-58. While § 1983 by its plain terms applies to "persons," it has been construed to apply to municipalities like the City of Boston where action pursuant to a municipal custom or

policy caused a constitutional tort.   Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1987).

The real challenge for Smith is to demonstrate with relevant facts that Joyce and the ISD's inspectors' actions deprived him of his constitutionally protected rights to freedom from unreasonable search and seizure, to equal protection, and to due process (prong 2).   His success depends on the standards required to make a particular claim of each of these constitutional rights.   I will consider each in turn.

1. Fourth Amendment[4]

The Fourth Amendment of the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.   While Smith alleges this right was violated, he has provided no evidence suggesting the Defendants' conduct constituted an "unreasonable search and seizure."   The ISD inspectors were acting within the authority granted them under Chapter 1, § 400:200B of the Massachusetts Sanitary Code to inspect for code violations.   Under ISD policy, inspectors reinspect all properties at the expiration of the time allotted to remedy violations.   The no-heat complaint clearly constituted an emergency situation.   Mrs. O'Shea's complaint

---

[4]Smith alleges violation of this right in his complaint, but does not make any reference to it in his supporting documents.

8

plainly constituted consent for entry.  No refusal of entry appeared in the record.  The entries to remedy the conceded violations were of the type the law has traditionally upheld.  <u>Cf.</u> <u>Camara v. Municipal Court of the City and County of San Francisco</u>, 387 U.S. 523, 539 (1967) (warrant unnecessary for emergency entry or where there is no refusal of entry).  The Defendants' presence was not unwarranted, and cannot be implicated as violating Smith's Fourth Amendment rights.

2. <u>Equal Protection: Selective Enforcement of the Housing Code</u>

Smith charges Joyce and the City's inspectors with improper selective enforcement of lawful local regulations.  <u>See</u> <u>LeClair v.</u> <u>Saunders</u>, 627 F.2d 606, 608 (2d Cir. 1980).  Specifically, Smith argues that the December 27 inspection and litany of code violations issued by ISD inspectors unreasonably targeted him for enforcement "as part of a scheme to embarrass and humiliate [him] for reasons not associated with the authority and responsibility given the City."

As the First Circuit has stated:

> Liability in the instant type of equal
> protection case should depend on proof
> that (1) the person, compared with others
> similarly situated, was selectively
> treated; and (2) that such selective
> treatment was based on impermissible
> considerations such as race, religion,
> intent to inhibit or punish the exercise
> of constitutional rights, or malicious or
> bad faith intent to injure a person.

<u>Yerardi's Moody St. Restaurant & Lounge, Inc. v. Bd. of Selectmen</u>, 878 F.2d 16, 21 (1st Cir. 1989).  Smith contends that liability arises because ISD treated him selectively and the Department's actions constituted "malicious or bad faith intent to injure."

Smith has not offered a sufficient factual basis to support a conclusion that he was selectively treated.  Plaintiffs claiming an equal protection violation must first "identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were 'singled...out for unlawful oppression.'" <u>Dartmouth Review v. Dartmouth College</u>, 889 F.2d 13, 19 (1st Cir. 1989) (citations omitted).  Here, Smith identifies no other landlords similarly situated and provides no examples of how similar code violations were handled.  In opposition to summary judgment, Smith's memorandum contends that "when a City that receives and handles as many as thirty-three (33) calls per day in cold stretches during sever [sic] months; dedicates an enormous amount of resources to one small property owner with a singular complaint of no heat (involving a broken furnace)...the City is violating the State and Federal civil rights of the plaintiff property owner."  Smith fails to buttress this conclusory statement with any specific evidence.  He presents no facts showing that other no-heat complaints were treated any differently.

10

On the contrary, the record suggests that ISD inspectors handled the complaint at 11 Newport Street pursuant to standard procedure. Upon receipt of the complaint, an Inspector visited the complaining tenant to identify the problem, a problem which Joyce concedes existed, and issued an accurate violation. ISD policy directs that properties be reinspected at the end of the time allotted for remedy; on December 26, Inspector Williams fulfilled this obligation, finding the no-heat complaint still outstanding. On December 27, ISD again reinspected, this time bringing its own contractor to fix the heating system, so to provide relief to the tenant.

It is important to note that the sanitary code provides no exemptions from time frames for remedying complaints because of holidays or weekends. Moreover, the requirement for making repairs with respect to a no-heat violation is not affected by the absence of the tenants or by the provision of temporary solutions such as space heaters. ISD was not being unduly harsh in reinspecting the property despite the Christmas holiday or the knowledge that Mrs. O'Shea had been away from her apartment.

Nor can Joyce's official conduct said to be unusual or unwarranted. As Commissioner of ISD, it was well within his authority to be on-site to supervise and direct his employees. It was not uncommon for Joyce to visit violating properties: Joyce apparently had been on the scene of code violation investigations

hundreds of times during his tenure.   Moreover, it does not appear
that Smith's property was singularly "targeted" by Joyce: According
to ISD employee John Dorsey, it was "pretty standard" for Joyce to
get involved in unremedied no-heat complaints; in such situations,
he typically went into the field to check on both the tenants and
the inspectors.   Indeed, Dorsey recalled accompanying Joyce to two
other properties with unremedied no-heat complaints on December 27,
2000, the same day that 11 Newport Street was visited.

Despite the evidence of Joyce's pattern and practice, Smith
maintains that he was singled out because of Joyce's malicious
intent to injure him.   While there may be evidence suggesting that
a pre-existing animosity could have fueled Joyce's interest in the
no-heat complaint (i.e., Smith's prior employment suit against the
City; Joyce's exclamation of "We've got him" upon receiving the no-
heat complaint), the suggestion is too insubstantial to satisfy
Smith's responsibility to prove the impermissible consideration
branch of a selective treatment equal protection claim.

3.   Substantive Due Process

Because "the doctrine of substantive due process does not
protect individuals from all [governmental] actions that infringe
liberty or injure property," to establish a claim a plaintiff must
demonstrate an "abuse of government power that shocks the
conscience" or "action that is legally irrational in that it is not
sufficiently keyed to any legitimate state interests."   PFZ

Properties, Inc., v. Rodriguez, 928 F.2d 28, 31-32 (1st Cir. 1991).

Where discretionary administrative action is involved, such as the denial of a local license or permit, the class of cases which meets this constitutional threshold is narrowly limited. See Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000); PFZ Properties, 928 F.2d at 31-32. In Nestor Colon Medina and Sucesores, Inc. v. Custodio, 964 F.2d 32 (1st Cir. 1992), the First Circuit held that the denial of a land use permit, even if arbitrary, did not constitute a substantive due process violation unless it was a "truly horrendous situation[]." Id. at 45. Similarly, the First Circuit has rejected substantive due process claims premised on malicious official action, finding, for example, that although a plaintiff's surveyor's license was revoked due to the licensing board chairman's animus toward him, the treatment was not "shocking or violative of universal standards of decency." Amsden v. Moran, 904 F.2d 748, 757 (1st Cir. 1990). "[E]ven the outright violation of state law by local officials" in denying a permit or license does not automatically raise a federal claim. Roy v. City of Augusta, 712 F.2d 1517, 1523 (1st Cir. 1983) (reemphasizing First Circuit's rejection of attempts to create a constitutional question out of a state law violation in the land use area); see also Creative Environments, Inc. v. Estabrook, 680 F.2d 822 (1st Cir. 1981). This austere standard guards against "insinuat[ing] the

13

oversight and discretion of federal judges into areas traditionally reserved for state and local tribunals." <u>Nestor Colon</u>, 964 F.2d at 45.

Smith's statements that Joyce's animus drove the ISD to issue multiple code violations fall short of establishing the type of "horrendous situation" for which <u>Nestor Colon</u> left the door to federal relief "slightly ajar." <u>Id.</u> Joyce's actions do not nearly amount to the level of malice necessary to meet this standard. For example, in <u>Rubinovitz v. Rogato</u>, 60 F.3d 906 (1st Cir. 1995), a city official was alleged to have engaged in a vendetta against a landlord who had evicted her friend. The official enlisted other government officials from various departments to cut off the landlord's gas, water, and sewage services, to charge the landlord with building code violations, and to frustrate relations with a contractor. <u>Id.</u> at 908-09. Not only did the city official wreak havoc on the landlord in multiple ways, but there was not the slightest vestige of any legitimate government purpose served. <u>Rubinovitz</u>, in which the First Circuit acknowledged that plaintiff had adduced "only barely enough evidence" to survive summary judgment, illustrates the extreme "malicious orchestrated campaign" needed to surmount the constitutional threshold. <u>Id.</u> at 912. If <u>Rubinovitz</u> provided "barely enough evidence," Smith does not even come close.

Moreover, while the record provides indication that Smith's

14

relationship with Joyce and the ISD may have been contentious, the record also clearly establishes that Smith's property violated the state sanitary code, and that the inspection was executed pursuant to ISD policy. <u>See</u> <u>infra</u> Part II.1.b. These facts alone prevent ISD's actions from being treated as legally irrational. <u>See</u> <u>Collins v. Nuzzo</u>, 244 F.3d 246 (1st Cir. 2001) (finding no due process claim in denial of license, despite showing of Board animus, because prior violations of license agreement by licensee).

Smith has thus failed to establish that the defendant's handling of the no-heat complaint involved any actionable misconduct required for showing a substantive due process violation.

**C. Violation of the Massachusetts Civil Rights Act (Count 1)**

1. <u>Against the City</u>

Count I of Smith's Complaint alleges the City violated rights guaranteed by the Massachusetts Civil Rights Act ("MCRA"). The MCRA provides for a cause of action:

> Whenever <u>any person or persons</u>, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or law of the United States, or of rights secured by the constitution or law of the commonwealth...

Mass. Gen. Laws c. 12, § 11H (emphasis added).

However, the City cannot be liable under the MCRA because a municipality is not a "person" as contemplated by the statute. Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 591-92 (2001) (holding "there is no indication in the MCRA that the word 'person' includes either the Commonwealth or any of its political subdivisions").

## 2. Against Joyce

To establish a claim under the MCRA § 11I, Smith must prove that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by "threats, intimidation or coercion." See Mass. Gen. Laws c. 12, § 11H; Bally v. Northeastern Univ., 403 Mass. 713, 717 (1989).

As discussed supra, Part II.B, Smith has failed to show interference, or attempted interference, with his constitutional rights.  But, even if I were to find a basis for concluding that his rights had somehow been violated, Smith's claim still fails for lack of proof of "threats, intimidation or coercion."  The Supreme Judicial Court of Massachusetts has cautioned that by the MCRA, "the Legislature did not intend to create a 'vast constitutional [and statutory] tort,'" Bally, 403 Mass. at 718 (quoting Bell, 394 Mass. at 182).   The requirement of threats, intimidation, or

16

coercion was specifically intended to limit liability under the Act. Bally, 403 Mass. at 718.

Joyce's exclamation of "we've got him," and his statement to Smith that he was going to treat him "just like Cliff Davis," could perhaps be considered some sort of threat. See Willitts v. Roman Catholic Archbishop of Boston, 411 Mass. 202, 210 (1991) (defining a "'threat' as 'acts or language by which another is placed in fear of injury or damage'")(quoting Delaney v. Chief of Police of Wareham, 27 Mass. App. Ct. 398, 409 (1989)). However, what is implicitly threatened here is the enforcement of the housing code through lawful means. Smith concedes as much, admitting he has no knowledge suggesting that Cliff Davis received any treatment other than what he deserved under the law, and acknowledging that all of the violations he received were well founded. Generally, by itself, a threat to use lawful means to reach an intended result is not actionable under the MCRA. See Sena v. Commonwealth, 417 Mass. 250, 263 (1994) (officers' threat of arrest not actionable because arrest pursuant to warrant); Pheasant Ridge Assocs. Ltd. Partnership v. Burlington, 399 Mass. 771, 782 (1987).

Smith claims that these verbal threats cannot be viewed in isolation, that the totality of Joyce's actions amounted to a "threat." But adverse administrative action, such as the denial of a building permit, does not rise to the level of threat, at least when not part of a larger scheme of harassment. Smith v.

Longmeadow, 29 Mass. App. Ct. 599, 603 (1990).  In order to establish a "scheme of harassment," Smith must provide evidence of (a) animus against him or his intended use of the property and (b) an attempt to thwart that use through adverse administrative action unrelated to the agency's legitimate concerns. Murphy v. Duxbury, 40 Mass. App. Ct 513, 518 (1996).  Smith has made insufficient factual showings as to both of these requirements. Joyce's exclamation of "we've got him" and threat to Smith that he was going to treat him "just like Cliff Davis," cannot alone establish Joyce's personal animosity.  The mere fact that Joyce had been employed by two parties (the City and Regina Quinlan themselves adversaries in their prior encounter with Smith) with whom Smith was engaged in legal disputes is not sufficient to imply an inference of animus.  There is no evidence that Joyce's actions were "unrelated to the agency's legitimate concerns." Joyce and his team of inspectors were enforcing the housing code, executing duties they were legally authorized, indeed obligated to perform. The facts of record reveal the ISD was on-site at 11 Newport Street responding to a no-heat complaint, with an eye on the health and safety of its residents.

**D. Slander & Libel (Counts II & III)**

In Counts II and III, Smith alleges that Joyce both libeled and slandered him in a series of Boston Globe articles.  Both libel and slander are forms of defamation; libel is predominately

18

written, whereas slander concerns oral communications.  <u>See</u> Prosser & Keeton, <u>Law of Torts</u>, § 112 (1984).

Under Massachusetts law, "[t]he elements of a libel case are a false and defamatory written communication of and concerning the plaintiff." <u>McAvoy v. Shufrin</u>, 401 Mass. 593, 597 (1988); <u>see</u> <u>Lyman v. New England Newspaper Publishing Co.</u>, 286 Mass. 258, 260-63 (1934).  The elements of slander are the same, except that slander requires oral, rather than written, defamation.  <u>See</u> Prosser & Keeton, <u>Law of Torts</u>, § 112.

Smith argues the evidence of record supplies these requisite elements, generically stating that "[a] simple review of the newspaper articles (Exhibits K, L, and M), together with the various violation notices (Exhibit D, E, H and I) make clear that [Joyce] libeled [Smith]."  In resting his response to Joyce's motion on this conclusory statement, Smith fails to adduce specific facts refuting Joyce's core averment: namely that Joyce was not the "speaker."

As Joyce contends, the record reveals that Smith's claims are fatally deficient in that there has been produced no evidence establishing the allegedly defamatory statements were made by Joyce himself.  Reviewing the December 29, 2000 Boston Globe article complained of, no direct quotation or paraphrased statement is attributed to Joyce.  Further, Smith makes no showing that the generically referenced "city official" who provided information for

the article was specifically Joyce.   Rather, the opposite
conclusion flows from the record: ISD employee John Dorsey handled
all media relations in December 2000; indeed, he is the only ISD
employee directly quoted by the Globe article.   Joyce, the record
suggests, tended to avoid any interaction with the media, leaving
the task to Dorsey instead.   Moreover, the record does not indicate
that Joyce dictated to Dorsey what information about specific
violators should be released to the media: at deposition, Dorsey
explained that the on-site inspectors typically provided him with
all the facts he relayed to media outlets.

Smith's allegation that his inclusion in a July, 1998, Boston
Globe list of the City's "worst landlords" constitutes libel is
similarly deficient.   Because Joyce was not the Commissioner of ISD
in July of 1998 (he was appointed in September that year), any
statements made to the Boston Globe relative to the "worst
landlords" cannot fairly be attributed to him.   Additionally, as
Joyce correctly pointed out, the statute of limitations on any
libel and slander in this statement had run by the time Smith filed
his complaint in December 2002.   <u>See</u> M.G.L. c. 260, § 4 (statute of
limitations on libel and slander is three years); <u>Flynn v.
Associated Press</u>, 401 Mass. 776 (1988) (in libel cases, the
statutory period begins to run on the date of publication).

The "various violations" Smith received were not written by
Joyce.   The on-site inspectors issued the violations: his or her

name is clearly listed on each and Smith has proffered no evidence or contention that Joyce directed that particular violations be cited.  Further, even if Joyce were the "speaker," these violations could not meet the falsity element to constitute libel; Smith has conceded he has no information indicating that any violation was inaccurate.

## E.  Intentional Infliction of Emotional Distress (Count IV)

Smith alleges that Joyce, by subjecting his property to a thorough housing inspection and uncovering multiple violations, intentionally inflicted emotional distress.  To prevail on this claim, Smith must establish:

> (1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and 'was utterly intolerable in a civilized community;' (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable man could be expected to endure it.'

Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976) (quoting Restatement (Second) of Torts § 46, comments d and j).  See also Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996); Tetrault v. Mahoney, Hawkes, & Goldings, 425 Mass. 456, 466 (1997).

These requirements set a high standard in order to "avoid litigation in situations where only bad manners and mere hurt feelings are involved." <u>Agis</u>, 371 Mass. at 145.  Liability cannot be predicated on "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities," nor does it arise where "the defendant has acted with an intent which is tortious" or where "his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." <u>Tetrault</u>, 425 Mass. at 466 (citing <u>Foley v. Polaroid Corp.</u>, 400 Mass. 82, 99 (1987)).

As Magistrate Judge Collings observed in <u>Ball v. Wal-Mart, Inc.</u>, 102 F. Supp. 2d. 44, 53 (D. Mass. 2002):

> [i]n a case alleging intentional infliction of emotional distress, a two-step test must be applied.  First, the judge must determine whether the conduct may reasonably be viewed as extreme and outrageous.  Second, the jury must determine whether the conduct was, in fact, extreme or dangerous [sic].  <u>Boyle v. Wenk</u>, 378 Mass. 592, 598 n. 11 (1979) (citation omitted).  If the first prong is decided in the defendant's favor there is no need to reach the second.  <u>See Redgrave v. Boston Symphony Orchestra, Inc.</u>, 557 F. Supp. 230, 236 (D. Mass. 1983) (holding <u>inter alia</u>; that the Boston Symphony Orchestra's conduct in canceling celebrity's contract did not rise to the level sufficient to survive a motion to dismiss).
>
> The term "outrageous" has been defined in Massachusetts to mean . . . "a high order of reckless ruthlessness or deliberate malevolence that...is simply intolerable." <u>Conway v. Smerling</u>, 37 Mass. App. Ct. 1, 8 (1994).

A defendant's extreme and outrageous conduct may be found in the totality of the circumstances, and does not have to be alleged in a single incident.  See Boyle, 378 Mass. at 595.

Smith alleges that Joyce's conduct, viewed in its entirety, amounted to an overt campaign to target, pursue, and wrongly and maliciously prosecute him for code violations.  He claims that "in a civilized society there is nothing more egregious, extreme or more outrageous."

But Smith provides no competent evidence to substantiate his boilerplate characterization of Joyce's conduct.  As Joyce notes, his presence at the reinspection of 11 Newport Avenue was not unwarranted: as Commissioner of ISD, it was well within his authority to be on-site to supervise and direct his employees. Nor was it unusual for Joyce to visit violating properties: Joyce had been on the scene of code violations hundreds of times during his tenure.  Moreover, it does not appear that Smith's apartment was uniquely "targeted" by Joyce: According to Dorsey, it was "pretty standard" for Joyce to get involved in unremedied no-heat complaints; in such situations, he typically went into the field to check on both the tenants and the inspectors.  Indeed, Dorsey recalled accompanying Joyce to two other properties with unremedied no-heat complaints on December 27, 2000, the same day that 11 Newport Avenue was visited.  In any event, Joyce's presence does not rise to the level of extreme necessary to sustain an emotional

distress claim.

Joyce's conduct once on-site, cannot be viewed as outrageous either.  His instruction to inspectors to go through the property "with a fine tooth comb and write up every violation you can find" is not an extreme one; it is the inspectors' official duty to conduct a thorough investigation and classify all violations uncovered. Moreover, Smith provides scant evidence establishing that this instruction was motivated by "reckless ruthlessness or deliberate malevolence." <u>Ball</u>, 102 F. Supp. 2d at 53. Smith points to Joyce's exclamation of "We've got him" upon receiving the no-heat violation as evidence of Joyce's intent to maliciously prosecute him.  He also highlights Joyce's "threat" "I'm going to treat you just like Cliff Davis" as a further example.  But neither statement can be construed as extreme or outrageous behavior. Smith is unable to show that Joyce's "threat" amounted to anything more than a promise to enforce the law.  Smith admits that he has no information suggesting that any of the violations he received were inaccurate, thus buttressing Joyce's claim that he was acting consistently with his official duties.

Evaluating the totality of Joyce's conduct in the harshest possible light, I cannot reasonably conclude that his course of action amounted to anything resembling "outrageous."  While he may have been exactingly thorough or overly zealous in his execution of the housing code, his conduct was certainly not "atrocious, and

24

utterly intolerable in a civilized society."


**D.  Negligent Infliction of Emotional Distress (Count V)**

1.  <u>Count V Against Joyce</u>

Count V alleges that Joyce's conduct negligently inflicted emotional distress on Smith.  To establish this tort, a plaintiff must prove:

> (1) negligence, (2) emotional distress, (3) causation, (4) physical harm manifested by objective symptomology, and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.

<u>Payton v. Abbott Labs</u>, 386 Mass. 540, 557 (1982).

Smith has failed to aver facts demonstrating genuine issues as to at least three of these elements.

First, as established <u>infra</u>, <u>Part II.D.2</u>, Smith has proffered insufficient evidence of Joyce's negligence.  Joyce did not fail to exhibit due care in his inspection or enforcement of the housing code.  Indeed, Smith's complaint appears to be that Joyce was too thorough.

Second, Smith has failed to provide sufficient evidence of "physical harm manifested by objective symptomology," <u>Id.</u>, and of a causal link between the physical harm and the events surrounding the no-heat complaint.  The SJC has explained that "a successful

negligent infliction of emotional distress claim...must do more than allege 'mere upset, dismay, humiliation, grief, and anger.'" Sullivan v. Boston Gas Co., 414 Mass. 129, 137 (1993) (quoting Corso v. Merrill, 119 N.H. 647, 653 (1979)). On motions for summary judgment, "plaintiffs must corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial." Id., at 137-38.

Smith has provided no such "objective evidence" here. He claims the Joyce's handling of the no-heat complaint caused him "extreme emotional injuries, embarrassment, and humiliation," and resulted in an exacerbation of his pre-existing Post-Traumatic Stress Syndrome. But Smith has submitted no corroborating documentation: no medical records, no sworn affidavits from treating physicians, not even a more detailed description of what symptoms he suffered.

Even if these "extreme emotional injuries" are corroborated as genuine and rise to the required level of physical harm, there is still no medical evidence that Smith's emotional suffering is in any way linked with the complained-of incident other than the fact that the symptoms were magnified after the inspection. Simply put, this is not enough to survive a summary judgment motion. Smith was being treated for Post-Traumatic Stress Syndrome, depression, hypertension, and migraine headaches before the no-heat complaint.

Those symptoms have never been fully resolved since they first appeared over fifteen years ago.  Smith concedes that he has had no additional treatment solely as a result of the complained of events.

To succeed on his claim, Smith must have produced objective evidence, for example, by a medical expert, that would tend to corroborate and link his symptoms to his encounters with Joyce. Smith's mere assertion that he suffered "extreme emotional injuries" following the no-heat complaint is plainly insufficient.

2. Against the City

Smith's claim of negligent infliction of emotional distress against the City is governed by the Massachusetts Torts Claim Act, which effectively removes the defense of immunity in certain tort actions against public employers.  See Spring v. Geriatric Authority of Holyoke, 394 Mass. 274, 285 (1985).  Specifically, the Act provides: "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment...."  M.G.L. c. 258  § 2.  The finding that no claim is made out against Joyce individually is effectively fatal to the claim against the City.

The City specifically argues that Smith's claim of negligent infliction of emotional distress is barred by M.G.L. c. 258, § 10 (a), which identifies certain categories of claims for which a

claimant may not recover against a public employer.  It states:

> 10.  The provisions of sections one to eight [of c. 258], inclusive, shall not apply to:
>
>> (a) any claim based upon an act or omission of a public employee when such employee is exercising due care in the execution of any statute or any regulation of a public employer, or any municipal ordinance or by-law whether or not such statute, regulation, ordinance or by-law is valid;

The City's inspectors were operating within the authority granted them under Ch. 1, § 400:200B of Massachusetts's Sanitary Code.  Their presence on Smith's property was not unwarranted: it is ISD's policy to reinspect properties at the expiration of the time allotted to remedy violations.  Nothing in the record indicates that ISD policy precludes an inspection of more than the cited code violations.  Moreover, Smith provides no evidence that the inspectors' conduct, once present on his property, amounted to anything more than exactingly thorough.  Commissioner Joyce's instructions to "go through the building with a fine tooth comb" are not inconsistent with the inspectors' job descriptions.  The fact that the December 23, 2000 inspection uncovered only two violations while the December 27, 2000 inspection conducted under Commissioner Joyce's instructions found fourteen is not conclusive of malicious foul play as contended by Smith.  Indeed, Smith concedes the opposite, admitting that none of the December 27

28

violations were inaccurate or falsified.  Because the inspectors were acting within their official scope of duty and seemingly without malice, I find no material factual issue concerning the inspectors' exercise of due care in enforcing the housing code. The exception for municipal tort liability found in M.G.L. c. 258, 10(a) applies.

### III. <u>CONCLUSION</u>

Summary Judgment as to Counts I, II, III, IV, and V against Joyce is GRANTED.  Summary Judgment as to Count V and that part of Count I against the City alleging violation of the MCRA is also GRANTED.


/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE